**Hearing Date: April 8, 2015 at 10:00 a.m. (ET)**
**Response Deadline: March 20, 2015 at 4:00 p.m. (ET)**

William J.F. Roll, III
Fredric Sosnick
Ned S. Schodek
Adam J. Goldstein
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000 (Telephone)
(212) 848-7179 (Facsimile)

*Attorneys for Defendant Merrill Lynch Capital Services, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                         :

In re:                      :        Chapter 11 Case
                          :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,  :       No. 08-13555 (SCC)
                          :
             Debtors.         :
                          :
-------------------------------------------------------- x
                          :
LEHMAN BROTHERS SPECIAL FINANCING  :
INC.,                        :
                          :
            Plaintiff,      :
                          :        Adversary Proceeding
-   against -              :
                          :        No. 14-02030 (SCC)
MERRILL LYNCH CAPITAL SERVICES, INC.,  :
                          :
            Defendant.     :
                          :
-------------------------------------------------------------x

**MEMORANDUM OF LAW OF DEFENDANT**
**MERRILL LYNCH CAPITAL SERVICES, INC.**
**IN SUPPORT OF ITS MOTION TO DISMISS**
**<u>COUNTS I, II, AND III OF ADVERSARY COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ......................................................................................1

BACKGROUND ..........................................................................................................6

ARGUMENT ..............................................................................................................8

    **Counts I, II, and III of the Complaint Should be Dismissed**
    **Because LBSF Failed to Join LCH as a Party to this Action Under Rule 19.**..............8

        A.      LCH Is a Required Party Under Rule 19(a)..................................................9

        B.      Joinder of LCH Is Not Feasible. ................................................................13

        C.      Absent Joinder of LCH, Equity and Good Conscience
                Require Dismissal of Counts I, II, and III of the Complaint.....................14

CONCLUSION ..........................................................................................................17

# TABLE OF AUTHORITIES

**Page**

**Cases**

*2 Montauk Highway LLC v. Global Partners LP*, 296 F.R.D. 94 (E.D.N.Y. 2013)...............14, 17

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112 (2d Cir. 1984).....................16

*Ball v. Shepard*, 202 N.Y. 247 (1911) .........................................................................................16

*Bomar Res., Inc. v. Sierra Rutile Ltd.*, No. 90 CIV. 3773 (JFK), 1991 WL 4544
    (S.D.N.Y. Jan. 15, 1991)...........................................................................................................9

*Briarpatch Ltd. L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296 (2d Cir. 2004)...............................16

*CP Solutions PTE, Ltd. v. Gen. Elec. Co.*, 553 F.3d 156 (2d Cir. 2009)..................................4, 17

*Davidson Well Drilling, Ltd. v. Bristol-Myers Squibb Co.*, No. 09 Civ. 1431
    (SAS), 2009 WL 2135396 (S.D.N.Y. July 16, 2009) .............................................................10

*Delcon Constr. Corp. v. U.S. Dept. of Hous. and Urban Dev.*, 205 F.R.D. 145
    (S.D.N.Y. 2002)................................................................................................................10, 13

*Global Detection and Reporting, Inc., v. Securetec Detektions–Systeme AG,* No.
    08 Civ. 5411 (GEL), 2008 WL 5054728 (S.D.N.Y. 2008)....................................................10

*Global Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701
    (S.D.N.Y. 1997) ...................................................................................................................9, 10

*In re Griffin Trading Co.,* 245 B.R. 291 (Bankr. N.D. Ill. 2000), *vacated as moot,*
    270 B.R. 882 (N.D. Ill. 2001) ...................................................................................................7

*Hovensa, L.L.C. v. Technip Italy S.p.A.*, No. 08 Civ. 1221 (NRB), 2009 WL
    690993 (S.D.N.Y. Mar. 15, 2009) ..........................................................................................10

*Jonesfilm v. Lion Gate Int'l*, 299 F.3d 134 (2d Cir. 2002) ....................................................10, 11

*Levin v. Tiber Holding Corp.*, 277 F.3d 243 (2d Cir. 2002)........................................................16

*Lomayaktewa v. Hathaway*, 520 F.2d 1324 (9th Cir. 1975)........................................................10

*M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1 (1972)...........................................................13

*Marvel Characters, Inc. v. Kirby,* 726 F.3d 119 (2d Cir. 2013) ...................................................14

*Mattera v. Clear Channel Commc'ns, Inc.*, 239 F.R.D. 70 (S.D.N.Y. 2006)..................................9

ii

*Mazzocchi v. Windsor Owners Corp.*, No. 11 CIV. 7913 AT, 2014 WL 594085
(S.D.N.Y. Feb. 11, 2014) .................................................................................13

*Miller v. Schloss*, 218 N.Y. 400 (1916) ...............................................................16

*Rozenzwig v. Brunswick Corp.*, No. 08-807 (SDW), 2008 WL 3895485 (Aug. 20,
2008 D.N.J.) ....................................................................................................14

*Ryan v. Volpone Stamp Co., Inc.*, 107 F. Supp. 2d 369 (S.D.N.Y. 2000) ..................10

*Stemcor USA v. Hyundai Merch. Marine Co.*, 386 F. Supp. 2d 229 (S.D.N.Y.
2005) ..............................................................................................................13

*T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*, No. 10-CV-2843 (JG)(ARL),
2010 WL 4038826 (E.D.N.Y. Oct. 14, 2010) .....................................................16

*Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721 (2d Cir. 2000) ...................................14

*Z & B Enters., Inc. v. Tastee-Freez Int'l, Inc.*, 162 F. App'x 16 (1st Cir. 2006).........9, 11

**Statutes**

11 U.S.C. § 546(g) .............................................................................................3

11 U.S.C. § 548(a)(1)(A) ....................................................................................3

28 U.S.C. § 1412 ..............................................................................................14

**Other Authorities**

Bankruptcy Rule 7012 .......................................................................................8

Bankruptcy Rule 7012(b)...........................................................................1, 5, 9, 17

Bankruptcy Rule 7019 ...............................................................................1, 8, 9, 14

Fed. R. Civ. P. 12(b)(6)...............................................................................*passim*

Fed. R. Civ. P. 12(b)(7)...............................................................................*passim*

Fed. R. Civ. P. 12(c) ..................................................................................*passim*

Fed. R. Civ. P. 19 ......................................................................................*passim*

Fed. R. Civ. P. 19(a) ...........................................................................8, 9, 12, 14

Fed. R. Civ. P. 19(a)(1) ...................................................................................8, 9

Fed. R. Civ. P. 19(a)(1)(A) ................................................................................9

Fed. R. Civ. P. 19(a)(3) .................................................................................................................14

Fed. R. Civ. P. 19(b) .............................................................................................................. *passim*

LCH Regulation 51(c) ...................................................................................................................13

LCH Regulation 55(a) .....................................................................................................................6

N.Y. C.P.L.R. 213 ............................................................................................................................5

Defendant Merrill Lynch Capital Services Inc. ("MLCS") through its undersigned

counsel, respectfully submits this memorandum of law in support of its motion to dismiss

(the "Motion") Counts I, II, and III of the *Adversary Complaint* [Ch. 11 ECF No. 44683][1]

("Complaint")[2] of Lehman Brothers Special Financing Inc. ("LBSF"), pursuant to Rule 7012(b)

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 12(b)(7) of the

Federal Rules of Civil Procedure (the "Federal Rules" or "Rules") or, alternatively, pursuant to

Federal Rule 12(c), for failure to join a required party under Bankruptcy Rule 7019 and Federal

Rule 19.  In support of the Motion, MLCS states as follows:

## PRELIMINARY STATEMENT

1.      As the Court is aware, MLCS previously moved to dismiss this adversary

proceeding, pursuant to Bankruptcy Rule 7012(b) and Federal Rule 12(b)(6), on the basis that the

Complaint failed to state a claim on which relief could be granted (the Rule 12(b)(6) Motion").[3]

At the heart of the Complaint are two swap transactions (the "Disputed Transactions")[4] that were

placed with LCH.Clearnet Limited ("LCH"), an independent UK-based clearing house.  In the

Rule 12(b)(6) Motion, MLCS argued, among other things, that:  (i) LBSF's claims with respect

to the Disputed Transactions had been released in the derivatives settlement agreement between

---

[1]     Unless otherwise noted, references to Electronic Case Filings refer to filings in the above-captioned adversary proceeding.  References to Electronic Case Filings in the chapter 11 proceedings of Lehman Brothers Holdings, Inc. ("LBHI") and its affiliates and subsidiaries (collectively, the "Debtors") will be preceded with "Ch. 11 ECF No."

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Complaint.   MLCS's use of LBSF's defined terms from the Complaint is for the Court's convenience only and is not intended to suggest that MLCS agrees with any characterization implied by such terms.  For example, despite using the term here, MLCS disputes any implication or suggestion that the so-called "Improper Collateral Adjustments" were improper or otherwise invalid.

[3]     *See Notice of Motion of Merrill Lynch Capital Services, Inc. to Dismiss Complaint* [ECF No. 5] and *Memorandum of Law in Support of Motion of Defendant Merrill Lynch Capital Services, Inc. Pursuant to Federal Rule of Bankruptcy Procedure 7012(b) and Federal Rule of Civil Procedure 12(b)(6) to Dismiss Complaint* [ECF No. 6] .

[4]     The Disputed Transactions are referred to in the Complaint as the "Erroneous Transactions"

the parties that was approved by the Bankruptcy Court in these chapter 11 cases (the "Settlement Agreement"); and (ii) under New York law, LBSF could not recover in quasi-contract where (as was the case with respect to the Disputed Transactions) there exist one or more actual contracts governing the relevant transactions.

2.    During the course of the briefing—and more specifically at the hearing (the "Hearing")—on the Rule 12(b)(6) Motion, it became clear that the involvement of LCH is critical to the resolution of this adversary proceeding.   The critical role of LCH was most apparent at the Hearing, when LBSF took the position for the first time that the fact that LCH stood between the parties rendered the Settlement Agreement inapplicable, because the Settlement Agreement, in LBSF's view, only covered "direct claims" between LBSF and MLCS.[5]  Although the Court ultimately denied the Rule 12(b)(6) Motion,[6] it recognized the importance of LCH's role in the Disputed Transactions and with respect to this adversary proceeding more generally, *see* 10/7/2014 Hr'g Tr. at 119:18-20 ("I'm a little perplexed.  Might not you bring in LCH as a third party defendant?"), and even appeared to anticipate this Motion,

---

[5]     In response to what MLCS's counsel called a dispositive admission for purposes of proving that the Settlement Agreement governed the Disputed Trades – namely that the trades were in existence on the Petition Date – LBSF's counsel raised for the first time that its argument turned on the fact that LBSF and MLCS were not in direct privity with respect to the Disputed Transactions:

> Your Honor, with respect to what I think was a clear misstatement by counsel [for MLCS] and he – he even called it the dispositive admission – . . . . If you look in the preamble [to the Settlement Agreement] the parties to the [Settlement A]greement are the Merrill counterparties and the Lehman entities, and they're all defined parties.  Note who is not included as a party, LCH or any other intermediary.

10/7/2014 Hr'g Tr. at 108:6-109:1; *see also id.* at 111:13-14 ("This is all about settling claims between -- direct claims between Merrill Lynch and Lehman Brothers.").

[6]     In rendering its decision, the Court indicated that its primary reason for denying the Rule 12(b)(6) Motion was its belief that dismissal would require the Court to make factual determinations that it concluded were beyond the scope of what it was permitted to do under Federal Rule 12(b)(6).  *See id.* at 124:14-18 ("And here I think, at least for the last hour, you've heard a lot from me about issues that I have identified that I believe do – would require me to make some factual determinations and, therefore, preclude my granting the motion to dismiss."); *see also Order Denying Defendant's Motion to Dismiss* [ECF No. 12].

noting at the conclusion of the Hearing that "[p]erhaps there's an additional motion to dismiss

that you [MLCS] have," *see id.* at 124:21-22.

       3.      Regardless of whether any fact issues might have precluded the Court

from granting the Rule 12(b)(6) motion – including how the Disputed Transactions ended up

being presented to LCH – there is no dispute that:  (i) LCH registered the Disputed Transactions,

at which point they became live trades;[7] (ii) once the trades became live on LCH, LBSF and

MLCS ceased to be in privity (or in any "quasi-contractual" relationship) with each other;[8] and

(iii) all of the amounts that LBSF seeks to recover from MLCS in Counts I through III of the

Complaint (the so-called "Improper Collateral Adjustments") were amounts that LBSF had

transferred to LCH and not MLCS.[9]  To be sure, LBSF tried to downplay the role of LCH in the

Complaint by characterizing LCH as a mere conduit through which margin payments were

passed from LBSF to MLCS and vice versa.[10]  But having used the privity between LBSF and

LCH as a sword to defeat the Rule 12(b)(6) Motion and avoid dismissal based on the

applicability of the Settlement Agreement to its claims,[11] LBSF cannot now shield itself from the

inescapable conclusion that this litigation should not proceed in LCH's absence by arguing that

this dispute involves only LBSF and MLCS.

---

[7]      *See* Compl. ¶¶ 15, 18-25.

[8]      *See supra* note 5 and accompanying text.

[9]      *See* Compl. ¶¶ 24, 32.   MLCS maintains that this fact alone – namely, that the money LBSF seeks to recover was transferred prepetition pursuant to an interest rate swap transaction that was registered and treated as live by an internationally recognized derivatives clearing house – requires dismissal pursuant to 11 U.S.C. § 546(g) because LBSF neither seeks to avoid these transfers pursuant to 11 U.S.C. § 548(a)(1)(A) nor alleges anything resembling actual fraud.  In denying the Rule 12(b)(6) Motion, the Court did not address MLCS's argument that the Improper Collateral Adjustments are "safe harbored" transfers.

[10]      *See* Compl. ¶¶ 25, 42, 43, 49.

[11]      Although not relevant to this Motion, MLCS does not agree with LBSF's position that the privity between it and LCH removes the Disputed Transactions from the scope of released claims set forth in the Settlement Agreement and reserves all rights with respect thereto.

4.      As described in greater detail below, the simple fact that all of the margin payments that LBSF seeks to recover in Counts I, II, and III were made to LCH (not MLCS), is reason enough for LCH to be deemed an indispensable party to this action.[12]  Moreover, as discussed in connection with the Rule 12(b)(6) Motion, at its core the relief that LBSF seeks is actually much closer to rescission than to restitution.  Although on the surface LBSF appears to seek only the return of money that LBSF paid *to LCH* (not MLCS) to return it to the status quo *ex ante*, whether LBSF is entitled to obtain that relief *from MLCS* depends *entirely* on whether this Court decides that the Disputed Transactions – pursuant to which LBSF's money was transferred – are not legally valid and enforceable trades.  *See* Compl. ¶ 6 ("In the alternative, *if this Court determines that the Erroneous Transactions* are enforceable and/or that MLCS has no obligation to return to LBSF the improper collateral transfer of $21 million . . .") (emphasis added); *see also id.* at ¶¶ 54, 64, 73 (all containing similar language).[13]

5.      LCH's absence as a party in this adversary proceeding—despite being at the center of the determinative legal (and factual) issues and referred to by name or by clear implication in no fewer than 37 of the 81 paragraphs in the Complaint—does not appear to be the

---

[12]    The Federal Rules no longer use the term "indispensable."  *See* Fed. R. Civ. P. 19 advisory committee's note (2007).  Despite the elimination of this term, "[t]here is no substantive difference between the present [R]ule [19] and the rule as applied by the district court prior to the 2007 amendment." *See CP Solutions PTE, Ltd. v. Gen. Elec. Co.*, 553 F.3d 156, 159 n. 2 (2d Cir. 2009).  The term "indispensable" is used in this Motion to refer to a determination that an action may not proceed without a required party.

[13]    *See also* 10/7/2014 Hr'g Tr. at 105:25-106:7 (**Counsel for LBSF**:  "[W]e are saying and have said all along that the transactions are fictitious.  They are counterfeit.  They are not bona fide.  Counsel [for MLCS] is telling you they are genuine.  They are legitimate.  Your Honor, that is a basic factual dispute that cannot be resolved by the Court on a motion to dismiss.  Our allegations are that [the Erroneous Transactions] are counterfeit and not genuine.  They are saying they are [genuine]."); *id.* at 107:17-108:5 (**Counsel for LBSF**:  "[W]e have invented fictitious transactions created by Merrill Lynch that were sought to be connected to the London Clearinghouse LCH.  Thereafter, things happened as a result of that that resulted in . . . $21 million of Lehman's money being given to Merrill Lynch.  That doesn't mean his suppositions about what might have happened and what went forward is correct.  They are disputed.  They are unknown, Your Honor.  Nobody really knows what happened here.  And what we need to do is figure out what happened here, bring it to you as a factual record for you to make a determination as a matter of law based upon a full factual record what happened here.").

result of mere inadvertence by LBSF.  To secure LCH's presence, LBSF would have had to pursue its claims to recover the value of the "Improper Collateral Adjustments" in the forum specified by LCH's General Regulations,[14] which govern the Disputed Transactions and to which LBSF agreed to be bound when it became an LCH "Member."  That forum is not this Court.

6.    The injustice of proceeding without LCH is manifest.  LBSF is seeking to have MLCS pay millions of dollars to LBSF based on a determination that the Disputed Transactions are unenforceable, while doing nothing to alter MLCS's real and continuing exposure to LCH on its corresponding legs of the very same trades.   Worse, because of the expiration of the applicable statute of limitations[15] by the time LBSF finally commenced this action against MLCS – approximately six years after the Disputed Transactions were registered and became live trades – if MLCS is ordered to reimburse LBSF for the margin payments that LBSF made to LCH, MLCS likely will have no ability to subsequently recover those payments from LCH.  Equity and good conscience—factors expressly built into Rule 19, *see* Fed. R. Civ. P. 19(b)—cannot countenance such a result.

7.    In sum, LCH is indispensable to this action and cannot be joined as a party to this adversary proceeding without rendering venue improper.  Accordingly, this Court should dismiss Counts I, II, and III of the Complaint pursuant to Bankruptcy Rule 7012(b) and Federal Rule 12(b)(7) or, in the alternative, Federal Rule 12(c).

---

[14]    A copy of the current General Regulations of LCH.Clearnet Limited (the "<u>LCH Regulations</u>") is annexed hereto as **Exhibit A**.  They are also available at http://www.lchclearnet.com/en/rules-regulations/ rulebooks/ltd.

[15]    *See* N.Y. C.P.L.R. 213 (2015).

## BACKGROUND

8.      Prior to the commencement of their chapter 11 cases,[16] the Debtors, including LBSF, were parties to hundreds of thousands of live derivative trades with thousands of counterparties, including, among others, MLCS and certain other affiliates and subsidiaries of Merrill Lynch & Co. Inc.  Compl. ¶ 1.  For some of these trades, LBSF and its counterparties made use of the services provided by independent clearing houses.  *See* Compl. ¶¶  2, 3, 19-21.  One such clearing house was LCH, of which both LBSF and MLCS were members during the time period from June 2008 to September 2008.

9.      Although the parties disagree on precisely how the Disputed Transactions were submitted to LCH, it is undisputed – and clearly alleged in the Complaint – that LCH accepted the registration of the Disputed Transactions on or about June 16, 2008 and processed and registered the Disputed Transactions as live swaps.  *Id.* at ¶¶ 15, 16.  Once the Disputed Transactions were accepted by LCH for registration, LCH immediately became the actual counterparty of both LBSF and MLCS in relation to the Disputed Transactions, and LBSF and MLCS each ceased being the counterparty to the other.  Under the terms of the Disputed Transactions, all payments were to be made to and received from LCH.  *See id.* at ¶¶ 19-20.  Once the Disputed Transactions were registered and became live trades, they were each bifurcated into two separate swap contracts, or "SwapClear Contracts" (as they are called in the LCH Regulations)[17] between MLCS and the clearing house (LCH), on one hand (the

---

[16]      LBHI and many of its Debtor affiliates filed voluntary chapter 11 petitions in this Court on September 15, 2008 (the "Petition Date").  LBSF did not file its own chapter 11 petition until October 3, 2008.

[17]      "SwapClear Contract" is defined in the LCH General Regulations as "a Contract entered into by the Clearing House with a SwapClear Clearing Member."  Ex. A, LCH Reg. 1 (Definition of "SwapClear Contract").  LCH Regulation 55(a) provides that "[a] SwapClear Transaction may be presented to the Clearing House for registration as two SwapClear Contracts . . ."  Moreover, the LCH Regulations define "SwapClear Transaction" as "any transaction the details of which are presented to the Clearing House . . . for the purpose of having such transaction registered at the Clearing House as two SwapClear Contracts . . .

"MLCS/LCH Trades"), and between the clearing house (LCH) and LBSF, on the other hand (the

"LBSF/LCH Trades"), pursuant to which each of MLCS and LBSF, respectively, made and

received its own transfers of initial and variation margin to and from LCH.  *See id.* at ¶¶ 22-24;

Ex. A, LCH Reg. 55.[18]  The following is an illustration of the pre-clearing and post-clearing

relationships among the various parties to each of the two Disputed Transactions:



10.     Following the Petition Date, LCH moved under its default rules to close

out LBSF's portfolio of trades with LCH, including the LBSF/LCH Trades.  Compl. ¶ 33.  This

"closing out" process did not result in a termination of the trades.  Rather, LBSF's portfolio of

trades, including its positions in the Disputed Transactions, was auctioned by LCH and

---

*regardless of whether such transaction (a) is an existing swap transaction*, (b) was entered into in
anticipation of clearing, or (c) is contingent on clearing." *See* Ex. A, LCH Reg. 1 (Definition of SwapClear
Transaction) (emphasis added).

[18]     *See also In re Griffin Trading Co.,* 245 B.R. 291, 296 (Bankr. N.D. Ill. 2000) ("[W]here there was one
contract formed in the trade between the buyer and the seller, after clearing, there are two contracts: one
between the seller and the exchange and the other between the buyer and the exchange."), *vacated as moot*,
270 B.R. 882 (N.D. Ill. 2001).

ultimately acquired by an unaffiliated LCH member, which now stands in LBSF's shoes in

respect of LBSF/LCH Trades.   As a result of the novation of the original contracts and the

substitution of a new party for LBSF, MLCS continues to remain at risk as interest rates continue

to shift throughout the remaining term of the MLCS/LCH Trades, and it continues to transfer

collateral to LCH (and remains obligated to do so) on account of the Disputed Transactions to

this day.

## ARGUMENT

### Counts I, II, and III of the Complaint Should Be Dismissed
### Because LBSF Failed to Join LCH as a Party to this Action Under Rule 19.

11.    In deciding a motion to dismiss pursuant to Federal Rule 12(b)(7), or, in

the alternative, pursuant to Federal Rule 12(c), made applicable to this proceeding by

Bankruptcy Rule 7012, for failure to join a party as required by Federal Rule 19 (as made

applicable to this proceeding by Bankruptcy Rule 7019), the court first must determine whether

an absent party is required to be joined to an action pursuant to Federal Rule 19(a).   Under Rule

19(a)(1), a person is "required" and must be joined as a party if:

> (A) in that person's absence, the court cannot accord complete
> relief among existing parties; or (B) that person claims an interest
> relating to the subject of the action and is so situated that disposing
> of the action in the person's absence may:  (i) as a practical matter
> impair or impede the person's ability to protect the interest; or
> (ii) leave an existing party subject to a substantial risk of incurring
> double, multiple, or otherwise inconsistent obligations because of
> the interest.

Fed. R. Civ. P. 19(a)(1).  If the court determines that the absent party is indeed required to be

joined, but joinder of that party is not feasible (because, for example, joining that party would

deprive the court of subject matter jurisdiction or render venue improper), the court must then

determine whether "in equity and good conscience" the action should nonetheless proceed in the

8

party's absence or be dismissed. Fed. R. Civ. P. 19(b). When deciding a motion to dismiss

pursuant to Rule 12(b)(7), courts may consider matters outside of the pleadings, including

affidavits and exhibits. *See Mattera v. Clear Channel Commc'ns, Inc.*, 239 F.R.D. 70, 74

(S.D.N.Y. 2006); *Bomar Res., Inc. v. Sierra Rutile Ltd.*, No. 90 CIV. 3773 (JFK), 1991 WL

4544, at *4 (S.D.N.Y. Jan. 15, 1991).

      12.    For the reasons discussed in greater detail below, LCH is both a required

party under Federal Rule 19(a)(1) and indispensable to this action. Because joinder of LCH is

not possible in this venue, however, this Court should dismiss Counts I, II, and III of the

Complaint pursuant to Rule 12(b)(7) or, in the alternative, Rule 12(c), and Bankruptcy Rules

7012(b) and 7019.

      A.    <u>LCH Is a Required Party Under Rule 19(a).</u>

      13.    Federal Rule 19 establishes that certain parties are "required" to be joined

to an action. Required parties include "those 'who ought to be made parties, in order that the

court may act on that rule which requires it to decide on, and finally determine the entire

controversy, and do complete justice, by adjusting all the rights involved in it.'" *Z & B Enters.,*

*Inc. v. Tastee-Freez Int'l, Inc.*, 162 F. App'x 16, 19 (1st Cir. 2006); *see also* Fed. R. Civ. P.

19(a)(1)(A). Rule 19(a)(1)(A), the "complete relief" clause, "stresses the desirability of joining

those persons in whose absence the court would be obliged to grant partial or 'hollow' rather

than complete relief to the parties before the court." Fed. R. Civ. P. 19 advisory committee's

note (1966). This specific provision is aimed not only at protecting the interests of the parties,

but also at advancing the public's interest in avoiding repeated lawsuits on the same subject

matter. *See id.*; *Global Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701

(S.D.N.Y. 1997).

14.     A party to a contract that is the subject of litigation—precisely LCH's situation here—is undoubtedly a "required" party. *See Ryan v. Volpone Stamp Co., Inc.*, 107 F. Supp. 2d 369, 387 (S.D.N.Y. 2000) ("It is well-established that a party to a contract which is the subject of the litigation is considered a necessary party."); *see also Hovensa, L.L.C. v. Technip Italy S.p.A.*, No. 08 Civ. 1221 (NRB), 2009 WL 690993, at *2 (S.D.N.Y. Mar. 15, 2009); *Global Detection and Reporting, Inc., v. Securetec Detektions–Systeme AG,* No. 08 Civ. 5411 (GEL), 2008 WL 5054728, at *1 (S.D.N.Y. 2008); *Global Disc. Travel Servs.,* 960 F. Supp. at 707-08. The reason for this well-settled principle is that Rule 19 seeks to avoid a situation where a non-joined party's rights and obligations under a contract remain undetermined at the conclusion of litigation. *Davidson Well Drilling, Ltd. v. Bristol-Myers Squibb Co.*, No. 09 Civ. 1431 (SAS), 2009 WL 2135396, at *3 (S.D.N.Y. July 16, 2009). As explained by one court:

> [I]f a court were to hold that the one named party *is* liable to the plaintiff, then '[the joined defendant] would have an interest in claiming over against [the absent defendant]. Thus, [the absent defendant] is properly seen as a "required" or necessary party to claims arising out of the [ ] agreement.'

*Id.* at *3 (quoting *Hovensa*, 2009 WL 690993, at *3 (alterations in original)).

15.     When a court is asked, as this Court is here, to make determinations with respect to the rights and obligations of a party to an agreement, while leaving the same issues open with respect to an unjoined party to the agreement, the court may be unable to afford complete relief to the parties to the suit. *See id.* at *5; *Delcon Constr. Corp. v. U.S. Dept. of Hous. and Urban Dev.*, 205 F.R.D. 145, 147 (S.D.N.Y. 2002); *see also Jonesfilm v. Lion Gate Int'l*, 299 F.3d 134, 141 (2d Cir. 2002). Accordingly, where a party seeks to rescind a contract, under Rule 19 all parties to that contract are generally required parties. *Lomayaktewa v. Hathaway*, 520 F.2d 1324, 1325 (9th Cir. 1975) ("No procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties

10

who may be affected by the determination of the action are indispensable."); *Z & B Enters.*, 162 F. App'x at 20 (rescission of contracts could not be granted in the absence of all parties to the contact because nonparties would not be bound by a judgment concerning the invalidity or enforceability of the contracts; judgment on invalidity or enforceability of contracts when contracting parties were not present in the action would "be a waste of judicial resources"). Likewise, if the resolution of a plaintiff's claim requires "the definition of a non-party's rights [or obligations] under a contract, it is likely that the non-party is necessary under Rule 19(a)." *Jonesfilm v. Lion Gate Int'l*, 299 F.3d 134, 141 (2d Cir. 2002).

16.    In this case, LBSF is seeking the return of the net amount of funds it transferred to LCH in relation to the Disputed Transactions. *See* Compl. ¶¶ 5, 25. A necessary predicate for LBSF to obtain that form of quasi-contract relief would be for the Court to hold that the contracts governing the trades are unenforceable. *See* Compl. ¶¶ 6, 54, 64, 73. The Complaint, therefore, is functionally a request for rescission: LBSF seeks to undo the Disputed Transactions as between itself and MLCS as of September 12, 2008 and to return LBSF and MLCS to the positions they were in on June 16, 2008 with respect to only those collateral adjustments specifically discussed in the Complaint (the Improper Collateral Adjustments). *See id.* at ¶¶ 24, 25, 38, 42, 44, 49, 50. In seeking this relief, LBSF attempts to sidestep the fact (which it subsequently noted as being critical to its arguments with respect to the release) that because LBSF and MLCS were not in privity with each other with respect to the Disputed Transactions, the Court cannot rescind (or grant any quasi-contractual relief with respect to) trades to which LCH is party unless LCH is before this Court. Without LCH's presence in this action, any determination that the trades are unenforceable will not be binding on LCH, the only counterparty of MLCS and LBSF to both Disputed Transactions. Thus, a judgment in LBSF's

11

favor here would not provide complete relief to the parties. Instead, a judgment in LBSF's favor would merely reverse certain transfers made during a short snapshot in time over the life of the Disputed Transactions while leaving those purportedly legally invalid trades completely intact. This is exactly the type of hollow relief Rule 19 was crafted to avoid.

17.    Regardless of whether the Disputed Transactions are the result of a mistake or were erroneously placed on the LCH,[19] it is undisputed that LCH is a party to all of the trades at issue. *See id*. at ¶¶ 19, 20, 24-27. Indeed, at the hearing on the Rule 12(b)(6) Motion, counsel for LBSF argued that its claims on account of the Disputed Transactions were not released by the parties' sweeping derivatives settlement agreement because that agreement covered only "direct transactions between Lehman Brothers and Merrill Lynch," not transactions like the Disputed Transactions that involve "LCH or any other intermediary" as a party. *See* 10/7/2014 Hr'g Tr. at 108-109.[20]

18.    LBSF cannot have it both ways. If LCH's involvement as a party to the Disputed Transactions is meaningful enough to remove it from the scope of the release provision in the Settlement Agreement, as LBSF asserts, then LCH must be joined as a party to this action, given that the central determinations this Court is being asked to make concern the very validity of the Disputed Transactions. As a party to the trades – specifically, LBSF's direct (and only) counterparty – LCH is a "required party" within the meaning of Federal Rule 19(a).

---

[19]    To the extent there is a dispute on whether there was a valid contract between LBSF and LCH on one leg of the trades and LCH and MLCS on the other leg, it is unnecessary for the Court to resolve it at this juncture. As LBSF acknowledges, LCH is a party to the trades at issue and, for the reasons explained herein, LCH's presence is required in this action.

[20]    As described above, MLCS believes that the terms of the release apply to bar LBSF's claims regardless of whether LCH was an intermediary. *See supra* note 11.

B.    Joinder of LCH Is Not Feasible.

19.    When a required party has not been joined in an action, the court must

order the party to be joined in the action, provided joinder is feasible.  *See* Fed. R. Civ. P. 19;

*Delcon*, 205 F.R.D. at 147.  Generally, joinder is not feasible where the court lacks jurisdiction

over the non-party, joinder would deprive the court of subject matter jurisdiction, or joinder

would render venue improper.  *See Mazzocchi v. Windsor Owners Corp.*, No. 11 CIV. 7913 AT,

2014 WL 594085, at *4 (S.D.N.Y. Feb. 11, 2014); Fed. R. Civ. P. 19 advisory committee's note

(1966).

20.    Joinder of LCH is not feasible here.   LCH's Regulations, which govern

the Disputed Transactions,[21] contain a forum selection clause that renders venue in this Court

improper.   Specifically, LCH Regulation  51(c) provides that "***the courts of England shall have***

***exclusive jurisdiction*** to hear and determine any claim or matter arising from or in relation to

any Contract or in relation to these Regulations . . . and each Member ***irrevocably submits to***

***such jurisdiction*** and to waive any objection which it might otherwise have to such courts being

a convenient and appropriate forum . . ."  Ex. A, LCH Reg. 51(c) (emphasis added).[22]

21.    Forum selection clauses, such as the one contained in LCH Regulation

51(c), are presumptively valid and enforceable, *see M/S Bremen v. Zapata Off–Shore Co.,* 407

U.S. 1 (1972), including where such clauses require disputes to be heard in a forum located

outside of the United States, *see Stemcor USA v. Hyundai Merch. Marine Co.*, 386 F. Supp. 2d

---

[21]    *See* Ex. A, LCH Reg. 54 ("The Clearing House shall provide the SwapClear Service subject to and in accordance with the terms of these SwapClear Regulations and the Procedures.").

[22]    As interest rate swaps that have been registered for clearing by LCH, the Disputed Transactions are "Contracts," which the LCH Regulations define as "a contract subject to the Regulations entered into by the Clearing House with a Member for the purposes of or in connection with the provision of clearing services . . . ." Ex. A, LCH Reg. 1 (Definition of "Contract").  The "SwapClear Contracts" comprising the Disputed Transactions are, by definition, "Contracts."  Additionally, any party in whose name a swap transaction is registered is a "Member."  *Id.* at LCH Reg. 4(c) ("A Member shall be a principal to and not an agent in respect of any Contract registered in his name with [LCH].").

229, 231 (S.D.N.Y. 2005).  Therefore, joinder of LCH in this action is not feasible.

*See Rozenzwig v. Brunswick Corp.*, No. 08-807 (SDW), 2008 WL 3895485, at *7-10 (Aug. 20,

2008 D.N.J.) (dismissing action where joinder of required party was not feasible because valid

and enforceable forum selection clause both constituted an objection to any venue outside of

Connecticut and rendered any venue outside of Connecticut improper); *see also* Fed. R. Civ. P.

19(a)(3) ("If a joined party objects to venue and the joinder would make venue improper, the

court must dismiss that party.").[23]

C.      Absent Joinder of LCH, Equity and Good Conscience
        Require Dismissal of Counts I, II, and III of the Complaint.

22.     When an absent person is required to be joined as a party to an action

under Federal Rule 19(a), and joinder of that party is not feasible, the court must determine

whether the party is "indispensable."  *Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721, 725 (2d Cir.

2000).  Put another way, "the court must determine in equity and good conscience, whether the

action should proceed among the existing parties or should be dismissed."  Fed. R. Civ. P. 19(b).

Courts in this Circuit analyze the following factors in making that determination:  "(1) whether a

judgment rendered in a person's absence might prejudice that person or parties to the action,

(2) the extent to which any prejudice could be alleviated, (3) whether a judgment in the person's

absence would be adequate, and (4) whether the plaintiff would have an adequate remedy if the

court dismissed the suit."  *Marvel Characters, Inc. v. Kirby,* 726 F.3d 119, 133 (2d Cir. 2013);

*2 Montauk Highway LLC v. Global Partners LP*, 296 F.R.D. 94, 99 (E.D.N.Y. 2013).

---

[23]     Bankruptcy Rule 7019 requires the court to determine whether venue of the adversary proceeding should be
transferred pursuant to 28 U.S.C. § 1412 if joinder of an absent party would render venue in the court's
district improper.  Section 1412, however, only permits a court to transfer venue "to a district court for
another district."  Because the forum selection clause in the LCH Regulations would render venue *in any
U.S. district court* improper, transfer pursuant to 28 U.S.C. § 1412 is not an option here.

Consideration of the aforementioned factors overwhelmingly favors dismissal of Counts I-III of the Complaint.

23.      With respect to the first factor, a judgment in LBSF's favor on any of Counts I through III of the Complaint rendered in LCH's absence would unduly and unfairly prejudice MLCS.   Any such judgment would necessarily require this Court to find that the Disputed Transactions are invalid and unenforceable because the invalidity of the Disputed Transactions is the sole basis on which LBSF asserts it is entitled to recover the amount of the "Improper Collateral Adjustments" from MLCS.   As discussed above, LBSF essentially is attempting to rescind the Disputed Transactions by seeking an award in restitution that would restore LBSF to the same position it occupied prior to the registration of the Disputed Transactions.

24.      Any adjudication that the Disputed Transactions are unenforceable that is not binding on LCH, however, would not relieve MLCS from its very real, continuing obligations to LCH—MLCS's only counterparty to the Disputed Transactions—with respect to these live and ongoing trades.   The LCH Regulations make clear that even if this Court were to find the Disputed Transactions invalid and unenforceable, it would not affect MLCS's past and continuing obligations to LCH under the Disputed Transactions that arose upon LCH's registration of those trades.   *See* Ex. A, LCH Reg. 55(j) ("If a SwapClear Transaction is revoked, avoided or otherwise declared invalid for any reason after particulars of it have been accepted by the Clearing House for registration such revocation, avoidance or invalidity shall not affect any SwapClear Contract . . ."").   Moreover, MLCS could not avail itself of this Court's determination that the Disputed Transactions were invalid in any subsequent proceeding against LCH seeking to rescind or invalidate the Disputed Transactions (or to obtain comparable relief) if LCH is not a

15

party to this action.  *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 252 (2d Cir. 2002).  Thus, a judgment in LBSF's favor on any of Counts I through III would require MLCS to tender funds to LBSF to reverse the effects of the Disputed Transactions from June 2008 through September 2008 as they relate to LBSF and MLCS, while MLCS would remain bound to make payments to absent party LCH through 2016 on *exactly the same trades* that would have been held unenforceable here.

25.      Even if MLCS potentially could use such a determination to obtain relief against LCH without having to relitigate the validity of the Disputed Transactions, MLCS will almost certainly be time-barred from doing so (if that is not already the case) if and when this Court eventually decides that pivotal issue.  Indeed, LBSF has waited so long to take any sort of action with respect to the Disputed Transactions *against anyone* (including MLCS), that any outcome at this point other than dismissal effectively guarantees that MLCS will be the only one left holding the bag at the end of the day.  Such a result cannot be squared with the principles of equity and good conscience at the heart of both Federal Rule 19(b) and the very causes of action asserted by LBSF in its Complaint.[24]

26.      With respect to the second factor under Federal Rule 19(b), no protective measure could conceivably alleviate or prevent prejudice to MLCS resulting from a judgment in favor of LBSF on any of Counts I through III of the Complaint.

---

[24]      *See Briarpatch Ltd. L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004) (to recover on a claim for unjust enrichment under New York law, plaintiff must prove that "equity and good conscience militate against permitting the defendant to retain what plaintiff is seeking to recover"); *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 125 (2d Cir. 1984) (citing *Miller v. Schloss*, 218 N.Y. 400, 407 (1916)) (to recover on a claim for money had and received under New York law, plaintiff must prove that "under principles of equity and good conscience, defendant should not be permitted to keep the money"); *See T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*, No. 10-CV-2843 (JG)(ARL), 2010 WL 4038826, at *5 (E.D.N.Y. Oct. 14, 2010) (citing *Ball v. Shepard,* 202 N.Y. 247, 253 (1911)) (to recover on a claim for mistaken payment, plaintiff must prove "that equity demands restitution by defendant to plaintiff").

27.     With respect to the third factor under Federal Rule 19(b), any judgment in favor of LBSF on Counts I through III of the Complaint that is rendered in LCH's absence would be necessarily inadequate.   The "adequacy" factor "refers to the 'public stake in settling disputes by wholes, whenever possible'" and concern for judicial efficiency and avoiding multiple or piecemeal litigation.   *See CP Solutions,* 553 F.3d at 160; *2 Montauk Highway LLC v. Global Partners LP,* 296 F.R.D. 94, 101 (E.D.N.Y. 2013).   As discussed above, a judgment in favor of LBSF on Counts I through III would require MLCS, to the extent it still would be possible to do so, to bring a subsequent action in the appropriate forum against LCH to seek rescission of the Disputed Transactions.   No subsequent action would be required to conclusively resolve all of the parties' rights and obligations in respect of the Disputed Transactions, however, if this action could proceed in the appropriate forum and among all of the necessary parties.

28.     With respect to the fourth factor under Federal Rule 19(b), dismissal of Counts I through III of the Complaint would not deprive LBSF of any remedy it would have had prior to the commencement of this adversary proceeding.   LBSF would still be able to seek rescission of the trades in the manner permitted under the LCH Regulations, including by bringing an action in the courts of England.   *See* Ex. A, LCH Reg. 51(c) (requiring any action to be brought in an English court).

## CONCLUSION

For the foregoing reasons, MLCS respectfully urges that the Court:  (a) dismiss Counts I, II, and III of the Complaint pursuant to Bankruptcy Rule 7012(b) and Rule 12(b)(7) or, in the alternative, enter judgment on the same Counts in favor of MLCS pursuant to Federal Rule 12(c) for failure to join LCH, a party whose presence in this adversary proceeding is plainly

required for this Court to meaningfully and fairly resolve the central question underlying LBSF's

claims; and (b) grant MLCS such other and further relief as the Court deems just and proper.[25]


Dated:  New York, New York
         February 26, 2015                          SHEARMAN & STERLING LLP

                                                    /s/  William J.F. Roll, III
                                                    William J.F. Roll, III
                                                    Fredric Sosnick
                                                    Ned S. Schodek
                                                    Adam J. Goldstein
                                                    599 Lexington Avenue
                                                    New York, New York 10022
                                                    Telephone: (212) 848-4000
                                                    Facsimile:  (212) 848-7179

                                                    *Attorneys for Defendant*
                                                    *Merrill Lynch Capital Services, Inc.*

---

[25]     A proposed form of order is annexed hereto as **Exhibit B**.

## **Exhibit A**

General Regulations of LCH.Clearnet Limited



**GENERAL REGULATIONS OF**

**LCH.CLEARNET LIMITED**

# CONTENTS

Regulation                                                                                           Page

Regulation 1        Definitions ................................................................................................2

Chapter I – SCOPE ................................................................................................59

Regulation 2        Obligations of the Clearing House to each Member ...................................59

Regulation 3        Performance by the Clearing House of its Obligations under the Terms of
                    an Open Contract ....................................................................................60

Chapter II – STATUS ...............................................................................................61

Regulation 4        Clearing Member Status of the Clearing House .........................................61

Regulation 5        Resigning and Retiring Members .............................................................62

Regulation 6        Co-operating Clearing House Status .........................................................65

Regulation 7        Non-Member Market Participant  Status ...................................................66

Regulation 8        Dealer Status ........................................................................................67

Regulation 9        Service Withdrawal ...............................................................................68

Chapter III – ACCOUNTS AND CLIENT CLEARING ..............................................69

Regulation 10       Accounts ...............................................................................................69

Regulation 11       Client Clearing Business ........................................................................71

Chapter IV – CONTRACT FORMATION, REGISTRATION AND TRANSFER ...............76

Regulation 12       Novation ...............................................................................................76

Regulation 13       Presentation of Particulars of Original Exchange Contracts and
                    Confirmation of Original Exchange Contracts ...........................................77

Regulation 14       Allocation of Original Exchange Contracts ................................................78

Regulation 15       Designation ...........................................................................................79

Regulation 16       Registration ...........................................................................................80

Regulation 17       Trading Information ...............................................................................85

Regulation 18       Transfer .................................................................................................86

Regulation 19       Transactions entered into through an Automated Trading System or
                    Platform ................................................................................................87

Chapter V – COLLATERAL AND VALUATIONS ......................................................89

Regulation 20       Margin and Collateral .............................................................................89

Regulation 21       Premium under Option Contracts .............................................................95

Regulation 22       Official Quotations and Reference Price ...................................................96

Regulation 23       Daily Settlement or Marking to Market ....................................................97

Regulation 24       Settlement and Revaluation:  Clearing Processing System .........................99

Regulation 25       Other Modes of Settlement and Revaluation ............................................100

Chapter VI – OPTIONS, OPEN CONTRACTS SUBJECT TO TENDER AND DELIVERY
                    CONTRACTS .......................................................................................101

Regulation 26     Exercise of Options .................................................................101

Regulation 27     Delivery Contract Arising upon the Exercise of an Option......................102

Regulation 28     Obligation to Make and Accept Tender under Cleared Exchange Contracts
                  ........................................................................................104

Regulation 29     Delivery Contracts.................................................................106

Regulation 30     Open Contracts Subject to Tender...............................................107

Regulation 31     Arrangements for Delivery and Payment of Price....................................108

Regulation 32     Restrictions on Clearing House's Obligations and Liability....................109

Chapter VII – DISPUTE RESOLUTION...........................................................110

Regulation 33     Arbitration: Cleared Exchange Contracts, LSE Derivatives Markets
                  Cleared Exchange Contracts, EquityClear Contracts or LCH EnClear
                  Contracts (for Physical Delivery).............................................110

Regulation 34     Collateral in Event of a Claim .................................................114

Chapter VIII – DEFAULT, DISORDER, IMPOSSIBILITY AND FORCE MAJEURE.....115

Regulation 35     Delivery (or other) Failures ....................................................115

Regulation 36     Default of a Member:  Substituted Obligation ...........................116

Regulation 37     Market Disorders, Impossibility of Performance, Trade Emergency........117

Regulation 38     Force Majeure.......................................................................119

Chapter IX – INVOICING BACK AND CURRENCY CONVERSION ............................120

Regulation 39     Invoicing Back......................................................................120

Regulation 40     Currency Conversion .............................................................122

Chapter X – DISCLOSURE, FEES, RECORDS AND AMENDMENTS...........................123

Regulation 41     Disclosure and Reporting ......................................................123

Regulation 42     Fees and Other Charges.........................................................124

Regulation 43     Records ...............................................................................125

Regulation 44     Alteration of Regulations and the Procedures ............................126

Chapter XI – NETTING AND DISTRIBUTION.....................................................127

Regulation 45     Netting ...............................................................................127

Regulation 46     Distribution of Assets ...........................................................131

REGULATION 46A     Solvency Threatening Treasury Default Loss .................................132

Chapter XII – MISCELLANEOUS .....................................................................134

Regulation 47     Procedures ..........................................................................134

Regulation 48     Interpretation of these Regulations.........................................135

Regulation 49     Waiver ................................................................................136

Regulation 50     Validity of Regulations and Action .........................................137

Regulation 51     Governing Law and Jurisdiction .............................................138

Regulation 52     Exclusion of Liability ...........................................................139

Chapter XIII – Intentionally left blank ...............................................................142

Regulation 53        Intentionally left blank...................................................................142

Chapter XIV – SWAPCLEAR REGULATIONS................................................................143

Regulation 54        Application of SwapClear Regulations ....................................................143

Regulation 55        Registration of SwapClear Contracts ......................................................147

Regulation 56        Compression ...........................................................................................151

Regulation 57        Collateralisation of SwapClear Contracts ..............................................156

Regulation 58        The reset rate for, and the net present value of, a SwapClear Contract.....158

Regulation 59        Default Management in respect of SwapClear Client Clearing Business .159

Regulation 60        Transfer...................................................................................................160

Chapter XV – REPOCLEAR REGULATIONS .................................................................167

Regulation 61        Application of RepoClear Regulations.....................................................167

Regulation 62        Submission of details of RepoClear Transactions and RepoClear GC
                     Transactions through an Approved Trade Matching System ....................171

Regulation 63        RepoClear transactions entered into through an Automated Trading System
                     ................................................................................................................172

Regulation 64        Disputes ..................................................................................................175

Regulation 65        Authorisation to act as a RepoClear Clearing Member............................176

Regulation 66        Daily Margining of RepoClear Contracts and RepoClear GC Contracts..177

Chapter XVI – EQUITYCLEAR REGULATIONS .............................................................178

Regulation 67        Application of EquityClear Regulations...................................................178

Regulation 68        EquityClear Open Offer for EquityClear ATP Matches ..........................182

Regulation 69        EquityClear Novation Transactions ........................................................186

Regulation 70        Disputes and Limitation of Liability ......................................................189

Regulation 71        Suspension of the EquityClear service or the EquityClear Open Offer ....190

Regulation 72        Rejection of ATP Matches and of EquityClear Novation Transactions....191

Chapter XVII – LCH ENCLEAR REGULATIONS .............................................................192

Regulation 73        Application of LCH EnClear Regulations.................................................192

Regulation 74        Registration of LCH EnClear Contracts...................................................196

Regulation 75        Daily Settlement .....................................................................................197

Chapter XVIII – LSE DERIVATIVES MARKETS REGULATIONS ................................198

Regulation 76        Application of Regulations for LSE market .............................................198

Regulation 77        LSE Derivatives Markets Orderbook Matches made on LSE Market ......202

Regulation 78        Reported Trades and LSE Derivatives Markets OTC Trades Reported to
                     LSE for Registration................................................................................206

Regulation 79        Registration of LSE Derivatives Markets Cleared Exchange Contracts
                     following Submission of Details of a Reported Trade or LSE Derivatives
                     Markets OTC Trade..................................................................................207

Regulation 80        Suspension of the Open Offer for LSE Derivatives Markets ...................208

Regulation 81    Cancellation, variation etc of LSE Derivatives Markets Cleared Exchange
Contracts.................................................................................................209

Regulation 82    Rejection of Orderbook Matches.............................................................210

Regulation 83    Cross-Border Transfers to the Clearing House of Contracts Executed by a
Member of a Co-operating Exchange - Automatic Transfers ...................211

Regulation 84    Default affecting a Cross-Border Transfer ..............................................213

Regulation 85    Impossibility of Transfer ........................................................................214

Regulation 86    Options ...................................................................................................215

Regulation 87    Re-registration of Contracts....................................................................216

Chapter XIX      217

Regulation 88    *[Intentionally Left Blank]* ......................................................................217

Chapter XX – NODAL REGULATIONS ............................................................................218

Regulation 89    Application ..............................................................................................218

Chapter XXI – FOREXCLEAR REGULATIONS...............................................................223

Regulation 90    Application of ForexClear Regulations....................................................223

Regulation 91    Registration of ForexClear Contracts ......................................................227

Regulation 92    Cancellation of ForexClear Contracts .....................................................229

Regulation 93    Variation Margin .....................................................................................230

Chapter XXII – NLX REGULATIONS ..............................................................................231

Regulation 94    Application ..............................................................................................231

**Scope**

Save where expressly stated to the contrary in these Regulations or the Procedures, these Regulations govern clearing services provided by LCH.Clearnet Limited.  They do not cover clearing services provided by LCH.Clearnet SA which are governed by a separate set of rules.

For the purposes of these Regulations, LCH.Clearnet Limited is referred to as the "**the Clearing House**".  The terms "**Member**" or "**Clearing Member**" are used to refer to an undertaking which is entitled to receive clearing services from LCH.Clearnet Limited (see "Definitions").  They do not mean "shareholder" of LCH.Clearnet Limited or of any other undertaking in the LCH.Clearnet Group.

Any Regulation or group of Regulations expressly stated not to apply to a category, or categories, of Contract shall not apply to such category, or categories, of Contract.

Regulation 54 to Regulation 60 (inclusive) apply only to SwapClear Contracts.  Save as provided in Regulation 54, the provisions of Regulation 2 to Regulation 52 (inclusive) shall not apply to SwapClear Contracts.

Regulation 61 to Regulation 66 (inclusive) apply only to RepoClear Contracts.  Save as provided in Regulation 61, the provisions of Regulation 2 to Regulation 52 (inclusive) shall not apply to RepoClear Contracts.

Regulation 67 to Regulation 72 (inclusive) apply only to EquityClear Contracts.  Save as provided in Regulation 67, the provisions of Regulation 2 to Regulation 52 (inclusive) shall not apply to EquityClear Contracts.

Regulation 73 to Regulation 75 (inclusive) apply only to LCH EnClear Contracts.  Save as provided in Regulation 73, the provisions of Regulation 2 to Regulation 52 (inclusive) shall not apply to LCH EnClear Contracts.

Regulation 76 to Regulation 87 (inclusive) apply only to LSE Derivatives Markets Cleared Exchange Contracts which are eligible for clearing pursuant to these Regulations and the LSE Derivatives Markets Rules. Save as provided in Regulation 76, the provisions of Regulation 2 to Regulation 52 (inclusive) shall not apply to LSE Derivatives Markets Cleared Exchange Contracts.

Regulation 91 applies only to Nodal Contracts. Save as provided in Regulation 89, the provisions of Regulation 2 to Regulation 52 (inclusive) shall not apply to Nodal Contracts.

Regulation 90 to Regulation 93 (inclusive) apply only to ForexClear Contracts.  Save as provided in Regulation 90, the provisions of Regulation 2 to Regulation 52 (inclusive) shall not apply to ForexClear Contracts.

Regulation 94 applies only to NLX Contracts. Save as provided in Regulation 94, the provisions of Regulation 2 to Regulation 52 (inclusive) shall not apply to NLX Contracts.

## REGULATION 1     DEFINITIONS

In these Regulations and the Procedures, except where the context otherwise requires, the following words and expressions shall have the following meanings:

| | |
|---|---|
| "**Account Balance**" | means, in relation to a Relevant Client Clearing Business of a Defaulter, an Individual Segregated Account Balance or an Omnibus Segregated Account Balance |
| "**ACSP Compression Cycle**" | means a Multilateral Compression Cycle established by the Clearing House and facilitated by an ACSP nominated by the Clearing House, which shall be open to participation by SwapClear Clearing Members in accordance with the provisions of Regulation 56 and relevant Compression Documentation |
| "**Account Information Documents**" | means the documents called "LCH.Clearnet Account Structures under EMIR" and "Fees for EMIR Segregation Accounts", as published by the Clearing House on its website and made available to Clearing Members and Clearing Clients upon request |
| "**Affiliated Client Omnibus Net Segregated Account**" | means, in relation to a Relevant Client Clearing Business, an account opened within the Clearing House by a Clearing Member on behalf of a group of Affiliated Omnibus Segregated Clearing Clients which is designated by the Clearing House as an Affiliated Client Omnibus Net Segregated Account |
| "**Affiliated Client Omnibus Segregated Account**" | means, in relation to a Relevant Client Clearing Business, (i) an Affiliated Client Omnibus Net Segregated Account or (ii) an Omnibus Gross Segregated Account opened on behalf of a group of Affiliated Omnibus Segregated Clearing Clients |
| "**Affiliated Omnibus Net Segregated Clearing Clients**" | means Affiliated Omnibus Segregated Clearing Clients in respect of whom the relevant Clearing Member clears Contracts with the Clearing House in an Affiliated Client Omnibus Net Segregated Account |

| | |
|---|---|
| **"Affiliated Omnibus Segregated Clearing Clients"** | means certain Omnibus Segregated Clearing Clients of a Clearing Member (i) whose identities have been recorded by the Membership department of the Clearing House and who are grouped together in a single Omnibus Segregated Account of the Clearing Member (ii) who are known to each other and (iii) who have elected to be grouped together in an Omnibus Segregated Account due to the existence of a common relationship between them (whether structural, economic, legal and/or otherwise) which is above and beyond the fact that they are grouped together in the relevant Omnibus Segregated Account. |
| **"Aggregate Excess Loss"** | means, in relation to a Default, the aggregate amount of all Excess Losses attributable to all types of Relevant Business in which the Defaulter was engaged. |
| **"Aggregate Omnibus Client Clearing Entitlement"** | has the meaning ascribed to it in Clause 9.3 of the Client Clearing Annex to the Default Rules |
| **"Applied Collateral Excess Proceeds"** | means, where the Clearing House has sold, disposed of or appropriated all or any part of the non-cash Collateral held by a Clearing Member with the Clearing House in an exercise of its powers under the Deed of Charge entered into with the relevant Clearing Member, the amount (if any) of realisation proceeds from such sale or disposal remaining after the Clearing House has applied the same in or towards discharge of the Clearing Member's obligations to the Clearing House or, in the case of an appropriation, an amount of such non-cash Collateral (or, where the amount in question is less than the minimum denomination of the relevant non-cash Collateral which can be delivered, cash) having a value equal to the excess (if any) of the value of the appropriated non-cash Collateral (as determined by the Clearing House in accordance with the relevant Deed of Charge) over the Clearing Member's obligations to the Clearing House which have been discharged by that appropriation |
| **"Applied FCM Buffer"** | has the meaning assigned to it in the FCM Regulations |
| **"approved agent"** | means a person appointed by the Clearing House to perform certain functions on its behalf in respect of an ATP |
| **"Approved Broker"** | means a person authorised by the Clearing House to participate as a broker in the LCH EnClear service |
| **"Approved Compression Services Provider (ACSP)"** | means an entity other than the Clearing House which is approved by the Clearing House for the facilitation of Multilateral Compression in relation to eligible SwapClear Contracts in accordance with Regulation 56 and relevant |

|  |  |
|---|---|
| | Compression Documentation. |
| **"Approved EquityClear Settlement Provider ("ASP")"** | means the operator of the securities depository and/or securities settlement system prescribed by the Clearing House from time to time for the provision of settlement services in respect of specified EquityClear Contracts |
| **"Approved EquityClear Trading Platform ("ATP")"** | means any trading platform approved as such from time to time by the Clearing House in respect of the EquityClear service |
| **"Approved Trade Source System"** | means a system or facility, such as an exchange, a clearing house, a swap execution facility, a designated contract market, trade or affirmation system or other similar venue or system, approved by the Clearing House for submitting SwapClear Transactions to the Clearing House (and excludes, for the avoidance of doubt, the ClearLink API) |
| **"Approved LSE Derivatives Markets Settlement Provider"** | means the securities depository or securities settlement system (or an operator thereof) approved by the Clearing House from time to time for the provision of settlement services in connection with the LSE Derivatives Markets Service |
| **"Associated Clearing House"** | means the clearing house appointed from time to time by a Co-operating Exchange to act as the central counterparty to some or all transactions made on, or under the rules of the Co-operating Exchange |
| **"Associated Collateral Balance"** | means the Account Balance or Account Balances (as applicable) to be transferred to a Receiving Clearing Member in respect of (i) an Individual Segregated Clearing Client; (ii) an individual Omnibus Gross Segregated Clearing Client (other than a Combined Omnibus Gross Segregated Clearing Client); (iii) each of the Omnibus Gross Segregated Clearing Clients comprising a group of Combined Omnibus Gross Segregated Clearing Clients; or (iv) each of the Identified Omnibus Net Segregated Clearing Clients or Affiliated Omnibus Net Segregated Clearing Clients within a particular Omnibus Segregated Account |
| **"ATP Market Rules"** | means the rules, regulations, administrative procedures, Memorandum and Articles of Association or bye-laws which regulate an ATP and the market administered by it as notified from time to time to the Clearing House |
| **"ATS Participant"** | has the meaning assigned to such term in Regulation 63(b) |
| **"Auction Portfolio"** | has the meaning assigned to it in the Default Rules |

| | |
|---|---|
| **"Automated Trading System"** | means an automated trading system in respect of which the Clearing House has an agreement with the operator thereof and in respect of which the Clearing House has notified RepoClear Participants in accordance with the Procedures |
| **"Automatic Early Termination Event"** | has the meaning ascribed to such term in Rule 5 of the Default Rules |
| **"Backup Clearing Member"** | means the Clearing Member(s) indicated by a Clearing Client as acting as such and notified to the Clearing House from time to time |
| **"Backup Client"** | means an Indirect Segregated Account Clearing Client identified by a Clearing Member to the Clearing House for the purposes of a transfer of Related Contracts and Collateral pursuant to a Client to Client Porting |
| **"Backload Registration Cycle"** | has the meaning assigned to it in the Procedures |
| **"Backloaded Registration Trade"** | has the meaning assigned to it in the Procedures |
| **"Block IRS Trade"** | Means a trade the notional amount of which is at or above the minimum block size established by the CFTC pursuant to CTFC Regulation 43.6 for the interest rate asset class and in effect as of the date of submission of such trade to the Clearing House for registration |
| **"Board"** | means the board of directors or other governing body (whether called a board, a committee or otherwise) of an Exchange |
| **"Bond Trade"** | means a trading activity in which a RepoClear Participant offers to sell RepoClear Eligible Securities, and another RepoClear Participant offers to purchase those RepoClear Eligible Securities, and a trade subsequently ensues |
| **"Business"** | means any transactions, liabilities or obligations arising out of any contract and includes, in relation to the relevant Services, Commodities Business, Equities Business, ForexClear Business, Listed Interest Rate Business, RepoClear Business and SwapClear Business. |
| **"business day"** | means in respect of a Cleared Exchange Contract, an OTC Contract (except where specified otherwise in the relevant OTC Contract Terms), an LCH EnClear Contract (except where specified otherwise in the LCH EnClear Contract Terms), and an EquityClear Contract a day on which the Clearing House is open for business |
| **"buyer"** | means a Member (or the Clearing House where the context so requires) who is a buyer under the terms of an exchange |

contract, a Cleared Exchange Contract, a LSE Derivatives Markets Cleared Exchange Contract, a RepoClear Transaction, a RepoClear Contract, a RepoClear GC Transaction, a RepoClear GC Contract, an EquityClear ATP Match, an EquityClear Novation Transaction or an Eligible EnClear Trade, as the case may be

| | |
|---|---|
| **"Capped Amount"** | has the meaning as described in Default Rule 15(c) |
| **"Carrying Clearing Member"** | means (a) a SwapClear Clearing Member that has a Client Account in respect of one or more SwapClear Clearing Clients, and from which Relevant SwapClear Contracts and the relevant Associated Collateral Balance(s) may be transferred to a Receiving Clearing Member pursuant to Regulation 60 of these Regulations and in accordance with the Procedures or (b) in respect of a transfer as described in sub-paragraph (ii) of the definition of "Receiving Clearing Member", an FCM Clearing Member |
| **"CEA"** | has the meaning assigned to it in the Default Rules |
| **"CFTC"** | has the meaning assigned to it in the Default Rules |
| **"CFTC Regulations"** | has the meaning assigned to it in the FCM Regulations |
| **"Cleared Exchange Contract"** | means a Contract entered into by the Clearing House on the terms of an exchange contract |
| **"Clearing Agreement"** | means in relation to Client Clearing Business entered into by a Clearing Member in respect of any Service, suitable contractual arrangements between the Clearing Member and its Clearing Client in relation to the relevant Client Clearing Service |
| **"Clearing Client"** | means any RepoClear Clearing Client, SwapClear Clearing Client, EquityClear Clearing Client, LCH EnClear Clearing Client, Turquoise Clearing Client, Nodal Clearing Client, ForexClear Clearing Client or NLX Clearing Client. For the avoidance of doubt, the reference to LCH EnClear Clearing Client includes a Customer (as such term is defined in Procedure 2E 1.4 in respect of LCH EnClear Services) |
| **"Clearing House"** | means LCH.Clearnet Limited whose registered office is located at Aldgate House, 33 Aldgate High Street, London EC3N 1EA, United Kingdom |

| | |
|---|---|
| **"Clearing House Applied Collateral"** | means, in respect of an account of a Clearing Member, any cash Collateral provided by the Clearing House in respect of which the Clearing Member's obligation to return such Collateral has been discharged pursuant to the Rulebook by means of that return obligation having been set-off against an obligation owed by the Clearing House to that Clearing Member, as contemplated by Regulation 20(v) |
| **"Clearing House Current Collateral Balance"** | means, in respect of an account of a Clearing Member, all cash Collateral which has been transferred by the Clearing House to that Clearing Member (or which would, but for the application of Regulation 57(d) or another comparable payment netting provision applying in the ordinary course of business, have been transferred by the Clearing House to that Clearing Member) on account of the Clearing House's variation margin obligations relating to the relevant account pursuant to the Rulebook, less any Clearing House Applied Collateral and any Clearing House Returned Collateral in relation to that account; **provided that** any amounts transferred by the Clearing House to the Clearing Member for the purpose of settling an obligation in respect of daily settlement amounts pursuant to Regulation 23(c) which is due and payable do not form part of the Clearing House Current Collateral Balance |
| **"Clearing House Returned Collateral"** | means, in respect of an account of a Clearing Member, any cash Collateral: (i) which a Clearing Member has returned to the Clearing House; or (ii) in respect of which the obligation to return such Collateral has been discharged as a result of the operation of Regulation 23(c) or as a result of the operation of Regulation 57(d) or another comparable payment netting provision applying in the ordinary course of business |
| **"Clearing House Prescribed Language"** | means, in relation to Client Clearing Business, the wording prescribed by the Clearing House for inclusion in the Clearing Agreements from time to time |

| | |
|---|---|
| **"Clearing Member Applied Collateral"** | means, in respect of an account of a Clearing Member: (i) any cash Collateral in respect of which the Clearing House's obligation to return such Collateral has been discharged pursuant to the Rulebook by means of that return obligation having been set-off against an obligation owed by that Clearing Member to the Clearing House, as contemplated by Regulation 20(u); (ii) any non-cash Collateral (including in the form of securities or gold) that has been appropriated and retained by the Clearing House pursuant to an exercise of its powers under a Deed of Charge and applied in or towards discharge of the Clearing Member's obligations to the Clearing House; and (iii) any non-cash Collateral that has been sold or otherwise disposed of by the Clearing House pursuant to an exercise of its powers under a Deed of Charge |
| **"Clearing Member Current Collateral Balance"** | means, in respect of an account of a Clearing Member: (A) the sum of (i) all Collateral which has been transferred by that Clearing Member to the Clearing House (or which would, but for the application of Regulation 57(d) or another comparable payment netting provision applying in the ordinary course of business, have been transferred by that Clearing Member to the Clearing House) on account of any type of that Clearing Member's margin obligations relating to the relevant account pursuant to the Rulebook; (ii) the cash proceeds of any non-cash Collateral relating to the relevant account which has been sold or otherwise disposed of by the Clearing House pursuant to an exercise of its powers under a Deed of Charge, the Default Rules or otherwise, to the extent that those proceeds have not been applied in or towards discharge of an obligation owed by the Clearing Member to the Clearing House; and (iii) any Applied Collateral Excess Proceeds credited to the relevant account; less (B) any Clearing Member Applied Collateral and any Clearing Member Returned Collateral in relation to that account; **provided that** any amounts transferred by the Clearing Member to the Clearing House for the purpose of settling an obligation in respect of daily settlement amounts pursuant to Regulation 23(c) which is due and payable do not form part of the Clearing Member Current Collateral Balance |
| **"Clearing Member Returned Collateral"** | means, in respect of an account of a Clearing Member, any Collateral: (i) which the Clearing House has returned to a Clearing Member (provided that the Clearing House shall only be treated as having returned any non-cash Collateral to a Clearing Member if the security in respect of that Clearing Member's interest in that non-cash Collateral pursuant to the relevant Deed of Charge has been released); or (ii) in respect of which the obligation to return such |

Collateral has been discharged as a result of the operation of Regulation 23(c) or as a result of the operation of Regulation 57(d) or another comparable payment netting provision applying in the ordinary course of business.

| | |
|---|---|
| **"Clearing Membership Agreement"** | means the agreement so designated under which, *inter alia*, the Clearing House agrees to make available clearing services in respect of Contracts together with any extension letter or other agreement; in these Regulations and the Procedures the expressions **"Clearing Member Agreement"**, **"Member Agreement"** and **"Membership Agreement"** shall have the same meaning as **"Clearing Membership Agreement"**; and in the Default Rules **"Clearing Membership Agreement"** includes the FCM Clearing Membership Agreement and the FCM Default Fund Agreement |
| **"ClearLink API"** | means a messaging standard used by market participants to interact with the Clearing House's clearing services |
| **"Client Account"** | means any Individual Segregated Account and any Omnibus Segregated Account |
| **"Client Clearing Business"** | means each of RepoClear Client Clearing Business, SwapClear Client Clearing Business, EquityClear Client Clearing Business, LCH EnClear Client Clearing Business, LSE Derivatives Markets Client Clearing Business, NODAL Client Clearing Business, ForexClear Client Clearing Business and NLX Client Clearing Business |
| **"Client Clearing Default Management Process"** | means the processes of the Clearing House outlined in the Client Clearing Annex to the Default Rules and includes the SwapClear DMP in relation to any Contract which is a SwapClear Contract in respect of SwapClear Client Clearing Business, the RepoClear DMP in relation to any Fixed Income Contract in respect of RepoClear Client Clearing Business and the ForexClear DMP in relation to any Contract which is a ForexClear Contract in respect of ForexClear Client Clearing Business |
| **"Client Clearing End-User Notice"** | means the Client Clearing End-User Notice as specified by the Clearing House from time to time |
| **"Client Clearing Entitlement"** | has the meaning assigned to it in the Client Clearing Annex to the Default Rules |
| **"Client Clearing Services"** | means SwapClear Client Clearing Services, RepoClear Client Clearing Services, EquityClear Client Clearing Services, LCH EnClear Client Clearing Services, LSE Derivatives Markets Client Clearing Services, NODAL Client Clearing Services, ForexClear Client Clearing |

Services and/or NLX Client Clearing Services

**"Client Excess"**  means (i) in respect of a Client Account other than an Omnibus Gross Segregated Account, that part of the Clearing Member Current Collateral Balance which is in excess of the Total Required Margin Amount for such account; and (ii) in respect of an Omnibus Gross Segregated Clearing Client or a group of Combined Omnibus Gross Segregated Clearing Clients, that portion of the amount by which the Clearing Member Current Collateral Balance for such account exceeds the Total Required Margin Amount for such account which is referable to such Omnibus Gross Segregated Clearing Client or Combined Omnibus Gross Segregated Clearing Clients (as applicable) as notified to the Clearing House by the relevant Clearing Member in the relevant Client Excess Spreadsheet

**"Client Excess Spreadsheet"**  has the meaning given to the term in Section 1.10 (*Client Excess Spreadsheet*) of Procedure 4 (*Margin and Collateral*) of the Clearing House's Procedures

**"Client to Client Porting"**  means the transfer to the appointed Backup Client of all of the open Related Contracts and the balance of the Collateral recorded by the Clearing House as being credited to the relevant Indirect Omnibus Segregated Account

**"closing-out contract"**  means for the purposes of these Regulations, a contract effected by or on behalf of the Clearing House and registered in a Member's name, being a contract on the same terms (except as to price or premium) as an open contract in the Member's name, save that where the Clearing House is a buyer or a fixed rate payer, as the case may be, under the terms of such open contract the Clearing House shall be a seller or floating rate payer, as the case may be, under the terms of such closing-out contract and vice-versa

**"Compression Documentation"**  means such documentation as may be prescribed from time to time by the Clearing House and/or any ACSP (where applicable) in relation to a Multilateral Compression Cycle or a SwapClear Clearing Member's participation in Multilateral Compression services, including:

(i)  for a Member Compression Cycle, such agreements and documents as the Clearing House may require from all relevant SwapClear Clearing Members in relation to Multilateral Compression in accordance with the relevant Compression Proposal;

(ii)  for an ACSP Compression Cycle, such agreements

and documents as may be required by the nominated ACSP and/or the Clearing House in order to allow a SwapClear Clearing Member to receive the services of the ACSP and participate in that ACSP Compression Cycle; and

(iii) such other documentation as the Clearing House may prescribe from time to time in Procedures, user manuals or other guidance documentation regarding Multilateral Compression.

**"Compression Proposal"**      means, in relation to any Multilateral Compression Cycle, the final statement as to the proposed set of Terminating SwapClear Contracts and the proposed set of resulting Post-Multilateral Compression Contracts, and, in relation to a SwapClear Clearing Member, references to Compression Proposal shall relate to such of the Terminating SwapClear Contracts and Post-Multilateral Compression Contracts as that SwapClear Clearing Member is or will become party to

**"Compression Time"**      means, on the date designated by the Clearing House for a Multilateral Compression Cycle, the time at which the Clearing House effects a Multilateral Compression by terminating the Terminating SwapClear Contracts and simultaneously registering the Post-Multilateral Compression Contracts in the names of the SwapClear Clearing Members participating in that Multilateral Compression Cycle in accordance with the Compression Proposal

**"CMS"**      means the Clearing House's collateral management system

**"Collateral"**      means cash, gold and/or securities which are denominated in currencies and of a description acceptable to the Clearing House as prescribed by these Regulations and the Procedures and which have been transferred, or are to be transferred, to or by the Clearing House in or towards discharge of margin obligations or anticipated margin obligations or otherwise as contemplated by the Rulebook. Where the context so permits, references to "**Collateral**" held by, or transferred to, the Clearing House shall include any cash proceeds resulting from the sale or disposal by the Clearing House of any non-cash Collateral pursuant to an exercise of its powers under a Deed of Charge, and such proceeds shall be considered cash Collateral

| | |
|---|---|
| **"Combined Omnibus Gross Segregated Clearing Clients"** | means two or more Omnibus Gross Segregated Clearing Clients within the same Omnibus Gross Segregated Account who have elected to have their positions combined for the purposes of calculating applicable margin requirements (on a net basis as between such Omnibus Gross Segregated Clearing Clients as if such Omnibus Gross Segregated Clearing Clients together are a single Omnibus Gross Segregated Clearing Client for the purposes of the relevant calculations) |
| **"Combined LSE Derivatives Markets Orderbook"** | means the electronic Orderbook operated by LSE and one or more Co-operating Exchanges |
| **"Commodities Business"** | means any transaction, obligation or liability arising out of any Commodities Contract |
| **"Commodities Contract"** | means any commodities contract cleared by the Clearing House |
| **"Commodities Clearing Member"** | means a Clearing Member which engages in Commodities Business |
| **"Commodities Contribution"** | means the amount of a Commodities Clearing Member's Contribution determined in accordance with the Commodities Default Fund Supplement and shall include any relevant Unfunded Contributions and any relevant Supplementary Contribution deposited and made by the Commodities Clearing Member with the Clearing House |
| **"Commodities Default Fund Supplement"** | means the Supplement relating to Commodities Business |
| **"Commodities Determination Date"** | has the meaning assigned to "Determination Date" in Rule C2(c) of the Commodities Default Fund Supplement |
| **"Commodities Excess Loss"** | means the net sum or aggregate of net sums certified to be payable by a defaulter by a Rule 19 Certificate in respect of Commodities Business, less (a) the proportion of the Capped Amount applicable to Commodities Business under Default Rule 15(c) and (b) any sums then immediately payable in respect of Commodities Business Default Losses owed by such Defaulter by any insurer or provider of analogous services under any policy of insurance or analogous instrument written in favour of the Clearing House |
| **"Commodities Fund Amount"** | means the amount of the commodities default fund established from time to time pursuant to the Commodities Default Fund Supplement |
| **"Commodities Service"** | means the clearing service of the Clearing House relating |

to Commodities Business

"**confirmed contract**"

means an original exchange contract which has been confirmed to the Clearing House by or on behalf of a buyer and a seller pursuant to Regulation 13 or 14 and the Procedures, save that where one or more allocations of an original exchange contract have taken place in accordance with Regulation 14 and the Procedures a "**confirmed contract**" shall only arise when the last allocation of such original exchange contract has been made and confirmed by a Member pursuant to Regulation 14 and the Procedures

"**Continuing Member** "

has the meaning as described in Default Rule 26

"**Contract**"

means (i) a contract subject to the Regulations entered into by the Clearing House with a Member for the purposes of or in connection with the provision of clearing services including, without limitation, an open contract, settlement contract, re-opening contract or closing-out contract; and also (ii) in the case of the Default Rules (including the SwapClear DMP Annex, RepoClear DMP Annex and ForexClear DMP Annex), the FCM Default Fund Agreement, and any other document, rule or procedure as specified by the Clearing House from time to time, an FCM Contract

"**contract for differences**"

means a Cleared Exchange Contract, an LSE Derivatives Markets Cleared Exchange Contract, an OTC Contract or an LCH EnClear Contract which is to be performed by cash settlement only

"**Contribution**"

means the contribution of a Clearing Member to a default fund of the Clearing House and includes, in each case in relation to the relevant Service, a Commodities Contribution, an Equities Contribution, a ForexClear Contribution, a Listed Interest Rate Contribution, a RepoClear Contribution and a SwapClear Contribution

"**Co-operating Clearing House**"

means a clearing house party to an agreement with the Clearing House in respect of the co-clearing of an Exchange pursuant to which such organisation co-clears specific types of Contract and agrees to be bound by these Regulations as a Member to the extent and subject to any variations agreed in such agreement

| | |
|---|---|
| **"Co-operating Clearing House Contract"** | means, in respect of a Co-operating Clearing House, a class of contract, which is cleared by the Co-operating Clearing House from time to time, permitted to be made by members of the Co-operating Clearing House under Co-operating Clearing House Rules and which is the subject of a Link |
| **"Co-operating Clearing House Rules"** | means the provisions of a Co-operating Clearing House's Memorandum or Articles of Association or other constitutional documents, by-laws, rules, regulations, procedures, customs, practices, notices and resolutions in whatever form adopted by such Co-operating Clearing House that regulate Co-operating Clearing House Contracts and the members and markets cleared by the Co-operating Clearing House and any amendment, variation or addition thereto |
| **"Co-operating Exchange"** | means an exchange (which may also act as a central counterparty) which is party to a co-operation agreement with LSE |
| **"Cover"** | means an amount of cash or (with the approval of the Clearing House) non-cash Collateral, determined by the Clearing House, and in a form and currency acceptable to the Clearing House as prescribed in the Procedures |
| **"Cross-Border Re-registration"** | means the re-registration of LSE Derivatives Markets Cleared Exchange Contracts from an account of a Linked Member maintained with a Co-operating Exchange to an account of a Member with the Clearing House in accordance with Regulation 87 |
| **"Cross-Border Transfers"** | means the automatic transfers of LSE Derivatives Markets Cleared Exchange Contracts from an account of a Linked Member maintained with a Co-operating Exchange to an account of a Member with the Clearing House |
| **"Cross-ISA Client Excess Deduction "** | means, where a Total Required Margin Amount relates to an Individual Segregated Account held by a Clearing Member on behalf of an Individual Segregated Account Clearing Client, if and to the extent that Client Excess is available in one or more other Individual Segregated Accounts held by such Clearing Member on behalf of the same Individual Segregated Account Clearing Client, a deduction by the Clearing House from the other Individual Segregated Account(s) of that Client Excess |
| **"daily settlement amounts"** | means amounts due to the Clearing House from a Member or to a Member from the Clearing House, as the case may be, arising out of settlement of open contracts pursuant to |

Regulation 23 or Regulation 75, and the Procedures

| | |
|---|---|
| **"Dealer"** | means a ForexClear Dealer, RepoClear Dealer and/or SwapClear Dealer, as the context may require |
| **"Dealer Clearing Agreement"** | means a ForexClear Dealer Clearing Agreement, RepoClear Dealer Clearing Agreement, and/or SwapClear Dealer Clearing Agreement, as the context may require |
| **"Dealer Register"** | means one or more of the Register of ForexClear Dealers, the Register of RepoClear Dealers and/or the Register of SwapClear Dealers, as the context may require |
| **"Deed of Charge"** | means a deed of charge entered into between a Clearing Member and the Clearing House in respect of all non-cash Collateral transferred to the Clearing House by that Clearing Member |
| **"Default"** | means the issue, in respect of a Clearing Member, of a Default Notice as provided for by Default Rule 3 or the occurrence, in respect of a Clearing Member, of an Automatic Early Termination Event |
| **"Defaulter"** | has the meaning assigned to it in Default Rule 4 |
| **"Defaulting Clearing Member"** | means a Clearing Member who is a Defaulter |
| **"Defaulting FXCCM"** | means a FXCCM who is a Defaulter |
| **"Defaulting RCM"** | means a RCM who is a Defaulter |
| **"Defaulting SCM "** | means a SCM who is a Defaulter |
| **"Default Loss"** | has the meaning assigned to it in Default Rule 16(b) |
| **"Default Management Process Agreement Amendment Agreement"** | has the meaning assigned to it in Regulation 11(r) |
| **"Default Notice"** | has the meaning assigned to it in Default Rule  3 |
| **"Default Rules"** | means the Clearing House's Default Rules including the Supplements from time to time in force pursuant to Part IV of The Financial Services and Markets Act 2000 (Recognition Requirements for Investment Exchanges and Clearing Houses) Regulations 2001 which, for the avoidance of doubt, form a part of these General Regulations |
| **"delivery contract"** | means a Cleared Exchange Contract or LSE Derivatives Markets Cleared Exchange Contract between the Clearing |

House and a Member:

(a)     for the immediate sale and purchase of a commodity arising on the exercise of an option pursuant to these Regulations; or

(b)     for the sale and purchase of a commodity for delivery on the date specified in the contract or on the date agreed between the parties, in either case being an open contract under which tender is not required to be given

**"delivery month"**  means in respect of an exchange contract, the meaning ascribed to it in the Exchange Rules governing such contract or, in respect of an LCH EnClear Contract, the meaning ascribed to it in the LCH EnClear Procedures, or in respect of an LSE Derivatives Markets Cleared Exchange Contract, an expiration month as defined in the LSE Derivatives Markets Rules

**"Determination Date"**  means the date for calculation of a Contribution other than an Unfunded Contribution or a Supplementary Contribution, as provided for in a Supplement, and includes a Commodities Determination Date, an Equities Determination Date, a ForexClear Determination Date, a Listed Interest Rate Determination Date, a RepoClear Determination Date and a SwapClear Determination Date

**"Determined Omnibus Net Segregated Clients"**  has the meaning assigned to it in the Client Clearing Annex to the Default Rules

**"Economic Terms"**  means that part of the SwapClear Contract Terms, RepoClear Contract Terms, RepoClear GC Contract Terms, EquityClear Contract Terms, LCH EnClear Contract Terms, or ForexClear Contract Terms as the case may require, designated as Economic Terms by the Clearing House from time to time

**"Eligible EnClear Trade"**  means a trade eligible for registration in the LCH EnClear Services

**"Eligible US Trading Venue"**  means, in respect of a SwapClear Clearing Member, a US Trading Venue for which the Clearing House's records reflect that such SwapClear Clearing Member has completed the Clearing House's process for enabling the SwapClear Clearing Member to be eligible to submit (or have submitted on its behalf) a transaction executed on such US Trading Venue to the Clearing House for registration

| | |
|---|---|
| **"EMIR"** | means Regulation (EU) No 648/2012 of the European Parliament and the Council of 4 July 2012 on OTC Derivatives, Central Counterparties, and Trade Repositories |
| **"EONIA"** | means in relation to a RepoClear Contribution, the overnight rate as calculated by the European Central Bank and appearing on the Reuters Screen EONIA Page (or, if such a rate is not available, such EONIA-linked rate as may be determined in light of market conditions at such time by the Clearing House and notified by the Clearing House to Clearing Members) |
| **"Equities Business"** | means any transaction, obligation or liability arising out of any Equities Contract |
| **"Equities Clearing Member"** | means a Clearing Member which engages in Equities Business and includes an EquityClear Clearing Member |
| **"Equities Contract"** | means any cash equity contracts, EquityClear (ccCFD) Contracts and equity derivative contracts cleared by the Clearing House |
| **"Equities Contribution"** | the amount of an Equities Clearing Member's Contribution determined in accordance with the Equities Default Fund Supplement and shall include any relevant Unfunded Contributions and any relevant Supplementary Contribution deposited and made by the Equities Clearing Member with the Clearing House |
| **"Equities Default Fund Supplement"** | means the Supplement relating to Equities Business |
| **"Equities Determination Date"** | has the meaning assigned to "Determination Date" in Rule E2(c) of the Equities Default Fund Supplement |
| **"Equities Excess Loss"** | means the net sum or aggregate of net sums certified to be payable by a Defaulter by a Rule 19 Certificate in respect of Equities Business, less (a) the proportion of the Capped Amount applicable to Equities Business under Default Rule 15(c) and (b) any sums then immediately payable in respect of Equities Business Default Losses owed by such Defaulter by any insurer or provider of analogous services under any policy of insurance or analogous instrument written in favour of the Clearing House |
| **"Equities Fund Amount"** | means the amount of the equities default fund established from time to time pursuant to the Equities Default Fund Supplement |
| **"Equities Service"** | means the clearing service of the Clearing House relating |

to Equities Business

| | |
|---|---|
| **"EquityClear ATP Match"** | means an EquityClear (Equities) ATP Match or EquityClear (ccCFD) ATP Match |
| **"EquityClear Business"** | means any transaction, obligation or liability arising out of any EquityClear Contract |
| **"EquityClear (ccCFD) ATP Match"** | means an EquityClear ATP Match where the relevant ATP Market Rules permit the matching of Trading Platform Particulars that consist of the sale or purchase of an EquityClear Eligible ccCFD and the corresponding purchase or sale, as the case may be, of an EquityClear Eligible ccCFD |
| **"EquityClear (ccCFD) Contract"** | means an EquityClear Contract entered into by the Clearing House with an EquityClear Clearing Member on the EquityClear (ccCFD) Contract Terms or such other terms specified by the relevant ATP |
| **"EquityClear(ccCFD) Contract Terms"** | means the terms applicable to each EquityClear (ccCFD) Contract, where such terms are not specified by the ATP, as set out from time to time in the Product Specific Contract Terms and Eligibility Criteria Manual |
| **"EquityClear (ccCFD) Open Offer"** | means the open offer made by the Clearing House in respect of an EquityClear (ccCFD) ATP Match meeting the EquityClear (ccCFD) Open Offer Eligibility Criteria |
| **"EquityClear Clearing Client"** | means, in respect of EquityClear Client Clearing Business, an Individual Segregated Account Clearing Client or an Omnibus Segregated Clearing Client |
| **"EquityClear Clearing House Business"** | means EquityClear Contracts entered into by EquityClear Clearing Member with the Clearing House on a proprietary basis and for its own account |
| **"EquityClear Clearing Member"** | means a Member who is designated by the Clearing House as an EquityClear Clearing Member eligible to clear EquityClear Contracts |
| **"EquityClear Client Clearing Business"** | means the provision of EquityClear Client Clearing Services by an EquityClear Clearing Member |
| **"EquityClear Client Clearing Services"** | means the entering into of EquityClear Contracts by an EquityClear Clearing Member in respect of its Individual Segregated Account Clearing Clients and/or its Omnibus Segregated Clearing Clients |
| **"EquityClear Contract"** | means an EquityClear (Equities) Contract and/or an EquityClear (ccCFD) Contract as the case may be |

| | |
|---|---|
| **"EquityClear Contract Terms"** | means the EquityClear (Equities) Contract Terms and/or the EquityClear (ccCFD) Contract Terms as the case may be |
| **"EquityClear Eligibility Criteria"** | means with regard to an EquityClear Open Offer, the conditions set out in Regulation 68(c) |
| **"EquityClear Eligible ccCFD"** | means a contract for difference in respect of an EquityClear Eligible Instrument (as such term is defined in the Procedures) prescribed by the Clearing House and eligible for those prescribed parts of the EquityClear service and which appear in the list or lists published for this purpose from time to time by the Clearing House |
| **"EquityClear Eligible Equities"** | means securities prescribed from time to time by the Clearing House which are eligible for any part or parts of the EquityClear service and which appear in the list or lists published from time to time by the Clearing House |
| **"EquityClear (Equities) ATP Match"** | means the matched Trading Platform Particulars resulting from the matching on an ATP, in accordance with the relevant ATP Market Rules, of Trading Platform Particulars received from, or on behalf of: (i) two EquityClear Clearing Members (with one as buyer and one as seller); or (ii) one EquityClear Clearing Member and one member of a relevant Co-operating Clearing House (with one as buyer and one as seller) |
| **"EquityClear (Equities) Contract"** | means an EquityClear Contract entered into by the Clearing House with an EquityClear Clearing Member on the EquityClear (Equities) Contract Terms or such other terms specified by the relevant ATP |
| **"EquityClear (Equities) Contract Terms"** | means the terms applicable to each EquityClear (Equities) Contract, where such terms are not specified by the ATP, as set out from time to time in the Product Specific Contract Terms and Eligibility Criteria Manual |
| **"EquityClear (Equities) Open Offer"** | means the open offer made by the Clearing House in respect of an EquityClear (Equities) ATP Match meeting the EquityClear (Equities) Open Offer Eligibility Criteria |
| **"EquityClear Mixed Member Match"** | means (i) an ATP Match reflecting two sets of matched Trading Platform Particulars submitted by, or on behalf of, one EquityClear Clearing Member and one member of a relevant Co-operating Clearing House (with one as buyer and one as seller), or (ii) an EquityClear Novation Transaction between one EquityClear Clearing Member and one member of a relevant Co-operating Clearing House (with one as buyer and one as seller) |

| | |
|---|---|
| **"EquityClear Novation Transaction"** | means the matched Trading Platform Particulars representing a bilateral transaction and either: |

(a)   concluded other than through the orderbook of a relevant ATP which is capable of being cleared in accordance with the relevant ATP Market Rules and the Regulations; or

(b)   concluded through an orderbook of an ATP, where the relevant ATP Market Rules specify that transactions executed there will be cleared via novation, and

in either case is submitted for registration by, or on behalf of, one EquityClear Clearing Member (or, in respect of an EquityClear Mixed Member Match, one member of the relevant Co-operating Clearing House) identified as, or as acting as clearing member for, the buyer and the same or another EquityClear Clearing Member identified as, or as acting as clearing member for, the seller

| | |
|---|---|
| **"EquityClear Open Offer"** | means an EquityClear (Equities) Open Offer or EquityClear (ccCFD) Open offer |
| **"EquityClear Regulations"** | means those Regulations which apply to EquityClear Contracts as specified in Regulation 67 |
| **"EquityClear Service"** | the service provided by the Clearing House under the EquityClear Regulations |
| **"€GC Trade"** | means a trading activity in which a RepoClear Participant (**"the First Participant"**) offers to sell (or buy) an agreed value of securities comprised in a €GC Basket (as defined in the Procedures), to be allocated in accordance with the RepoClear Procedures applicable to RepoClear €GC Contracts, and another RepoClear Participant (**"the Second Participant"**) offers to buy (or sell, as the case may be) the securities so allocated, on the conditions that: |

(a)   at the end of a specified period of time, the Second Participant sells (or buys, as the case may be) Equivalent Securities (as such term is used in the RepoClear €GC Contract Terms) and the First Participant buys (or sells, as the case may be) those Equivalent Securities; and

(b)   the understanding of the parties is that their obligations during the term of the transaction will be represented by a series of overnight repurchase transactions affected either through CBL's service under the AutoAssign Supplement, Euroclear's AutoSelect service or any other equivalent service

provided by a triparty agent, as the case may be, as contemplated by the RepoClear Procedures applicable to RepoClear €GC Contracts,

and a trade subsequently ensues

**"Excess Loss"**

means in relation to any Relevant Business and any Default, the net sum or aggregate of net sums certified to be payable by the Defaulter by a Rule 19 Certificate in respect of the Relevant Business, less (a) the proportion of the Capped Amount applicable to the Relevant Business under Rule 15(c) and (b) any sums then immediately payable in respect of Default Losses for that Relevant Business by any insurer or provider of analogous services under any policy of insurance or analogous instrument written in favour of the Clearing House, and includes, in relation to the relevant Services, a Commodities Excess Loss, an Equities Excess Loss, a ForexClear Excess Loss, a Listed Interest Rate Excess Loss, a RepoClear Excess Loss and a SwapClear Excess Loss

**"Exchange"**

means an organisation (whether an exchange, association, company or otherwise) responsible for administering a futures, options, stock or other market, to which the Clearing House provides clearing services

**"exchange contract"**

means a class of contract (1) on the terms published from time to time by an Exchange and permitted to be made by a member of such Exchange on the market administered by that Exchange or otherwise in accordance with Exchange Rules, or (2) eligible for submission to the Clearing House for registration pursuant to the Exchange Rules.  For the purposes of these Regulations **"exchange contract"** shall not include any class of contract capable of being made on the London Stock Exchange, or on any ATP

**"Exchange Product Specific Eligibility Criteria"**

means, as applicable, the relevant the relevant Nodal Contract Terms or the relevant NLX Contract Terms

**"Exchange Rules"**

means the rules, regulations, administrative procedures, Memorandum and Articles of Association or bye-laws which regulate an Exchange and the market administered by it as notified from time to time to the Clearing House and, without prejudice to the generality of the foregoing, any regulations or directions made by the Board and any procedures, practices and administrative requirements relevant of the Exchange.  The term **"Exchange Rules"** shall include the LSE Derivatives Markets Rules, as the case may be, save where the context otherwise requires

| | |
|---|---|
| **"Exchange Transaction"** | means an LSE Derivatives Markets Transaction, a Nodal Transaction or a NLX Transaction (as applicable) |
| **"Executing Party"** | means each person described as a party to a SwapClear Transaction or a FCM SwapClear Transaction (as applicable) in the details submitted to the Clearing House via the relevant Approved Trade Source System or FCM Approved Trade Source System (as applicable) |
| **"Execution Terms"** | means the terms (if any) that apply to a SwapClear Transaction relating to the registration or non-registration of such SwapClear Transaction |
| **"Exempt Client Clearing Member"** | means a Clearing Member to which, in the sole determination of the Clearing House, an Exempting Client Clearing Rule would apply upon such Clearing Member becoming a defaulter |
| **"Exempting Client Clearing Rule"** | means, in relation to a Clearing Member, any law, regulation or statutory provision (having the force of law) of a governmental authority the effect of which, in the determination of the Clearing House in its absolute discretion, is to protect the operation of the Client Clearing Annex of the Default Rules from challenge under the insolvency laws applicable to that Clearing Member |
| **"expiry date or month"** | means a date or month prescribed by Exchange Rules in respect of an option contract |
| **"FCM Approved Trade Source System"** | has the meaning assigned to it in the FCM Regulations |
| **"FCM Buffer"** | has the meaning assigned to it in the FCM Regulations |
| **"FCM Clearing Member"** | has the meaning assigned to it in the FCM Regulations |
| **"FCM Clearing Membership Agreement"** | has the meaning assigned to it in the FCM Regulations |
| **"FCM Client"** | has the meaning assigned to it in the FCM Regulations |
| **"FCM Client Segregated Sub-Account"** | has the meaning assigned to it in the FCM Regulations |
| **"FCM Contract"** | has the meaning assigned to it in the FCM Regulations |
| **"FCM Default Fund Agreement"** | has the meaning assigned to it in the FCM Regulations |
| **"FCM EnClear Contract"** | has the meaning assigned to it in the FCM Regulations |

| | |
|---|---|
| "**FCM ForexClear Client Clearing Services**" | has the meaning assigned to it in the FCM Regulations |
| "**FCM ForexClear Contract**" | has the meaning assigned to it in the FCM Regulations |
| "**FCM ForexClear Transaction**" | has the meaning assigned to it in the FCM Regulations |
| "**FCM Omnibus Clearing Product Client Account with LCH**" | has the meaning assigned to it in the FCM Regulations |
| "**FCM Omnibus EnClear Client Account with LCH**" | has the meaning assigned to it in the FCM Regulations |
| "**FCM Omnibus ForexClear Client Account with LCH**" | has the meaning assigned to it in the FCM Regulations |
| "**FCM Omnibus SwapClear Client Account with LCH**" | has the meaning assigned to it in the FCM Regulations |
| "**FCM Procedures**" | has the meaning assigned to it in the FCM Regulations |
| "**FCM Regulations**" | means the Clearing House's FCM Regulations |
| "**FCM SwapClear Client Clearing Services**" | has the meaning assigned to it in the FCM Regulations |
| "**FCM SwapClear Contract**" | has the meaning assigned to it in the FCM Regulations |
| "**FCM SwapClear Transaction**" | has the meaning assigned to it in the FCM Regulations |
| "**FCM Transaction**" | has the meaning assigned to it in the FCM Regulations |
| "**Fed Funds Rate**" | means the Federal Funds Rate as published by the Federal Reserve Bank of New York (or, if such a rate is not available, such Fed Fund-linked rate as may be determined in light of market conditions at such time by the Clearing House and notified by the Clearing House to Clearing Members) |
| "**First Defaulter**" | has the meaning as described in Default Rule 22 |
| "**Fixed Income Contract**" | means a RepoClear Contract or a RepoClear GC Contract |
| "**ForexClear Amendment**" | has the meaning assigned to it in Rule F12 of the ForexClear Default Fund Supplement |
| "**ForexClear Approved Trade Source System**" | means a system or facility, such as an exchange, a clearing house, a swap execution facility, a designated contract market, trade or affirmation system, a ForexClear Matcher |

|  | or other similar venue or system, approved by the Clearing House for submitting ForexClear Transactions to the Clearing House (and excludes, for the avoidance of doubt, the ClearLink API) |
|---|---|
| **"ForexClear Business"** | means any transaction, obligation or liability arising out of any ForexClear Contract |
| **"ForexClear Clearing Client"** | means, in respect of ForexClear Client Clearing Business, an Individual Segregated Account Clearing Client or an Omnibus Segregated Clearing Client |
| **"ForexClear Clearing House Business"** | means ForexClear Contracts entered into by a ForexClear Clearing Member with the Clearing House on a proprietary basis and for its own account |
| **"ForexClear Clearing Member (FXCCM)"** | means a Member who is designated by the Clearing House as a ForexClear Clearing Member eligible to clear ForexClear Contracts which includes, in the case of the Default Rules (including the ForexClear DMP Annex), the FCM Default Fund Agreement and any other document, rule or procedure as specified by the Clearing House from time to time, an FCM Clearing Member |
| **"ForexClear Client Clearing Business** | means the provision of ForexClear Client Clearing Services by a ForexClear Clearing Member |
| **"ForexClear Client Clearing Services"** | means the entering into of ForexClear Contracts by a ForexClear Clearing Member in respect of its Individual Segregated Account Clearing Clients and/or its Omnibus Segregated Clearing Clients |
| **"ForexClear Contract"** | means a Contract entered into by the Clearing House with a ForexClear Clearing Member on the ForexClear Contract Terms which includes, in the case of the Default Rules (including the ForexClear DMP Annex but excluding, for the avoidance of doubt, the Client Clearing Annex), the FCM Default Fund Agreement and any other document, rule or procedure as specified by the Clearing House from time to time, an FCM ForexClear Contract |
| **"ForexClear Contract Terms"** | means the terms applicable to each ForexClear Contract as set out from time to time in the Product Specific Contract Terms and Eligibility Criteria Manual |
| **"ForexClear Contribution"** | means the amount of an FXCCM's Contribution determined in accordance with the ForexClear Default Fund Supplement and shall include any ForexClear Unfunded Contributions and any relevant Supplementary Contribution deposited and made by the FXCCM with the Clearing House |

| | |
|---|---|
| **"ForexClear Dealer (FXD)"** | means a person admitted by the Clearing House to the Register of ForexClear Dealers and who has not been removed from the Register of ForexClear Dealers |
| **"ForexClear Dealer Clearing Agreement (FDC Agreement)"** | means a written agreement, in the form and on the terms prescribed by the Clearing House between an FXD, an FXCCM and the Clearing House |
| **"ForexClear Default Fund Supplement"** | means the Supplement relating to ForexClear Business |
| **"ForexClear Default Management Process"** | has the meaning assigned to it in the ForexClear DMP Annex in the Default Rules |
| **"ForexClear Default Management Process Completion Date"** | has the meaning assigned to it in the ForexClear DMP Annex in the Default Rules |
| **"ForexClear Default Period"** | has the meaning ascribed to it in Rule F2 of the ForexClear Default Fund Supplement |
| **"ForexClear Determination Date"** | has the meaning assigned to it in Rule F2 of the ForexClear Default Fund Supplement |
| **"ForexClear DMG"** | has the meaning assigned to it in the ForexClear DMP Annex in the Default Rules |
| **"ForexClear DMP"** | has the meaning assigned to it in the ForexClear DMP Annex in the Default Rules |
| **"ForexClear Eligibility Criteria"** | means the product eligibility criteria in respect of ForexClear Transactions as set out in the Product Specific Contract Terms and Eligibility Criteria Manual as published on the Clearing House's website from time to time |
| **"ForexClear Excess Loss"** | means the net sum or aggregate of net sums certified to be payable by a Defaulter in respect of ForexClear Business by a Rule 19 Certificate less (a) the proportion of the Capped Amount applicable to ForexClear Business under Rule 15(c) and (b) any sums then immediately payable in respect of ForexClear Business Default Losses owed by such Defaulter by any insurer or provider of analogous services under any policy of insurance or analogous instrument written in favour of the Clearing House |
| **"ForexClear Fund Amount"** | means the amount as determined in accordance with Rule F2(c) of the ForexClear Default Fund Supplement |
| **"ForexClear Loss Distribution Process"** | has the meaning assigned to it in Rule F9 of the ForexClear Default Fund Supplement |

| | |
|---|---|
| "**ForexClear Matcher**" | means a party which has been notified in writing by the Clearing House to ForexClear Participants from time to time as being a matching provider for the ForexClear Service |
| "**ForexClear Participants (FXPs)**" | means ForexClear Clearing Members, and ForexClear Dealers, and "**ForexClear Participant**" means either of them |
| "**ForexClear Regulations**" | means those Regulations which apply to ForexClear Contracts as specified in Regulation 90 |
| "**ForexClear Service**" | means the service provided by the Clearing House under the ForexClear Regulations |
| "**ForexClear Transaction**" | means a contract, meeting the ForexClear Eligibility Criteria for registration as a ForexClear Contract, entered into between two ForexClear Participants, of which particulars are presented to the Clearing House for registration in the name of ForexClear Clearing Members in accordance with the Regulations. In addition, a ForexClear Transaction shall include an FCM ForexClear Transaction where the relevant ForexClear Clearing Member is an executing party |
| "**ForexClear Unfunded Contribution**" | has the meaning assigned to it in Rule F8 of the ForexClear Default Fund Supplement |
| "**ForexClear Unfunded Contribution Notice**" | has the meaning assigned to it in Rule F8 of the ForexClear Default Fund Supplement |
| "**ForexClear Voluntary Payment**" | has the meaning assigned to it in Rule F10 of the ForexClear Default Fund Supplement |
| "**ForexClear Voluntary Payment Notice**" | has the meaning assigned to it in Rule F10 of the ForexClear Default Fund Supplement |
| "**Fund Amount**" | in relation to the Commodities Business, the Equities Business and the Listed Interest Rate Business, has the meaning given to the term "Fund Amount" in the Supplement relating to each such Business and includes such amounts and the ForexClear Fund Amount, the General Fund Amount, the RepoClear Segregated Fund Amount and/or the SwapClear Segregated Fund Amount as applicable |
| "**GC Trade**" | means a €GC Trade or a $GC Trade or a Term £GC Trade |
| "**Hedged Account**" | has the meaning assigned to it in the FCM Regulations |
| "**House Clearing Business**" | means, in respect of SwapClear, SwapClear Clearing House Business and FCM SwapClear Clearing House Business, in |

respect of ForexClear, ForexClear Clearing House Business and FCM ForexClear Clearing House Business, in respect of RepoClear, RepoClear Clearing House Business and in respect of any other Service, Contracts entered into by a Clearing Member with the Clearing House on a proprietary basis and for its own account

**"House Excess"**    means in relation to a Service, that part of the Clearing Member Current Collateral Balance maintained by a Clearing Member with the Clearing House on a proprietary basis and for its own account which is in excess of the relevant Total Required Margin Amount

**"Identified Client Omnibus Net Segregated Account"**    means, in relation to a Relevant Client Clearing Business, (i) an account opened within the Clearing House by the relevant Clearing Member on behalf of its Identified Omnibus Segregated Clearing Clients which is designated by the Clearing House as an Identified Client Omnibus Net Segregated Account; together with (ii) for the purposes of the Default Rules, any Omnibus Segregated Account comprising Determined Omnibus Net Segregated Clients

**"Identified Client Omnibus Segregated Account"**    means (i) an Identified Client Omnibus Net Segregated Account or (ii) an Omnibus Gross Segregated Account opened on behalf of a group of Identified Omnibus Segregated Clearing Clients

**"Identified Omnibus Net Segregated Clearing Clients"**    means Identified Omnibus Segregated Clearing Clients in respect of whom the relevant Clearing Member clears Contracts with the Clearing House in an Identified Client Omnibus Net Segregated Account

**"Identified Omnibus Segregated Clearing Clients"**    means, in relation to a Relevant Client Clearing Business, (i) certain Omnibus Segregated Clearing Clients of the relevant Clearing Member or FCM whose identities have been recorded by the Membership department of the Clearing House and who are grouped together in a single Omnibus Segregated Account of the Clearing Member but who are not Affiliated Omnibus Segregated Clearing Clients; together with (ii) for the purposes of the Default Rules, any Determined Omnibus Net Segregated Clearing Clients who are grouped together in a single Omnibus Segregated Account

**"Indirect Clearing Client"**    means a client of an Individual Segregated Account Clearing Client in respect of whom the relevant Clearing Member clears Contracts with the Clearing House in an Indirect Omnibus Segregated Account

**"Indirect Omnibus Segregated Account"**    means in respect of an Individual Segregated Account, the sub-account to such Individual Segregated Account opened within the Clearing House by the relevant Clearing Member

|  | on behalf of the related Individual Segregated Account Clearing Clients and designated by the Clearing House as an Indirect Omnibus Segregated Account |
|---|---|
| **"Indirect Segregated Account Clearing Client"** | means a Clearing Client acting on behalf of Indirect Clearing Clients comprising an Indirect Omnibus Segregated Account |
| **"Individual Segregated Account"** | means an account opened within the Clearing House by a Clearing Member or an FCM which enables the relevant Clearing Member or FCM (as applicable) to distinguish the assets and positions held for the account of an Individual Segregated Account Clearing Client from the assets and positions held for the account of its other clients, and which is designated by the Clearing House as an Individual Segregated Account |
| **"Individual Segregated Account Balance"** | means, in respect of an Individual Segregated Account Clearing Client, the Clearing Member Current Collateral Balance of the Individual Segregated Account held by the relevant Clearing Member on behalf of such client (together with any receivables, rights, intangibles and any other collateral or assets deposited or held with the Clearing House in connection with such an account) |
| **"Individual Segregated Account Clearing Client"** | means a Clearing Client in respect of whom the relevant Clearing Member clears Contracts with the Clearing House in an Individual Segregated Account |
| **"initial margin"** | means an amount determined and published from time to time by the Clearing House with regard to each category of contract, in respect of which Members may be required to transfer to the Clearing House Collateral in accordance with these Regulations and the Procedures as a condition of registration of a contract by the Clearing House and otherwise in respect of all Contracts registered with the Clearing House, as prescribed by these Regulations and the Procedures |
| **"Insufficient Resources Determination"** | has the meaning assigned to it in Rule C10 of the Commodities Default Fund Supplement, Rule E10 of the Equities Default Fund Supplement, Rule L10 of the Listed Interest Rate Default Fund Supplement, Rule S11 of the SwapClear Default Fund Supplement, Rule F11 of the ForexClear Default Fund Supplement, or Rule R11 of the RepoClear Default Fund Supplement, as applicable |
| **"LCH Approved Outsourcing Party"** | means a party approved for these purposes by the Clearing House, as set out in the FCM Procedures |

| | |
|---|---|
| "**LCH.Clearnet Group**" | means the group of undertakings consisting of LCH.Clearnet Limited, LCH.Clearnet Group Limited, LCH.Clearnet LLC, LCH.Clearnet (Luxembourg) S.a.r.l, LCH.Clearnet Service Company Limited and Banque Centrale de Compensation S.A. trading as LCH.Clearnet SA.  (any references to a "**member**" of LCH.Clearnet Group Limited within these Regulations is to be construed accordingly) |
| "**LCH EnClear Clearing Client**" | means, in respect of LCH EnClear Client Clearing Business, an Individual Segregated Account Clearing Client or an Omnibus Segregated Clearing Client |
| "**LCH EnClear Clearing House Business**" | means LCH EnClear Contracts entered into by a LCH EnClear Clearing Member with the Clearing House on a proprietary basis and for its own account |
| "**LCH EnClear Clearing Member**" | means a Member who is designated by the Clearing House as an LCH EnClear Clearing Member eligible to clear LCH EnClear Contracts |
| "**LCH EnClear Client Clearing Business**" | means the provision of LCH EnClear Client Clearing Services by a LCH EnClear Clearing Member |
| "**LCH EnClear Client Clearing Services**" | means the entering into of LCH EnClear Contracts by a LCH EnClear Clearing Member in respect of its Individual Segregated Account Clearing Clients and/or its Omnibus Segregated Clearing Clients |
| "**LCH EnClear Contract**" | means a Contract entered into by the Clearing House with an LCH EnClear Clearing Member on any applicable set of Contract Terms prescribed in the LCH EnClear Regulations |
| "**LCH EnClear Contract Terms**" | means the relevant Contract Terms in respect of LCH EnClear Contracts as set out from time to time in the Product Specific Contract Terms and Eligibility Criteria Manual |
| "**LCH EnClear Regulations**" | means those Regulations which apply to LCH EnClear Contracts as specified in Regulation 73 |
| "**LCH EnClear Service**" | means the service provided by the Clearing House under the LCH EnClear Regulations |
| "**LCH EnClear Trading Platform" ("ETP")**" | means any trading platform approved as such from time to time by the Clearing House in respect of the LCH EnClear service |
| "**LCIA Rules**" | means the LCIA Arbitration Rules of The London Court of International Arbitration |

| | |
|---|---|
| **"LIBOR"** | means, in relation to a Contribution, the rate per annum (rounded upwards, if not already such a multiple, to the next whole multiple of one-sixteenth of one per cent) known as the British Bankers' Association Interest Settlement Rate for three-month deposits in sterling being offered to prime banking names in London at or about the time specified by the Procedures for fixing the rate of interest for the period for which interest is payable or, where no such rate is available, such rate as in the opinion of the Clearing House approximates thereto |
| **"Link"** | means the trading and/or clearing arrangements established by the Clearing House and a Co-operating Clearing House and, as the case may be, an Exchange in respect of one or more exchange contracts |
| **"Link Agreement"** | means an agreement entered into between the Clearing House and a Co-operating Clearing House and if applicable, an Exchange for the purposes of a Link |
| **"Linked Member"** | means an member of a Co-operating Exchange |
| **"Listed Interest Rate Business"** | means any transaction, obligation or liability arising out of a Listed Interest Rate Contract |
| **"Listed Interest Rate Clearing Member"** | means a Clearing Member which engages in Listed Interest Rate Business |
| **"Listed Interest Rate Contract"** | means any listed interest rate derivative contract cleared by the Clearing House |
| **"Listed Interest Rate Contribution"** | means the amount of a Listed Interest Rate Clearing Member's Contribution determined in accordance with the Listed Interest Rate Default Fund Supplement and shall include any relevant Unfunded Contributions and any relevant Supplementary Contribution deposited and made by the Listed Interest Rate Clearing Member with the Clearing House |
| **"Listed Interest Rate Default Fund Supplement"** | means the Supplement relating to Listed Interest Rate Business |
| **"Listed Interest Rate Determination Date"** | has the meaning assigned to "Determination Date" in Rule L2(c) of the Listed Interest Rate Default Fund Supplement |
| **"Listed Interest Rate Excess Loss"** | means the net sum or aggregate of net sums certified to be payable by a Defaulter by a Rule 19 Certificate in respect of Listed Interest Rate Business, less (a) the proportion of the Capped Amount applicable to Listed Interest Rate Business under Default Rule 15(c) and (b) any sums then immediately payable in respect of Listed Interest Rate |

|  | Business Default Losses owed by such Defaulter by any insurer or provider of analogous services under any policy of insurance or analogous instrument written in favour of the Clearing House |
|---|---|
| **"Listed Interest Rate Fund Amount"** | means the amount of the listed interest rate default fund established from time to time pursuant to the Listed Interest Rate Default Fund Supplement |
| **"Listed Interest Rate Service"** | means the clearing service of the Clearing House relating to Listed Interest Rate Business |
| **"lot"** | means the standard unit or quantity prescribed by an Exchange, with the approval of the Clearing House, as the trading unit of an exchange contract.<br><br>In relation to a contract other than an exchange contract, the standard unit or quantity prescribed by the relevant contract terms |
| **"LSE"** | means the London Stock Exchange plc or any successor in title |
| **"LSE Derivatives Markets Clearing Client"** | means, in respect of LSE Derivatives Markets Client Clearing Business, an Individual Segregated Account Clearing Client or an Omnibus Segregated Clearing Client |
| **"LSE Derivatives Markets Clearing House Business"** | means LSE Derivatives Markets Cleared Exchange Contracts entered into by a LSE Derivatives Markets Clearing Member with the Clearing House on a proprietary basis and for its own account |
| **"LSE Derivatives Markets Client Clearing Business"** | means the provision of Turquoise Client Clearing Services by a LSE Derivatives Markets Clearing Member |
| **"LSE Derivatives Markets Client Clearing Services"** | means the entering into of LSE Derivatives Markets Cleared Exchange Contracts by a LSE Derivatives Markets Clearing Member in respect of its Individual Segregated Account Clearing Clients and/or its Omnibus Segregated Clearing Clients |
| **"LSE Derivatives Markets Account"** | means an account maintained in the name of LSE plc by the Clearing House pursuant to Regulation 10 in which LSE Derivatives Markets Cleared Exchange Contracts may be registered pursuant to Regulation 77 or in such other circumstances as may be agreed between LSE and the Clearing House from time to time |
| **"LSE Derivatives Markets Cleared Exchange Contract"** | means a Contract entered into by the Clearing House in accordance with the LSE Derivatives Markets Regulations |
| **"LSE Derivatives Markets** | means a Member authorised by the Clearing House to |

| | |
|---|---|
| **Clearing Member**" | participate in the LSE Derivatives Markets Service |
| "**LSE Derivatives Markets Contract Specification**" | means in respect of an LSE Derivatives Markets Eligible Product, the relevant contract specification set out in the LSE Derivatives Markets Rules. |
| "**LSE Derivatives Markets Eligible Product**" | means a product traded under the rules of the London Stock Exchange Derivatives Market which LSE has agreed from time to time with the Clearing House is to be cleared by the Clearing House pursuant to these Regulations |
| "**LSE Derivatives Markets Orderbook**" | means the electronic orderbook operated by LSE for the trading of LSE Derivatives Markets Eligible Products |
| "**LSE Derivatives Markets Orderbook Match or Orderbook Match**" | means a match made on the LSE Derivatives Markets Orderbook of two sets of LSE Derivatives Markets Trade Particulars submitted by or on behalf of two Members or a match made on the Combined LSE Derivatives Markets Orderbook of two sets of LSE Derivatives Markets Trade Particulars submitted by or on behalf of a Member and a Linked Member |
| "**LSE Derivatives Markets OTC Trade**" | means an OTC trade reported to LSE in accordance with its Rules for its OTC Service |
| "**LSE Derivatives Markets Platform**" | means LSE in its capacity as a recognised investment exchange |
| "**LSE Derivatives Markets Regulations**" | means those Regulations which apply to LSE Derivatives Markets Eligible Products as specified in Regulation 76 |
| "**LSE Derivatives Markets Rules**" | means the rules, practices, procedures, trading protocols and arrangements of the LSE Derivatives Markets Platform as may be prescribed from time to time relating to LSE Derivatives Markets Eligible Products |
| "**LSE Derivatives Markets Service**" | the service provided by the Clearing House under the LSE Derivatives Markets Regulations |
| "**LSE Derivatives Markets Trade Particulars**" | means the trade particulars of an order submitted to the LSE Derivatives Markets Orderbook by or on behalf of a Member or, in the case of a Member which is a Co operating Clearing House, submitted to the Combined LSE Derivatives Markets Orderbook by or on behalf of a relevant Linked Member |
| "**LSE Derivatives Markets Transactions**" | means an Orderbook Match, LSE Derivatives Markets OTC Trade and Reported Trade Cross-Border Re-registration and a Cross-Border Transfer |
| "**margin**" | means initial margin and/or variation margin and any amounts required to be transferred and maintained under |

Regulation 20(a) (*Margin and Collateral*)

| | |
|---|---|
| "**Margin Cover**" | has the meaning ascribed to such term in Default Rule 15(a) |

"**market**"    means a futures, options, forward, stock or other market, administered by an Exchange, or an OTC market in respect of which the Clearing House has agreed with such Exchange or, in respect of an OTC market, with certain Participants in that market, to provide clearing services on the terms of these Regulations and the Procedures

"**market day**"    means in respect of a commodity, a day on which the market on which that commodity is dealt in is open for trading

"**Member**" or "**Clearing Member**"

(a)    subject to (b) means an undertaking (including a firm or company) which is entitled to be party to Contracts with the Clearing House in accordance with a Clearing Membership Agreement and the Procedures or a Co-operating Clearing House, where so agreed with the Co-operating Clearing House (as applicable). For the avoidance of doubt, the terms "**Member**" and "**Clearing Member**" for the purposes of these Regulations, Default Rules and Procedures, do not mean shareholder of LCH.Clearnet Limited or of any other undertaking in the LCH.Clearnet Group

(b)    "Clearing Member" includes or means (as the case may be) FCM Clearing Member for the purpose of the Default Rules (including the SwapClear DMP Annex and the ForexClear DMP Annex), the FCM Default Fund Agreement and any other document, rule or procedure as specified by the Clearing House from time to time

"**Member Compression Cycle**"    means a Multilateral Compression Cycle requested by two or more SwapClear Clearing Members and agreed to by the Clearing House in relation to eligible SwapClear Contracts held by those requesting SwapClear Clearing Members. For the avoidance of doubt, a Member Compression Cycle will not involve any ACSP

"**MER**"    has the meaning assigned to it in Section 2C3.2 of the Procedures

"**Minimum ForexClear Contribution**"    means USD 5,000,000

"**Minimum Non-Tolerance**    means £10,000,000 (which, for the avoidance of doubt, excludes the £3,000,000 minimum amount payable by an

| | |
|---|---|
| **SwapClear Contribution**" | SCM in respect of the SwapClear Tolerance Contribution Amount); |
| "**Minimum RepoClear Contribution**" | means EUR 2,500,000 |
| "**Minimum RepoClear Contribution Member**" | means an RCM in respect of which the Preliminary RepoClear Contribution calculated under Rule R2 of the RepoClear Default Fund Supplement, is equal to or less than the Minimum RepoClear Contribution for the time being |
| "**Minimum SwapClear Contribution Member**" | means an SCM in respect of which the SwapClear Non-Tolerance Contribution Amount calculated under paragraph (h) of Rule S2 of the SwapClear Default Fund Supplement is equal to or less than the Minimum Non-Tolerance SwapClear Contribution for the time being |
| "**Multilateral Compression**" | means the exercise in which some or all of the SwapClear Contracts submitted by two or more SwapClear Clearing Members for inclusion in a Multilateral Compression Cycle are wholly terminated and, where relevant, replaced with other SwapClear Contracts whose combined notional value is less than the combined notional value of the terminated SwapClear Contracts in that Multilateral Compression Cycle |
| "**Multilateral Compression Cycle**" | means the process of Multilateral Compression in accordance with a Compression Proposal, whether by way of an ACSP Compression Cycle or a Member Compression Cycle |
| "**Net Recovery**" | means any sum received by the Clearing House from or for the account of a Defaulter after the issue by the Clearing House of a Rule 19 Certificate in respect of losses arising upon the Defaulter's Default less any amount payable to any insurer or provider of analogous services in respect of any amount due from but not previously paid by the Defaulter |
| "**New Member**" | means, on the day as at which any Contribution is to be calculated, any Clearing Member which either has become a Clearing Member, or has commenced clearing in respect of the relevant Service, since the immediately preceding day prescribed for calculating similar Contributions |
| "**NLX**" | NASDAQ OMX NLX Limited of 131 Finsbury Pavement, London EC2A 1NT |
| "**NLX Clearing Client**" | means, in respect of NLX Client Clearing Business, an Individual Segregated Account Clearing Client or an |

Omnibus Segregated Clearing Client

| | |
|---|---|
| **"NLX Clearing House Business"** | means NLX Contracts entered into by a NLX Service Clearing Member with the Clearing House on a proprietary basis and for its own account |
| **"NLX Client Clearing Business"** | means the provision of NLX Client Clearing Services by a NLX Service Clearing Member |
| **"NLX Client Clearing Services"** | means the entering into of NLX Contracts by a NLX Service Clearing Member in respect of its Individual Segregated Account Clearing Clients and/or its Omnibus Segregated Clearing Clients |
| **"NLX Contract"** | A Contract entered into by the Clearing House with an NLX Service Clearing Member pursuant to the NLX Regulations |
| **"NLX Contract Terms"** | means the terms of a NLX Contract as set out from time to time in the NLX contract specification provided in the NLX Rules |
| **"NLX Eligible Derivative product"** | A derivative product prescribed from time to time by the Clearing House as eligible for the NLX Service |
| **"NLX Reference Price"** | A Reference Price in respect of an NLX Contract |
| **"NLX Regulations"** | means those Regulations which apply to NLX Contracts as specified in Regulation 94 |
| **"NLX Rules"** | the rules, practices, procedures, trading protocols and arrangements of the NLX Trading Facility as the case may be and as may be prescribed from time to time relating to NLX Eligible Derivative Products |
| **"NLX Service"** | the service provided by the Clearing House under the NLX Regulations |
| **"NLX Service Clearing Member"** | a Member who is designated by the Clearing House as eligible to clear NLX Contracts |
| **"NLX Trading Facility"** | the facility, trading system or systems operated directly or indirectly by NLX on which NLX Eligible Derivative Products may be traded |
| **"NLX Transaction"** | a contract in an NLX Eligible Derivative Product between NLX Service Clearing Members arising or registered on an NLX Trading Facility meeting the requirements of the Regulations and the Procedures |
| **"Nodal"** | means Nodal Exchange, LLC of 8065 Leesburg Pike, Suite |

700, Vienna, VA 22182, United States of America

| | |
|---|---|
| **"Nodal Clearing Client"** | means, in respect of NODAL Client Clearing Business, an Individual Segregated Account Clearing Client or an Omnibus Segregated Clearing Client |
| **"Nodal Clearing House Business"** | means Nodal Contracts entered into by a Nodal Service Clearing Member with the Clearing House on a proprietary basis and for its own account |
| **"Nodal Client Clearing Business"** | means the provision of NODAL Client Clearing Services by a Nodal Service Clearing Member |
| **"Nodal Client Clearing Services"** | means the entering into of Nodal Contracts by a Nodal Service Clearing Member in respect of its Individual Segregated Account Clearing Clients and/or its Omnibus Segregated Clearing Clients |
| **"Nodal Contract"** | means a Contract entered into by the Clearing House with a Nodal Service Clearing Member pursuant to the Nodal Regulations |
| **"Nodal Contract Terms"** | means the terms of a Nodal Contract as set out from time to time in the Nodal contract specification provided in the Nodal Rules |
| **"Nodal Eligible Derivative Product"** | means a derivative product prescribed from time to time by the Clearing House as eligible for the Nodal Service |
| **"Nodal Reference Price"** | means a Reference Price in respect of a Nodal Contract |
| **"Nodal Regulations"** | means those Regulations which apply to Nodal Contracts as specified in Regulation 89 |
| **"Nodal Service"** | means the service provided by the Clearing House under the Nodal Regulations |
| **"Nodal Service Clearing Member"** | means a Member who is designated by the Clearing House as eligible to clear Nodal Contracts |
| **"Nodal Trading Facility"** | means the facility, trading system or systems operated directly or indirectly by Nodal on which Nodal Eligible Derivative Products may be traded |
| **"Nodal Transaction"** | means a contract in a Nodal Eligible Derivative Product between Nodal Service Clearing Members arising or registered on a Nodal Trading Facility meeting the requirements of the Regulations and the Procedures |
| **"Nodal Rules"** | means the rules, practices, procedures, trading protocols and arrangements of the Nodal Trading Facility as the case may be and as may be prescribed from time to time relating |

|                                                             | to Nodal Eligible Derivative Products |
|---|---|
| **"Non-Defaulting FXCCM"** | means an FXCCM which is not a Defaulter under Rule 4 of the Default Rules |
| **"Non-Defaulting RCM"** | means an RCM which is not a Defaulter under Rule 4 of the Default Rules |
| **"Non-Defaulting SCM"** | means an SCM which is not a Defaulter under Rule 4 of the Default Rules |
| **"Non-Deliverable FX Transaction"** | has the meaning given to it in the 1998 FX and Currency Option Definitions published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association, and the Foreign Exchange Committee, or any successor organisations, as amended and updated from time to time |
| **"Non-Identified Client Omnibus Net Segregated Account"** | means, in relation to a Relevant Client Clearing Business, an account opened within the Clearing House by the relevant Clearing Member on behalf of its Non-Identified Omnibus Segregated Clearing Clients which is designated by the Clearing House as a Non-Identified Client Omnibus Net Segregated Account but, for the avoidance of doubt, does not include any Omnibus Segregated Account comprising Determined Omnibus Net Segregated Clients |
| **"Non- Identified Omnibus Segregated Clearing Client"** | means, in relation to a Relevant Client Clearing Business, certain Omnibus Segregated Clearing Clients of the relevant Clearing Member or FCM whose identities are not recorded by the Membership department of the Clearing House and who are grouped together in an Omnibus Segregated Account which is not an Identified Client Omnibus Segregated Account or an Affiliated Client Omnibus Segregated Account of the Clearing Member but, for the avoidance of doubt, does not include any Determined Omnibus Net Segregated Clients |
| **"Non-Member Market Participant ("NCP")""** | means, in respect of a particular Service, a person, other than a Clearing Member in such Service, who meets the criteria set out in Procedure 1 (*Clearing Member, Non-Member Market Participant and Dealer Status*) and has been notified to the Clearing House in accordance with Regulation 7 (Non-Member Market Participant Status) |
| **"official quotation"** | means a price determined by the Clearing House under Regulation 22 |

| | |
|---|---|
| **"Omnibus Gross Segregated Account"** | means, in relation to a Relevant Client Clearing Business, an account opened within the Clearing House by a Clearing Member on behalf of a group of Omnibus Gross Segregated Clearing Clients which is designated by the Clearing House as an Omnibus Gross Segregated Account |
| **"Omnibus Gross Segregated Clearing Clients"** | means Affiliated Omnibus Segregated Clearing Clients or Identified Omnibus Segregated Clearing Clients (as applicable) in respect of whom the relevant Clearing Member clears Contracts with the Clearing House in an Omnibus Gross Segregated Account |
| **"Omnibus Segregated Account"** | means an account opened within the Clearing House by a Clearing Member or an FCM which enables the relevant Clearing Member or FCM (as applicable) to distinguish its assets and positions from the assets and positions held for the account of its clients (or a group of clients). For the avoidance of doubt, the term includes Identified Client Omnibus Segregated Accounts, Affiliated Client Omnibus Segregated Accounts and Non-Identified Client Omnibus Net Segregated Accounts |
| **"Omnibus Segregated Account Balance"** | means, in respect of an individual Identified Omnibus Segregated Clearing Client or an individual Affiliated Omnibus Segregated Clearing Client, such part of the Clearing Member Current Collateral Balance of the relevant Omnibus Segregated Account which is attributed by the Clearing House to the relevant client (together with any receivables, rights, intangibles and any other collateral or assets deposited or held with the Clearing House in connection with such an account) |
| **"Omnibus Segregated Clearing Client"** | means an Identified Omnibus Segregated Clearing Client, an Affiliated Omnibus Segregated Clearing Client and/or a Non-Identified Omnibus Segregated Clearing Client |
| **"Open Contract or open contract"** | means a Contract made with a Member on the terms (subject to variation of such terms as provided in the Regulations) of an original contract or a Contract made with a Member on the terms set out in the Regulations and/or any agreement entered into with the Member, which, in either case, has not been closed-out, settled or invoiced back in accordance with the Regulations and the Procedures. The term "open contract" shall include, where relevant, an option contract and a delivery contract, but shall not include a settlement contract, a re-opening contract or a closing-out contract |
| **"open contract subject to tender"** | means a Cleared Exchange Contract made with a Member on the terms (unless otherwise provided in the Regulations) of an original exchange contract in respect of which a |

|  | tender has been given, which has not been closed out, settled or invoiced back in accordance with the Regulations and the Procedures, and shall include, except where the context otherwise requires, a delivery contract |
|---|---|
| **"Open Offer for LSE Derivatives Markets"** | means the open offer contained in Regulation 77 in relation to Orderbook Matches |
| **"option"** | means a right to enter into a contract for the sale and purchase of a commodity for future delivery, a contract for differences, or a delivery contract |
| **"option contract"** | means a contract for an option on the terms of an exchange contract |
| **"original contract"** | means an original exchange contract, EquityClear Novation Transaction, Eligible EnClear Trade, or an OTC Transaction other than a Repo Trade, Bond Trade or GC Trade |
| **"original exchange contract"** | means a contract including, where relevant, an option contract on the terms of an exchange contract which: |

(a)     has been entered into on a market or otherwise under or in accordance with Exchange Rules and subject to Exchange Rules of which particulars are to be presented to the Clearing House for registration in the name of members in accordance with Exchange Rules, the Regulations or the Procedures; or

(b)     by agreement with a Co-operating Clearing House is to be registered in the name of a Co-operating Clearing House in accordance with the terms of any agreement made with a Participating Exchange.

Where any such contract is for more than one lot there shall be deemed to be a separate contract in respect of each lot and the term "**original exchange contract**" shall be construed accordingly.    The term "**original exchange contract**" shall include a confirmed contract, except where the context otherwise requires.  For the avoidance of doubt, the term "**original exchange contract**" shall not include any ATP Match made pursuant to the rules of an Approved EquityClear Trading Platform

| **"OTC Contract"** | means a Contract entered into by the Clearing House with a Member on the relevant OTC Contract Terms, as prescribed by the Clearing House from time to time, in accordance with the Regulations and the Procedures and/or any agreement entered into with the Member |

| | |
|---|---|
| **"OTC Contract Terms"** | means the SwapClear Contract Terms in respect of SwapClear Contracts, the RepoClear Contract Terms in respect of RepoClear Contracts, the RepoClear SGC, the RepoClear Term £GC Contact Terms in respect of the RepoClear Term £GC Contact Contract Terms in respect of RepoClear SGC Contracts and the RepoClear €GC Contract Terms in respect of RepoClear €GC Contracts and the ForexClear Contract Terms in respect of ForexClear Contracts |
| **"OTC market"** | means any dealings in an investment (as defined in section 22(1) and Schedule 2 Part II of the Financial Services and Markets Act 2000) which are entered into otherwise than on or subject to the rules of an Exchange |
| **"OTC Service"** | means a service provided by the Clearing House for the clearing of a category of OTC Contract |
| **"OTC Transaction"** | means a transaction being a SwapClear Transaction, RepoClear Transaction, RepoClear GC Transaction, Repo Trade, Bond Trade or GC Trade, or ForexClear Transaction |
| **"Own Resources Provision"** | means Article 35 of Commission Delegated Regulation (EU) No 153/2013 of 19 December 2012 supplementing Regulation (EU) No 648/2012 of the European Parliament and of the Council with regard to regulatory technical standards on requirements for central counterparties or any law, regulation, rule, official directive or guideline (having the force of law) which replaces, supplements, modifies, amends or varies such provision |
| **"Portfolios"** | has the meaning assigned to it in the Default Rules |
| **"Porting Window"** | has the meaning assigned to it in the Client Clearing Annex to the Default Rules |
| **"Porting Window Reduction"** | has the meaning assigned to it in the Client Clearing Annex to the Default Rules |
| **"Post-Compression Contracts"** | means the Post-Multilateral Compression Contracts and/or any replacement SwapClear Contracts referred to in Regulation 56 |
| **"Post-Multilateral Compression Contracts"** | means, in relation to a Compression Proposal, the SwapClear Contracts registered as a result of Multilateral Compression in accordance with such Compression Proposal |

| | |
|---|---|
| **"premium"** | means the consideration for the selling of an option payable by the buyer in accordance with these Regulations and the Procedures |
| **"Price"** | means in the case of: |

    (a)    a contract on the terms of an exchange contract which is to be performed by delivery of a commodity, the consideration to be paid by the buyer in cash in the currency prescribed by the terms of the exchange contract, and in the case of an exchange contract which is a contract for differences, the valuation quoted as a price under its terms: or

    (b)    an OTC Contract, the price calculated by the Clearing House in accordance with the Regulations and the Procedures; or

    (c)    an EquityClear Contract, the consideration to be paid by the buyer in cash in the currency as set out in the ATP Match or EquityClear Novation Transaction information received by the Clearing House or its relevant approved agent; or

    (d)    an LCH EnClear Contract, the price calculated by the Clearing House in accordance with the Regulations and Procedures

| | |
|---|---|
| **"Procedures"** | means Section 1 (*Clearing Member, Non-Member Market Participant and Dealer Status*), Section 2B *RepoClear Service*) to Section 2J (*NLX Service*) and Sections 3 (*Financial Transactions*) to 8 (*Complaints*) of the Rulebook and the procedures for application for and regulation of membership of the Clearing House and in respect of SwapClear Dealers, RepoClear Dealers, and ForexClear Dealers respectively, for: |

<table>
<tr><td></td><td>(a)</td><td>application for admission to the Register of SwapClear Dealers and regulation of SwapClear Dealers admitted to the Register;</td></tr>
<tr><td></td><td>(b)</td><td>application for admission to the Register of RepoClear Dealers and regulation of RepoClear Dealers;</td></tr>
<tr><td></td><td>(c)</td><td>application for admission to the Register of ForexClear Dealers,</td></tr>
</table>

and shall also include FCM Procedures where the term "Procedures" is used in the Default Rules. For the avoidance of doubt, a reference to "Procedures" is not intended to refer to procedures provided for or required by any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or of any regulatory, self-regulatory or other authority or organisation

| | |
|---|---|
| **"Product"** | has the meaning assigned to it in the FCM Regulations |
| **"Product Specific Contract Terms and Eligibility Criteria Manual"** | means the Product Specific Contract Terms and Eligibility Criteria Manual as published on the Clearing House's website from time to time |
| **"prompt date"** | has, in respect of an exchange contract, the meaning ascribed to it in the Exchange Rules governing such contract |
| **"Proprietary Account"** | means an account opened within the Clearing House by a Clearing Member in respect of such Clearing Member's House Clearing Business |
| **"Protest"** | has the meaning given to it in Exchange Rules |
| **"Rate X" and Rate "Y"** | means, in relation to a SwapClear Transaction or a SwapClear Contract, the outstanding payment obligations of each party to the transaction, such that Rate X comprises the outstanding payment obligations of one party to the other and Rate Y comprises the outstanding payment obligations of the other party to the first party |
| **"Receiving Clearing Member"** | means a SwapClear Clearing Member or an FCM Clearing Member nominated by one or more SwapClear Clearing Client(s) to receive the transfer of Relevant SwapClear Contracts and, where applicable, the relevant Associated Collateral Balance(s) held in respect of such SwapClear Clearing Client(s) from a Carrying Clearing Member pursuant to Regulation 60 of these Regulations and in |

accordance with the Procedures. For the avoidance of doubt, (i) an entity that is a SwapClear Clearing Client may also be a Receiving Clearing Member (other than a Receiving Clearing Member that is an FCM Clearing Member), and (ii) a Receiving Clearing Member that is not an FCM Clearing Member may be nominated to receive a transfer of FCM SwapClear Contracts and associated Collateral attributable to an FCM Client from a Carrying Clearing Member that is an FCM Clearing Member pursuant to Regulation 13 of the FCM Regulations (capitalised terms used in this sub-paragraph (ii) having the meanings set out in the FCM Regulations)

**"Reference Currency Buyer"**    means in relation to ForexClear Contract that is a Non-Deliverable FX Transaction, the party specified as the 'Reference Currency Buyer' in the Economic Terms

**"Reference Currency Seller"**    means in relation to ForexClear Contract that is a Non-Deliverable FX Transaction, the party specified as the 'Reference Currency Seller' in the Economic Terms

**"Reference Price"**    means a price (howsoever called) by reference to which a Contract is settled to market, marked to market, settled or valued in accordance with the Regulations and Procedures

**"Register of ForexClear Dealers"**    means the register which lists ForexClear Dealers regarded by the Clearing House as for the time being eligible to submit contracts for registration as ForexClear Contracts by the Clearing House

**"Register of RepoClear Dealers"**    means the register which lists RepoClear Dealers regarded by the Clearing House as for the time being eligible to submit contracts for registration as RepoClear Contracts or RepoClear GC Contracts by the Clearing House or to deal through one or more Automated Trading Systems specified by the Clearing House in respect of each such RepoClear Dealer pursuant to which the Clearing House becomes a party to RepoClear Contracts or RepoClear GC Contracts, as the case may be, in accordance with the terms of the RepoClear Dealer Clearing Agreement and Regulation 19

**"Register of SwapClear Dealers"**    means the register which lists SwapClear Dealers regarded by the Clearing House as for the time being eligible to submit contracts for registration as SwapClear Contracts by the Clearing House

**"Registration Time"**    (i)    in respect of SwapClear Contracts shall have the meaning given in Regulation 55(e);

(ii)    in respect of Nodal Contracts and NLX Contracts shall have the meaning given in the Procedures; and

(iii)    in respect of RepoClear Contracts, RepoClear SGC

|   | Contracts, RepoClear Term £GC Contracts, EquityClear Contracts, LCH EnClear Contracts, LSE Derivatives Markets Cleared Exchange Contracts and ForexClear Contracts, shall have the meaning given in the Procedures, |
|---|---|
|   | in each case subject to Regulation 16(e) |
| **"Regulations"** | means the Clearing House's General Regulations which include the Default Rules, and Clearing House Settlement Finality Regulations, from time to time in force |
| **"Regulatory Body"** | means the Bank of England, the Secretary of State, the Prudential Regulation Authority, the Financial Conduct Authority or any other professional body designated under Part XX of the Financial Services and Markets Act 2000 or other body given regulatory powers under that Act, the Commodity Futures Trading Commission of the United States (CFTC) or any department, agency, office or tribunal of a nation or state or any other body or authority which exercises a regulatory or supervisory function under the laws of the United Kingdom or under any foreign law |
| **"Related Contract"** | means: (i) in relation to the SwapClear Service, a Related SwapClear Contract (as such term is defined in the Procedures); (ii) in relation to the RepoClear Service, a Related RepoClear Contract (as such term is defined in the Procedures); (iii) in relation to the ForexClear Service, a Related ForexClear Contract (as such term is defined in the Procedures); ; (iv) in relation to the EquityClear Service, a Related EquityClear Contract (as such term is defined in the Procedures); (v) in relation to the LCH EnClear Service, a Related LCH EnClear Contract (as such term is defined in the Procedures); (vi) in relation to the LSE Derivatives Markets Service, a Related LSE Derivatives Markets Cleared Exchange Contract (as such term is defined in the Procedures); (vii) in relation to the Nodal Service, a Related Nodal Contract (as such term is defined in the Procedures); and (viii) in relation to the NLX Service, a Related NLX Contract (as such term is defined in the Procedures) |
| **"Relevant Auction Contract"** | has the meaning given to the term in the Client Clearing Annex |
| **"Relevant Business"** | has the meaning as described in Default Rule 15(c) |
| **"Relevant Client Clearing Business"** | means the Client Clearing Business conducted by a particular Clearing Member in a particular Service |

| | |
|---|---|
| **"Relevant Contract"** | has the meaning assigned to it in the Client Clearing Annex |
| **"Relevant Default"** | has the meaning ascribed to it in Rule S2 of the SwapClear Default Fund Supplement, Rule F2 of the ForexClear Default Fund Supplement or Rule R2 of the RepoClear Default Fund Supplement, as applicable |
| **"Relevant SwapClear Contracts"** | means those SwapClear Contracts registered with a Carrying Clearing Member on behalf of one or more SwapClear Clearing Clients that are subject to a request to be transferred to a Receiving Clearing Member and includes, in the case of a transfer as described in sub-paragraph (ii) of the definition of "Receiving Clearing Member", FCM SwapClear Contracts |
| **"re-opening contract"** | means a contract arising pursuant to Regulation 30(b) or 30(c) |
| **"RepoClear Additional Payments Cap"** | means, in respect of a RCM on any date, an amount equal to the Clearing Member Current Collateral Balance of that RCM in connection with its RepoClear Business as at the date of the Default causing losses leading to an Insufficient Resources Determination (or, where such an Insufficient Resources Determination is made following concurrent Defaults, the date of the earliest Default) |
| **"RepoClear Amendment"** | has the meaning assigned to it in Rule R12 of the RepoClear Default Fund Supplement |
| **"RepoClear Business"** | means any transaction, obligation or liability arising out of any Fixed Income Contract |
| **"RepoClear Clearing Client"** | means, in respect of RepoClear Client Clearing Business, an Individual Segregated Account Clearing Client or an Omnibus Segregated Clearing Client |
| **"RepoClear Clearing House Business"** | means, a Fixed Income Contract entered into by a RepoClear Clearing Member with the Clearing House on a proprietary basis and for its own account |
| **"RepoClear Clearing Member" or "RCM"** | means a Member who is designated by the Clearing House as a RepoClear Clearing Member participating in any part of the RepoClear Service |
| **"RepoClear Client Clearing Business"** | means the provision of RepoClear Client Clearing Services by a RepoClear Clearing Member |

| | |
|---|---|
| **"RepoClear Client Clearing Service"** | means the entering into of RepoClear Contracts, RepoClear €GC Contracts, RepoClear GC Contracts, RepoClear SGC Contracts or RepoClear Term £GC Contracts by a RepoClear Clearing Member in respect of its Individual Segregated Account Clearing Clients and/or its Omnibus Segregated Clearing Clients |
| **"RepoClear Contract"** | means a Contract entered into by the Clearing House with a RepoClear Clearing Member on the RepoClear Contract Terms |
| **"RepoClear Contract Terms"** | means the Terms set out from time to time in the Product Specific Contract Terms and Eligibility Criteria Manual |
| **"RepoClear Contribution"** | means the amount of an RCM's Contribution determined in accordance with the RepoClear Default Fund Supplement and shall include any RepoClear Unfunded Contributions and any relevant Supplementary Contribution deposited and made by the RCM with the Clearing House |
| **"RepoClear Dealer"** | means a person admitted by the Clearing House to the Register of RepoClear Dealers and who has not been removed from the Register |
| **"RepoClear Dealer Clearing Agreement"** | means a written agreement, in the form and on the terms prescribed by the Clearing House, between a RepoClear Dealer, a RepoClear Clearing Member and the Clearing House which has the function, amongst other things, of setting out the terms on which the RepoClear Clearing Member agrees to clear RepoClear Transactions, RepoClear SGC Transactions, or RepoClear Term £GC Contracts RepoClear €GC Transactions, Repo Trades, Bond Trades, SGC Trades, Term £GC Trades and €GC Trades for the RepoClear Dealer |
| **"RepoClear Default"** | means any Default in respect of an RCM |
| **"RepoClear Default Fund Supplement"** | means the Supplement relating to the RepoClear Business |
| **"RepoClear Default Management Process"** | has the meaning assigned to it in the RepoClear DMP Annex in the Default Rules |
| **"RepoClear Default Management Process Completion Date"** | has the meaning assigned to it in the RepoClear DMP Annex in the Default Rules |
| **"RepoClear Default Period"** | has the meaning ascribed to it in Rule R2 of the RepoClear Default Fund Supplement |
| **"RepoClear Determination** | has the meaning assigned to it in Rule R2 of the RepoClear |

| | |
|---|---|
| **Date**" | Default Fund Supplement |
| "**RepoClear Eligibility Criteria**" | means with regard to RepoClear Transactions, the product criteria set out in the Product Specific Contract Terms and Eligibility Criteria Manual as published on the Clearing House's website from time to time |
| "**RepoClear Eligible Securities**" | means with regard to RepoClear Transactions, Bond Trades and Repo Trades securities of a type described in the Product Specific Contract Terms and Eligibility Criteria Manual |
| "**RepoClear Excess Loss**" | means the net sum or aggregate of net sums certified to be payable by a Defaulter by a Rule 19 Certificate in respect of RepoClear Business less (a) the proportion of the Capped Amount applicable to RepoClear Business under Rule 15(c) and (b) any sums then immediately payable in respect of RepoClear Business Default Losses owed by such Defaulter by any insurer or provider of analogous services under any policy of insurance or analogous instrument written in favour of the Clearing House |
| "**RepoClear €GC Contract**" | means a Contract entered into by the Clearing House with a RepoClear Clearing Member on the RepoClear €GC Contract Terms |
| "**RepoClear €GC Contract Terms**" | means the Terms set out from time to time in the Product Specific Contract Terms and Eligibility Criteria Manual |
| "**RepoClear €GC Transaction**" | means a contract, meeting the requirements of the Regulations and Procedures for registration as a RepoClear €GC Contract, details of which are presented to the Clearing House for registration in the name of RepoClear Clearing Members in accordance with the Regulations, Procedures and the terms of any agreement entered into between the Clearing House and each such RepoClear Clearing Member, and any RepoClear Dealer Clearing Agreement, as applicable |
| "**RepoClear GC Contract**" | means a RepoClear €GC Contract or a RepoClear SGC Contract or a RepoClear Term £GC Contract. |
| "**RepoClear GC Transaction**" | means a RepoClear €GC Transaction or a RepoClear SGC Transaction or a RepoClear Term £GC |
| "**RepoClear Loss Distribution Process**" | has the meaning assigned to it in Rule R9 of the RepoClear Default Fund Supplement |
| "**RepoClear Open Offer Eligibility Criteria**" | means with regard to Bond Trades, Repo Trades and GC Trades, the requirements set out in paragraphs (i) to (vii) inclusive of Regulation 63(c) |

| | |
|---|---|
| "**RepoClear Participants**" | means RepoClear Clearing Members and RepoClear Dealers and "RepoClear Participant" means any of them |
| "**RepoClear Regulations**" | means those Regulations which apply to Fixed Income Contracts as specified in Regulation 61 |
| "**RepoClear Segregated Fund Amount**" | means the amount as determined in accordance with Rule R2 and R3 of the RepoClear Default Fund Supplement |
| "**RepoClear Service**" | the service provided by the Clearing House under the RepoClear Regulations |
| "**RepoClear SGC Contract**" | means a Contract entered into by the Clearing House with a RepoClear Clearing Member on the RepoClear SGC Contract Terms |
| "**RepoClear SGC Transaction**" | means a contract, meeting the requirements of the Regulations and Procedures for registration as a RepoClear SGC Contract, details of which are presented to the Clearing House for registration in the name of RepoClear Clearing Members in accordance with the Regulations, Procedures and the terms of any agreement entered into between the Clearing House and each such RepoClear Clearing Member, and any RepoClear Dealer Clearing Agreement, as applicable |
| "**RepoClear Term £GC Contract**" | means a Contract entered into by the Clearing House with a RepoClear Clearing Member on the RepoClear Term £GC Contract Terms |
| "**RepoClear Term £GC Transaction**" | means a contract, meeting the requirements of the Regulations and Procedures for registration as a RepoClear Term £GC Contract, details of which are presented to the Clearing House for registration in the name of RepoClear Clearing Members in accordance with the Regulations, Procedures and the terms of any agreement entered into between the Clearing House and each such RepoClear Clearing Member, and any RepoClear Dealer Clearing Agreement, as applicable |
| "**RepoClear Transaction**" | means a contract, meeting the requirements of the Regulations and Procedures for registration as a RepoClear Contract, details of which are presented to the Clearing House for registration in the name of RepoClear Clearing Members in accordance with the Regulations, Procedures and the terms of any agreement entered into between the Clearing House and each such RepoClear Clearing Member, and any RepoClear Dealer Clearing Agreement, as applicable.  A "**RepoClear Repo Transaction**" is such a contract for the trade of a repo; a "**RepoClear Bond Transaction**" is such a contract for the trade of bond/s |
| "**RepoClear Unfunded** | has the meaning assigned to it in Rule R8 of the RepoClear |

| | |
|---|---|
| **Contribution**" | Default Fund Supplement |
| "**RepoClear Unfunded Contribution Notice**" | has the meaning assigned to it in Rule R8 of the RepoClear Default Fund Supplement |
| "**Reported Trade**" | means a trade, other than a trade resulting in an LSE Derivatives Markets Orderbook Match, which is reported to LSE for registration with the Clearing House in accordance with Exchange Rules or the terms of any arrangements entered into between LSE and a Co-operating Exchange |
| "**Repo Trade**" | means a trading activity in which a RepoClear Participant ("**the First Participant**") offers to sell (or buy) RepoClear Eligible Securities, and another RepoClear Participant ("**the Second Participant**") offers to buy (or sell, as the case may be) those securities, on condition that, at the end of a specified period of time, the Second Participant sells (or buys, as the case may be) equivalent securities and the First Participant buys (or sells, as the case may be) those equivalent securities, and a trade subsequently ensues |
| "**Required Margin Amount**" | means: (i) in respect of any type of margin and any account other than an Omnibus Gross Segregated Account; and (ii) in respect of any type of margin and (a) each individual Omnibus Gross Segregated Clearing Client (other than a Combined Omnibus Gross Segregated Clearing Client) comprising an Omnibus Gross Segregated Account; or (b) in respect of Combined Omnibus Gross Segregated Clearing Clients, those Combined Omnibus Gross Segregated Clearing Clients together, the most recent amount of each type of margin which the Clearing House requires in respect of the relevant account or client(s) (as the case may be) as determined by the most recent Collateral balances and valuations shown on the Collateral Management System and notified to the relevant Clearing Member by the Clearing House |
| "**Resignation Effective Date**" | means the date on which the termination of a Resigning Member's Clearing Member status in respect of a specific Service becomes effective, as specified in Regulation 5(a) |
| "**Resigning Member**" | means at any time any Clearing Member: (i) who has given notice to the Clearing House for the purposes of resigning from a particular Service; or (ii) in respect of whom the Clearing House has given notice for the purposes of requiring such Clearing Member to resign from a particular Service |
| "**Retirement Effective Date**" | means the date on which the termination of a Retiring Member's Clearing Member status becomes effective, as |

specified in Regulation 5(e)

**"Retiring Member"**              means at any time any Clearing Member or, as the context may require, any former Clearing Member: (i) who has given notice to terminate its Clearing Member status to the Clearing House; or (ii) in respect of whom the Clearing House has terminated or given notice to terminate its Clearing Member status

**"Return Window"**              has the meaning assigned to it in the Client Clearing Annex to the Default Rules

**"Risk Neutralisation"**         has the meaning assigned to it in the Default Rules

**"Rule 19 Certificate"**         has the meaning assigned to it in Rule 19 of the Default Rules

**"Rulebook"**                    means the Regulations, Default Rules, Settlement Finality Regulations, Procedures, and such other rules of the Clearing House, as published and amended from time to time

**"Rules Change Committee"**      means the decision-making body that will oversee and implement all material alterations, amendments or extensions to the Rulebook or the Clearing Membership Agreement in accordance with its terms of reference

**"Rules of the Clearing House"** means the Rulebook of the Clearing House including the General Regulations, Default Rules, Settlement Finality Rules and Procedures

**"SCM Branch"**                  means a branch or part of a SwapClear Clearing Member, not being a different legal person from the SwapClear Clearing Member, which is authorized by the Clearing House to submit to the Clearing House, in the name of that SwapClear Clearing Member, SwapClear Transactions for registration, subject to these Regulations and the Procedures, by the Clearing House as SwapClear Contracts

**"Security Deed"**               means a security deed entered into by a Clearing Member in favour of its Clearing Clients in the form prescribed by the Clearing House from time to time and published on the Clearing House's website

**"segregated client"**          means a person whose monies are held by a Member separately from the Member's own monies with whom the Member has agreed (or in respect of which the Member is required) not to use such person's monies for the Member's own account

**"seller"**                      means a Member (or the Clearing House where the context so requires) who is a seller under the terms of an exchange

contract, a Cleared Exchange Contract, an LSE Derivatives Markets Cleared Exchange Contract, a RepoClear Transaction, a RepoClear GC Transaction, a RepoClear Contract, a RepoClear GC Contract, an EquityClear ATP Match, an EquityClear Novation Transaction, an EquityClear Contract, or an LCH EnClear Contract, as the case may be

**"Service"**

means any one of the services made available by the Clearing House:  (i) to an Exchange; (ii) under the SwapClear Regulations and under the FCM Regulations in respect of FCM SwapClear Contracts; (iii) under the RepoClear Regulations; (iv) under the EquityClear Regulations; (v) under the LCH EnClear Regulations and under the FCM Regulations in respect of FCM EnClear Contracts; (vi) under the LSE Derivatives Markets Regulations; (vii) under the Nodal Regulations; or (viii) under the ForexClear Regulations and under the FCM Regulations in respect of FCM ForexClear Contracts

**"settlement contract"**

means a contract between the Clearing House and a Member arising pursuant to Regulation 23(b) or Regulation 75(b)

**"settlement price"**

means one or more prices determined and issued by an Exchange in accordance with its Exchange Rules in respect of a delivery month or prompt date

In relation to a Contract other than an exchange contract, one or more prices determined in accordance with the Regulations or the Procedures.

**"SGC Trade"**

means a trading activity in which a RepoClear Participant ("**the First Participant**") offers to sell (or buy) an agreed value of securities comprised in an SGC Basket (as defined in the Procedures), to be allocated in accordance with the RepoClear Procedures applicable to RepoClear SGC Contracts, and another RepoClear Participant ("**the Second Participant**") offers to buy (or sell, as the case may be) the securities so allocated, on the conditions that:

(a) at the end of a specified period of time, the Second Participant sells (or buys, as the case may be) Equivalent Securities (as such term is used in the RepoClear SGC Contract Terms) and the First Participant buys (or sells, as the case may be) those Equivalent Securities; and

(b) the understanding of the parties is that their obligations during the term of the transaction will be represented by a series of overnight repurchase transactions affected through Euroclear UK and Ireland delivery by value (DBV) functionality, as

contemplated by the RepoClear Procedures applicable to RepoClear SGC Contracts,

and a trade subsequently ensues

**"SONIA"**                means the overnight rate as calculated by the Wholesale Market Broker's Association and appearing on the Reuters Screen SONIA Page (or, if such a rate is not available, such SONIA-linked rate as may be determined in light of market conditions at such time by the Clearing House and notified by the Clearing House to Clearing Members)

**"Special Member"**       means:

(a)    an organisation which has the necessary licences, authorisations and approvals to act as a clearing house or otherwise provide clearing services or an organisation which has the necessary licences, authorisations and approvals to administer a futures, options, stock or other market and also to act as a clearing house in respect of such market or markets; or

(b)    an organisation carrying on comparable activities, as the Clearing House may determine from time to time,

which has concluded a Clearing Membership Agreement with the Clearing House in such form as the parties may agree, pursuant to which such organisation clears specific types of Contract and agrees to be bound by these Regulations as a Member, to the extent and subject to any variations agreed in such Clearing Membership Agreement

**"Specified Exchange"**   means London Stock Exchange plc, The London Metal Exchange Limited, Nodal Exchange LLC, Hong Kong Mercantile Exchange Limited or any Exchange succeeding to any such person

**"Standard Terms"**       means that part of the SwapClear Contract Terms, the RepoClear Contract Terms, the LCH EnClear Contract Terms, or the ForexClear Contract Terms designated as Standard Terms by the Clearing House from time to time

**"strike price"**         means the price specified in an option contract which becomes the price of the commodity under a contract for the future sale and purchase of that commodity for future delivery or, as the case may be, under a delivery contract, in either case on the exercise of the option the subject of such option contract, in accordance with Exchange Rules, these Regulations and the Procedures

| | |
|---|---|
| **"Supplement"** | means a supplement specific to a particular Service and includes the Commodities Default Fund Supplement, the Equities Default Fund Supplement, the ForexClear Default Fund Supplement, the Listed Interest Rate Default Fund Supplement, the RepoClear Default Fund Supplement and the SwapClear Default Fund Supplement |
| **"Supplementary Contribution"** | means a supplementary Contribution of a Clearing Member, provided for under Rule C7(b), E7(b), F7(c), L7(b), R7(c) or S7(c) (as applicable), and referable to the relevant Service provided by the Clearing House |
| **"SwapClear Amendment"** | has meaning assigned to it in Rule S12 of the SwapClear Default Fund Supplement |
| **"SwapClear Business"** | means any transaction, obligation or liability arising out of any SwapClear Contract |
| **"SwapClear Clearing Client"** | means, in respect of SwapClear Client Clearing Business, an Individual Segregated Account Clearing Client or an Omnibus Segregated Clearing Client |
| **"SwapClear Clearing House Business"** | means SwapClear Contracts entered into by a SwapClear Clearing Member with the Clearing House on a proprietary basis and for its own account |
| **"SwapClear Clearing Member" or "SCM"** | means a Member who is designated by the Clearing House as a SwapClear Clearing Member eligible to clear SwapClear Contracts which includes, in the case of the Default Rules (including the SwapClear DMP Annex), the FCM Default Fund Agreement and any other document, rule or procedure as specified by the Clearing House from time to time, an FCM Clearing Member |
| **"SwapClear Client Clearing Business"** | means the provision of SwapClear Client Clearing Services by a SwapClear Clearing Member |
| **"SwapClear Client Clearing Services"** | means the entering into of SwapClear Contracts by a SwapClear Clearing Member in respect of its Individual Segregated Account Clearing Clients and/or its Omnibus Segregated Clearing Clients |
| **"SwapClear Contract"** | means a Contract entered into by the Clearing House with a SwapClear Clearing Member on the SwapClear Contract Terms which includes, in the case of the Default Rules (including the SwapClear DMP Annex but excluding, for the avoidance of doubt, the Client Clearing Annex), the FCM Default Fund Agreement and any other document, rule or procedure as specified by the Clearing House from time to time, an FCM SwapClear Contract |

| | |
|---|---|
| **"SwapClear Contract Terms"** | means the terms applicable to each SwapClear Contract as set out from time to time in the Product Specific Contract Terms and Eligibility Criteria Manual |
| **"SwapClear Contribution"** | means the amount of an SCM's Contribution determined in accordance with the SwapClear Default Fund Supplement and shall include any SwapClear Unfunded Contributions and any relevant Supplementary Contribution deposited and made by the SCM with the Clearing House |
| **"SwapClear Dealer Clearing Agreement"** | means a written agreement, in the form and on the terms prescribed by the Clearing House between a SwapClear Dealer, a SwapClear Clearing Member and the Clearing House |
| **"SwapClear Dealer" or "SD"** | means a person admitted by the Clearing House to the Register of SwapClear Dealers and who has not been removed from the Register |
| **"SwapClear Default Fund Supplement"** | means the Supplement relating to the SwapClear Business |
| **"SwapClear Default Management Process"** | has the meaning assigned to it in the SwapClear DMP Annex in the Default Rules |
| **"SwapClear Default Management Process Completion Date"** | has the meaning assigned to it in the SwapClear DMP Annex in the Default Rules |
| **"SwapClear Default Period"** | has the meaning ascribed to it in Rule S2 of the SwapClear Default Fund Supplement |
| **"SwapClear Determination Date"** | has the meaning assigned to it in Rule S2 of the SwapClear Default Fund Supplement |
| **"SwapClear DMG"** | has the meaning assigned to it in the SwapClear DMP Annex in the Default Rules |
| **"SwapClear DMP"** | has the meaning assigned to it in the Default Rules |
| **"SwapClear Eligibility Criteria"** | means the product eligibility criteria in respect of SwapClear Transactions as set out in the Product Specific Contract Terms and Eligibility Criteria Manual as published on the Clearing House's website from time to time |
| **"SwapClear Excess Loss"** | means the net sum or aggregate of net sums certified to be payable by a Defaulter by a Rule 19 Certificate in respect of SwapClear Business less (a) the proportion of the Capped Amount applicable to SwapClear Business under Rule 15(c) of the Default Rules and (b) any sums then immediately payable in respect of SwapClear Business |

|  | Default Losses owed by such Defaulter by any insurer or provider of analogous services under any policy of insurance or analogous instrument written in favour of the Clearing House |
|---|---|
| **"SwapClear Regulations"** | means those Regulations which apply to SwapClear Contracts as specified in Regulation 54 |
| **"SwapClear Segregated Fund Amount"** | means the amount as determined in accordance with Rule S2(b) of the SwapClear Default Fund Supplement |
| **"SwapClear Service"** | the service provided by the Clearing House under the SwapClear Regulations |
| **"SwapClear Tolerance"** | has the meaning assigned to it in Section 2C.3.2 of the Procedures |
| **"SwapClear Tolerance Utilisation"** | means, in respect of each SCM, the value of the SwapClear Tolerance utilised by that SCM at any particular time, as determined by the Clearing House in its sole discretion |
| **"SwapClear Transaction"** | means any transaction the details of which are presented to the Clearing House via an Approved Trade Source System for the purpose of having such transaction registered at the Clearing House as two SwapClear Contracts or one SwapClear Contract and one FCM SwapClear Contract (as the case may be), regardless of whether such transaction (a) is an existing swap transaction, (b) was entered into in anticipation of clearing, or (c) is contingent on clearing |
| **"SwapClear Unfunded Contribution"** | has the meaning assigned to it in Rule S8 of the SwapClear Default Fund Supplement |
| **"SwapClear Unfunded Contribution Notice"** | has the meaning assigned to it in Rule S8 of the SwapClear Default Fund Supplement |
| **"SwapClear Voluntary Payment"** | has the meaning assigned to it in Rule S10 of the SwapClear Default Fund Supplement |
| **"SwapClear Voluntary Payment Notice"** | has the meaning assigned to it in Rule S10 of the SwapClear Default Fund Supplement |
| **"SWORD"** | means the system used by the Clearing House for, *inter alia*, facilitating the issue, recording and electronic transfer of London Metal Exchange warrants |
| **"tender"** | means a notice given by or on behalf of a seller (or buyer where Exchange Rules so require) pursuant to Exchange Rules, these Regulations and the Procedures, of an intention to make (or take) delivery of a commodity |
| **"Term £GC Trade"** | means a trading activity in which a RepoClear Participant ("**the First Participant**") offers to sell (or buy) an agreed |

value of securities comprised in a Term £GC Basket (as defined in the Procedures), to be allocated in accordance with the RepoClear Procedures applicable to RepoClear Term £GC Contracts, and another RepoClear Participant ("**the Second Participan**t") offers to buy (or sell, as the case may be) the securities so allocated, on the conditions that:

a)      at the end of a specified period of time, the Second Participant sells (or buys, as the case may be) Equivalent Securities (as such term is used in the RepoClear Term £GC Contract Terms) and the First Participant buys (or sells, as the case may be) those Equivalent Securities; and

b)      the understanding of the parties is that their obligations during the term of the transaction will be effected through the CREST delivery by value (DBV) functionality of Euroclear UK and Ireland, as contemplated by the rules of Euroclear UK and Ireland and RepoClear Procedures applicable to RepoClear Term £GC Contracts, and a trade subsequently ensues

| | |
|---|---|
| **"Terminating SwapClear Contracts"** | means, in relation to any Compression Proposal, the SwapClear Contracts which will be terminated and replaced with Post-Multilateral Compression Contracts in accordance with Regulation 56 |
| **"Total Required Margin Amount"** | means the aggregate of the Required Margin Amount for all types of margin relating to (i) in respect of any account other than an Omnibus Gross Segregated Account, the relevant account after deducting any amounts pursuant to a Cross-ISA Client Excess Deduction (if applicable) or (ii) in respect of an Omnibus Gross Segregated Account, the relevant Omnibus Gross Segregated Clearing Client or Combined Omnibus Gross Segregated Clearing Clients together (as applicable) |
| **"trade correction procedures"** | means the procedures established for the purposes of a Link to facilitate the correction of errors contemplated by such procedures |

| | |
|---|---|
| **"Trading Platform Particulars"** | means the orders or other trade particulars submitted in respect of the sale or purchase of EquityClear Eligible Equities or EquityClear Eligible ccCFD(s), to an ATP in accordance with the relevant ATP Market Rules by, or on behalf of, an EquityClear Clearing Member or, in the case of an EquityClear Mixed Member Match, by, or on behalf of a member of a relevant Co-operating Clearing House |
| **"Trading System"** | means the Nodal Trading Facility or the NLX Trading Facility (as applicable) |
| **"Treasury Account"** | means any accounting process under which an amount due under a Treasury Contract from a member to the Clearing House is set off against any amount due from the Clearing House to that Member |
| **"Treasury Contract"** | means any contract, including a contract of deposit, entered into by the Clearing House with that Member for purposes of, in connection with or otherwise in the course of its treasury management activities |
| **"Unallocated Excess"** | has the meaning assigned to it in the FCM Regulations |
| **"Unallocated Excess Sub-Account"** | has the meaning assigned to it in the FCM Regulations |
| **"Undertaking to Pay or Deliver"** | has the meaning ascribed to such term in Regulation 11(c) |
| **"Unfunded Contribution"** | means the unfunded Contribution of a Clearing Member referable to a specific Service provided by the Clearing House |
| **"US Trading Venue"** | means a swap execution facility or designated contract market registered as such with the CFTC which the Clearing House has approved for the purposes of having transactions executed thereon submitted to the Clearing House for registration. For the avoidance of doubt, a US Trading Venue need not be an Approved Trade Source System |
| **"US Trading Venue Transaction"** | means, in respect of a Clearing Member, a transaction recorded in the Clearing House's systems (via applicable messaging from the relevant US Trading Venue, Approved Trade Source System or otherwise) as a transaction that was executed on a swap execution facility or designated contract market that, as at the time of such execution, was an Eligible US Trading Venue in respect of such Clearing Member |

"**variation margin**"                means an amount determined by the Clearing House in accordance with the Procedures in respect of original contracts or open contracts (as the case may be)

For the purpose of a ballot under clause 9.4(c) of the Clearing Membership Agreement, "**Quarter Day**" shall be construed as referring to a Determination Date.

Any reference in these Regulations or the Procedures to statutes or statutory instruments or provisions thereof shall be to such statutes or statutory instruments or provisions thereof as amended, modified or replaced from time to time.

Reference to writing contained in these Regulations or the Procedures shall include typing, printing, lithography, photography or any other mode of representing or reproducing words in a visible form.

Words importing the singular shall, where the context permits, include the plural and vice-versa.

Any reference to time contained in these Regulations or the Procedures shall, unless otherwise stated, be to London time.  Times are shown using the twenty four hour clock.

Any reference in these Regulations to a person or a party (howsoever described) shall include its successors.

Headings are used herein for ease of reference only.

# CHAPTER I – SCOPE

## REGULATION 2    OBLIGATIONS OF THE CLEARING HOUSE TO EACH MEMBER

(a)    The Clearing House shall perform the obligations referred to in paragraph (b) below so as to ensure the performance of all open contracts in accordance with these Regulations.

(b)    The obligations of the Clearing House to each Member shall be, as a counterparty to an open contract registered in the name of a Member in accordance with these Regulations and the Procedures, to perform its obligations under the terms of such open contract as principal to such Member in accordance with the provisions of these Regulations and the Procedures, but subject to the restrictions on the Clearing House's obligations and liabilities contained in these Regulations.

(c)    The performance by the Clearing House of its obligations referred to in this Regulation 2 shall always be subject to the provisions of these Regulations.  The benefit of the performance by the Clearing House of such obligations is conferred upon Members as principals and upon no other persons whatsoever.  It is not the intention of the Clearing House or its members to confer any benefit on or give any right to enforce any provisions of this Regulation or any of the other Regulations to any person who is not a member.  Rights of third parties to enforce any provision of any of these Regulations pursuant to the Contract (Rights of Third Parties) Act 1999 are expressly excluded.

## REGULATION 3   PERFORMANCE BY THE CLEARING HOUSE OF ITS OBLIGATIONS UNDER THE TERMS OF AN OPEN CONTRACT

The Clearing House's obligations under the terms of an open contract shall be performed (a) in the manner and form and by such day and time as may be prescribed in Exchange Rules (where applicable), these Regulations or the Procedures, and (b) in the case of an open contract to which the Clearing House is party with a Member which is a Co-operating Clearing House, in accordance with the terms of any agreement made with such Member, save that (i) where Exchange Rules specify a time by which the seller or the buyer shall perform its obligations under the terms of an exchange contract, the Clearing House shall be deemed to have complied with Exchange Rules if it performs its obligations under the terms of an open contract, as seller or buyer, as the case may be, promptly after such time, unless Exchange Rules expressly provide that performance must be made by the Clearing House by such time; and (ii) where the Economic Terms of an OTC Contract, or the EquityClear Contract Terms, or the LCH EnClear Contract Terms specify a time by which a party thereto shall perform its obligations, the Clearing House shall be deemed to have complied with the Economic Terms, or the EquityClear Contract Terms or the LCH EnClear Contract Terms, as applicable, if it performs its obligations promptly after such time.

# CHAPTER II – STATUS

## REGULATION 4    CLEARING MEMBER STATUS OF THE CLEARING HOUSE

(a)    Application for clearing member status of the Clearing House shall be made in accordance with the Procedures.  A Member's clearing member status of the Clearing House shall be governed by these Regulations, the Procedures and any Clearing Membership Agreement to which he is for the time being party.  Clearing member status does not provide or entitle a Member to any shareholding membership of LCH.Clearnet Limited or any shareholding or other membership of any other member of the LCH.Clearnet Group or any entitlement to membership of or participation in LCH.Clearnet SA, which has separate and distinct membership requirements.

(b)    The Clearing House shall determine which categories of Contract a Member is eligible to have registered in its name from time to time.  If, in its absolute discretion, the Clearing House determines that a Member no longer meets the relevant eligibility criteria for a particular category, or categories, of Contract the Clearing House may rescind that Member's eligibility to have Contracts of such category or categories registered in his name, but without prejudice to his right to have registered in his name, subject to the Regulations, the categories of Contracts in respect of which the Member does meet the eligibility criteria.  The Clearing House may from time to time publish a list of Members identifying the category or categories of Contracts which each Member is eligible to have registered in its name.

(c)    A Member shall be a principal to and not an agent in respect of any Contract registered in his name with the Clearing House.  In performing its obligations and exercising its rights under these Regulations, the Clearing House shall take no account of any right or interest which any person other than the Member may have in any Collateral transferred by such Member to the Clearing House.

**REGULATION 5    RESIGNING AND RETIRING MEMBERS**

(a)    A Clearing Member may resign from a particular Service by exercising its rights under Rules C7(e), E7(e), F3(e), L7(e), R3(d) or S3(e) of the Default Rules (each an "**Accelerated Termination Provision**"), or by giving no less than three months' written notice to the Clearing House by completing a Resignation Letter, a copy of which can be obtained from the Clearing House Membership Department. Resignation takes effect on the Resignation Effective Date, which is:

  (i)    where the Clearing Member is exercising its rights under, and has complied with the requirements of, the Accelerated Termination Provision for the relevant Service, the date determined in accordance with that Accelerated Termination Provision; or

  (ii)   otherwise, the later of: (A) the resignation date specified in the written notice to the Clearing House in relation to the relevant Service; and (B) the date on which all Contracts registered in the Resigning Member's name on the relevant Service have been closed out or transferred so as to ensure that there are no remaining open Contracts in respect of the relevant Service to which the Resigning Member is a party.

(b)    Upon the Clearing House being satisfied that the Resigning Member is not a Defaulter and that all obligations of the Resigning Member to which the relevant Collateral is capable of being applied in accordance with the Rulebook have been irrevocably paid or discharged in full and that no such obligations are capable of arising:

  (i)    the Clearing House shall: (A) in the case of cash Collateral transferred to the Clearing House for the purpose of collateralising the Resigning Member's obligations in respect of the relevant Service (other than any constituting Clearing Member Returned Collateral or Clearing Member Applied Collateral), transfer an amount of cash to the Resigning Member equal to such cash; and (B) in the case of non-cash Collateral transferred to the Clearing House for the purpose of collateralising the Resigning Member's obligations in respect of the relevant Service (other than any constituting Clearing Member Returned Collateral or Clearing Member Applied Collateral), transfer that same Collateral (or equivalent Collateral) to the Resigning Member; and

  (ii)   the Resigning Member shall, in the case of cash Collateral transferred to the Resigning Member for the purpose of collateralising the Clearing House's obligations in respect of the relevant Service (other than any constituting Clearing House Returned Collateral or Clearing House Applied Collateral), transfer an amount of cash to the Clearing House equal to such cash.

(c)    A Resigning Member other than a Defaulter who is resigning from a particular Service shall be liable in respect of Aggregate Excess Losses relating to any Default which arises in the relevant Service prior to the relevant Resignation Effective Date. In such circumstances, and as further provided in the Default Rules, the Resigning Member may be required to maintain some or all of its Contribution in connection with that Service until after the completion of the default management process related to the relevant Default, notwithstanding that the relevant Resignation Effective Date might occur prior to such time.

(d)     A Clearing Member must at all times be a Clearing Member in respect of at least one Service, and a Clearing Member may not utilise the resignation process set out in paragraphs (a) to (c) above so as to resign from all (or all remaining) Services in respect of which he is a Clearing Member. Where a Clearing Member wishes to stop being a Clearing Member in respect of all (or all remaining) Services, the retirement process set out in paragraphs (e) to (g) below should be used.

(e)     A Clearing Member may, in accordance with clause 8 of the Clearing Membership Agreement and as further described in the Procedures, retire from Clearing Member status altogether by giving no less than three months' written notice to the Clearing House. Retirement takes effect on the Retirement Effective Date, which is the later of: (i) the retirement date specified in the notice of retirement; and (ii) the date on which all Contracts registered in the Retiring Member's name have been closed out or transferred so as to ensure that there are no remaining open Contracts to which the Retiring Member is a party. A Clearing Member may also retire from Clearing Member status by exercising its rights under the Accelerated Termination Provision(s) applying to all Services in which it participates; in this case, the Retirement Effective Date is the date on which the Retiring Member's resignation from the last remaining Service becomes effective in accordance with the relevant Accelerated Termination Provision.

(f)     Upon the Clearing House being satisfied that the Retiring Member is not a Defaulter and that all obligations of the Retiring Member to which the relevant Collateral is capable of being applied in accordance with the Rulebook have been irrevocably paid or discharged in full and that no such obligations are capable of arising:

(i)     the Clearing House shall: (A) in the case of cash Collateral transferred to the Clearing House for the purpose of collateralising the Retiring Member's obligations (other than any constituting Clearing Member Returned Collateral or Clearing Member Applied Collateral), transfer an amount of cash to the Retiring Member equal to such cash; and (B) in the case of non-cash Collateral transferred to the Clearing House for the purpose of collateralising the Retiring Member's obligations (other than any constituting Clearing Member Returned Collateral or Clearing Member Applied Collateral), transfer that same Collateral  (or equivalent Collateral) to the Retiring Member; and

(ii)     the Retiring Member shall, in the case of cash Collateral transferred to the Retiring Member for the purpose of collateralising the Clearing House's obligations (other than any constituting Clearing House Returned Collateral or Clearing House Applied Collateral), transfer an amount of cash to the Clearing House equal to such cash.

(g)     A Retiring Member other than a Defaulter shall be liable in respect of Aggregate Excess Losses relating to any Default which arises prior to the relevant Retirement Effective Date. In such circumstances, and as further provided in the Default Rules, the Retiring Member may be required to maintain some or all of its Contribution until after the completion of the default management process related to the relevant Default, notwithstanding that the Retirement Effective Date might occur prior to such time.

(h)     Clearing Members should contact the Clearing House Membership Department (+44 (0)20 7426 7949; membership@lchclearnet.com) for further details on how to retire from Clearing Member status or how to resign from a particular Service.

(i)     The Clearing House may also, by giving no less than three months' written notice, require a Clearing Member to retire from Clearing Member status or to resign from one or more specific Services. Following the service of such a notice, the relevant Clearing Member will become a Retiring Member or a Resigning Member (as the case may be) and will be required to close out or transfer all Contracts registered in its name or all Contracts registered in its name in connection with the specified Service or Services, respectively, by the date specified in the relevant notice.

(j)     The arrangements for a Clearing Member who is a Defaulter to resign from a particular Service or retire from Clearing Member status and for the repayment of the Collateral and the Contributions provided by such Defaulter to the Clearing House are as set out in the Default Rules.

**REGULATION 6     CO-OPERATING CLEARING HOUSE STATUS**

(a)     A Co-operating Clearing House is a (i) a Co-operating Exchange or Associated Clearing House party to a Link Agreement with the Clearing House; or (ii) a clearing house party to an agreement with the Clearing House in respect of the co-clearing of an Exchange pursuant to which such organisation co-clears specific types of Contract.

(b)     Regulation 4(a) above, shall not apply to a Co-operating Clearing House.  Admission of a Co-operating Clearing House shall be governed by the policies of the Clearing House.  A Co-operating Clearing House is a Special Member.

(c)     A list of Co-operating Clearing Houses currently admitted and information regarding the Link Agreements is available on the Clearing House's website.

**REGULATION 7    NON-MEMBER MARKET PARTICIPANT  STATUS**

(a)    In accordance with this Regulation 7 and the Procedures, an NCP may submit instructions and present Exchange Transactions or EquityClear trades to the Clearing House on behalf of a Clearing Member.

(b)    A Clearing Member must, in accordance with the Procedures, notify the Clearing House of the appointment of an NCP as the Clearing Member's agent.

(c)    The Clearing House shall be entitled to rely on information and instructions received from an NCP. The Clearing Member remains fully responsible for meeting all obligations to the Clearing House in respect of all Contracts arising from such instructions delivered by or on behalf of an NCP.

(d)    The termination by the Clearing Member of its arrangement with an NCP shall be without prejudice to the Clearing Member's obligations arising from or in relation to any Exchange Transaction, EquityClear trades or Contracts arising prior to such termination.

**REGULATION 8    DEALER STATUS**

(a)    Application for admission to one or more Dealer Registers shall be made in accordance with these Regulations and the Procedures.  An applicant for admission to a Dealer Register must satisfy the criteria prescribed by the Clearing House from time to time in order to be admitted to the relevant Dealer Register(s).  A Dealer shall be subject to, and governed by, these Regulations, the Procedures and the Dealer Clearing Agreement(s) to which it is for the time being party.

(b)    A person admitted to a Dealer Register shall at all times satisfy the criteria prescribed from time to time by the Clearing House for admission to that Dealer Register and any rules prescribed from time to time by the Clearing House for Dealers in the relevant Service.

(c)    The Clearing House may suspend or remove a Dealer from one or more Dealer Registers in accordance with these Regulations, the Procedures and, if applicable, the Dealer Clearing Agreement(s) to which it is for the time being party.  Any person who has been suspended from a Dealer Register for a period of more than three months shall be removed from that Dealer Register and must make a new application if it wishes to be re-admitted to that Dealer Register.

(d)    A Dealer may request, by giving three months' written notice to the Clearing House, that its name be removed from one or more Dealer Registers.  At the end of such notice period, the Clearing House shall remove the Dealer from the relevant Dealer Register(s).

(e)    A SwapClear Dealer's suspension or removal from a Dealer Register under Regulation 8(c), shall not, where it is a Member, affect its membership of the Clearing House, nor, subject to any contrary determination by the Clearing House under Regulation 4, shall it affect the categories of Contract which such a person is eligible to have registered in its name.

(f)    Where a Clearing Member is also a Dealer it shall, automatically on the Clearing House serving a default notice in accordance with these Regulations, be removed from each relevant Dealer Register.

(g)    Without prejudice to paragraph (f) of this Regulation, the Clearing House shall suspend from each Dealer Register any Member whose Clearing Membership Agreement has been terminated or who is no longer eligible to have Contracts in the relevant Service registered in its name, and who is not, from the date of such termination or such ineligibility, party to a Dealer Clearing Agreement with another Clearing Member in the relevant Service, for such period as the Clearing House may determine.

(h)    The Clearing House may, for the purposes of this Regulation 8, prescribe different criteria to be satisfied by RepoClear Dealers in respect of Repo Trades, Bond Trades, RepoClear Transactions, RepoClear GC Transactions or GC Trades.

**REGULATION 9    SERVICE WITHDRAWAL**

(a)    If at any time the Clearing House decides to withdraw part or the whole of a Service it shall give not less than six months' notice in accordance with the Clearing Membership Agreement, the relevant Dealer Clearing Agreement and/or the Procedures (as applicable) to all Dealers and Clearing Members participating in that Service (for the purposes of this Regulation 9, the "affected Participants") of the date on which the service will be withdrawn (the "**Relevant Withdrawal Date**").  The accidental omission by the Clearing House to give notice under this Regulation to, or the non-receipt of notice under this Regulation by, one or more affected Participants shall not invalidate the Relevant Withdrawal Date. Where only a part of a Service is being withdrawn, notice need only be given to those Dealers and Clearing Members authorised or approved to participate in that part of the relevant Service. If the Clearing House becomes aware that it has omitted to give notice under this Regulation to any affected Participant prior to the Relevant Withdrawal Date it will immediately notify the affected Participant of the Relevant Withdrawal Date in accordance with the applicable notice provisions.

(b)    Without prejudice to its rights under the Default Rules, any notice given under paragraph (a) shall specify the nature of the service which the Clearing House will provide until the Relevant Withdrawal Date. Unless otherwise specified in the notice, and without prejudice to its rights under the Default Rules, the Clearing House will not, other than pursuant to action under the Default Rules, register a Contract in respect of the relevant Service, other than a closing-out contract, after notice to withdraw the service has been given under Regulation 9(a).

(c)    If at the Relevant Withdrawal Date (or, in respect of the ForexClear Service, the date falling five Business Days before the Relevant Withdrawal Date) a Clearing Member who is an affected Participant has not closed out all open Contracts in respect of the relevant Service registered in its name, the Clearing House shall (in the case of a Relevant Withdrawal Date in respect of the ForexClear Service, with five Business Days' notice to the affected ForexClear Clearing Member) at its sole discretion, be entitled to:

    (i)    liquidate any or all of such Contracts and require such contracts to be cash settled at a price determined by the Clearing House; and/or

    (ii)    postpone the Relevant Withdrawal Date until such time as the Clearing House determines.

(d)    Business Days for the purpose of this Regulation 9 means a day (other than a Saturday or Sunday) on which banks are open for general business in London.

## CHAPTER III – ACCOUNTS AND CLIENT CLEARING

## REGULATION 10   ACCOUNTS

(a)    Accounts (including, where requested, Client Accounts) shall be opened between each Member and the Clearing House in accordance with the Procedures.  The Clearing House shall offer segregated accounts (i) by maintaining separate records enabling it to distinguish in accounts the positions and assets held for the account of one Clearing Member from the positions and assets held for the account of any other Clearing Member; (ii) by allowing Clearing Members to provide Client Clearing Services to Clearing Clients on an Omnibus Segregated Account basis, by offering to keep separate records enabling each Clearing Member to distinguish in accounts with the Clearing House its own proprietary positions and assets from those held for the account of its Clearing Clients; (iii) by allowing Clearing Members to provide Client Clearing Services to Clearing Clients on an Individual Segregated Account basis, by offering to keep separate records enabling each Clearing Member to distinguish in accounts with the Clearing House positions and assets (including, for the avoidance of doubt, Client Excess) for the account of an individual Clearing Client from those held for the accounts of other Clearing Clients and those held by the Clearing Member; and (iv) by allowing Clearing Members to provide Client Clearing Services to Indirect Clearing Clients, by maintaining separate records and accounts enabling each Individual Segregated Account Clearing Client acting on behalf of Indirect Clearing Clients to distinguish in accounts held with the Clearing House the assets and positions of the Individual Segregated Account Clearing Client from those held for the accounts of the relevant Indirect Clearing Clients. Regulation 11(g) below provides information in respect of the different types of Client Accounts. For the avoidance of doubt, a Member shall be responsible for all obligations owed to the Clearing House in respect of every account opened in respect of such Member.

(b)    This paragraph applies to a Member's Proprietary Accounts.  In the event that more than one Proprietary Account is opened in respect of a Member, the Clearing House shall have the right to combine or consolidate the balances on any or all of the Member's Proprietary Accounts, and to set off any amount or amounts standing from time to time to the credit of any one or more of such accounts in or towards payment or satisfaction of all or any of the Member's liabilities to the Clearing House on any one or more of such accounts. Further detail in respect of the composition and operation of Proprietary Accounts is set out in the Procedures Section 3 (*Financial Transactions*), paragraph 1.1 (*Accounts and Ledgers*).

(c)    This paragraph applies to a Member's Client Accounts. Save in the case of a Cross-ISA Client Excess Deduction, the Clearing House shall not combine or consolidate the balances on or positions recorded in a Member's Client Accounts or set off any amount or amounts standing to the credit of any such Client Account in or towards payment or satisfaction of the Member's liabilities to the Clearing House on any other such Client Account or on any Proprietary Account. Further detail in respect of the composition and operation of Client Accounts is set out in the Procedures Section 3 (*Financial Transactions*), paragraph 1.1 (*Accounts and Ledgers*).

(d)    Amounts standing to the credit of a Member's Proprietary Accounts may be applied by the Clearing House towards the payment of any sum whatsoever due by the Member to the Clearing House whether or not arising under these Regulations, save

that, subject to Rule 8(d) of the Default Rules, no amounts standing to the credit of such accounts (other than House Excess) shall be applied in or towards payment or satisfaction of all or any of the Member's liabilities to the Clearing House on any one or more of the Member's Client Accounts.  Amounts standing to the credit of a Member's account relating to Contributions made under the Default Rules may be applied as provided for in the Default Rules.

(e)    Any rights of set-off, combination of accounts or appropriation which the Clearing House may have under these Regulations or otherwise shall apply whether or not accounts are denominated in the same currency.

(f)    Interest calculated on a basis determined from time to time by the Clearing House in accordance with the Procedures may at the Clearing House's discretion (but subject to the provisions of the Default Rules and to Regulation 66(d)) be paid, or, in the case of negative interest rates, be charged, on amounts standing to the credit of any of the Member's Proprietary Accounts and/or Client Accounts.

(g)    Debit balances due to the Clearing House on any account opened in respect of a Member are payable by such Member on demand and interest may at the Clearing House's discretion be charged on debit balances remaining unpaid (whether or not demand for payment is made) on a basis and at a rate determined from time to time by the Clearing House in accordance with the Procedures.

(h)    Subject to the provisions of the Default Rules, the Clearing House may at its absolute discretion alter the basis of calculating interest rates and such alteration shall be effective in respect of all current and future business on the date notified to Exchanges and to Members in accordance with the Procedures.

(i)    If a Member specifies a Termination Date under Regulation 45, the Member shall be entitled to set off any or all amounts (whether present or future, liquidated or unliquidated, actual or contingent; but excluding any claims in respect of the outstanding balance of a Clearing Member's Contribution under Default Rule 16(a)(i)) due as between the Clearing House and the Member, **provided**, **however**, **that** a Termination Amount or other sum payable in respect of an amount recorded in or referable to a kind of account may not be combined or set-off against any other amount unless such other amount is recorded in or referable to the same kind of account.  For the purposes of this Regulation 10(i), each Client Account of the Member shall constitute a separate "kind of account" but the Proprietary Accounts of the Member shall together constitute a single "kind of account".

(j)    Where a payment has been made to the Clearing House by a Member through the PPS, that payment will only be credited to the account of the Member with the Clearing House if it (i) is paid into an account of the Clearing House with an institution which is solvent, (ii) that institution has performed its concentration function (being the transfer of net funds from the institution to a central account in the name of the Clearing House) and (iii) the institution has made the relevant payments to other Members on the date when the payment was due to be received by the Clearing House.

**REGULATION 11   CLIENT CLEARING BUSINESS**

(a)    The Services are provided by the Clearing House to Clearing Members.  Any Clearing Member who wishes to offer Client Clearing Services in respect of a Service to its clients shall apply to the Clearing House and obtain the approval of the Clearing House before first offering such Client Clearing Services in respect of such Service. Any Client Clearing Services related services which are offered by a Clearing Member prior to obtaining the approval of the Clearing House shall not be treated as Client Clearing Services and the clients of the Clearing Member receiving such services shall not be treated as Clearing Clients. In accordance with the requirement under Article 39(7) of EMIR the Clearing House has published the Account Information Documents which together contain information regarding the levels of protection and account segregation which the Clearing House provides and the costs associated with such levels of segregation. The Account Information Documents are available on the Clearing House's website and are also made available to Clearing Members and Clearing Clients upon request.

(b)    Following the receipt of an application from a Clearing Member pursuant to paragraph (a) above, the Clearing House will confirm to a Clearing Member whether or not it is an Exempt Client Clearing Member.

(c)    Each Clearing Member which is designated by the Clearing House as an Exempt Client Clearing Member undertakes and agrees with the Clearing House on the following terms:

(i)    such Exempt Client Clearing Member shall pay or deliver (as applicable) to or to the order of the Clearing House each of the Account Balances relating to those of its Clearing Clients whose Relevant Contracts are transferred to a Backup Clearing Member in accordance with the Client Clearing Annex (each such obligation of the Exempt Client Clearing Member being accelerated so as to become immediately due and payable at the time of the relevant transfer);

(ii)    such Exempt Client Clearing Member shall pay or deliver (as applicable) to or to the order of the Clearing House each of the Client Clearing Entitlements relating to those of its Individual Segregated Account Clearing Clients, Affiliated Omnibus Segregated Clearing Clients and Identified Omnibus Segregated Clearing Clients whose Relevant Contracts are closed out and liquidated in accordance with the Client Clearing Annex (each such obligation of the Exempt Client Clearing Member being accelerated so as to become immediately due and payable at the time of the relevant close out and liquidation); and

(iii)    the obligations set out in sub-paragraphs (i) and (ii) of this paragraph (c) (the "**Undertaking to Pay and Deliver**") shall, for the avoidance of doubt, constitute Secured Obligations as defined in and provided for by the Deed of Charge between such Exempt Client Clearing Member and the Clearing House.

(d)    The approval of the offering and the provision of Client Clearing Services on an Individual Segregated Account basis, Affiliated Client Omnibus Segregated Account basis or Identified Client Omnibus Segregated Account basis by any Clearing

Member which is not such an Exempt Client Clearing Member will be conditional upon (i) the entering into by such Clearing Member of a Security Deed in respect of each of its Clearing Clients in relation to amounts due to it from the Clearing House; (ii) delivery to the Clearing House of evidence of the Clearing Member having entered into such Security Deed, such evidence to be in a form satisfactory to the Clearing House (in the Clearing House's sole discretion) and (iii) the making of any amendments to each such Security Deed as may be prescribed by the Clearing House from time to time.

(e)    In determining whether or not to grant approval to a Clearing Member in respect of the offering of Client Clearing Services, the Clearing House will consider factors including but not limited to the relevant concentration of risks relating to the provision (by the Clearing Member and or any other Clearing Member) of Client Clearing Services to Clients.  The Clearing House shall be entitled to require the delivery of information from a Clearing Member about the criteria and arrangements it adopts for the provision of Client Clearing Services to Clients, both at the time of the process for the approval of the offering by the relevant Clearing Member of Client Clearing Services and as deemed necessary by the Clearing House on an ongoing basis.

(f)    Subject to the provisions of these Regulations, Client Clearing Services may be provided by the relevant Clearing Member to its Clearing Clients on whatever terms the Clearing Member decides should apply **provided**, **however**, **that**:

  (i)    each Clearing Member shall, before providing the relevant Client Clearing Services to any client, ensure that it has entered into a Clearing Agreement with that client which gives the Clearing House enforceable rights against that client in the terms of the Clearing House Prescribed Language;

  (ii)    Contracts entered into by the Clearing Member in respect of Client Clearing Business and Collateral transferred to the Clearing House in respect of Client Clearing Business shall always be separately identified by the Clearing Member to the Clearing House and, subject to the provisions of Rule 8(d) of the Default Rules, shall never be combined with House Clearing Business or Collateral transferred to the Clearing House in respect of House Clearing Business;

  (iii)    in no circumstances will the client money protections provided for by the Client Assets sourcebook of the Handbook published by the Financial Conduct Authority be available in relation to accounts opened with the Clearing House in respect of Client Clearing Business;

  (iv)    each Clearing Member shall, before providing Client Clearing Services to any Clearing Client ensure that the Clearing Client has been provided with or has been directed to a copy of the Client Clearing End-User Notice; and

  (v)    each Clearing Member shall, before providing Client Clearing Services to any Individual Segregated Account Clearing Client, Affiliated Omnibus Segregated Clearing Client or Identified Omnibus Segregated Clearing Client, deliver to the Clearing House information regarding the identify of such

Clearing Client in accordance with the Clearing House's client identification requirements as published from time to time on the Clearing House's website.

(g)     Client Clearing Services in respect of a Service may, in accordance with the Procedures and subject to paragraph (i) below, be provided by a Clearing Member to its Clearing Clients, and Contracts may be entered into by a Clearing Member with the Clearing House in respect of such Clearing Clients, on:

    (i)     an Individual Segregated Account basis; or

    (ii)    an Omnibus Segregated Account basis with segregation, by the opening of:

        (A)    one or more Non-Identified Client Omnibus Net Segregated Accounts;

        (B)    one or more Identified Client Omnibus Net Segregated Accounts; and/or

        (C)    one or more Affiliated Client Omnibus Net Segregated Accounts; and/or

        (D)    one or more Omnibus Gross Segregated Accounts.

(h)     A Clearing Member may operate one or more Individual Segregated Accounts on behalf of an Individual Segregated Account Clearing Client in respect of one or more Service(s).

(i)     A Clearing Member may  operate one or more Omnibus Segregated Accounts on behalf of its Clearing Clients in respect of one or more Service(s).

(j)     Client Clearing Services may be provided by a Clearing Member to an Individual Segregated Clearing Client who is, in turn, providing indirect clearing services to its Indirect Clearing Clients.  In such circumstances, the following will apply:

    (i)     the Clearing Member will open a single Indirect Omnibus Segregated Account in respect of all Indirect Clearing Clients of an Individual Segregated Clearing Client who are receiving indirect clearing services in respect of a particular Service;

    (ii)    the Clearing Member shall, before providing the relevant Client Clearing Services to the relevant Individual Segregated Clearing Client, ensure that such client has entered into an agreement with each of its Indirect Clearing Clients which gives the Clearing House enforceable rights against those Indirect Clearing Clients in the terms of the Clearing House Prescribed Language and any such other provisions as shall be agreed from time to time between the Clearing House and Clearing Members;

    (iii)   the Clearing Member shall, before providing the relevant Client Clearing Services to the relevant Individual Segregated Clearing Client, ensure that each relevant Indirect Clearing Client has been provided with or has been directed to a copy of the Client Clearing End-User Notice; and

(iv)   the term "**Individual Segregated Account Clearing Client**" shall be construed to mean an Individual Segregated Account Clearing Client providing indirect clearing services in respect of a Service on behalf of its Indirect Clearing Clients; the term "**Individual Segregated Account**" shall be construed to mean such an account comprising a sub-account in the form of an Indirect Omnibus Segregated Account opened by a Clearing Member in respect of such an Individual Segregated Account Clearing Client; and the term "**Individual Segregated Account Balance**" shall be construed accordingly.

(k)   The fees and charges applied by the Clearing House to Clearing Members in respect of the provision, maintenance and administration of Individual Segregated Accounts and each type of Omnibus Segregated Account shall be as set out in the Clearing House's Account Information Documents.

(l)   The Total Required Margin Amount relating to each Client Account of a Clearing Member will be calculated by the Clearing House and the obligation to provide Collateral in respect of such margin obligations will be discharged by:

(i)   if and to the extent that there is Collateral available in the relevant Client Account, deduction by the Clearing House of amounts from such Collateral; and

(ii)   otherwise, transfer by the Clearing Member to the Clearing House of Collateral with a value which is at least sufficient to discharge the relevant requirement.

(m)   Where a Clearing Member transfers Collateral to the Clearing House for the credit of a Client Account the Clearing House will record the Collateral in the relevant Client Account (as instructed by the Clearing Member or any agent or representative acting on behalf of such Clearing Member) **provided that** the Clearing Member has informed the Clearing House of the Client Account to which such Collateral is to be credited.

(n)   The Clearing House shall be entitled to rely on information received from a Clearing Member or any agent or representative acting on behalf of such Clearing Member in relation to the clearing business undertaken by it (including such information regarding the proper segregation of positions and assets in such Clearing Member's Accounts).  No Clearing Member shall transfer to the Clearing House any monies or securities other than amounts provided for the purposes of, or in connection with, the provision of clearing services by the Clearing House.

(o)   Without prejudice to paragraph (n) above, a Clearing Member shall, as soon as reasonably practicable following a request from the Clearing House, provide the Clearing House with any information which the Clearing House may reasonably require in relation to each Relevant Client Clearing Business of that Clearing Member.

(p)   In addition to and without prejudice to any other provision in the Rulebook, in circumstances where an investment manager or similar third party agent acts on behalf of a client on behalf of whom a Clearing Member is providing Client Clearing

Services, the Clearing House shall be entitled to treat instructions received from the investment manager or similar third party as if they were instructions received from the relevant underlying client.

(q)     Where any formalities or registration requirements apply in respect of the Security Deed (and any other document which the Clearing House may from time to time determine), a Clearing Member is required to comply with such obligations or to procure by agreement that such requirements are to be complied with.  The Clearing House agrees to exercise its default powers in a manner consistent with the provisions of the Security Deed and related documentation, including by accepting instructions from the relevant Clearing Clients of a Clearing Member following the occurrence of a Default in respect of such Clearing Member.

(r)     Any reference in a deed of assignment between a SwapClear Clearing Member and the Clearing House to the "**Default Management Process Agreement Amendment Agreement**" or to the "**SwapClear Default Management Process Agreement**" shall be construed as a reference to the Client Clearing Annex.

# CHAPTER IV – CONTRACT FORMATION, REGISTRATION AND TRANSFER

## REGULATION 12   NOVATION

(a)    Upon registration of an original contract by the Clearing House, such contract shall be replaced by novation (without prejudice to the Clearing House's rights to effect further novation under paragraph (b) below) by two open contracts, one between the seller and the Clearing House as buyer, as principals to such contract, and one between the buyer and the Clearing House as seller, as principals to such contract. Each open contract shall be subject to the Regulations including the restrictions on the Clearing House's obligations and liabilities set out in the Regulations (including, without limit, Regulation 32 and Regulation 52) and otherwise on the same terms as the original contract replaced by such open contracts.

(b)    Upon the transfer of an open contract (including, for the avoidance of doubt, Relevant Contracts transferred to a Backup Clearing Member pursuant to the Client Clearing Annex) pursuant to these Regulations such open contract shall be discharged and replaced by novation by an open contract between the Member into whose name the contract was transferred and the Clearing House, as principals to such open contract. Such open contract shall be subject to the Regulations and otherwise on the same terms as the open contract which it replaced.

(c)    Upon the exercise of an option by or on behalf of a Member or, as the case may be, by the Clearing House or upon the deemed exercise of such option pursuant to these Regulations, the option contract shall be replaced by novation by an open contract on the terms specified in the option contract at the strike price or at some other price in accordance with the terms of such option contract.

**REGULATION 13 PRESENTATION OF PARTICULARS OF ORIGINAL EXCHANGE CONTRACTS AND CONFIRMATION OF ORIGINAL EXCHANGE CONTRACTS**

(a)     Particulars of every original exchange contract which is to be registered by the Clearing House in the name of a Member shall be presented to the Clearing House (i) by or on behalf of the Member who made the original exchange contract on the market or otherwise under Exchange Rules, (ii) in the case of a party to the original exchange contract who is not a Member, by or on behalf of the Member who acts as his clearing member or on whose instructions the original exchange contract was made or, (iii) if made on the instructions of a member of the market who is not a Member, by or on behalf of the Member who acts as the latter's clearing member. Presentation of particulars shall be made in such form and manner and by such times as are prescribed by the Procedures or, where the Clearing House has so agreed with an Exchange, as prescribed in Exchange Rules.

(b)     The obligation contained in paragraph (a) above to present particulars of original exchange contracts shall be in addition to and without prejudice to any obligation on any Member to present particulars of an original exchange contract pursuant to Regulation 28(h) or 28(i).

(c)     Every original exchange contract presented for registration in the name of a Member in accordance with paragraph (a) above shall be confirmed by or on behalf of such Member, in such manner and form and by such times as are prescribed by the Procedures or, where the Clearing House has so agreed with an Exchange, as prescribed in Exchange Rules.

(d)     Notwithstanding paragraph (c) above, an original exchange contract may subject to Exchange Rules and the Procedures be allocated by or on behalf of a Member to another Member or to a member of an Exchange who is not a Member and shall thus be confirmed pursuant to Regulation 14(a) instead of paragraph (c) above.

(e)     If an original exchange contract is not confirmed by or on behalf of a Member pursuant to paragraph (c) above, or is not allocated by or on behalf of such Member within the prescribed time pursuant to Regulation 14, the Clearing House may in accordance with the Procedures deem such contract as having been confirmed pursuant to paragraph (c) above.

(f)     Any changes to the prescribed methods, forms and times set out in the Procedures in respect of presentation of particulars of original exchange contracts and confirmation of such contracts shall be made by the Clearing House only after consultation with the relevant Exchange or Exchanges, save that the Clearing House may at its absolute discretion make such changes without such consultation where it deems it necessary in the circumstances then prevailing.

(g)     Confirmation of an original exchange contract by or on behalf of a Member pursuant to this Regulation 13 or Regulation 14 and the Procedures shall be effective immediately (unless otherwise specified in the Procedures) and shall constitute the consent of the Member to such contract being registered in his name in accordance with these Regulations.

## REGULATION 14   ALLOCATION OF ORIGINAL EXCHANGE CONTRACTS

(a)      Any Member proposing to allocate an original contract to another Member or to a member of an Exchange who is not a Member shall do so in such manner and form and by such time as may be prescribed by the Procedures.  Allocation of an original contract by or on behalf of a Member pursuant to the Procedures shall constitute confirmation of the original contract by such Member.

(b)      Unless it is intended that an original contract be allocated in accordance with the Procedures to another Member or to a member of an Exchange who is not a Member, any contract allocated to a Member or to a member of an Exchange who is not a Member shall be confirmed or, where the Procedures so prescribe, shall be deemed to have been confirmed to the Clearing House by or on behalf of such Member or, as the case may be, the Member who acts as the clearing member for such member of the Exchange, in such manner and form and by such time as may be prescribed by the Procedures.  If such contract is allocated on by or on behalf of such Member to another Member or to a member of an Exchange who is not a Member, such act of allocation shall constitute confirmation of the contract by such Member.

(c)      Where an original contract is allocated to a Member or to a member of an Exchange who is not a Member pursuant to paragraph (a) or (b) above and the Clearing House does not receive confirmation of such contract from that Member or the Member acting as clearing member for such member, as the case may be, within the relevant time prescribed by the Procedures, the Clearing House shall, subject to Regulation 16, register such contract in the name of the Member who sought to allocate the contract.

(d)      Notwithstanding paragraph (c) above, a Member may from time to time agree in writing with the Clearing House that he shall accept for registration in his name any original contract allocated to him in accordance with paragraphs (a) or (b) above and such Member shall be deemed to have confirmed such contract in accordance with the Procedures.

(e)      No original contract on the terms of an exchange contract may be allocated under this Regulation 14 to any Member who is not authorised under Exchange Rules to have original contracts on the terms of that exchange contract registered in his name.

(f)      Notwithstanding the provisions of the Procedures, the Clearing House may, without assigning any reason, make any allocation of an original contract subject to any conditions stipulated by it.

## REGULATION 15   DESIGNATION

A Member shall designate the account of the Member in which a Contract shall be registered in the manner and form and by the time prescribed by Exchange Rules or the Procedures.  If the Member fails to so designate an account, the Clearing House may, at its discretion and in accordance with the Procedures (and where it satisfied that it has appropriate information to make the relevant determination), determine in which account of the Member the Contract should be entered.

## REGULATION 16   REGISTRATION

(a)     The Clearing House shall not register an original exchange contract in the name of a Member unless such contract has been confirmed or deemed confirmed pursuant to Regulation 12, 14 or 27 by or on behalf of a Member as a buyer and a Member as a seller who thereby have consented to such contract being registered in his name.  For the avoidance of doubt, the same Member may act in a capacity of seller and buyer in respect of such registration of a contract.  The Clearing House shall register a contract in the name of a Member which is a Co-operating Clearing House in accordance with the terms of any agreement made with the Co-operating Clearing House and none of the following paragraphs shall apply in respect of a Member which is a Co-operating Clearing House.

(b)     Where the Procedures so provide the Clearing House may require the Members in whose names one or more contracts are to be registered to transfer Collateral to the Clearing House in respect of their initial and variation margin obligations as a condition of registration of such contract or contracts, and such Collateral shall be transferred to the Clearing House in accordance with Regulation 20 and, if applicable, the SwapClear Regulations, the RepoClear Regulations, the EquityClear Regulations, the LCH EnClear Regulations, the ForexClear Regulations and the LSE Derivatives Markets Regulations.

(c)     The Clearing House may decline to register a contract in the name of a Member where it considers such action advisable for its own protection or the protection of the relevant market.  The Clearing House may, without assigning any reason, make the registration of any contract subject to any conditions stipulated by the Clearing House including, without limitation, the transfer of sufficient Collateral by both Members in whose name any such contract is to be registered.

(d)     No original exchange contract for a commodity shall be registered in the name of a Member who is not entitled under Exchange Rules to have original exchange contracts for such commodity registered in his name.

(e)     The Clearing House shall be deemed to register in the name of a Member an original contract or RepoClear Transaction at the Registration Time in respect of the relevant type of Contract, provided that, in the case of a Contract registered by the Clearing House pursuant to Rule 6(a) of the Default Rules, the Registration Time shall be deemed to be the time chosen by the Clearing House whereupon this Regulation 16 shall take effect.

(f)     Without prejudice to the Clearing House's rights under paragraph (g) of this Regulation, a Clearing Member shall be bound by a Contract registered in its name pursuant to the presentation of particulars of an Exchange Transaction, an OTC Transaction, an Eligible EnClear Trade or an EquityClear Novation Transaction, as the case may be, by him or on his behalf, including: (i) in the case of a RepoClear Transaction or RepoClear GC Transaction, where such particulars are presented by a RepoClear Dealer with whom it is party to a RepoClear Dealer Clearing Agreement; (ii) in the case of a ForexClear Transaction, where such particulars are presented by a ForexClear Dealer with whom it is party to a FDC Agreement; (iii) in the case of an Eligible EnClear Trade, where such particulars are presented by an Approved Broker

or otherwise on the Clearing Member's behalf; and (iv) in the case of an EquityClear Novation Transaction, where such particulars are submitted by an NCP.

(g) For the avoidance of doubt, any transaction of which details have been submitted by or on behalf of a Clearing Member for registration as a Contract which is not so registered shall remain in effect between the original parties to that transaction or be terminated, as the case may be, according to any terms agreed between the parties thereto (directly or by virtue of the application of the relevant ATP Market Rules or of their common participation or membership of the relevant Trading System through or on which the transaction was executed or by which it was registered) but subject to the relevant Exchange Rules and the Clearing House (and each other member of the LCH.Clearnet Group and their respective officers, employees and agents) shall have no obligations or liability in relation thereto.

(h) Without prejudice to the Clearing House's rights under Regulation 16(i), an original exchange contract, Eligible EnClear Trade or OTC Transaction submitted for registration must, in order that it be registered as the relevant type of Contract, meet the eligibility criteria and other requirements as prescribed on the Clearing House's website for the relevant type of Contract, at the time when the details (as prescribed from time to time by the Clearing House) of the original exchange contract, Eligible EnClear Trade or OTC Transaction are presented to the Clearing House and at all times thereafter up to and including the Registration Time. A Clearing Member may not revoke, cancel or transfer an Exchange Transaction, Eligible EnClear Trade or OTC Transaction that has been submitted for registration unless permitted (as applicable) by the relevant Exchange Rules and by the relevant Regulations or the relevant Procedures or with the consent of the Clearing House. A Clearing Member shall not allow the submission for registration of a transaction which is not a relevant Exchange Transaction, Eligible EnClear Trade or OTC Transaction.

(i) If at any time after registration of a Contract the Clearing House determines that the corresponding transaction of which details were submitted for registration did not, at the Registration Time, meet the eligibility criteria for registration as a Contract, the Clearing House shall, as soon as practicable thereafter, set aside each such Contract. Upon the purported Contract being set aside under this Regulation 16, the particulars of the transaction in question shall be deemed never to have been submitted to the Clearing House (and such transaction shall remain in effect between the original parties thereto or be terminated, as the case may be, in accordance with any terms agreed between them, whether directly or (where applicable) by virtue of the application of the relevant ATP Market Rules or Trading System rules). Any payment made under, or in respect of, a Contract set aside under this paragraph shall be repayable to the person who made the payment and any securities delivered under such Contract shall be re-delivered to the person who made the delivery of such securities. Without prejudice to Regulation 52 and its obligations under this Regulation 16, the Clearing House (and each other member of the LCH.Clearnet Group and their respective officers, employees and agents) shall have no liability whatsoever to any person arising out of or in respect of the registration by it in error or otherwise of a contract as a Contract in respect of a transaction which did not meet the eligibility criteria at the Registration Time to enable it to be registered as the relevant type of Contract.

(j)      An Exchange Transaction, EquityClear Novation Transaction, Eligible EnClear Trade or OTC Transaction presented for registration to, and accepted by, the Clearing House shall be registered by the Clearing House as two Contracts, one between the First Clearing Member as the seller, Reference Currency Seller or party paying a Fixed Price (as the case may be) and the Clearing House as the buyer, Reference Currency Buyer or party paying a Floating Price (as the case may be) as principals to such contract, and the other between the Clearing House as the seller, Reference Currency Seller or party paying a Fixed Price (as the case may be) and the Second Clearing Member as the buyer, Reference Currency Buyer or party paying a Floating Price (as the case may be) as principals to such contract.  For the purposes of this Regulation 16:

(i)      "First Clearing Member" is a Clearing Member who:

(A)      was, before registration of the Contract party to the corresponding Exchange Transaction, Eligible EnClear Trade or OTC Transaction as the seller or the party paying a Fixed Price (as the case may be), or, if appropriate, who has Accepted such Eligible EnClear Trade in accordance with the relevant Procedures;

(B)      in the case of a Repo Transaction, has a subsisting RepoClear Dealer Clearing Arrangement with a RepoClear Dealer who was party to the corresponding Repo Transaction as the seller;

(C)      in the case of a ForexClear Transaction, was, before registration of the ForexClear Contract, party to the corresponding ForexClear Transaction as the Reference Currency Seller, or who has a subsisting FDC Agreement with the ForexClear Dealer who was party to the corresponding ForexClear Transaction as the Reference Currency Seller; or

(D)      was, before registration of the EquityClear Contract identified in the particulars of the corresponding EquityClear Novation Transaction as, or as acting as clearing member for, the seller; and

(ii)     "Second Clearing Member" is a Clearing Member (who may be the same as the First Clearing Member) who:

(A)      was, before registration of the Contract, party to the corresponding Exchange Transaction, Eligible EnClear Trade or OTC Transaction as the buyer or the party paying a Floating Price (as the case may be), or, if appropriate, who has Accepted such Eligible EnClear Trade in accordance with the relevant Procedures;

(B)      in the case of a Repo Transaction, has a subsisting RepoClear Dealer Clearing Arrangement with a RepoClear Dealer who was party to the corresponding Repo Transaction as the buyer;

(C)      in the case of a ForexClear Transaction, was, before registration of the ForexClear Contract, party to the corresponding ForexClear Transaction as the Reference Currency Buyer, or who has a subsisting

FDC Agreement with the ForexClear Dealer who was party to the corresponding ForexClear Transaction as the Reference Currency Buyer; or

(D)     was, before registration of the EquityClear Contract identified in the particulars of the corresponding EquityClear Novation Transaction as, or as acting as clearing member for, the buyer.

(iii)    In the case of an EquityClear Novation Transaction which is an EquityClear Mixed Member Match, Regulation 69(c) applies.

(iv)    For the purposes of this Regulation 16(j), "Accepted" shall mean that the relevant LCH EnClear Clearing Member has agreed, by such means as may be prescribed from time to time by the Procedures, to become counterparty with the Clearing House to such LCH EnClear Contract.

(k)     With effect from registration of an Exchange Transaction, EquityClear Novation Transaction, Eligible EnClear Trade or OTC Transaction as two Contracts under paragraph (i) of this Regulation 16:

(i)     the parties to the corresponding Eligible EnClear Trade (to the extent that they are bound by these Regulations), Exchange Transaction, EquityClear Novation Transaction or OTC Transaction shall be released and discharged from all rights and obligations thereunder which fall due for performance on or after the Registration Time; where the parties to the corresponding Eligible EnClear Trade are not bound by these Regulations, such trade shall be dealt with according to the terms agreed by the parties to that trade;

(ii)    each Contract registered under paragraph (j) of this Regulation 16 shall be governed by the relevant Contract Terms applicable to that Contract and the General Regulations and Procedures;

(iii)    subject always to sub-paragraph (ii) above, the First Clearing Member shall have the same rights against, and owe the same obligations to, the Clearing House under the respective Contract to which it is a party as the seller, Reference Currency Seller or party paying a Fixed Price (or the person identified as acting as clearing member for that person) had and owed in respect of its counterparty under the corresponding Exchange Transaction, Eligible EnClear Trade, EquityClear Novation Transaction or OTC Transaction; and

(iv)    subject always to sub-paragraph (ii) above,  the Second Clearing Member shall have the same rights against, and owe the same obligations to, the Clearing House under the respective Contract to which it is a party as the buyer, Reference Currency Buyer or party paying a Floating Price (or the person identified as acting as clearing member for that person) had and owed in respect of its counterparty under the corresponding Exchange Transaction, Eligible EnClear Trade, EquityClear Novation Transaction or OTC Transaction.

In sub-paragraphs (iii) and (iv) above, a reference to the "same" rights or obligations is a reference to rights or obligations, falling due for exercise or performance after the Registration Time, and which are the same in nature and character as the rights or obligations arising from the corresponding Exchange Transaction or the Economic Terms of the corresponding OTC Transaction, Eligible EnClear Trade or EquityClear Novation Transaction (it being assumed, for this purpose, that such Exchange Transaction, EquityClear Novation Transaction, Eligible EnClear Trade or OTC Transaction was a legal, valid, binding and enforceable obligation of the parties thereto and, in the case of an EquityClear Novation Transaction, Eligible EnClear Trade or an OTC Transaction, that the Economic Terms thereof were as presented to the Clearing House for registration), notwithstanding the change in the person entitled to them or obliged to perform them and subject to any changes thereto as a result of the operation of the Standard Terms or of the EquityClear Contract Terms, as applicable.

(l)     If an Exchange Transaction, Eligible EnClear Trade, EquityClear Novation Transaction or OTC Transaction is revoked, avoided or otherwise declared invalid for any reason after particulars of it have been accepted by the Clearing House for registration that revocation, avoidance or invalidity shall not affect any Contract unless otherwise determined by the Clearing House.

(m)     In the case of a Repo Transaction, the Clearing House may, with the agreement of RepoClear Clearing Members party to corresponding RepoClear Contracts or RepoClear GC Contracts, set aside or take such other steps with respect to such Contracts on such terms as may be agreed if either or both RepoClear Clearing Members consider that they have entered into a Contract in error or have agreed to certain terms of the Contract in error.

**REGULATION 17   TRADING INFORMATION**

The Clearing House shall make available to a Member in the manner and by the time prescribed by the Procedures, such details of original contracts presented for registration in the name of that Member, open contracts registered in that Member's name, and Collateral transferred to the Clearing House by that Member as may be prescribed in the Procedures.

**REGULATION 18   TRANSFER**

(a)     If a Member wishes to transfer an open contract from his name to be registered in the name of another Member, the Clearing House may, with the agreement of both Members and subject to such conditions as it may stipulate, at its absolute discretion and, without prejudice to any power of the Clearing House under the Default Rules, and where relevant with the consent of the Exchange whose Exchange Rules form part of the terms of such open contract, transfer the registration of such open contract into the name of the Member agreeing to have such contract registered in his name, whereupon Regulation 12(b) (Novation) shall take effect.

(b)     No open contract on the terms of an exchange contract may be transferred pursuant to paragraph (a) above to any Member who is not entitled under Exchange Rules to have open contracts on the terms of that exchange contract registered in his name.  No open contract may be transferred pursuant to paragraph (a) above to any Member who is not a Member in respect of the relevant Service.

(c)     Rights under an open contract shall not be capable of assignment by a Member.  Any such purported assignment by a Member shall be void.

**REGULATION 19    TRANSACTIONS    ENTERED    INTO    THROUGH    AN AUTOMATED TRADING SYSTEM OR PLATFORM**

(a)     This Regulation 19 applies in respect of: (i) RepoClear Contracts or RepoClear GC Contracts entered into by the Clearing House under Regulation 63(d); and (ii) EquityClear Contracts entered into by the Clearing House under Regulation 68(e).

(b)     Any Contract to which this Regulation applies which is entered into by the Clearing House with Clearing Members shall be registered in the name of each relevant Clearing Member following receipt of the details required by the Clearing House of such Contracts from the operator of the relevant ATS, the operator of the relevant ATP, or the relevant approved agent (in accordance with the arrangements made between the Clearing House and such ATS, ATP or approved agent from time to time), as applicable.

(c)     If the details required by the Clearing House in respect of a Contract to which this Regulation 19 applies are not provided to the Clearing House by the operator of the relevant ATS, the operator of the relevant ATP or the relevant approved agent, as applicable, in accordance with the Clearing House's requirements, by the time prescribed by the Clearing House from time to time, or the Clearing House is not able to access such details, the Clearing House may decree that neither the Clearing House nor the Clearing Member party thereto shall be obliged to perform their respective obligations under the Contracts in question. If the Clearing House so decrees, such Contracts shall be performed in accordance with any directions given by the Clearing House which may, without limitation, impose a change to the terms of an affected Contract. Any directions given by the Clearing House under this paragraph (c) shall be binding on all affected Clearing Members or Dealers.

(d)     Without prejudice to Regulation 52, the Clearing House (and each other member of the LCH.Clearnet Group and their respective officers, employees and agents) shall not be liable to any Clearing Member or anyone else for any loss, cost, damage or expense of whatsoever nature suffered or incurred by it or them in respect of any Contract to which this Regulation 19 applies if the Clearing House does not receive the relevant details referred to in paragraph (c) by the time referred to in such paragraph (c) in respect of such Contract.

(e)     If the Clearing House or, where relevant, its approved agent receives details:

        (i)     of a trade from an ATS specified by an ATS Participant by notice given under Regulation 63(b) and which notice has not been withdrawn and the details of the trade purportedly meet the relevant RepoClear Open Offer Eligibility Criteria set out in Regulation 63(c); or

        (ii)    of an EquityClear (Equities) ATP Match or of an EquityClear (ccCFD) ATP Match in respect of an EquityClear Clearing Member from an ATP specified by the EquityClear Clearing Member by notice given under Regulation 68(b) and which has not been withdrawn in respect of that ATP, and the details of the EquityClear (Equities) ATP Match or EquityClear (ccCFD) ATP Match purportedly meet the relevant Eligibility Criteria set out in Regulation 68(c),

the ATS Participant, the RepoClear Clearing Member of the relevant ATS Participant, or the EquityClear Clearing Member (as the case may be) shall be bound by any RepoClear Contract, RepoClear GC Contract, EquityClear (Equities) Contract or EquityClear (ccCFD) Contract registered in his name in respect of such trade or match and the terms of such registered Contract shall be as set out in Regulation 63(b) or Regulation 68(b), as the case may be.

(f)     Without prejudice to paragraph (e), the Clearing House may with the agreement of the Clearing Members party to corresponding RepoClear Contracts, RepoClear GC Contracts, EquityClear (Equities) Contracts or EquityClear (ccCFD) Contract set aside or take such other steps with respect to such contracts on such terms as may be agreed if either or both Clearing Members consider that they have entered into a contract in error or that certain terms of the contract have been agreed by them or their respective ATS Participants in error.

## CHAPTER V – COLLATERAL AND VALUATIONS

## REGULATION 20   MARGIN AND COLLATERAL

(a)     The Clearing House may in accordance with the Procedures require a Member to transfer Collateral to the Clearing House, and to maintain a Clearing Member Current Collateral Balance, in an amount or of a value determined by the Clearing House, as security for the performance by such Member of its obligations to the Clearing House in respect of all contracts from time to time to be registered in his name as open contracts pursuant to these Regulations.  The obligation upon a Member to transfer Collateral to the Clearing House pursuant to this paragraph shall be in addition to any other obligation of the Member to transfer Collateral to the Clearing House pursuant to these Regulations.

(b)     The Clearing House may in accordance with the Procedures require a Member to transfer Collateral to the Clearing House in respect of initial or variation margin in circumstances prescribed by the Regulations and the Procedures in respect of any open contract registered in the Member's name, such Collateral to be transferred by the Member in such form and manner and by such time or times as may be prescribed by the Procedures.

(c)     If insufficient Collateral is standing to the credit of a Member's account, or if any assets or monies transferred by a Member to the Clearing House as Collateral are determined by the Clearing House in accordance with the Procedures to be insufficient, such Collateral as the Member is required to transfer to the Clearing House pursuant to paragraph (b) above or Regulation 16 or the SwapClear Regulations, the RepoClear Regulations, the EquityClear Regulations, the LCH EnClear Regulations, or LCH EnClear Regulations, the LSE Derivatives Markets Regulations or the ForexClear Regulations, as applicable, shall be transferred to the Clearing House by the Member in such form and manner and by such time or times as may be prescribed by the Procedures.

(d)

(i)     The Clearing House shall be entitled to assume that all securities and other assets transferred by a Member to the Clearing House as Collateral pursuant to these Regulations or under the terms of any agreement made with the Member are the sole legal and beneficial property of the Member or are transferred for the purposes of these Regulations with the legal and beneficial owner's unconditional consent and free of such owner's interest.  A Member may not transfer securities or other assets to the Clearing House as Collateral otherwise than in conformity to this paragraph.  It shall be accepted by every person dealing on the terms of these Regulations that a Member has such person's unconditional consent to transfer to the Clearing House as Collateral for the purposes of these Regulations any securities or other assets of such person in the Member's possession, free of such person's interest.

(ii)    Each Member represents and warrants to the Clearing House as at each date on which such Member transfers securities or other assets to the Clearing House as Collateral pursuant to these Regulations (a) that such Member is the sole legal and beneficial owner of those securities or other assets or, as the case may be, those securities or other assets are so transferred with the legal

and beneficial owner's unconditional consent and free of such owner's interest and (b) that the provision to the Clearing House of such securities or other assets pursuant to these Regulations will not constitute or result in a breach of any trust, agreement or undertaking whatsoever.

(iii)    The Clearing House may, in its absolute discretion and at any time require a Member to transfer other securities or assets to the Clearing House in substitution of any securities or assets transferred to the Clearing House pursuant to this Regulation 20.

(e)    The rate of initial margin in respect of each exchange contract shall be determined from time to time by the Clearing House after consultation with the relevant Exchange and such rate shall be published from time to time by the Clearing House. Subject to paragraph (g) below, any alteration of the rate so determined shall take effect on the expiry of such period of notice to Members as shall from time to time be agreed with the relevant Exchange. Any such notice shall be given to Members in accordance with the Procedures.

(f)    The rate of initial margin in respect of each category of OTC Contract shall be determined from time to time by the Clearing House, and such rate shall be published from time to time by the Clearing House. The rate of initial margin in respect of EquityClear Contracts and LCH EnClear Contracts respectively shall be determined from time to time by the Clearing House and such rate shall be published from time to time by the Clearing House.

(g)    Notwithstanding paragraph (e) or paragraph (f) above, the Clearing House shall be entitled at its absolute discretion, without assigning any reason and without prior notice to a Member or, where applicable, to an Exchange, to modify the rate of initial margin applicable to an exchange contract, to an OTC Contract or to EquityClear Contracts or to LCH EnClear Contracts, or to demand larger or additional amounts of Collateral in respect of the initial margin obligations of a Member, either before registration of a contract or at any time after registration. Any Collateral demanded by the Clearing House pursuant to this paragraph shall be transferred by the Member to the Clearing House on demand and in such form as the Clearing House may require.

(h)    The Clearing House shall be entitled at any time to demand from a Member the immediate transfer of Collateral in respect of that Member's margin obligations in an amount deemed necessary by the Clearing House without reference to official quotations or Reference Prices in respect of any open contract in the Member's name, if, in the opinion of the Clearing House, the transfer to the Clearing House of such Collateral by the Member is necessary in the circumstances then prevailing which may be affecting or may in the Clearing House's opinion be likely to affect market conditions or the Member's performance of its obligations under the terms of such contracts or under the terms of any original or confirmed contract to which the Member is party.

(i)    The Clearing House shall be entitled to make an accommodation charge at a rate determined by the Clearing House and published on the Clearing House's website, in respect of any non-cash Collateral (other than Clearing Member Returned Collateral or Clearing Member Applied Collateral) transferred to the Clearing House. Any

alteration in the basis of calculating the rates of accommodation charge shall become effective in respect of all current and future business by the time as published on the Clearing House's website.

(j)     Without prejudice to the requirements of paragraph (e) or (f) above, the Clearing House may at its absolute discretion accept Collateral to an agreed amount in a form other than those specified in the Procedures, subject always to the Clearing House's prior assessment as to the appropriateness of such form of Collateral in accordance with its standard risk management procedures and to any special arrangements which the Clearing House may prescribe in each case (including as to valuation and haircut). The Clearing House may at its discretion make an accommodation charge at a special rate.

(k)     If, in the opinion of the Clearing House, any asset which has been transferred to it by a Member as Collateral pursuant to these Regulations is no longer either of sufficient value or otherwise acceptable to the Clearing House, the Clearing House shall be entitled to demand further Collateral from such Member.  Such Collateral shall be transferred by such Member to the Clearing House on demand in a form prescribed by the Procedures, **provided that** at any time the Clearing House shall be entitled to require the Member to transfer Collateral to the Clearing House in a specified form and to demand that the Member replace the whole or part of any asset transferred to the Clearing House by that Member pursuant to these Regulations with Collateral in the form of cash.

(l)     Any request by a Clearing Member (including, for the avoidance of doubt, a Resigning Member or a Retiring Member) for the release or return of excess Collateral shall be dealt with in accordance with the Procedures.

(m)     If the Clearing House takes any step or steps under the Default Rules in relation to a Member, any sum (including without limitation the price due to be paid by the Clearing House in respect of the delivery of any property or currency by or on behalf of the Member) standing to the credit of any of the Member's accounts shall be treated as Collateral.

(n)     Unless the Clearing House otherwise agrees in writing or as expressly contemplated by the Rulebook, no Member may assign or otherwise transfer its right to the return of any Collateral or Contributions transferred to the Clearing House in the form of cash. Any such purported assignment or transfer by a Member (whether by way of security or otherwise) shall be void.  A Member shall not otherwise encumber (or seek to encumber) its right to the return of any cash Collateral or Contributions transferred to the Clearing House.

(o)     Where the Clearing House is party to a Link Agreement with a Co-operating Clearing House:

(i)     the Clearing House may request collateral from that Co-operating Clearing House in whatever form may be stipulated in the terms of that Link Agreement; and

(ii)     if collateral is transferred to the Clearing House by such Co-operating Clearing House pursuant to such Link Agreement, that collateral shall be

deemed to be Collateral for the purposes of these Regulations and the Default Rules.

(p)    Any references in the Rulebook to (i) Collateral deposited or held by or with the Clearing House or a Clearing Member or in an account maintained by the Clearing House or a Clearing Member; (ii) balances of Collateral with the Clearing House or a Clearing Member or in an account maintained by the Clearing House or a Clearing Member; and (iii) Collateral credited to an account maintained by the Clearing House or a Clearing Member (and any phrases describing similar concepts), shall be construed as including all Collateral transferred to the Clearing House by that Clearing Member or to that Clearing Member by the Clearing House (as applicable) and any Applied Collateral Excess Proceeds credited to that Clearing Member's account by the Clearing House, but as excluding any relevant Clearing Member Returned Collateral, Clearing Member Applied Collateral, Clearing House Returned Collateral and/or Clearing House Applied Collateral (as applicable).

(q)    Expressions in the Rulebook such as "furnish", "provide", "deposit" and "post" (and similar expressions) are used to describe the act of transferring Collateral to or, as the case may be, from, the Clearing House and, when used in conjunction with such expressions, expressions in the Rulebook such as "margin", "cover for margin" and "collateral" (and similar expressions) are used to describe the collateral which is transferred to or, as the case may be, from, the Clearing House. Where the context so permits, references to Collateral being held in an account means that the Collateral is recorded in the books and records of the Clearing House as being attributable to a particular Clearing Member or Clearing Client. Where the Rulebook so provides, references to Collateral being "transferred" from the Clearing House to the Clearing Member may include the Clearing House recording in its books and records such Collateral as being attributable to the Clearing Member and held in an account of that Clearing Member with the Clearing House.

(r)    The Rulebook shall be construed such that:

(i)    save as stated in sub-paragraph (ii), all transfers of Collateral to or, as the case may be, from, the Clearing House are effected on an outright title-transfer basis (with there being no intention to create any form of *in rem* security interest in such collateral, and despite any references to such collateral being held by the Clearing House or a Clearing Member or in an account maintained by the Clearing House or a Clearing Member or to such collateral being credited to an account maintained by the Clearing House or a Clearing Member (or to similar concepts));

(ii)    wherever non-cash Collateral is transferred to the Clearing House, it is held by the Clearing House as custodian for the Clearing Member which transferred it, on and subject to the terms of the Deed of Charge between the Clearing House and that Clearing Member;

(iii)    wherever the Clearing House is required to return cash Collateral or Applied Collateral Excess Proceeds to a Clearing Member or a Clearing Member is required to return cash Collateral to the Clearing House, that requirement is to pay an amount of cash equal to the amount expressed to be so required to be returned; and

(iv)    wherever the Clearing House is required to return non-cash Collateral to a Clearing Member, that requirement is to return (unless otherwise provided in the Procedures) the same non-cash Collateral (or equivalent non-cash Collateral) as was transferred to the Clearing House by that Clearing Member and to release the same from the security created by the relevant Deed of Charge.

(s)    In determining the amount of Collateral which the Clearing House requires to be transferred to or from the Clearing House pursuant to the Rulebook, the Clearing House shall take into account the amount of any Collateral which has previously been determined as being required to be transferred to or from the Clearing House but which, at the time of that determination, has not been so transferred.

(t)    Upon the Clearing House being satisfied (acting in good faith) that all obligations of a Clearing Member pursuant to the Rulebook have been irrevocably paid or discharged in full and that no such obligations are capable of arising:

(i)    the Clearing House shall (A) in the case of cash Collateral transferred to the Clearing House for the purpose of collateralising that Clearing Member's obligations (other than any constituting Clearing Member Returned Collateral or Clearing Member Applied Collateral), pay an amount of cash to that Clearing Member equal to such cash; and (B) in the case of non-cash Collateral transferred to the Clearing House for the purpose of collateralising that Clearing Member's obligations (other than any constituting Clearing Member Returned Collateral or Clearing Member Applied Collateral), transfer that same Collateral (or equivalent Collateral) to that Clearing Member; and

(ii)    the Clearing Member shall, in the case of cash Collateral transferred to the Clearing Member for the purpose of collateralising the Clearing House's obligations (other than any constituting Clearing House Returned Collateral or Clearing House Applied Collateral), transfer an amount of cash to the Clearing House equal to such cash.

(u)    Wherever the Rulebook contemplates an obligation of a Clearing Member being discharged by the Clearing House using, or otherwise applying, cash Collateral transferred to the Clearing House for the purpose of collateralising that Clearing Member's obligations to the Clearing House (including any Applied Collateral Excess Proceeds), the manner in which such discharge shall occur is by the acceleration of the Clearing House's obligation to return that cash Collateral or Applied Collateral Excess Proceeds to that Clearing Member (but only in an amount which does not exceed the obligation of that Clearing Member which is to be so discharged) and the set-off of that transfer obligation against that Clearing Member's obligation which is to be so discharged.`

(v)    Wherever the Rulebook contemplates an obligation of the Clearing House being discharged by a Clearing Member using, or otherwise applying, cash Collateral transferred to that Clearing Member for the purpose of collateralising the Clearing House's obligations to that Clearing Member, the manner in which such discharge shall occur is by the acceleration of that Clearing Member's obligation to return that cash Collateral to the Clearing House (but only in an amount which does not exceed the obligation of the Clearing House which is to be so discharged) and the set-off of

that transfer obligation against the Clearing House's obligation which is to be so discharged.

(w)    Where a Clearing Member is a Futures Commission Merchant and it proposes to transfer to the Clearing House Collateral relating to Client Clearing Business in connection with the clearing of a futures or options contract that is traded on an exchange that is not a designated contract market, it shall request that the Clearing House approve such proposed transfer and following the Clearing House's written approval, the Clearing House shall hold such Collateral as a foreign futures or foreign options secured amount subject to the requirements of CFTC Rule 30.7. By making such request, a Clearing Member shall be deemed to represent and undertake to the Clearing House that it will not engage in House Clearing Business or transfer Collateral in relation to House Clearing Business and the Clearing Member acknowledges that any such approval from the Clearing House is issued in reliance upon such representation or undertaking being true and accurate at all times.

The Clearing House's written approval shall satisfy the Clearing Member's requirement to obtain an acknowledgement pursuant to Part 30 of CFTC Regulations.

**REGULATION 21   PREMIUM UNDER OPTION CONTRACTS**

(a)     The premium payable by a buyer under the terms of an option contract shall be paid by the buyer to the Clearing House in the form and manner prescribed in the Procedures and by the time specified in Exchange Rules or the Procedures with respect to the relevant exchange contract.

(b)     The Clearing House shall pay to a seller under the terms of an option contract his premium in accordance with the Procedures and by the time specified in Exchange Rules or the Procedures with respect to the relevant exchange contract.

**REGULATION 22    OFFICIAL QUOTATIONS AND REFERENCE PRICE**

(a)     The Clearing House may determine official quotations and Reference Prices for the purposes of these Regulations and the Procedures in such manner and at such times as may be prescribed in the Procedures.  Except as prescribed in the Procedures, an official quotation or Reference Price is binding on a Clearing Member and may in no circumstances be called in question.

(b)     If the official quotations and/or Reference Prices prescribed in the Procedures are unavailable, the Clearing House may determine, in its sole discretion, a substitute official quotation or Reference Price.  In such circumstances, the substitute official quotation or Reference Price determined by the Clearing House is binding on a Clearing Member and may in no circumstances be called in question.

(c)     For the avoidance of doubt, the Clearing House is not responsible for and does not warrant the accuracy of any settlement price determined by a third party or any index which is the subject of an exchange contract or any Reference Price.

**REGULATION 23   DAILY SETTLEMENT OR MARKING TO MARKET**

(a)    Where Exchange Rules or the Procedures so prescribe in respect of exchange contracts, the Clearing House may effect the daily settlement to market or daily marking to market of all open contracts (in each case, as opposed to requiring the collateralisation of such open contracts) on the terms of such exchange contracts in accordance with the Procedures and Exchange Rules, save where the Procedures otherwise provide.  Daily settlement to market shall not apply to open contracts which are for the account of a Member's Client Accounts.

(b)    The Clearing House shall, in accordance with the Procedures, in respect of each open contract in a Member's name which is subject to daily settlement to market or daily marking to market (as opposed to a collateralisation requirement), effect and register a settlement contract, being a contract on the same terms (except as to price or premium), including the strike price where applicable, as the open contract, save that where the Member is a buyer under the terms of the open contract the Member shall be a seller under the terms of the settlement contract and vice-versa, such settlement contract to be effected in accordance with the Procedures (or Exchange Rules if applicable) at the relevant official quotation or Reference Price for that day.  The Clearing House shall thereupon settle each open contract against the respective settlement contract in accordance with the Procedures.

(c)    The Clearing House shall, upon completion of the process set out in paragraph (b) above, calculate the daily settlement amounts in accordance with the Procedures and shall thereafter debit or credit (as the case may be) the Member's account and upon the Clearing House so doing, the Member and the Clearing House shall (unless otherwise agreed) settle any daily settlement amounts arising as follows:

    (i)    any profit arising to a Member shall: (A) be credited to the applicable account; (B) to the extent that that account is a collateral account, become part of the Clearing Member Current Collateral Balance; and (C) subject to the Clearing House's right to retain such profit pursuant to these Regulations, be paid to the Member on the Member's request; and

    (ii)    any loss arising to a Member shall be debited from the applicable account of the Member to the extent that there is an available balance in such account and, in accordance with these Regulations, the Member shall pay the amount of any shortfall in respect of such loss to the Clearing House forthwith on demand.

(d)    The Clearing House shall, upon completion of the calculation of daily settlement amounts pursuant to paragraph (c) above, in the manner prescribed by the Procedures:

    (i)    in respect of those open contracts in a Member's name which have been settled pursuant to paragraph (b) above and which are subject to daily settlement to market, register at the official quotation or Reference Price referred to in paragraph (b) above, contracts in the Member's name as open contracts on the same terms (except as to price or premium), including the strike price where applicable, as the settled open contracts, save that no contract for the purchase and no contract for the sale of the same commodity,

for the same delivery month, or expiry month and strike price, where applicable, shall be registered in the Member's name;

(ii)    in respect of those open contracts in a Member's name which have been settled pursuant to paragraph (b) above and which are subject to daily marking to market as prescribed by the Procedures, register at the official quotation referred to in paragraph (b) above contracts in the Member's name as open contracts on the same terms (except as to price or premium) including the strike price, where applicable, as the settled open contracts.

(e)    A Member may, in respect of all open contracts in his name which are subject to daily marking to market, request the Clearing House within the time and in the manner prescribed by the Procedures, to settle such contracts being the same number of contracts for the purchase and sale of the same commodity for the same delivery month or, where applicable, for the same expiry month and strike price. Such a request, once made, shall be irrevocable unless the Clearing House otherwise consents. Where such a request is made, the Clearing House shall as soon as practicable after the close of trading on that market day (but not necessarily on that day, and provided documentation has been supplied by the Member in accordance with the Procedures) debit or credit (as the case may be) the Member's account.

(f)    In respect of those open contracts of which settlement might have been requested by a Member under paragraph (e) above, the Clearing House may, if no request for settlement has been received by the cessation of trading for the delivery month applicable to those contracts, at any time thereafter proceed as if settlement had been requested and debit or credit (as the case may be) the Member's accounts accordingly.

## REGULATION 24   SETTLEMENT   AND   REVALUATION:   CLEARING PROCESSING SYSTEM

(a)     Where Exchange Rules or the Procedures so prescribe in respect of exchange contracts, the Clearing House may effect the settlement or revaluation of open contracts on the terms of such exchange contracts in accordance with a clearing processing system adopted by the Exchange.

(b)     The settlement of open contracts under this Regulation may be effected daily or less frequently, as required by the clearing processing system.  The clearing processing system may expressly or by implication require the contract value of open contracts to be altered daily or less frequently by reference to official quotations or otherwise and, if so, open contracts subject to the system shall be revalued accordingly.  The Clearing House shall have no obligation to notify a Member of the revaluation of an open contract to which it is party, save as provided by the clearing processing system.

**REGULATION 25   OTHER MODES OF SETTLEMENT AND REVALUATION**

Settlement, revaluation and collateralisation procedures (other than those contained in Regulation 23 and Regulation 24) may be prescribed, in respect of open contracts on the terms of certain exchange contracts and in respect of open contracts which are OTC Contracts, EquityClear Contracts or LCH EnClear Contracts in the Procedures or where agreed with, an Exchange, in Exchange Rules.   The relevant settlement, revaluation and collateralisation procedures (as applicable) may be effected by the Clearing House in accordance with such provisions.

## CHAPTER VI – OPTIONS, OPEN CONTRACTS SUBJECT TO TENDER AND DELIVERY CONTRACTS

## REGULATION 26   EXERCISE OF OPTIONS

(a)     An option may, subject to paragraph (d) below, be exercised, or deemed to be exercised, or abandoned in accordance with paragraph (b) or (c) below on the day and by the time prescribed by Exchange Rules, or if there is no such prescribed day or time, by the day and time specified in the Procedures. If any prescribed day is not a business day, an option may be exercised, deemed to be exercised, or abandoned on such day as may be prescribed by the relevant Exchange Rules, or if no such day is so prescribed, on the next business day.

(b)     Subject to Exchange Rules an option may be exercised by notice in writing or in such other form as may be prescribed by Exchange Rules or the Procedures and in the manner prescribed by the Procedures, and if not so exercised by the day and time referred to in paragraph (a) above, the option shall either expire or, if Exchange Rules so provide, be deemed to have been exercised in accordance with Exchange Rules or, where relevant, the Procedures.

(c)     Subject to Exchange Rules, an option may be abandoned by notice in writing or in such other form as may be prescribed by Exchange Rules or the Procedures and in the manner prescribed by the Procedures and if not so abandoned by the day and time referred to in paragraph (a) above, the option shall be deemed to have been exercised in accordance with the Exchange Rules or, where relevant, the Procedures.

(d)     If permitted under Exchange Rules or, where relevant, the Procedures, an option may be exercised or abandoned by or on behalf of a Member prior to the day and time referred to in paragraph (a) above in accordance with Exchange Rules or, where relevant, the Procedures.

(e)     The Clearing House shall be entitled to rely and act upon any form of exercise or abandonment made in accordance with paragraphs (b), (c) or (d) above without making any enquiry, investigation or check as to whether it complies with the Exchange Rules or as to the authority of any person purporting to exercise or abandon an option on behalf of a Member save that the Clearing House may reject any notice of exercise or abandonment (or exercise or abandonment made in such other prescribed form, as the case may be) if it does not appear to comply with Exchange Rules or the Procedures notwithstanding that it may as buyer have passed on such notice or other prescribed form of exercise or abandonment to a seller.

(f)     Subject to paragraph (e) above, no notice (or other form) of exercise or abandonment once received by the Clearing House may be cancelled or withdrawn.

(g)     Where the Clearing House is a buyer under the terms of an option contract, the Clearing House may exercise or abandon an option in accordance with Exchange Rules or the Procedures and in accordance with Regulation 3.

(h)     Upon the exercise or deemed exercise of an option pursuant to this Regulation 12(c) and Regulation 26 shall come into effect.

## REGULATION 27   DELIVERY CONTRACT ARISING UPON THE EXERCISE OF AN OPTION

(a)    Subject to these Regulations open contracts which are delivery contracts shall be fulfilled in accordance with Exchange Rules.  No delivery contract shall be for a unit or quantity smaller than one lot and the amount or quantity to be delivered shall be one lot or such other amount or quantity as may be specified for the commodity in Exchange Rules from time to time after agreement with the Clearing House.

(b)    Where an open contract which is a delivery contract arises by novation pursuant to Regulation 12(c) upon the exercise or deemed exercise of an option, the buyer under the terms of the delivery contract shall give to the Clearing House such information as may be prescribed by Exchange Rules or, where relevant, the Procedures by the time and in the manner specified in Exchange Rules or the Procedures.  The Clearing House as buyer under the terms of a delivery contract shall, in accordance with Regulation 3, give to the seller under the terms of such contract, such information as may be prescribed by Exchange Rules or the Procedures.

(c)    The seller under the terms of a delivery contract shall deliver the commodity to the Clearing House as buyer in such manner and at such time as may be prescribed in Exchange Rules or, where relevant, the Procedures, and the Clearing House as seller under the terms of a delivery contract shall, in accordance with Regulation 3, deliver the commodity the subject of such contract to a Member as buyer under the terms of such contract.

(d)    The buyer shall pay the price and such other amounts to the Clearing House as may be required by Exchange Rules or, where relevant, the Procedures in the form and manner and by the time prescribed in Exchange Rules or the Procedures, and the Clearing House shall, in accordance with Regulation 3, pay the seller his price and such other amounts as may be required by Exchange Rules or, where relevant, the Procedures.

(e)    Notwithstanding paragraphs (c) and (d) above, the Clearing House may in its absolute discretion in accordance with the Procedures:

(i)    direct a Member who is a seller under a delivery contract to deliver the commodity the subject matter of such contract to such other Member, being a buyer under a delivery contract, as the Clearing House may appoint; and

(ii)    direct a Member who is a buyer under a delivery contract to pay the price and any other amounts payable pursuant to such contract to such other Member, being a seller under a delivery contract, as the Clearing House may appoint;

and delivery or payment in accordance with such direction shall constitute the due performance of such obligations of such buyer or seller as the case may be towards the Clearing House.  Each Member agrees that it will accept delivery of a commodity, or as the case may be, payment of the price, from a Member directed in accordance with (i) or (ii) above, in satisfaction of the obligations owed to it by the Clearing House to deliver the commodity or make payment of the price and such other amounts under the terms of a delivery contract.

(f)    If an invoice is not ready when payment becomes due pursuant to this Regulation, payment shall be made and received on account.

**REGULATION 28   OBLIGATION TO MAKE AND ACCEPT TENDER UNDER CLEARED EXCHANGE CONTRACTS**

(a)     Subject to these Regulations open contracts which are Cleared Exchange Contracts or LSE Derivatives Markets Cleared Exchange Contracts shall be fulfilled in accordance with Exchange Rules or the Procedures.  No Cleared Exchange Contract shall be for a unit or quantity smaller than one lot and the amount or quantity tendered shall be for one lot or such other amount or quantity as may be specified for the commodity in Exchange Rules from time to time after agreement with the Clearing House.  Where the terms of a Cleared Exchange Contract or LSE Derivatives Markets Cleared Exchange Contract so permit, the Clearing House may give directions to one or more Members concerning the performance of such contract and in such case each such Member shall be bound by and shall comply with any such direction.

(b)     Paragraphs (c) to (l) below and Regulation 30 and Regulation 31 shall not apply to Cleared Exchange Contracts and LSE Derivatives Markets Cleared Exchange Contracts which are contracts for differences or such option contracts as the Procedures may prescribe.  Members shall fulfil their obligations to the Clearing House under the terms of such contracts in the manner and by the time prescribed by Exchange Rules, these Regulations and the Procedures.  The Clearing House shall fulfil its obligations as seller or buyer, as the case may be, under the terms of such contracts in accordance with Regulation 3.   Regulation 29 shall apply and paragraphs (c) to (l) below shall not apply to delivery contracts.

(c)     A Member, as seller in respect of a Cleared Exchange Contract in his name which is not to be settled pursuant to Regulation 23 or Regulation 25 and the Procedures, shall give a tender to the Clearing House as buyer, together with such other documents as may be required by Exchange Rules or the Procedures by the time specified in Exchange Rules or the Procedures in respect of a Cleared Exchange Contract for a particular delivery month or prompt date, and in the form and manner prescribed by Exchange Rules or the Procedures.  The Clearing House, as seller in respect of a Cleared Exchange Contract which is not to be settled pursuant to Regulation 23 or Regulation 25 and the Procedures, shall in accordance with Regulation 3 give a tender to the buyer under the terms of such contract, together with such other documents as may be required by Exchange Rules or the Procedures.

(d)     A seller or buyer shall give to the Clearing House such additional documents or information required by Exchange Rules to be given in respect of an open contract subject to tender by the time prescribed by Exchange Rules and in the form and manner specified therein or in the Procedures.  The Clearing House as seller (or buyer) under the terms of an open contract subject to tender shall in accordance with Regulation 3 give such additional documents or information to the buyer (or seller) under the terms of such contract.

(e)     The Clearing House shall be under no obligation to check a tender or documents received from a Member pursuant to paragraph (c) or (d) above.  The passing on by the Clearing House of such tender or such documents received from a seller (or buyer as the case may be) pursuant to the terms of an open contract subject to tender, to a buyer (or seller as the case may be) pursuant to the terms of an open contract subject to tender, shall not constitute acceptance by the Clearing House of such tender or such documents, and if the Member to whom it passed on such tender or such documents

rejects the same where permitted by Exchange Rules, the Clearing House shall be entitled to reject the same as against the Member from whom it received such tender or such documents.

(f)     Every buyer (not being the Clearing House) who has a Cleared Exchange Contract in his name for the current delivery period or prompt date shall be bound to accept in fulfilment of the Clearing House's obligations as seller under paragraph (c) any tender or documents complying with Exchange Rules which is given to him by the Clearing House in accordance with Regulation 3.

(g)     Subject to paragraph (e), no tender may be withdrawn or substituted by the seller once such tender is received by the buyer except with the consent of such buyer or otherwise in accordance with Exchange Rules.

(h)     Where permitted by Exchange Rules, a tender together with such other documents as may be required by Exchange Rules or the Procedures may be given to the Clearing House by or on behalf of a seller in respect of an original exchange contract to which the seller is party, such tender to be given to the Clearing House together with such particulars of the contract as may be required by the Clearing House, including if required the name of the buyer in respect of such contract, by the time specified in Exchange Rules or the Procedures.  Registration of such contract in the name of the seller shall be effected as prescribed by the Procedures.

(i)     The Clearing House may give a tender, together with such other documents as may be required by Exchanges Rules or the Procedures, to a buyer in respect of an original exchange contract to which the buyer is party.  Such particulars of the contract as the Clearing House may require shall be furnished by or on behalf of the buyer to the Clearing House in accordance with Exchange Rules or the Procedures.  Registration of such contract in the name of the buyer shall be effected as prescribed by the Procedures.

(j)     The Clearing House may give a tender and documents received from a seller pursuant to paragraph (h) above to a buyer in respect of an original exchange contract to which the buyer is party, and shall do so as agent for the seller.  The furnishing of particulars and the registration of such contract in the name of a buyer shall be effected as provided in paragraph (i) above.  Upon registration of an original exchange contract pursuant to paragraph (h), the giving of the tender and documents by the Clearing House to the buyer pursuant to this paragraph shall be deemed to have been given and accepted by such parties in fulfilment of their obligations under paragraph (c) and (f) above.

(k)     In implementing this Regulation, the Clearing House may effect and register such contracts in a Member's name as may be prescribed in the Procedures at a price determined by the Clearing House in accordance with the Procedures.

(l)     If Exchange Rules require a buyer to give a tender and a seller to receive a tender in respect of a Cleared Exchange Contract, a reference in this Regulation and in Regulation 30 to a seller giving a tender shall be construed as being a reference to a buyer giving a tender and a reference to a buyer receiving a tender shall be construed as being a reference to a seller receiving a tender.

## REGULATION 29   DELIVERY CONTRACTS

(a)     The obligations of Members under delivery contracts shall be performed in accordance with the terms of such delivery contracts and in the manner and by the time prescribed by Exchange Rules, these Regulations and the Procedures.   The Clearing House shall fulfil its obligations as seller or buyer, as the case may be, under the terms of a delivery contract in accordance with Regulation 3 and the Procedures.

(b)     Where the terms of an open contract so permit, the Clearing House may give directions to one or more Members concerning the performance of such open contract and in such case each such Members shall be bound by and shall comply with any such direction.

## REGULATION 30    OPEN CONTRACTS SUBJECT TO TENDER

(a)    Without prejudice to the provisions of Regulation 31(a), under an open contract subject to tender or a delivery contract:

    (i)    the buyer shall be obliged to pay his buying price to the Clearing House as seller in the manner and by the time prescribed by Exchange Rules or the Procedures;

    (ii)    the Clearing House as buyer shall be obliged to pay the seller his selling price in the manner and by the time prescribed by Regulation 3;

    (iii)    subject to Exchange Rules any compensation, adjusting payment, or other allowance payable by or to either the buyer or seller under the terms of the open contract shall be paid to or by the Clearing House;

(b)    Notwithstanding that open contracts may have been settled under Regulation 23 a seller may, with the agreement of the Clearing House and by the time specified in the Procedures, give the Clearing House a tender in respect of any such contract so settled.  Upon receipt of such tender, the Clearing House shall (unless the Procedures otherwise allow) effect on the Member's behalf re-opening contracts (that is a sale by the Member to the Clearing House and a purchase by the Member from the Clearing House of one lot, each on the same terms (including delivery) as the settled contract except as to price) and register such contracts as open contracts in the Member's name, the re-opening contracts to be effected at a price determined by the Clearing House or the Exchange as prescribed by the Procedures.  The submission of a tender in accordance with the Procedures shall constitute confirmation of any such re-opening contracts and the seller's tender (or buyer's as the case may be) shall be deemed to have been made pursuant to his sale (or purchase) under the respective re-opening contract.

(c)    Notwithstanding that an open contract may have been settled under Regulation 23, the Clearing House may in accordance with the Procedures give a tender to a buyer under Regulation 28 as if the contract were still open and on so doing the Clearing House shall effect on the Member's behalf re-opening contracts (defined as in paragraph (b) above and to be effected as there described) and register such contracts as open contracts in the Member's name.  The receipt by the Buyer of such tender shall constitute confirmation of the re-opening contract and shall be deemed to occur pursuant to the Member's purchase under the respective re-opening contract.

(d)    In implementing this Regulation, the Clearing House may effect and register such contracts in a Member's name as it may deem necessary for the purposes hereof or as may be prescribed in the Procedures and at a price determined by the Clearing House in accordance with the Procedures.

# REGULATION 31  ARRANGEMENTS FOR DELIVERY AND PAYMENT OF PRICE

(a)  In respect of its obligations under the terms of any open contract as seller to deliver a commodity to the buyer or as buyer to pay the price and any other payments required to be made under the terms of such contract to the seller, the Clearing House may in its absolute discretion in accordance with the Procedures:

   (i)  direct a Member who is a seller under an open contract to deliver the commodity the subject matter of such contract to such other Member, being a buyer under an open contract as the Clearing House may appoint; and

   (ii)  direct a Member who is a buyer under an open contract to pay the price and any other amounts payable pursuant to such contract to such other Member, being a seller under an open contract as the Clearing House may appoint,

and delivery or payment in accordance with such direction shall constitute the due performance of such obligations of such buyer or seller as the case may be towards the Clearing House.  Each Member agrees that it will accept delivery of a commodity or, as the case may be, payment of the price, and such other amounts from another Member in accordance with such direction in satisfaction of the obligations owed to it by the Clearing House to make payment of the price or such other amounts or to deliver the commodity under the terms of an open contract.

(b)  If an invoice is not ready when payment becomes due, payment shall be made and received on account.

(c)  A Member may from time to time agree in writing with the Clearing House in respect of such exchange contracts as are prescribed in the Procedures that he shall pay to and receive from the Clearing House in accordance with the Procedures a net amount in respect of his obligations to make or take delivery (as the case may be) of a commodity where such commodity is a currency and to make or receive payment (as the case may be) of the buying or selling price.

(d)  If a buyer where permitted by Exchange Rules, rejects the commodity delivered to it pursuant to the Clearing House's obligations to make delivery of the commodity under the terms of an open contract subject to tender, the Clearing House shall be entitled to reject the same as against the seller from whom it took delivery of the same under the terms of an open contract subject to tender, and the Clearing House shall not be deemed to have accepted a commodity delivered to it by a seller which it delivers on to a buyer until such buyer has accepted the commodity.

## REGULATION 32   RESTRICTIONS ON CLEARING HOUSE'S OBLIGATIONS AND LIABILITY

(a)    This Regulation shall apply to open contracts subject to tender and delivery contracts and shall not apply to contracts for differences or option contracts.

(b)    The Clearing House (or any other member of the LCH.Clearnet Group) shall not be liable in respect of a claim made against it in respect of an open contract subject to tender or a delivery contract by a Member concerning:

    (i)    a tender given by the Clearing House; or

    (ii)    any documents accompanying a tender as required by Exchange Rules or Procedures; or

    (iii)    the performance by the Clearing House of its obligations under an open contract to make delivery of a commodity or to pay the price; or

    (iv)    any other dispute or matter arising under the terms of such contract;

    unless the conditions set out in paragraphs (c), (d) and (e) below are satisfied.

(c)    The Member shall (without prejudice to his taking any other steps which may be required of or open to him under the relevant Exchange Rules or the Procedures) give written notice and particulars of his claim to the Clearing House not later than 17:00 hours (such time to be of the essence) on the seventh business day following the day on which, in accordance with the relevant Exchange Rules or the Procedures, documents must be taken up and paid for by the buyer (whether or not a buyer fulfils such obligation), or if there are no such documents, not later than 17.00 hours (such time to be of the essence) on the seventh business day following the last day on which the buyer, in accordance with the relevant Exchange Rules or the Procedures, must take delivery of the commodity (whether or not the buyer fulfils such obligation).

(d)    Where the relevant Exchange Rules provide for arbitration, the Member shall refer all disputes referred to in paragraph (b) above in respect of the contract to arbitration under the relevant Exchange Rules, shall give to the Clearing House notice of such referral pursuant to Exchange Rules and details of any award made.

(e)    The Member shall promptly provide the Clearing House with such further particulars of his claim, as the Clearing House may from time to time require in writing.

## CHAPTER VII – DISPUTE RESOLUTION

**REGULATION 33   ARBITRATION:   CLEARED EXCHANGE CONTRACTS, LSE DERIVATIVES   MARKETS   CLEARED   EXCHANGE   CONTRACTS, EQUITYCLEAR CONTRACTS OR LCH ENCLEAR CONTRACTS (FOR PHYSICAL DELIVERY)**

(a)   In this Regulation 33, "**Relevant Rules**" means relevant Exchange Rules or relevant ATP Market Rules.

Subject to Regulation 70(a), paragraph (e) below, and to the terms of a Link Agreement to which the Clearing House and a Co-operating Clearing House are party, a dispute arising from or in relation to any Cleared Exchange Contract, any EquityClear Contract, or any LCH EnClear Contract for physical delivery ("**Physical LCH EnClear Contract**") or in relation to these Regulations relating to the clearing of Cleared Exchange Contracts, EquityClear Contracts or Physical LCH EnClear Contracts shall, unless resolved between the Clearing House and the Member, be referred to arbitration under the Relevant Rules and arbitration shall be conducted in accordance with such Relevant Rules.   The Clearing House shall be entitled to call upon a Member who is a buyer and a Member who is a seller, under the terms of Cleared Exchange Contracts, EquityClear Contracts or Physical LCH EnClear Contracts as applicable, which have been matched by the Clearing House and in respect of which reference to arbitration has been made under the same Relevant Rules, to conduct the arbitration between them under such Relevant Rules as applicable.

(b)   In the event that the Clearing House elects to call upon a seller and a buyer to arbitrate between them pursuant to Regulation 33(a) above and the Relevant Rules, the following process shall apply:

(i)   the Clearing House shall give notice of such election to the buyer, the seller and the relevant Exchange or the relevant ATP as applicable, in accordance with such Relevant Rules;

(ii)   the seller shall at its own expense have the conduct of the Clearing House's case against the buyer, and the buyer shall at its own expense have the conduct of the Clearing House's case against the seller, in either case, subject to the provisions of this Regulation;

(iii)   copies of all pleadings, correspondence and documents shall be given to the Clearing House and the Clearing House shall be entitled to submit any additional arguments to the arbitrators in support of its own case, in which case it shall supply copies of such submissions to the seller and the buyer;

(iv)   the arbitrators shall have the power to call upon the Clearing House to disclose documents relating to the arbitration which are in its custody, power or possession to the same extent as if it were a direct party to the arbitration; and

(v)   the arbitrators shall issue two awards, one between the seller and the Clearing House and one between the buyer and the Clearing House which shall

determine the rights of each of the seller and the buyer against the Clearing House and vice versa.

(c)     If the Clearing House is found liable to one of the parties to the arbitration ("**the first party**") in respect of a breach of a Cleared Exchange Contract or an EquityClear Contract and the other party to the arbitration ("**the second party**") is found liable to the Clearing House in respect of such breach of a Cleared Exchange Contract, or EquityClear Contract as applicable, which has been matched by the Clearing House as referred to in paragraph (a) above, the liability of the Clearing House to the first party shall be deemed to be a foreseeable consequence of the breach by the second party and the Clearing House shall be entitled to be indemnified in respect of such liability by the second party.

(d)     Subject to the terms of Link Agreement to which the Clearing House and a Co-operating Clearing House are party, a dispute arising from or in relation to any LSE Derivatives Markets Cleared Exchange Contract (including a dispute concerning Member compliance with the Exchange Rules) or in relation to these Regulations relating to the clearing of an LSE Derivatives Markets Cleared Exchange Contracts shall, unless resolved between the Clearing House and the Member, be finally resolved by arbitration under the LCIA Rules, which rules are deemed to be incorporated by reference into this clause, by three arbitrators, the seat of the arbitration to be England, with any hearings to be held in London in the English language.  The Clearing House shall be entitled, at its option, to call upon a Member who is a buyer and a Member who is a seller, under the terms of the LSE Derivatives Markets Cleared Exchange Contracts to conduct the arbitration accordingly.

(e)     In the event that the Clearing House elects pursuant to Regulation 33(d) above, to call upon a seller and a buyer to arbitrate between them, the following process shall apply:

(i)      the Clearing House shall give notice of such election to the buyer, the seller and to LSE and any relevant Co-operating Clearing House;

(ii)     the seller shall at its own expense have the conduct of the Clearing House's case against the buyer, and the buyer shall at its own expense have the conduct of the Clearing House's case against the seller, in either case, subject to the provisions of this Regulation;

(iii)    copies of all pleadings, correspondence and documents shall be given to the Clearing House and the Clearing House shall be entitled to submit any additional arguments to the arbitrators in support of its own case, in which case it shall supply copies of such submissions to the seller and the buyer;

(iv)     the arbitrators shall have the power to call upon the Clearing House to disclose documents relating to the arbitration which are in its custody, power or possession to the same extent as if it were a direct party to the arbitration; and

(v)      the arbitrators shall issue two awards, one between the seller and the Clearing House and one between the buyer and the Clearing House which shall determine the rights of each of the seller and the buyer against the Clearing House and vice versa.

(f)    If the Clearing House is found liable to one of the parties to the arbitration ("**the first party**") in respect of a breach of an LSE Derivatives Markets Cleared Exchange Contract and the other party to the arbitration ("**the second party**") is found liable to the Clearing House in respect of such breach of a LSE Derivatives Markets Cleared Exchange Contract, the liability of the Clearing House to the first party shall be deemed to be a foreseeable consequence of the breach by the second party and the Clearing House shall be entitled to be indemnified in respect of such liability by the second party.

(g)    Where any dispute arises from or in relation to any LCH EnClear Contract or in relation to these Regulations relating to the clearing of an LCH EnClear Contract and there are at the time such dispute arises no provisions in the Relevant Rules for arbitration of such dispute or no Relevant Rules, then the dispute shall, unless resolved between the Clearing House and the Member, be finally resolved by the LCIA Rules, which rules are deemed to be incorporated by reference into this clause, by three arbitrators, the seat of the arbitration to be England, with any hearings to be held in London in the English language.  The Clearing House shall be entitled, at its option, to call upon a Member who is a buyer and a Member who is a seller, under the terms of the LCH EnClear Contract to conduct the arbitration accordingly.

(h)    In the event that the Clearing House elects pursuant to Regulation 33(g) above, to call upon a seller and a buyer to arbitrate between them, the following process shall apply:

(i)     the Clearing House shall give notice of such election to the buyer and the seller, as applicable;

(ii)    the seller shall at its own expense have the conduct of the Clearing House's case against the buyer, and the buyer shall at its own expense have the conduct of the Clearing House's case against the seller, in either case, subject to the provisions of this Regulation;

(iii)   copies of all pleadings, correspondence and documents shall be given to the Clearing House and the Clearing House shall be entitled to submit any additional arguments to the arbitrators in support of its own case, in which case it shall supply copies of such submissions to the seller and the buyer;

(iv)    the arbitrators shall have the power to call upon the Clearing House to disclose documents relating to the arbitration which are in its custody, power or possession to the same extent as if it were a direct party to the arbitration; and

(v)     the arbitrators shall issue two awards, one between the seller and the Clearing House and one between the buyer and the Clearing House which shall determine the rights of each of the seller and the buyer against the Clearing House and vice versa.

(i)    If the Clearing House is found liable to one of the parties to the arbitration ("**the first party**") in respect of a breach of an LCH EnClear Contract and the other party to the arbitration ("**the second party**") is found liable to the Clearing House in respect of such breach of an LCH EnClear Contract, the liability of the Clearing House to the first party shall be deemed to be a foreseeable consequence of the breach by the

second party and the Clearing House shall be entitled to be indemnified in respect of such liability by the second party.

(j)    The Clearing House shall be bound by an arbitration award made against it in pursuance of an, arbitration whether it participates directly in the arbitration or not.

(k)    No person may refer to arbitration under Exchange Rules any dispute arising from or in connection with the Default Rules or any step taken or proposed to be taken under the Default Rules.

**REGULATION 34   COLLATERAL IN EVENT OF A CLAIM**

If notice of claim and notice of intention to refer a dispute to arbitration is given to the Clearing House pursuant to Exchange Rules, Regulation 34 or Regulation 70 in respect of an open contract, any or all Collateral (including any Applied Collateral Excess Proceeds) standing to the credit of the account in which the relevant contract is registered (whether such Collateral is held with respect to the contract under dispute or otherwise) may be retained by the Clearing House.  The Clearing House may at any time and from time to time demand transfer by such Member of additional Collateral, in such amount as it may deem appropriate in respect of such contract or contracts, to be held by the Clearing House under these Regulations until the claim is finally disposed of.  The amount of such Collateral to be transferred by the Member to the Clearing House shall be assessed by reference to such circumstances as the Clearing House in its discretion deems relevant.

## CHAPTER VIII – DEFAULT, DISORDER, IMPOSSIBILITY AND FORCE MAJEURE

## REGULATION 35    DELIVERY (OR OTHER) FAILURES

(a)    Without prejudice to the Default Rules and the Procedures, if a RepoClear Clearing Member, an EquityClear Clearing Member or a Clearing Member acting in respect of an LSE Derivatives Markets Cleared Exchange Contract as seller fails to deliver securities to the Clearing House under a RepoClear Contract, RepoClear GC Contract, EquityClear Contract or LSE Derivatives Markets Cleared Exchange Contract by the due time therefor, the Clearing House may issue directions, in accordance with the Procedures, to the seller and to a Clearing Member as buyer under a corresponding Contract regarding the performance of such Contracts and such directions shall be binding on such Clearing Members.

(b)    The Clearing House shall be entitled to demand Collateral in respect of a Member's margin obligations in such amounts and in such form as it may require in accordance with the Procedures:

      (i)    from a Clearing Member who has failed to deliver securities under a RepoClear Contract, RepoClear GC Contract or EquityClear Contract by the due time therefor and from the buying Clearing Member under the corresponding Contract; and

      (ii)    from a Clearing Member where it has failed to deliver securities or other instruments or pay the Price under an LSE Derivatives Markets Cleared Exchange Contract by the due time therefor.

(c)    A Clearing Member who has failed to deliver securities or other instruments to the Clearing House under a RepoClear Contract, RepoClear GC Contract, EquityClear Contract or LSE Derivatives Markets Cleared Exchange Contract, or to pay the Price shall indemnify the Clearing House in respect of all losses, costs, taxes and expenses suffered or incurred by the Clearing House in taking any steps under this Regulation 35.

(d)    Without prejudice to the Default Rules, if a selling Clearing Member acts in such a manner (which could, without limit, include persistent failure to deliver securities to the Clearing House under RepoClear Contracts, RepoClear GC Contracts, EquityClear Contracts or LSE Derivatives Markets Cleared Exchange Contracts (other than in circumstances where Regulation 37 and/or Regulation 38 apply)), and the Clearing House in its reasonable opinion (and, in the case of the LSE Derivatives Markets Service, after consultation with LSE) determines that the reputation of the relevant Service is being, or has been, undermined, the Clearing House shall be entitled to terminate, on written notice, either summarily or at the expiry of the period specified in the notice, the Clearing Member's ability to have RepoClear Contracts, RepoClear GC Contracts, EquityClear Contracts and/or LSE Derivatives Markets Cleared Exchange Contracts (as the case may be) registered in his name and to require him to liquidate or transfer under Regulation 18 open contracts, being RepoClear Contracts, RepoClear GC Contracts, EquityClear Contracts and/or LSE Derivatives Markets Cleared Exchange Contracts (as the case may be) registered in his name.

**REGULATION 36   DEFAULT OF A MEMBER:  SUBSTITUTED OBLIGATION**

Where a Member defaults in performance of an open contract subject to tender, and by the operation of Default Rules the Member's rights and liabilities in respect of such performance are discharged and there arises in their place an obligation to account as between the Member and the Clearing House for a settlement amount, then the Clearing House shall be entitled to substitute an obligation to account for such settlement amount, or proportions thereof *pro rata*, for its rights and liabilities in respect of performance of open contracts subject to tender with one or more other Members (such open contracts and such other Members to be selected by the Clearing House in its absolute discretion) for the same commodity and delivery month or prompt date.  No Member shall question the settlement amount or any determination made by the Clearing House under this Regulation.

**REGULATION 37 MARKET DISORDERS, IMPOSSIBILITY OF PERFORMANCE, TRADE EMERGENCY**

(a)    Paragraph (c) of this Regulation 37 shall not apply to open contracts which are option contracts.

(b)    In relation to Cleared Exchange Contracts and LSE Derivatives Markets Cleared Exchange Contracts, if a Board, after consultation with the Clearing House, or the Clearing House, if it deems it impracticable to consult with the Board with respect to sub-paragraph (i) below only, or if the Clearing House, in relation to OTC Contracts or EquityClear Contracts, or LCH EnClear Contracts determines that one of the following conditions is satisfied, namely:

(i)    a state of war exists or is imminent or threatened or civil unrest or terrorist or other criminal action has occurred or is imminent or threatened, and is likely to affect or has affected the normal course of business, including, but not limited to, performance under a Contract; or

(ii)    the government of any nation, state or territory or any institution or agency thereof has proclaimed or given notice of its intention to exercise, vary or revoke controls which appear likely to affect the normal course of business, including, but not limited to, performance under a Contract; or

(iii)    the EU or any international organisation, or any institution or agency thereof, has introduced, varied, terminated or allowed to lapse any provision so as to be likely to affect the normal course of business, including, but not limited to, performance under a Contract; or has given notice of its intention to do so or appears to be about to do so;

then:

(iv)    in respect of such open contracts which are OTC Contracts or EquityClear Contracts or LCH EnClear Contracts as specified by the Clearing House, and notified to the affected Members, the Clearing House shall be entitled to invoice back such contracts in accordance with Regulation 39 and the Procedures at a price determined by the Clearing House or to require such Members to comply with any directions issued by the Clearing House regarding the performance of, or any other direction in respect of, such contracts; and

(v)    such open contracts which are Cleared Exchange Contracts for such delivery months, prompt dates or other delivery periods as the Board in consultation with the Clearing House or (where the Clearing House so determines without consultation with the Board) as the Clearing House shall specify (which may include open contracts under which tender or a notice or some other prescribed form of exercise has been given) shall, (unless the relevant Exchange Rules otherwise provide) upon the Board's (or the Clearing House's, as the case may be) formal announcement that such condition is satisfied, be invoiced back in accordance with Regulation 39 and the Procedures at a price determined by the Board (or the Clearing House as the case may be).  In the event that a price falls to be determined by the Clearing House it shall, adopt the settlement

price which in the opinion of the Clearing House was last determined or announced by the Board pursuant to Exchange Rules.

Accounts shall be made up by the Clearing House in accordance with the Procedures for each Member who is a party to open contracts invoiced back pursuant to this paragraph. Settlement of such accounts shall be due immediately and settlement thereof shall be made forthwith in discharge of such contracts invoiced back notwithstanding any further change of circumstances.

(c)    If, in the opinion of the Clearing House after consultation with the relevant Board, a seller's complete performance of an open contract becomes impossible for any reason whatsoever (except in such circumstances as are set out in paragraph (b) above), the affected contract may at the Clearing House's option thereupon be closed by invoicing back at a price determined by the Board, and such price shall be binding on all affected parties. Accounts shall be made up by the Clearing House in accordance with the Procedures.

(d)    If an Exchange determines in accordance with its Exchange Rules that an excessive position or unwarranted speculation or any other undesirable situation or practice is developing or has developed which is affecting or capable of affecting a market in a commodity, the Clearing House may take such action as is requested of it by such Exchange in respect of one or more open contracts for such commodity in a Member's name as may be provided by Exchange Rules, or as may be agreed between the Exchange and the Clearing House.

Any formal announcement made under this Regulation shall be made by notice posted up on the floor of the market or as prescribed by the Procedures.

## REGULATION 38    FORCE MAJEURE

(a)    Neither the Clearing House (nor any other member of the LCH.Clearnet Group) nor a Member shall be liable for any failure, hindrance or delay in performance in whole or in part of its obligations under the terms of these Regulations or of any Contract if such failure, hindrance or delay arises out of events or circumstances beyond its control.  Such events or circumstances may include, but are not limited to, acts of God or the public enemy, acts of a civil or military authority other than the acts referred in Regulation 37(b)(i), (ii) or (iii) above, terrorist or other criminal action, civil unrest, embargoes, fire, flood, labour dispute, unavailability or restriction of computer or data processing facilities, energy supplies, settlement systems or of bank transfer systems or wires, and any other causes beyond the parties reasonable control including, without prejudice to the foregoing, any causes specified in Exchange Rules.

(b)    On the happening of any one or more of the events or circumstances referred to in paragraph (a) above, which shall immediately be notified by the party prevented, hindered or delayed from performing any of the obligations referred to in paragraph (a) above to the other:

(i)    in respect of affected Cleared Exchange Contracts, and LSE Derivatives Markets Cleared Exchange Contracts, the Clearing House shall be entitled at the time prescribed in the relevant Exchange Rules or if no such time is prescribed at any time after receipt of such notice, to invoice back in accordance with Chapter IX, some or all Contracts in the Member's name at a price determined by the relevant Exchange, or where Exchange Rules permit, to take such other action as it deems necessary or desirable in respect of some or all Contracts in the Member's name or require the Member to take such action as the Clearing House may direct in respect of the same; and

(ii)    in respect of affected OTC Contracts, affected EquityClear Contracts, and affected LCH EnClear Contracts, the Clearing House shall be entitled to require any of the affected Contracts to be performed in accordance with directions issued by the Clearing House or invoiced back in accordance with Regulation 39, or shall be entitled to require the Member to take such action as the Clearing House may direct in respect of such Contracts.

## CHAPTER IX – INVOICING BACK AND CURRENCY CONVERSION

## REGULATION 39   INVOICING BACK

(a)     Invoicing back of a Member's Contracts pursuant to Regulation 37 or 38 or the Default Rules or otherwise shall be carried out by the Clearing House effecting and registering pursuant to the Procedures opposite contracts between itself and the Member at the price referred to in the relevant Regulation or, where applicable, in paragraph (d) below, and thereupon settling such Contracts against such opposite contracts.

(b)     The Clearing House shall, in addition to carrying out the process referred to in paragraph (a) above, register opposite contracts between itself and such other Members as the Clearing House may select in its absolute discretion in proportion to the net position of open contracts in their names for the same commodity and delivery month or prompt date as the Contracts invoiced back under paragraph (a) above to the nearest whole number of lots, or in the case of option contracts on the terms of the exchange contracts specified in the Procedures, for the same expiry month and strike price as the Contracts invoiced back under paragraph (a) above, or in the case of OTC Contracts on the same OTC Contract Terms as the Contracts invoiced back under paragraph (a) above, or, in the case of EquityClear Contracts on the same EquityClear Contract Terms as the Contracts invoiced back under paragraph (a) above, or in the case of LCH EnClear Contracts on the same LCH EnClear Contract Terms (as the case may be) as the Contracts invoiced back under paragraph (a) above, and thereupon settling such open contracts against such opposite contracts.

(c)     Where open contracts are invoiced back pursuant to Regulation 37(b) or Regulation 37(c) the Clearing House shall credit or debit (as the case may be) the Member's accounts affected by such invoicing back in accordance with Regulation 37(b) or Regulation 37(c), as applicable.  Where a Contract is invoiced back under the Default Rules, the account of such other Member as may be affected under paragraph (b) above shall be made up in accordance with that paragraph.

(d)     Opposite contracts effected and registered by the Clearing House pursuant to:

    (i)     paragraph (a) and (b) above, other than where done pursuant to the Default Rules, shall, subject to Regulation 37(b) or Regulation 37(c), be at a price or, where applicable, a premium fixed or determined by the relevant Board or, in the case of OTC contracts or EquityClear Contracts or LCH EnClear Contracts, at a price determined by the Clearing House, and, shall be binding as a final settlement upon the parties affected by invoicing back.

    (ii)     paragraph (a) pursuant to the Default Rules shall be at a price or, where applicable, a premium fixed or determined by the Clearing House, and, shall be binding as a final settlement upon the parties affected by invoicing back except that this paragraph shall be without prejudice to any further liability of the defaulting Member to the Clearing House or to any additional rights which the Clearing House may have against the defaulting Member whether under these Regulations, at law or otherwise.

(e)    In this Regulation:

(i)    "**net position**" means:  in respect of open contracts which are Cleared Exchange Contracts or LSE Derivatives Markets Cleared Exchange Contracts, one or more of such Cleared Exchange Contracts or LSE Derivatives Markets Cleared Exchange Contracts as the case may be, against which the Member in whose name they are registered has no matching Cleared Exchange Contracts or LSE Derivatives Markets Cleared Exchange Contracts as the case may be for the same delivery month, expiry month or prompt date; in respect of open contracts which are SwapClear Contracts, means one or more of such SwapClear Contracts against which the Member in whose name they are registered has no matching SwapClear Contracts on the same Economic Terms; in respect of RepoClear Contracts, means one or more of such RepoClear Contracts against which the Member in whose name they are registered has no matching RepoClear Contracts on the same Economic Terms; in respect of EquityClear Contracts, means one or more of such EquityClear Contracts against which the Member in whose name they are registered has no matching EquityClear Contracts on the same EquityClear Contract Terms; in respect of LCH EnClear Contracts, means one or more of such LCH EnClear Contracts against which the Member in whose name they are registered has no matching LCH EnClear Contracts on the same LCH EnClear Contract Terms, as the case may be; in respect of open contracts which are ForexClear Contracts, means one or more of such ForexClear Contracts against which the Member in whose name they are registered has no matching ForexClear Contracts on the same Economic Terms;

(ii)    "**opposite contract**" means a contract on the same terms (except as to price or premium), as the Contract to be invoiced back in accordance with this Regulation, but:

(A)    where a Member is a seller, in respect of the Cleared Exchange Contract, the LSE Derivatives Markets Cleared Exchange Contract, the RepoClear Contract, the EquityClear Contract or LCH EnClear Contract to be invoiced back, such Member shall be a buyer in respect of the opposite contract and vice versa;

(B)    where a SwapClear Clearing Member is a floating rate payer, in respect of a SwapClear Contract to be invoiced back, such SwapClear Clearing Member shall be a fixed rate payer in respect of the opposite contract and vice versa;

(C)    where a ForexClear Clearing Member is a Reference Currency Buyer in respect of a ForexClear Contract to be invoiced back, such ForexClear Clearing Member shall be a Reference Currency Seller in respect of the opposite contract and vice versa.

**REGULATION 40   CURRENCY CONVERSION**

The Clearing House shall be entitled in its discretion to convert monies standing to the debit or credit of a Member's accounts (including Client Accounts) into such other currency or currencies as it thinks fit, such conversion to be effected at such reasonable rate or rates of exchange as the Clearing House may determine in accordance with the Procedures.

### CHAPTER X – DISCLOSURE, FEES, RECORDS AND AMENDMENTS

## REGULATION 41   DISCLOSURE AND REPORTING

(a)     The Clearing House shall have authority to supply any information whatsoever concerning a Member and its trading to (a) an Exchange or an exchange with whom the Clearing House has entered into an agreement pursuant to which the parties have agreed to exchange information as required or contemplated by its Exchange Rules, (b) any Regulatory Body which is entitled to receive or request any such details or information, (c) a Co-operating Clearing House pursuant to an agreement entered into with the Co-operating Clearing House, (d) any Approved EquityClear Settlement Provider pursuant to an agreement entered into with that Approved EquityClear Settlement Provider, (e) a member of the LCH.Clearnet Group, (f) any other person or body to which the Clearing House is, in its reasonable opinion, legally required to disclose the same, (g) any other person or body to which the Clearing House has agreed to provide such information (including, without limitation, pursuant to Section 5 (*Disciplinary Proceedings*) of the Procedures), (h) a trade or data repository or similar body on an ongoing basis in the ordinary course of business, or (i) any securities depository or securities settlement system on an ongoing basis in the ordinary course of business.

(b)     The Clearing House shall also be entitled to supply any information whatsoever concerning a Member to any person who has provided or may be contemplating entering into arrangements to provide the Clearing House directly or indirectly with stand-by or other finance, insurance cover, guarantee or other financial backing, which the Clearing House has been requested or is legally required to disclose to assist such person in relation to the provision of, or continued provision of, such finance, insurance cover, guarantee or financial backing.

(c)     The Clearing House shall have authority (a) to obtain and make use of information from SWORD, securities depositories, warehouses and/or any other trade repositories relating to a Member; and (b) to disclose such information to any Regulatory Body or Exchange which is entitled to receive or request any such information.

**REGULATION 42    FEES AND OTHER CHARGES**

(a)     The Clearing House shall be entitled to levy fees in respect of such matters and at such rates as may from time to time be prescribed.  Such fees shall be payable by such Members, by such times, and in such manner as may be prescribed by the Procedures.

(b)     Accommodation charges made by the Clearing House pursuant to Regulation 20(h) to (j) shall be payable to the Clearing House by such Members, in such manner and by such times as may be prescribed by the Procedures.

(c)     Any changes to be made to the fees and charges payable pursuant to paragraphs (a) and (b) above shall take effect, as prescribed by the Procedures.

**REGULATION 43   RECORDS**

A Member shall not be entitled to the return of any particulars, notices or any other documentation presented to the Clearing House pursuant to Regulations 12 to 15 and Regulation 23 to Regulation 30 inclusive.

Notwithstanding any provision in the Clearing Membership Agreement, Rulebook or any other agreement or contract to which the Clearing House may be a party, the Clearing House shall maintain all records and information on all contracts it has processed for a period of at least ten years.

**REGULATION 44   ALTERATION OF REGULATIONS AND THE PROCEDURES**

(a)       Unless the Clearing Membership Agreement or these Regulations otherwise specifically provide in relation to any proposed amendment or extension, the Rules Change Committee (acting in accordance with its terms of reference) may from time to time, by notice delivered by the Clearing House to the Exchanges and Members, alter, amend or extend these Regulations.

(b)       Any such alterations, amendments or extensions may be made with immediate effect or with such deferred effect as the Rules Change Committee shall determine.  Any alterations, amendments or extensions to these Regulations may take effect so as to apply to Contracts registered in a Member's name at the time such alterations, amendments or extensions come into effect if the Rules Change Committee so determines.

(c)       Unless the Clearing Membership Agreement or these Regulations or the Procedures otherwise specifically provide in relation to any proposed alterations, amendments or extensions, the Rules Change Committee may from time to time alter, amend or extend the Procedures by notice delivered to such Exchanges and Members as may be affected.

(d)       The accidental omission to give notice under this Regulation to, or the non-receipt of notice under this Regulation by, any Exchange or Member shall not invalidate the amendment or extension with which the notice is concerned.

## CHAPTER XI – NETTING AND DISTRIBUTION

## REGULATION 45   NETTING

(a)     If at any time the Clearing House fails to make a payment or a delivery of an asset to a Member, other than a Defaulter, under a Contract for a period of 30 days from the date when the obligation to pay or deliver fell due then that Member may exercise its rights under paragraph (c) below.

(b)     If at any time the Clearing House commences a voluntary case or other procedure seeking or proposing liquidation, administration, receivership, voluntary arrangement or a scheme of arrangement, or other similar relief with respect to itself or to its debts under any bankruptcy, insolvency, regulatory, supervisory or similar law, or if any of the foregoing cases or procedures is commenced in relation to the Clearing House by any other person which results in liquidation or winding up of the Clearing House, or if the Clearing House takes corporate action to authorise any of the foregoing, in any such case other than for the purposes of corporate restructuring (including any consolidation, amalgamation or merger), then a Member, other than a Defaulter, may exercise the right given to it under paragraph (c) below.

(c)     A Member entitled to exercise rights under this paragraph may, at any time whilst any of the circumstances referred to in paragraph (a) or (b) giving rise to such rights continue, by notice in writing to the Clearing House, specify a Termination Date for the termination and liquidation of all Contracts to which it is a party in accordance with paragraph (d) below.

(d)     Upon the occurrence of a Termination Date:

(i)      neither the Clearing House nor the Member shall be obliged to make any further payments or deliveries under any Contract between them which would, but for this Regulation 45, have fallen due for performance on or after the Termination Date, and any obligations to make further such payments or deliveries which would otherwise have fallen due shall be satisfied by settlement (whether by payment, set-off or otherwise) of the Termination Amount;

(ii)     the Member shall (on, or as soon as reasonably practicable after, the Termination Date) determine (discounting if appropriate) in respect of each Contract its total loss or, as the case may be, gain, in each case expressed in the lawful currency of the United Kingdom (the "**Base Currency**"), (and, if appropriate, including any loss of bargain, cost of funding or, without duplication, loss or, as the case may be, gain as a result of the termination, liquidation, obtaining, performing or re-establishing of any hedge or related trading position), as a result of the termination, pursuant to this agreement, of each payment or delivery which would otherwise have been required to be made under such Contract (assuming satisfaction of each applicable condition precedent and having due regard to, if appropriate, such market quotations published on, or official settlement prices set by, a relevant exchange or clearing organisation, as may be available on, or immediately preceding, the date of calculation);

(iii)    any cash Collateral balance held by the Clearing House and/or the Member in respect of the other party's initial margin and/or variation margin obligations shall (to the extent not already due and payable) be accelerated so as to become immediately due and payable to the party who provided such cash Collateral, and the Member shall (on, or as soon as reasonably practicable after, the Termination Date) determine the Base Currency Equivalent of such amount(s). For the purposes of this Regulation 45, the "**Base Currency Equivalent**" means, in respect of any amount denominated in the Base Currency, such Base Currency amount and, in respect of any amount denominated in a currency other than the Base Currency (the "**Other Currency**"), the amount in the Base Currency determined by the Member as being required to purchase such amount of such Other Currency as at the relevant Termination Date, with the Base Currency; and

(iv)    the Member shall treat each loss to it determined under paragraph (d)(ii) above and the Base Currency Equivalent of any amount of cash Collateral due and payable to it as a positive amount and each gain by it determined under paragraph (d)(ii) above and the Base Currency Equivalent of any amount of cash Collateral due and payable by it as a negative amount and, subject to paragraph (v), shall aggregate all of such amounts to produce a single, net positive or negative amount, denominated in the Base Currency (the "**Termination Amount**").

(v)    Where a Member has a Proprietary Account and one or more Client Accounts:

(A)    the Member shall determine one or more net amounts under paragraph (d)(iv): a separate net amount in respect of gains and losses arising on Contracts registered in each of its Client Accounts and any corresponding cash Collateral balances held by that Member or the Clearing House; and a further separate net amount in respect of gains and losses arising on all Contracts registered in such Member's Proprietary Account (or Proprietary Accounts as combined) and any corresponding cash Collateral balances held by that Member or the Clearing House; and

(B)    each of the net amounts determined under paragraph (v)(A) shall constitute Termination Amounts.

(vi)    If a Termination Amount determined pursuant to paragraph (v) above is a positive amount, the Clearing House shall pay it to the Member and if any such Termination Amount is a negative amount, the Member shall pay it to the Clearing House, in either case in accordance with paragraph (vii). The Member shall notify the Clearing House of each such Termination Amount, and by which party it is payable, immediately after the calculation thereof.

(vii)    A Termination Amount shall, subject to Regulation 46, be paid in the Base Currency by the close of business on the business day following notification pursuant to paragraph (vi) above (converted as required by applicable law into any other currency, any costs of such conversion to be borne by, and (if applicable) deducted from any payment to, the Clearing House). Any Termination Amount which is not paid on such day shall bear interest, at the

average rate at which overnight deposits in the currency of such payment are offered by major banks in the London interbank market as of 11:00 hours (London time) (or, if no such rate is available, at such reasonable rate as the Member may select) plus 1 per cent. per annum, for each day for which any such sum remains unpaid.

(viii)   For the purposes of any calculation required to be made under this Regulation, the Member may convert amounts denominated in any other currency into the Base Currency at such rate prevailing at the time of the calculation as it shall reasonably select.

The Member's rights under this Regulation 45 shall be in addition to, and not in limitation or exclusion of, any other rights which the Member may have (whether by agreement, operation of law or otherwise, including its rights under Regulation 10(i)).

(e)   If a Member is a Defaulter and either:

(i)   no default management process has been commenced by the Clearing House in respect of such Member within 3 business days following a Default Notice being issued in respect of that Member; or

(ii)   such default management process has been commenced within such period but that Member determines (acting reasonably) that the relevant default management process is unlikely to be completed,

then, provided that an event or circumstance as described in paragraph (a) (ignoring, for this purpose, the words "other than a defaulter" in that paragraph) or (b) above has also occurred, the relevant Member shall be entitled to exercise the rights provided under paragraph (c) above, notwithstanding that it is a Defaulter.

(f)   Interpretation in Relation to FDICIA. The Clearing House and each Clearing Member intend that certain provisions of the General Regulations and the Procedures (including this Regulation 45) be interpreted in relation to certain terms that are defined in FDICIA, as follows:

(i)   The Clearing House is a "clearing organization".

(ii)   An obligation of a Clearing Member to make a payment to the Clearing House, or of the Clearing House to make a payment to a Clearing Member, subject to a netting contract, is a "covered clearing obligation" and a "covered contractual payment obligation".

(iii)   An entitlement of a Clearing Member to receive a payment from the Clearing House, or of the Clearing House to receive a payment from a Clearing Member, subject to a netting contract, is a "covered contractual payment entitlement".

(iv)   The Clearing House is a "member", and each Clearing Member is a "member".

(v)   The amount by which the covered contractual payment entitlements of a Clearing Member or the Clearing House exceed the covered contractual

payment obligations of such Clearing Member or the Clearing House after netting under a netting contract is its "net entitlement".

(vi)    The amount by which the covered contractual payment obligations of a Clearing Member or the Clearing House exceed the covered contractual payment entitlements of such Clearing Member or the Clearing House after netting under a netting contract is its "net obligation".

(vii)   The General Regulations and the Procedures, including this Regulation 45 constitute a "netting contract".

(viii)  The provisions of the Rulebook (including the Default Rules) and the Procedures providing for the use and liquidation of Collateral each constitute a "security agreement of arrangement or other credit enhancement related to one or more netting contracts between any 2 members of a clearing organization".

(ix)    For purposes of this Regulation 45, the term "payment" means "a payment of United States dollars, another currency, or a composite currency, and a noncash delivery, including a payment or delivery to liquidate an unmatured obligation".

**REGULATION 46    DISTRIBUTION OF ASSETS**

(a)     Where (after any netting and set-off provided for in Regulation 45 of these Regulations, Regulation 10(i) of these Regulations, Regulation 25 of the FCM Regulations, Regulation 7(i) of the FCM Regulations, or otherwise) the Clearing House has insufficient assets available to it to pay all claims of the Clearing Members (which shall include FCM Clearing Members for the purposes of this Regulation 46) in full (including, for the avoidance of doubt, any claims in respect of outstanding Contributions under Default Rule 16(a)(i)), such claims shall be met first in an amount equal to the sum of the outstanding Contributions of each such Clearing Member and, thereafter, *pro rata* to each Clearing Member's remaining claim, taking into account any amounts already received.

(b)     To the extent the Clearing House does not have sufficient assets available to it to pay each Clearing Member the amount equal to the sum of its outstanding Contributions, the Clearing House shall distribute the assets available to it to Clearing Members in respect of their claims relating to outstanding Contributions in priority to other Clearing Member claims, in each case in an amount equal to the proportion that the outstanding Contributions of the relevant Clearing Member bear to the aggregate of all outstanding Contributions of all Clearing Members.

**REGULATION 46A          SOLVENCY THREATENING TREASURY DEFAULT LOSS**

(a)      In this Regulation:

"**Calculation Period**" means, in respect of a type of Business, a period of the number of days specified in the "Combined Loss Value" calculation in relation to the Fund Amount of that type of Business and ending on the business day preceding the date on which the Clearing House determines that a Solvency Threatening Treasury Default Loss has occurred (and the terms "Business", "Combined Loss Value" and "Fund Amount" have the meanings set out in the Default Fund Rules);

"**Margin Weight**" means:

(i)      the aggregate of a Clearing Member's total margin requirement (in respect of all of its Proprietary Accounts and all of its Client Accounts) for each type of Business undertaken by the Clearing Member averaged over the relevant Calculation Period preceding a determination of a Solvency Threatening Treasury Default Loss under Regulation 46A(b) below;

divided by

(ii)      the total average margin requirement of all Clearing Members (including FCM Clearing Members) during the same period; and

"**Treasury Default**" means, in connection with the Clearing House's treasury management activities, the default of: (A) an issuer of a debt instrument underlying a treasury management contract; and/or (B) a counterparty to a treasury management contract (including a deposit-taking institution), as determined by the Clearing House in its sole discretion.

(b)      In the event of a Treasury Default, the Clearing House may determine in its sole discretion that a loss has been caused by or arises out of a Treasury Default. If the Clearing House so determines, it must determine the quantum of that loss by ascertaining the gross amount of the loss and reducing it by EUR 15 million. The result is referred to as a "**Solvency Threatening Treasury Default Loss**".

(c)      The Clearing House will, in respect of each Clearing Member, determine an amount of the Solvency Threatening Treasury Default Loss to be allocated to that Clearing Member based on that Clearing Member's Margin Weight (an "**Allocated Loss**"). The day on which the Clearing House determines that a Solvency Threatening Treasury Default Loss has taken place shall be the determination day for the purposes of establishing the Calculation Period.

(d)      The maximum Allocated Loss that each Clearing Member can be allocated is equal to: (i) the total Clearing House treasury investment portfolio immediately prior to the Solvency Threatening Treasury Default Loss, reduced by EUR 15 million; multiplied by (ii) that Clearing Member's Margin Weight. For the purpose of the calculation of Margin Weight, the margin requirements for any Clearing Member who has become a defaulter at any point prior to the date of allocation, shall be disregarded.

(e)     Each Clearing Member shall pay to the Clearing House within an hour of demand a cash amount equal to its Allocated Loss. The Clearing House shall be entitled to debit such cash amount from the PPS account associated with that Clearing Member's Proprietary Account.

(f)     Any determination made by the Clearing House, and any action taken by the Clearing House, pursuant to this Regulation is binding on a Clearing Member and may in no circumstances be challenged or called into question.

(g)     If, after exercising its rights under this Regulation, the Clearing House makes a recovery in respect of the Treasury Default, the Clearing House will (after replenishing its own losses and expenses) distribute the net proceeds of such recovery pro rata to the amount of the Allocated Loss paid by each Clearing Member and each FCM Clearing Member in respect of that Treasury Default by crediting the relevant Clearing Member's Proprietary Account. Nothing in this Regulation 46A(g) obliges the Clearing House to pursue any litigation or take other action in order to recover the amounts contemplated hereby.

## CHAPTER XII – MISCELLANEOUS

**REGULATION 47    PROCEDURES**

The Procedures shall take effect and shall be binding on Members as if they formed part of these Regulations save that, in the event of any conflict between the provisions of these Regulations and the Procedures, the provisions of these Regulations shall prevail.

**REGULATION 48   INTERPRETATION OF THESE REGULATIONS**

(a)     In the event of inconsistency between the provisions of these Regulations and Exchange Rules, or between these Regulations and the rules or regulations or other contractual provisions of any trading platform or other undertaking, the provisions of these Regulations shall prevail.

(b)     The headings to these Regulations are for convenience only and shall not affect their interpretation.

## REGULATION 49   WAIVER

No failure by the Clearing House to exercise, nor any delay on its part in exercising, any of its rights (in whole or in part) under these Regulations shall operate as a waiver of the Clearing House's rights or remedies upon that or any subsequent occasion, nor shall any single or partial exercise of any right or remedy prevent any further exercise thereof or any other right or remedy.

**REGULATION 50    VALIDITY OF REGULATIONS AND ACTION**

(a)     If at any time any provision of these Regulations becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions of these Regulations nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall in any way be affected or impaired thereby.

(b)     Action taken by the Clearing House pursuant to Exchange Rules may not be questioned on the ground that the Exchange Rules are to any extent invalid or ultra vires or that a determination or request made by the Exchange, or any agreement made by the Exchange, is ultra vires, incompatible with Exchange Rules or otherwise questionable.

## REGULATION 51   GOVERNING LAW AND JURISDICTION

(a)    These Regulations and the Procedures, an OTC Contract, an LSE Derivatives Markets Cleared Exchange Contract, an EquityClear Contract, an LCH EnClear Contract, a Nodal Contract and an NLX Contract and all non-contractual or other obligations arising out of or in connection with it shall be governed by and construed in accordance with English law.

(b)    Any dispute arising from or in relation to any Contract or in relation to these Regulations shall, unless resolved between the Clearing House and a Member, be referred to arbitration under the Relevant Rules in accordance with Regulation 33. Any right of the Clearing House or the Member to bring or maintain any action, suit or other legal procedures against the other shall be conditional upon the obtaining of an arbitration award. Notwithstanding the foregoing, the Clearing House shall have an unconditional right to maintain proceedings to obtain security for a claim.   This paragraph is subject to Regulation 33(k) and shall not apply to any action, suit or other legal procedure concerning a dispute there referred to.

(c)    The Clearing House and every Member hereby irrevocably agree for the benefit of the Clearing House that the courts of England shall have exclusive jurisdiction to hear and determine any claim or matter arising from or in relation to any Contract or in relation to these Regulations which does not fall to be referred to arbitration under paragraph (b), or to be dealt with under the ATS Rules (as defined in Regulation 63(a)) pursuant to the provisions of Regulation 64 and each Member irrevocably submits to such jurisdiction and to waive any objection which it might otherwise have to such courts being a convenient and appropriate forum, save that this submission to the exclusive jurisdiction of the English courts shall not (and shall not be construed so as to) limit the right of the Clearing House to take proceedings in any other court of competent jurisdiction, nor shall the taking of action in one or more jurisdictions preclude the taking of action in any other jurisdiction, whether concurrently or not.

(d)    Each Member irrevocably waives, with respect to itself and its revenues and assets, all immunity on the grounds of sovereignty or other similar grounds from suit, jurisdiction of any court, relief by way of injunction, order for specific performance or for recovery of property, attachment of its assets (whether before or after judgement) and execution or enforcement of any judgement to which it or its revenues or assets might otherwise be entitled in any proceedings in the courts of any jurisdiction and irrevocably agrees that it will not claim any such immunity in any proceedings.

(e)    Subject to paragraph (a) above and Exchange Rules, a Cleared Exchange Contract shall, after registration in the name of a Member, continue to be governed by and construed in accordance with the law governing it prior to registration.

**REGULATION 52    EXCLUSION OF LIABILITY**

(a)    Without prejudice to the provisions of Regulations 2 and 32 and 52(e) neither the Clearing House, nor any other member of the LCH.Clearnet Group shall have any liability whatsoever to any Member or to any other person (including, without limitation, any Clearing Client of a Member) in contract, tort (including, without limitation, negligence), trust, as a fiduciary or under any other cause of action in respect of any damage, loss, cost or expense of whatsoever nature suffered or incurred by a Member or any other person, as the case may be, as a result of:  any suspension, restriction or closure of the market administered by an Exchange, an ATP or a Co-operating Clearing House, whether for a temporary period or otherwise or as a result of a decision taken on the occurrence of a market emergency; any failure by the Clearing House or an Exchange or a Co-operating Clearing House or an ATP or its operator or the relevant approved agent or the Approved EquityClear Settlement Provider to supply each other with data or information in accordance with arrangements from time to time established between any or all of such persons; the failure of any systems, communication facilities or technology supplied, operated or used by the Clearing House, an Exchange, or a Co-operating Clearing House; any event which is outside the control of the Clearing House; any act or omission of an Exchange, or a Co-operating Clearing House in connection with a Co-operating Clearing House Contract or any contracts made on such terms, including, without limitation, any error in the establishment of a settlement price made by an Exchange; any act or omission of the Clearing House, an Exchange, or a Co-operating Clearing House (as the case may be) in connection with the operation of a Link or the arrangement for the transfer of Contracts under a Link.

(b)    Neither the Clearing House nor any other member of the LCH.Clearnet Group shall have any liability to a Member or any other person (including without limitation a SwapClear Dealer, or a RepoClear Dealer or a ForexClear Dealer) in respect of any dispute arising from or in relation to any OTC Transaction, Eligible EnClear Trade, or an ATP Match including, but not limited to, any dispute as to the validity or otherwise of such OTC Transaction, Eligible EnClear Trade, the terms of such OTC Transaction, Eligible EnClear Trade, trade or ATP Match, or whether any alleged agreement or arrangement constitutes an OTC Transaction or Eligible EnClear Trade.

(c)    Without prejudice to the provisions of Regulation 2 and Regulation 52(e), neither the Clearing House nor any other member of the LCH.Clearnet Group shall have any liability whatsoever to any SwapClear Clearing Member, RepoClear Clearing Member, EquityClear Clearing Member, LCH EnClear Clearing Member, ForexClear Participant or to any other person (including, without limitation, a SwapClear Dealer or a RepoClear Dealer) in contract, tort (including without limitation, negligence), trust, as a fiduciary or under any other cause of action in respect of any damage, loss, cost or expense of whatsoever nature suffered or incurred as a result of:  any suspension of an OTC Service or the EquityClear Service or the LCH EnClear Services (or any part thereof), whether for a temporary period or otherwise, a step taken by the Clearing House under Regulation 16(i), Regulation 37, Regulation 38, Regulation 55(g), or Regulation 72 or any failure or malfunction of any systems, communication lines or facilities, software or technology supplied, operated or used by the Clearing House or the relevant approved agent; the occurrence of any event which is outside the control of the Clearing House; or any exercise by the Clearing

House of its discretion under the Regulations, or any decision by the Clearing House not to exercise any such discretion.

(d)     Without prejudice to Regulation 52(c) and Regulation 52(e), unless otherwise expressly provided in the Regulations or in any other agreement to which the Clearing House is party, neither the Clearing House nor any other member of the LCH.Clearnet Group shall have any liability under any circumstances (including, without limitation, as a result of any negligence by the Clearing House, or any other member of the LCH.Clearnet Group Limited, or their respective officers, employees, agents or representatives), to any Member, or a SwapClear Dealer, a RepoClear Dealer, or a ForexClear Dealer for any indirect or consequential loss or damage, or loss of anticipated profit (whether direct or indirect) or loss of bargain, suffered or incurred by any such Member, SwapClear Dealer, RepoClear Dealer, or a ForexClear Dealer, and shall not in any circumstances be liable for any loss, cost, damage or expense suffered or incurred by any person as a result of any negligence on the part of the Clearing House, or any other member of the LCH.Clearnet Group Limited, or their respective officers, employees, agents or representatives.

(e)     Nothing in this Regulation 52 shall be construed as an attempt by the Clearing House to exclude any liability for any fraud, fraudulent misrepresentation or wilful default on the part of the Clearing House.  The Clearing House accepts liability for any personal injury or death caused by the negligence of the Clearing House and for any fraud or wilful default on the part of the Clearing House and for any actions that it may take on the basis of advice given to it by the SwapClear DMG, and for the accuracy of the information that it distributes to the SwapClear Clearing Members in connection with the SwapClear DMP pursuant to the SwapClear DMP Annex in the Default Rules, and for any actions that it may take on the basis of advice given to it by the ForexClear DMG, and for the accuracy of the information that it distributes to the ForexClear Clearing Members in connection with the ForexClear DMP pursuant to the ForexClear DMP Annex in the Default Rules.

(f)     Without prejudice to the provisions of Regulation 2 and Regulation 32 and Regulation 52(e) neither the Clearing House, nor any other member of the LCH.Clearnet Group shall have any liability whatsoever to any Member or to any other person (including, without limitation, any Clearing Client of a Member or a member of a Co-operating Clearing House or any Clearing Client of such member) in contract, tort (including, without limitation, negligence), trust, as a fiduciary or under any other cause of action in respect of any damage, loss, cost or expense of whatsoever nature suffered or incurred by a Member or any other person, as the case may be, as a result of the failure of any systems, communication facilities or technology supplied, operated or used by LSE or as a result of any negligence, wrongdoing, or other act, error, failure or omission on the part of LSE, in supplying any services to the Clearing House with regard to the LSE Derivatives Markets Services or as a result of or in connection with any inconsistency or conflict between any provision contained in the LSE Derivatives Markets Rules on the one hand and any provision of these Regulations, Default Rules and Procedures and any other Clearing House documentation on the other hand.

(g)     For the purposes of the Contracts (Rights of Third Parties) Act 1999, save as is expressly set out herein, these Regulations, Default Rules and Procedures do not create any rights in any persons who is/are not a Member/s.

(h)     Without prejudice to Regulation 2 and Regulation 52(e), neither the Clearing House, nor any other member of the LCH.Clearnet Group, shall have any liability whatsoever to any Member or to any other person (including, without limitation, any client of a Member) in contract, tort (including, without limitation, negligence), trust, as a fiduciary or under any other cause of action in respect of any damage, loss, cost or expense of whatsoever nature suffered or incurred by a Member or any other person as the case may be, as a result of any service failure, whether complete or partial, of any payment or securities services provider, including (without limitation) any Securities System Operator, custodian, settlement agent, securities depository, securities settlement system, settlement facility or central bank.

## CHAPTER XIII – INTENTIONALLY LEFT BLANK

**REGULATION 53   INTENTIONALLY LEFT BLANK**

## CHAPTER XIV – SWAPCLEAR REGULATIONS

## REGULATION 54   APPLICATION OF SWAPCLEAR REGULATIONS

(a)     The Clearing House shall provide the SwapClear Service subject to and in accordance with the terms of these SwapClear Regulations and the Procedures.

(b)     SwapClear Clearing Members shall be bound by these SwapClear Regulations. Applications to become a SwapClear Clearing Member shall be made in accordance with Regulation 54(d) and (e). Other than as expressly specified in this Regulation 54, the remainder of the Regulations shall not apply to the SwapClear Service. A summary table of those Regulations which apply to the SwapClear Service as described in Regulation 54(a) to (q) is provided at Regulation 54(r).

(c)     Regulation 2 and Regulation 3 of the Regulations apply to the SwapClear Service.

**SwapClear Clearing Membership**

(d)     A Clearing Member may apply to become a SwapClear Clearing Member in accordance with the Procedures.

(e)     Regulation 4 applies to membership of the SwapClear Service and applications for such membership.

(f)     Regulation 5 applies to a SwapClear Clearing Member.

**Accounts**

(g)     Regulation 10 applies to the opening and operation of accounts with respect to a SwapClear Clearing Member. Such accounts shall be designated in accordance with Regulation 15.

**Client Clearing**

(h)     Regulation 11 applies to those SwapClear Clearing Members who provide (or wish to provide) Client Clearing Services.

**Formation, registration and transfers of SwapClear Contracts**

(i)     Regulation 16(b), Regulation 16(c), Regulation 17 and Regulation 55 apply to the registration and formation of a SwapClear Contract.

(j)     Regulation 18 (and, insofar as relevant, Regulation 12(b)) apply to a SwapClear Contract entered  into by a SwapClear Clearing Member in respect of SwapClear Clearing House Business.

(k)     Regulation 60 applies to a SwapClear Contract entered into by a SwapClear Clearing Member in respect of SwapClear Client Clearing Business, save that where a SwapClear Clearing Member is a Defaulter, Regulation 12(b) applies insofar as relevant.

(l)     Regulation 54 to Regulation 60 apply to the SwapClear Service.

**Margin and Collateral**

(m)     Regulation 20 applies to a SwapClear Clearing Member.

**Reference prices and Revaluation**

(n)     Regulation 22 applies to open SwapClear Contracts.

**Other Applicable Regulations**

(o)     Regulation 37 to Regulation 46 inclusive apply to SwapClear Clearing Members and SwapClear Contracts.

**Default Rules**

(p)     The Default Rules (including the SwapClear DMP Annex) apply to SwapClear Clearing Members and SwapClear Contracts.

**Clearing House Settlement Finality Regulations**

(q)     The Clearing House Settlement Finality Regulations apply in relation to SwapClear Clearing Members and SwapClear Contracts.

**Summary table of Regulations which apply to the SwapClear Service**

(r)     The Regulations listed in this Regulation 54(r) apply to the SwapClear Service as described under Regulation 54(a) to (q).

| *Regulation* | *Title* |
| --- | --- |
| Regulation 2 | Obligation to the Clearing House to each Member |
| Regulation 3 | Performance by the Clearing House of its Obligations under the Terms of an Open Contract |
| Regulation 4 | Clearing Member Status of the Clearing House |
| Regulation 5 | Resigning and Retiring Members |
| Regulation 8 | Dealer Status |
| Regulation 9 | Service Withdrawal |
| Regulation 10 | Accounts |
| Regulation 11 | Client Clearing Business |
| Regulation 12(b) | Novation |
| Regulation 15 | Designation |
| Regulation 16(b) | Registration |

| Regulation | Title |
|------------|-------|
| and (c) | |
| Regulation 17 | Trading Information |
| Regulation 18 | Transfer |
| Regulation 20 | Margin and Collateral |
| Regulation 22 | Official Quotations and Reference Price |
| Regulation 25 | Other Modes of Settlement and Revaluation |
| Regulation 37 | Market Disorders, Impossibility of Performance, Trade Emergency |
| Regulation 38 | Force Majeure |
| Regulation 39 | Invoicing Back |
| Regulation 40 | Currency Conversion |
| Regulation 41 | Disclosure and Reporting |
| Regulation 42 | Fees and Other Charges |
| Regulation 43 | Records |
| Regulation 44 | Alteration of Regulations and the Procedures |
| Regulation 45 and Regulation 46 | Netting and Distribution of Assets |
| Regulation 47 | Procedures |
| Regulation 48(b) | Interpretation of these Regulations |
| Regulation 49 | Waiver |
| Regulation 50(a) | Validity of Regulations and Action |
| Regulation 51 | Governing Law and Jurisdiction |
| Regulation 52 | Exclusion of Liability |
| Regulation 54 to Regulation 60 | SwapClear Regulations |
| Default Rules | Default Rules (including SwapClear DMP Annex) |

| *Regulation* | *Title* |
|---|---|
| Settlement Finality Regulations | Settlement Finality Regulations |

**REGULATION 55    REGISTRATION OF SWAPCLEAR CONTRACTS**

(a)    A SwapClear Transaction may be presented to the Clearing House for registration as two SwapClear Contracts or one SwapClear Contract, and one FCM SwapClear Contract (in accordance with the other provisions of the Rulebook).

(b)    Once a SwapClear Transaction has been presented to the Clearing House, the Clearing House shall (where applicable in accordance with paragraph (c) below and Section 1.3 (*Registration*) of Procedure 2C (the SwapClear Service) request the consent of each of the relevant SwapClear Clearing Members with whom a SwapClear Contract shall be registered as a result thereof to such registration.  Upon each such SwapClear Clearing Member providing its consent, such SwapClear Transaction shall be deemed to have been submitted (as such term is defined in the Procedures) to the Clearing House for registration.  Any such consent shall be provided in accordance with the Procedures.

(c)    A SwapClear Clearing Member which has been nominated to clear the SwapClear Contract arising from the registration of a SwapClear Transaction on behalf of a third party Executing Party other than a SwapClear Dealer will (only where such SwapClear Transaction is not a US Trading Venue Transaction) be notified by the Clearing House of the relevant SwapClear Transaction and shall choose whether to grant or refuse consent to the registration of such SwapClear Transaction and the SwapClear Contract(s) resulting from such SwapClear Transaction.  In circumstances where (i) a SwapClear Clearing Member is an Executing Party in relation to a SwapClear Transaction and shall clear one of the SwapClear Contracts resulting from such SwapClear Transaction; or (ii) or a SwapClear Transaction is a US Trading Venue Transaction, the consent of that SwapClear Clearing Member to the registration of the relevant SwapClear Transaction will occur automatically and without the need for any further action by such SwapClear Clearing Member.

(d)    The Clearing House shall register or reject the registration of a SwapClear Contract in respect of a SwapClear Transaction presented for registration subject to, and in accordance with these Regulations and Procedures as quickly as would be technically practicable if fully automated systems were used (the standard required in Part 39 of the CFTC Regulations), **provided that**:

(i)    both sides of the relevant SwapClear Transaction have been properly presented and submitted for clearing by (or on behalf of the) the Executing Parties;

(ii)    the relevant SwapClear Transaction meets the eligibility criteria as prescribed on the Clearing House's website at the time the particulars of the SwapClear Transaction are presented to the Clearing House and continues to meet such criteria at the Registration Time;

(iii)    such SwapClear Contract is consented to by the relevant SwapClear Clearing Member (to the extent such consent is required) in accordance with paragraph (c) above and Section 2C3.2 of the Procedures;

(iv)    the applicable SwapClear Clearing Member has transferred, upon request of the Clearing House and in accordance with Regulation 20 and such other

applicable provisions of the Rulebook, all required Collateral in respect of such SwapClear Contract prior to registration (taking into account any available MER and/or SwapClear Tolerance, if any); provided that such Collateral need not be transferred prior to registration as a condition to the registration of such SwapClear Contract unless such SwapClear Contract results from a SwapClear Transaction that is a Block IRS Trade;

(v)     all the conditions applicable (under the terms of the Rulebook or the FCM Rulebook, as the case may be) for the registration of the other SwapClear Contract or the FCM SwapClear Contract (as the case may be) deriving from the relevant SwapClear Transaction have been satisfied.

(e)    From the time of registration by the Clearing House of two SwapClear Contracts or one SwapClear Contract and one FCM SwapClear Contract (as the case may be) (the **"Registration Time"**) in respect of a SwapClear Transaction in accordance with the Procedures:

(i)     where both of the Executing Parties in respect of such SwapClear Transaction are SwapClear Member(s) and/or SwapClear Dealer(s), those Executing Parties shall be released and discharged from all rights and obligations thereunder which fall due for performance on or after the Registration Time and, in all other cases, the rights and obligations of the Executing Parties to the SwapClear Transaction shall be governed by the applicable Execution Terms, or as otherwise agreed by such Executing Parties; and

(ii)    the relevant SwapClear Clearing Member(s) will be deemed to be and will be bound by the SwapClear Contract(s) with the Clearing House automatically and without any further action on its part, on terms that, without limitation, incorporate all applicable terms of the Rulebook (including the SwapClear Contract Terms applicable to the relevant SwapClear Contract).

(f)    The Economic Terms shall be such that:  (A) a SwapClear Clearing Member paying (or clearing on behalf of a person paying) Rate X and receiving (or clearing on behalf of a person receiving) Rate Y under a SwapClear Transaction shall have such rights against, and owe such obligations to, the Clearing House under the corresponding SwapClear Contract registered by it in respect of such SwapClear Transaction as further provided for in the final paragraph of this sub-paragraph (f) and (B) a SwapClear Clearing Member paying (or clearing on behalf of a person paying) Rate Y and receiving (or clearing on behalf of a person receiving) Rate X under a SwapClear Transaction shall have such rights against, and owe such obligations to, the Clearing House under the corresponding SwapClear Contract registered by it in respect of such SwapClear Transaction as further provided for in the final paragraph of this sub-paragraph (f).

In this sub-paragraph (f), a reference to the **"rights"** and **"obligations"** is a reference to rights and obligations, falling due for exercise or performance after the Registration Time, and which are the same in nature and character as the rights or obligations set out in the Economic Terms of the corresponding SwapClear Transaction (it being assumed, for this purpose, that such SwapClear Transaction was a legal, valid, binding and enforceable obligation of the parties thereto and that the Economic Terms thereof were as presented to the Clearing House for registration), notwithstanding the

change in the person entitled to them or obliged to perform them, and subject to any change thereto as a result of the operation of the Standard Terms.  In this sub-paragraph (f), a reference to "**paying**" means either paying under a SwapClear Transaction that is an existing swap transaction or "agreeing to pay" under a SwapClear Transaction that is contingent on clearing.

(g)    If at any time after registration of a SwapClear Contract, the Clearing House determines that the corresponding SwapClear Transaction of which details were presented for registration did not, at the Registration Time, meet the SwapClear Eligibility Criteria in existence at the Registration Time (an "**Ineligible SwapClear Transaction**"), the Clearing House shall, immediately set aside both SwapClear Contracts (or, in the case of a SwapClear Transaction that resulted in a SwapClear Contract and an FCM SwapClear Contract, such SwapClear Contract) arising from such Ineligible SwapClear Transaction.  Upon a SwapClear Contract (an "**Ineligible SwapClear Contract**") being set aside under this paragraph (g):  (1) the Clearing House will notify the SwapClear Clearing Member party to such Ineligible SwapClear Contract via the Approved Trade Source System through which details of the relevant Ineligible SwapClear Transaction were originally presented to the Clearing House that such Ineligible SwapClear Contract has been set aside; and (2) such Ineligible SwapClear Contract shall immediately be deemed to be terminated and shall thereafter have no force or effect.  Where an Ineligible SwapClear Contract is set aside pursuant to this paragraph (g), all payments (including, without limitation, variation margin) (if any) paid by the Clearing House or by a SwapClear Clearing Member in respect of such ineligible SwapClear Contract up to and including the time when such Ineligible SwapClear Contract was set aside shall be retained by the receiving party upon termination as a termination payment.  Any other payment obligations in respect of an Ineligible SwapClear Contract and/or the relevant Ineligible SwapClear Transaction shall be as agreed between the Executing Parties to such Ineligible SwapClear Transaction and shall not be paid by or to the Clearing House.

(h)    Notwithstanding anything to the contrary in this Rulebook, the Clearing House may decline to register a SwapClear Transaction as a SwapClear Contract or a SwapClear Contract and a FCM SwapClear Contract (as the case may be) where it considers such action advisable for its own protection or the protection of the relevant market; **provided that** the Clearing House may (subject to the provisions of the Rulebook) register any SwapClear Contract which reduces the risk exposure of the Clearing House and the applicable SwapClear Clearing Member, as determined in the discretion of the Clearing House. The Clearing House may, subject to sub-paragraph (d) above and without assigning any reason, make the registration of any SwapClear Transaction subject to any conditions stipulated by the Clearing House including, without limitation, the transfer to the Clearing House of additional Collateral by any SwapClear Clearing Member in whose name any such SwapClear Transaction is to be registered.

(i)    Any SwapClear Transaction of which details have been presented for registration and which are not so registered will be governed by the applicable Execution Terms among the relevant parties, and the Clearing House shall have no obligations or liability in relation thereto.

(j)    If a SwapClear Transaction is revoked, avoided or otherwise declared invalid for any reason after particulars of it have been accepted by the Clearing House for registration such revocation, avoidance or invalidity shall not affect any SwapClear Contract arising under this Regulation 55, Regulation 12(b) or Regulation 18.

In the case of a SwapClear Contract registered by the Clearing House pursuant to Rule 6(a) of the Default Rules, the Registration Time shall be deemed to be the time chosen by the Clearing House whereupon this Regulation 55 shall take effect.

**REGULATION 56    COMPRESSION**

(a)    Notwithstanding any other provision of these Regulations if:

    (i)    one or more SwapClear Contracts registered by a SwapClear Clearing Member in accordance with the Rulebook has substantially the same Economic Terms as one or more other SwapClear Contracts registered for the account of such SwapClear Clearing Member, and

    (ii)    all such SwapClear Contracts are either (a) registered on the SwapClear Clearing Member's own behalf or (b) registered on behalf of the same SwapClear Clearing Client,

then, to the extent permitted in the Procedures and this Regulation 56, the SwapClear Clearing Member may request that the Clearing House compress and combine all such SwapClear Contracts by terminating the relevant existing SwapClear Contracts and in some instances, compressing them into one or more SwapClear Contracts having a net future cash flow equal to the net future cash flow of such original SwapClear Contracts. For the avoidance of doubt, in no circumstances can a SwapClear Contract registered in the Proprietary Account of a SwapClear Clearing Member be compressed pursuant to this Regulation 56 with a SwapClear Contract registered in the Client Account of that SwapClear Clearing Member.

(b)    For purposes of paragraph (a) above, two or more SwapClear Contracts may be deemed by the Clearing House to have "substantially the same Economic Terms" if they are based on the same underlying currencies and the Clearing House considers them, in its sole discretion, to have substantially the same fundamental economic attributes which influence the amount, value date and direction of all coupon cash flows. For the avoidance of doubt, the Clearing House may determine that two or more SwapClear Contracts have "substantially the same Economic Terms" even if they have differing fixed rates. Two or more SwapClear Contracts that are compressed under the terms of this paragraph and paragraph (a) above shall be aggregated if the position of the SwapClear Clearing Member is in the same direction on each such SwapClear Contract (i.e., obligations to make payment aggregated and rights to receive payment aggregated), such that the SwapClear Contract that replaces the compressed SwapClear Contracts shall have a notional amount equal to the total notional amount of the compressed SwapClear Contracts. Two or more SwapClear Contracts that are compressed under the terms of this paragraph and paragraph (a) above shall be netted if the position of the SwapClear Clearing Member is in the opposite direction on two or more of each such SwapClear Contracts (i.e., obligations to make payment netted against rights to receive payment). In most such cases the SwapClear Contract (if any) that replaces the compressed SwapClear Contracts shall have a notional amount equal to the net notional amount of the compressed SwapClear Contracts, however, in some cases the replacement SwapClear Contracts will have an aggregate notional amount that is greater than the net notional amount of the compressed SwapClear Contracts **provided that** in no event will the aggregate notional amounts of the replacement SwapClear Contracts be greater than the aggregate notional amounts of the compressed SwapClear Contracts, and **provided further** that in the event that the net notional amount and net future cash flows are equal to zero such compression shall result in no replacement SwapClear Contracts. The Clearing House shall determine (in its sole discretion) whether SwapClear

Contracts that are the subject of a request for compression from the SwapClear Clearing Member may be compressed and, if such SwapClear Contracts are compressed, the Clearing House shall determine the resulting terms of the SwapClear Contract(s) (if any) that replaces the compressed SwapClear Contracts, and such determination shall be binding on the SwapClear Clearing Member, absent manifest error. It is a condition for compression of SwapClear Contracts that the amount of Collateral that the Clearing House requires in respect of the original SwapClear Contracts is equal to that which is required by the Clearing House in respect of the replacement SwapClear Contract(s).

(c)    In addition, the Clearing House may, from time to time in its absolute discretion, make available in accordance with this Regulation 56, Multilateral Compression on the basis of a Multilateral Compression Cycle which is either:

   (i)    an ACSP Compression Cycle, available to SwapClear Clearing Members; or

   (ii)    a Member Compression Cycle, where so requested by two or more SwapClear Clearing Members and agreed to by the Clearing House.

(d)    In participating in any Multilateral Compression Cycle, a SwapClear Clearing Member:

   (i)    must be party to relevant Compression Documentation with the Clearing House and/or any nominated ACSP at such time as is contemplated in the Compression Documentation and from such time up to and including the Compression Time for that Multilateral Compression Cycle and at all relevant times must be accepted by the Clearing House and/or any nominated ACSP as an entity eligible to participate in such Multilateral Compression Cycle;

   (ii)    in relation to an ACSP Compression Cycle, shall nominate those SwapClear Contracts which it wishes to make available for Multilateral Compression in accordance with the relevant Compression Documentation;

   (iii)    in relation to a Member Compression Cycle, shall together with the other requesting SwapClear Clearing Member(s) provide to the Clearing House details of the proposed Terminating SwapClear Contracts and, where the Member Compression Cycle also includes the registration of Post-Multilateral Compression Contracts, details of those SwapClear Contracts (in such form as the Clearing House may require from time to time) which shall, subject to the Clearing House's confirmation, constitute the Compression Proposal;

   (iv)    warrants and represents to the Clearing House that the terms of its participation in the proposed Multilateral Compression Cycle are in compliance with all applicable laws and regulation; and

   (v)    agrees and acknowledges that the Multilateral Compression Cycle will operate, and Multilateral Compression shall take place, in accordance with this Regulation 56, the relevant Compression Proposal as accepted by such SwapClear Clearing Member, relevant Compression Documentation and such other processes and procedures as may be notified by the Clearing House from time to time.

(e)     Where the Clearing House intends to run an ACSP Compression Cycle, it shall nominate an ACSP to facilitate that ACSP Compression Cycle and produce the Compression Proposal.   Such ACSP shall notify SwapClear Clearing Members meeting the criteria at (d)(i) above of the timing and procedure for such ACSP Compression Cycle and invite such SwapClear Clearing Members to confirm their interest.  The Compression Documentation for such Multilateral Compression Cycle shall include any documentation relevant to that ACSP.   Additional information on the administrative procedures for any Multilateral Compression Cycle may be included in the Compression Documentation or other procedures published by the Clearing House or a nominated ACSP from time to time or in connection with a particular Multilateral Compression Cycle.

(f)     In any Multilateral Compression Cycle, Multilateral Compression shall only take place in accordance with the terms of a Compression Proposal which has been established and accepted by all participating SwapClear Clearing Members in accordance with this Regulation 56.   Notwithstanding the other provisions of this Regulation 56, the Clearing House shall determine (in its sole discretion) whether SwapClear Contracts proposed for inclusion in a Compression Proposal may be so included.

(g)     A Compression Proposal shall:

    (i)     in relation to an ACSP Compression Cycle, be generated by the nominated ACSP in accordance with the relevant Compression Documentation and details submitted to the ACSP by participating SwapClear Clearing Members, and be communicated by the ACSP to each participating SwapClear Clearing Member in the manner contemplated in the relevant Compression Documentation for acceptance;

    (ii)    in relation to a Member Compression Cycle, be constituted by the details submitted to the Clearing House by the requesting SwapClear Clearing Members (subject to the Clearing House's determination that such proposed details are eligible for Multilateral Compression), and shall form the basis for the subsequent acceptance by each requesting SwapClear Clearing Member; and

    (iii)   in all cases include only those SwapClear Contracts that are eligible for Multilateral Compression in the relevant Multilateral Compression Cycle and that are registered in a SwapClear Clearing Member's Proprietary Account.

(h)     Where it wishes to participate in a Multilateral Compression Cycle, each participating SwapClear Clearing Member shall confirm its acceptance of a Compression Proposal in the manner and by the time specified by the Clearing House or otherwise contemplated in the relevant Compression Documentation. In relation to an ACSP Compression Cycle, each participating SwapClear Clearing Member agrees and acknowledges that the ACSP's confirmation to the Clearing House that such SwapClear Clearing Member has confirmed its acceptance of the Compression Proposal to the ACSP shall constitute a binding acceptance by such SwapClear Clearing Member to the Clearing House for the purposes of this Regulation 56.  Upon a SwapClear Clearing Member's acceptance of a Compression Proposal in accordance with this paragraph, such SwapClear Clearing Member shall be irrevocably bound to

the terms of that Compression Proposal and the Multilateral Compression contemplated thereunder.

(i)    The Clearing House may require margin, subsequent to a SwapClear Clearing Member's acceptance of a Compression Proposal but prior to the Compression Time, in connection with the Multilateral Compression Cycle and the SwapClear Clearing Member's positions thereunder.

(j)    Each SwapClear Clearing Member that confirms its acceptance of a Compression Proposal in accordance with relevant Compression Documentation agrees and acknowledges for the benefit of the Clearing House that, by its acceptance, such SwapClear Clearing Member:

   (i)    shall be bound by and act in accordance with the terms of this Regulation 56, the Compression Documentation and any notifications made by the Clearing House or any nominated ACSP pursuant thereto;

   (ii)    shall meet any margin calls from the Clearing House made prior to the Compression Time in connection with the Multilateral Compression Cycle. Any such margin will be called in accordance with the Procedures; and

   (iii)    is bound by the terms of the Compression Proposal and the terminations and, where applicable, registrations of SwapClear Contracts comprised therein.

(k)    Following acceptance of the Compression Proposal by all participating SwapClear Clearing Members, the Clearing House shall effect Multilateral Compression at such time as it may determine.  For the avoidance of doubt, the irrevocable acceptance of a Compression Proposal by participating SwapClear Clearing Members shall not bind or require the Clearing House to proceed with a Multilateral Compression Cycle.  At any time prior to the Compression Time, the Clearing House may, in its sole and absolute discretion, decide not to proceed with a Multilateral Compression Cycle.

(l)    Without prejudice to the rights of the Clearing House set out in paragraph (k) above, a Compression Proposal shall be rejected by the Clearing House if:

   (i)    a SwapClear Clearing Member which has accepted a Compression Proposal is not eligible to participate in the relevant Multilateral Compression Cycle;

   (ii)    any of the SwapClear Contracts included as a Post-Multilateral Compression Contract or a Terminating SwapClear Contract are not eligible for such Multilateral Compression Cycle;

   (iii)    in relation to a Member Compression Cycle, the proposals submitted by the relevant SwapClear Clearing Members do not match; or

   (iv)    any SwapClear Clearing Member due to participate in a Multilateral Compression Cycle rejects the Compression Proposal or does not provide the margin as required by the Clearing House.

(m)    When the Clearing House effects a Multilateral Compression, it shall terminate all Terminating SwapClear Contracts and, where the Multilateral Compression includes the registration of Post-Multilateral Compression Contracts, simultaneously with and

contingent upon the termination of the Terminating SwapClear Contracts, shall register the Post-Multilateral Compression Contracts in the Proprietary Accounts of the relevant SwapClear Clearing Members. The Clearing House shall notify the participating SwapClear Clearing Members once the Multilateral Compression has been effected.

(n)    The Clearing House shall have no involvement in and accepts no responsibility or liability in relation to any Multilateral Compression-related balancing, termination or ancillary payments or fees that participating SwapClear Clearing Members may agree between themselves in accordance with relevant Compression Documentation or otherwise.

(o)    Without prejudice to any other provisions of these Regulations, in particular Regulation 45, or any Compression Documentation, neither the Clearing House, nor any other member of LCH.Clearnet Group shall have any liability whatsoever to any SwapClear Clearing Member or to any other person in contract, tort (including, without limitation, negligence), trust, as a fiduciary or under any other cause of action in respect of any damage, loss, cost or expense of whatsoever nature suffered or incurred by a SwapClear Clearing Member or any other person, as the case may be:

(i)    as a result of any action the Clearing House takes under this Regulation 56, whether in accordance with a Compression Proposal, in reliance on information provided by SwapClear Clearing Members or any ACSP or otherwise;

(ii)    in relation to an ACSP Compression Cycle, as a result of any action or omission of an ACSP, including, without limitation, any error or omission in the terms of any Compression Proposal; or

(iii)    in relation to any Multilateral Compression Cycle, as a result of any action or omission of a participating SwapClear Clearing Member, including, without limitation, any error or omission in the terms of any Compression Proposal.

(p)    An ACSP's liability in respect of its acts or omissions is subject to the relevant terms of the applicable Compression Documentation.

(q)    Any notification or communication required in connection with a Multilateral Compression Cycle shall be made in accordance with the Compression Documentation or, if not specified in the Compression Documentation, the Procedures or such other guidance as the Clearing House may provide from time to time.

(r)    Notwithstanding any other provision of these Regulations or the terms of the SwapClear Contracts, the Clearing House may disclose details of any Compression Proposal and related details of SwapClear Clearing Members to any ACSP or otherwise as the Clearing House considers appropriate in order to facilitate a Multilateral Compression Cycle.

**REGULATION 57    COLLATERALISATION OF SWAPCLEAR CONTRACTS**

(a)    The net present value of each SwapClear Contract shall be calculated by the Clearing House for the purposes of determining required variation margin in such manner and at such times as may be provided in the Procedures.  Except as prescribed in the Procedures, the net present value calculated by the Clearing House may in no circumstances be called in question.

(b)    The Clearing House shall, at least daily:

    (i)    where the net present value of an outstanding SwapClear Contract has moved in favour of the Clearing House since the last valuation, call on the SwapClear Clearing Member to transfer to the Clearing House cash in an amount equal to (A) the net present value to the Clearing House of the relevant SwapClear Contract minus (B) the current balance of cash Collateral provided to the Clearing House by such SwapClear Clearing Member in respect of its variation margin obligations in respect of that SwapClear Contract; and

    (ii)    where the net present value of an outstanding SwapClear Contract has moved in favour of the SwapClear Clearing Member since the last valuation, transfer to the SwapClear Clearing Member cash in an amount equal to (A) the net present value to the SwapClear Clearing Member of the relevant SwapClear Contract minus (B) the current balance of cash Collateral provided to such SwapClear Clearing Member by the Clearing House in respect of its variation margin obligations in respect of that SwapClear Contract,

provided that:

    (iii)    (A) and/or (B), as used in sub-paragraphs (i) and (ii) above, may be negative numbers where the net present value of a SwapClear Contract has moved in favour of the party that was "out of the money" at the time of the preceding valuation;

    (iv)    any time the calculation provided for in this Regulation 57(b) is performed for the first time in respect of any particular SwapClear Contract that SwapClear Contract shall for the purpose of sub-paragraphs (i) and (ii) above be deemed to have had a net present value of zero at the time of the preceding valuation; and

    (v)    the calculations under this Regulation 57(b) shall disregard any amount previously determined to be payable by one party to the other pursuant to Regulation 57(d) but which has not yet been so transferred.

(c)    Cash provided by the Clearing House or a SwapClear Clearing Member under Regulation 57(b) is provided by way of title transfer and, other than where the provision of cash reduces a party's current balance of cash Collateral, for the purpose of collateralising the relevant party's obligations under the relevant SwapClear Contract(s).

(d)    In respect of all SwapClear Contracts, on every Business Day, the Clearing House shall aggregate:

  (i)    the sums which would otherwise have been payable by the SwapClear Clearing Member to the Clearing House as cash Collateral (in respect of variation margin obligations) on such date, any coupon payments which would otherwise have been due on that date from the SwapClear Clearing Member to the Clearing House and any other sums which would otherwise have been payable by the SwapClear Clearing Member to the Clearing House on such date (including, for the avoidance of doubt, any amounts due in respect of an obligation to return cash Collateral and any settlement amounts payable under a SwapClear Contract); and

  (ii)    the sums which would otherwise have been payable by the Clearing House to the SwapClear Clearing Member as cash Collateral (in respect of variation margin obligations) on such date, any coupon payments which would otherwise have been due on that date from the Clearing House to the SwapClear Clearing Member and any other sums which would otherwise have been payable by the Clearing House to the SwapClear Clearing Member on such date (including, for the avoidance of doubt, any amounts due in respect of an obligation to return cash Collateral and any settlement amounts payable under a SwapClear Contract),

  (in each case which are payable in the same currency and which are payable in respect of the same Client Account or the same Proprietary Account), and all such sums shall be automatically satisfied and discharged and only the excess of the larger aggregate amount over the smaller aggregate amount shall be payable by the party by whom the larger aggregate amount would otherwise have been payable.

(e)    The parties acknowledge that effect of Regulation 57(d) is that any settlement payment obligation of a Clearing Member (or of the Clearing House) under a SwapClear Contract and any obligation of the Clearing House's (or of the Clearing Member) on the date of such settlement to return same-currency cash Collateral provided to it by way of variation margin in respect of that SwapClear Contract will be netted against each other, with only the balance being payable in accordance with Regulation 57(d).

## REGULATION 58   THE RESET RATE FOR, AND THE NET PRESENT VALUE OF, A SWAPCLEAR CONTRACT

The Clearing House may determine the reset rate for, and the net present value of, a SwapClear Contract for the purposes of these Regulations and the Procedures in such manner and at such times as may be prescribed in the Procedures.  Except as prescribed in the Procedures, neither the reset rate nor the net present value determined by the Clearing House may in any circumstances be challenged.

**REGULATION 59   DEFAULT  MANAGEMENT  IN  RESPECT  OF  SWAPCLEAR CLIENT CLEARING BUSINESS**

The process for default management in respect of SwapClear Client Clearing Business is set out in the Client Clearing Annex to the Default Rules.

**REGULATION 60    TRANSFER**

(a)    Other than in the event that a SwapClear Clearing Member is a Defaulter, SwapClear Contracts carried by such a SwapClear Clearing Member in respect of SwapClear Client Clearing Business shall not be transferred except as provided in this Regulation 60 or in the Procedures.

(b)    A Receiving Clearing Member may (A) upon the instruction or at the request of an Individual Segregated Account Clearing Client or an individual Omnibus Gross Segregated Clearing Client (other than a Combined Omnibus Gross Segregated Clearing Client), request the Clearing House (as set out in the Procedures) to transfer to the Receiving Clearing Member the relevant SwapClear Clearing Client's portfolio (and not less than an entire portfolio) of SwapClear Contracts registered with the Carrying Clearing Member in a particular Client Account and, if also requested, to transfer the Associated Collateral Balance attributable to such SwapClear Clearing Client in respect of such Client Account from the Carrying Clearing Member to the Receiving Clearing Member: or (B) upon the instruction or at the request of (i) all of the Identified Omnibus Net Segregated Clearing Clients comprising a single Identified Client Omnibus Net Segregated Account held by a Carrying Clearing Member; (ii) all of the Affiliated Omnibus Net Segregated Clearing Clients comprising a single Affiliated Client Omnibus Net Segregated Account held by a Carrying Clearing Member; or (iii) all of the Omnibus Gross Segregated Clearing Clients comprising a particular group of Combined Omnibus Gross Segregated Clearing Clients of a Carrying Clearing Member, request the Clearing House (as set out in the Procedures), to transfer the entire portfolio (and not less than an entire portfolio) of SwapClear Contracts registered with the Carrying Clearing Member in a particular Client Account on behalf of the relevant SwapClear Clearing Clients and, if also requested, to transfer the Associated Collateral Balances attributable to such SwapClear Clearing Clients in respect of such Client Account from the Carrying Clearing Member to the Receiving Clearing Member.  It is a condition precedent to a transfer described in this paragraph that:

(i)    no relevant SwapClear Clearing Client has become insolvent (each such SwapClear Clearing Client will be presumed to be solvent by the Clearing House unless evidenced to the contrary by the Carrying Clearing Member in the manner set forth in the Procedures or as otherwise reasonably determined by the Clearing House);

(ii)    neither the Carrying Clearing Member nor the Receiving Clearing Member is a Defaulter;

(iii)    such transfer would not violate or result in the violation of any applicable law or regulation;

(iv)    the relevant SwapClear Clearing Client(s), the Receiving Clearing Member and the Carrying Clearing Member have each executed all documents necessary or required by the Clearing House in order to effect such transfer (including, where applicable, a Security Deed, Deed of Charge, Clearing Membership Agreement and/or a Clearing Agreement);

(v)     the Receiving Clearing Member has consented to the transfer of the Relevant SwapClear Contracts and, if applicable, the Associated Collateral Balance(s);

(vi)    the Receiving Clearing Member has transferred sufficient Collateral to the Clearing House in respect of its current SwapClear Contracts and the Relevant SwapClear Contracts;

(vii)   the Carrying Clearing Member has not rejected such transfer (it being presumed by the Clearing House that the Carrying Clearing Member has not so rejected the transfer unless evidenced to the contrary by the Carrying Clearing Member in the manner set forth in the Procedures or as otherwise reasonably determined by the Clearing House); and

(viii)  in the event that the transfer will lead to a requirement for the Carrying Clearing Member to transfer additional Collateral to the Clearing House, the Carrying Clearing Member transfers sufficient Collateral to the Clearing House.

By requesting a transfer of the Relevant SwapClear Contracts of a SwapClear Clearing Client and, if applicable, the Associated Collateral Balance(s) pursuant to this paragraph (b), the Receiving Clearing Member shall be deemed to have represented to the Clearing House that all of the conditions to such transfer set forth herein and in the Procedures have been satisfied.

For purposes of (vii) above, the Carrying Clearing Member may be entitled to reject a particular transfer only if (a) a relevant SwapClear Clearing Client has failed to satisfy all outstanding obligations that are due and payable to the Carrying Clearing Member and/or its Affiliates, including any requirement for additional Collateral that may result from the proposed transfer, where, with respect to obligations owed to Affiliates of the Carrying Clearing Member by a SwapClear Clearing Client, "**obligations**" shall consist only of those obligations that arise as a result of cross-margining, cross-netting or other similar arrangements with respect to the Relevant SwapClear Contracts of that SwapClear Clearing Client that are being transferred or that SwapClear Clearing Client's related collateral, (b) the transfer of the Relevant SwapClear Contracts of that SwapClear Clearing Client would result in the SwapClear Clearing Client breaching exposure limits with, and/or other risk parameters set by, the Carrying Clearing Member and/or its Affiliates, or (c) such rejection is in accordance with terms agreed as between the Carrying Clearing Member and the relevant SwapClear Clearing Client.

(c)     A Receiving Clearing Member may (A) upon the instruction or at the request of an Individual Segregated Account Clearing Client or an individual Omnibus Gross Segregated Clearing Client (other than a Combined Omnibus Gross Segregated Clearing Client), request the Clearing House (as set out in the Procedures) to transfer a portion of that SwapClear Clearing Client's portfolio of SwapClear Contracts registered with a Carrying Clearing Member, or (B) upon the request or instruction of an Identified Omnibus Net Segregated Clearing Client, an Affiliated Omnibus Net Segregated Clearing Client or a Combined Omnibus Gross Segregated Clearing Client which is not otherwise covered by paragraph (b) above, request the Clearing House (as set out in the Procedures), to transfer either the whole or a part of such SwapClear Clearing Client's portfolio of SwapClear Contracts registered with the Carrying

Clearing Member.  It is a condition precedent to a transfer described in this paragraph that:

(i)    no relevant SwapClear Clearing Client has become insolvent (each such SwapClear Clearing Client will be presumed to be solvent by the Clearing House unless evidenced to the contrary by the Carrying Clearing Member in the manner set forth in the Procedures or as otherwise reasonably determined by the Clearing House);

(ii)    neither the Carrying Clearing Member nor the Receiving Clearing Member is a Defaulter;

(iii)    such transfer would not violate or result in the violation of any applicable law or regulation;

(iv)    the relevant SwapClear Clearing Client(s), the Receiving Clearing Member and the Carrying Clearing Member have each executed all documents necessary or required by the Clearing House in order to effect such transfer (including, where applicable, a Security Deed, Deed of Charge, Clearing Membership Agreement and/or a Clearing Agreement);

(v)    the Receiving Clearing Member has consented to the transfer of the Relevant SwapClear Contracts;

(vi)    the Receiving Clearing Member has transferred sufficient Collateral to the Clearing House in respect of its current SwapClear Contracts and the Relevant SwapClear Contracts;

(vii)    the Carrying Clearing Member has not rejected such transfer (it being presumed by the Clearing House that the Carrying Clearing Member has not so rejected the transfer unless evidenced to the contrary by the Carrying Clearing Member in the manner set forth in the Procedures or as otherwise reasonably determined by the Clearing House); and

(viii)    in the event that the transfer will lead to a requirement for the Carrying Clearing Member to transfer additional Collateral to the Clearing House, the Carrying Clearing Member transfers sufficient Collateral to the Clearing House.

By requesting a transfer of the Relevant SwapClear Contracts of a SwapClear Clearing Client pursuant to this paragraph (c), the Receiving Clearing Member shall be deemed to have represented to the Clearing House that all of the conditions to such transfer set forth herein and in the Procedures have been satisfied.

For the avoidance of doubt, in no circumstances may any part of the Clearing Member Current Collateral Balance held in the Client Account in which the Relevant SwapClear Contracts are registered be transferred under this paragraph (c).

For purposes of (vii) above, the Carrying Clearing Member may be entitled to reject a particular transfer only if (a) a relevant SwapClear Clearing Client has failed to satisfy all outstanding obligations that are due and payable to the Carrying Clearing Member and/or its Affiliates, including any requirement for additional Collateral that may

result from the proposed transfer, where, with respect to obligations owed to Affiliates of the Carrying Clearing Member by a SwapClear Clearing Client, "**obligations**" shall consist only of those obligations that arise as a result of cross-margining, cross-netting or other similar arrangements with respect to the Relevant SwapClear Contracts of that SwapClear Clearing Client that are being transferred or that SwapClear Clearing Client's related collateral, (b) the transfer of the Relevant SwapClear Contracts of that SwapClear Clearing Client would result in the SwapClear Clearing Client breaching exposure limits with, and/or other risk parameters set by, the Carrying Clearing Member and/or its Affiliates, or (c) such rejection is in accordance with terms agreed as between the Carrying Clearing Member and the relevant SwapClear Clearing Client.

(d)     For the purposes of a transfer pursuant to paragraph (b) above that includes the transfer of the corresponding Associated Collateral Balance(s), the Carrying Clearing Member shall notify the Clearing House of the specific collateral which should comprise such Associated Collateral Balance(s).  In the event that the Carrying Clearing Member fails to notify the Clearing House of the specific collateral which should comprise the Associated Collateral Balance(s), the Clearing House shall identify and select (in the manner set out in the Procedures) the Collateral it deems appropriate to comprise the Associated Collateral Balance(s) attributable to the Relevant SwapClear Contracts entered into by the Carrying Clearing Member on behalf of the relevant SwapClear Clearing Client(s) in its sole discretion and, along with the Receiving Clearing Member, shall take such actions and provide such information in connection with the transfer as may be required under the Procedures.  Once the Associated Collateral Balance(s) which are the subject of the relevant transfer have been notified by the Clearing House to the Receiving Clearing Member, the Receiving Clearing Member may elect to reject the transfer of some or all of such Associated Collateral Balance(s).  Any such election will not, of itself, prevent the transfer of the Relevant SwapClear Contracts of the relevant SwapClear Clearing Client(s) and any Associated Collateral Balance which has been accepted by the Receiving Clearing Member, **provided that** the conditions set out in sub-paragraphs (i) to (viii) of paragraph (b) above are satisfied in relation to such transfer.  The Clearing House shall transfer the Associated Collateral Balance that has been identified and consented to by the Receiving Clearing Member.  In the event that, for whatever reason, the Clearing House is unable to transfer such Associated Collateral Balance, the Clearing House will not proceed with the transfer of the Relevant SwapClear Contracts.

(e)     Further to the satisfaction of the conditions set out in paragraphs (b) and (c) above, and **provided that** the Clearing House does not determine, in its sole discretion, that (x) the transfer cannot be effected under these Regulations, the Procedures or otherwise under applicable laws or regulations and/or (y) where the transfer is as described in paragraph (ii) of the definition of "Receiving Clearing Member", additional conditions as set out in Regulation 13 of the FCM Regulations need to be and have not been complied with, the Clearing House shall transfer the Relevant SwapClear Contract(s) into the name of the Receiving Clearing Member as follows: (A) in the case of a transfer effected in accordance with paragraph (b) above, where the Receiving Clearing Member is the same entity as the relevant SwapClear Clearing Client, the Relevant SwapClear Contracts (and, if applicable, the Associated Collateral Balance) shall be transferred to the Proprietary Account of the Receiving

Clearing Member; (B) in a case of a transfer (i) not covered by (A) of this paragraph (e) and (ii) where the Receiving Clearing Member is an FCM Clearing Member, the Relevant SwapClear Contracts (and, if applicable, the Associated Collateral Balance) shall be transferred to the relevant FCM Client Sub-Account of the relevant Receiving Clearing Member and all of the SwapClear Contracts to be transferred (which are subject to the Rulebook) shall, upon transfer, be converted to FCM SwapClera Contracts subject to the FCM Regulations and the FCM Procedures but shall otherwise remain on the same contract terms; and (C) in all other cases, the Relevant SwapClear Contracts (and, if applicable, the Associated Collateral Balance(s)) shall be transferred to the relevant Individual Segregated Account or Omnibus Segregated Account of the Receiving Clearing Member. The transfer of the Relevant SwapClear Contracts shall occur by novation of all of the Carrying Clearing Member's rights and obligations in respect of such Relevant SwapClear Contracts to the Receiving Clearing Member.

(f)     In the case where a transfer of Relevant SwapClear Contracts pursuant to paragraph (b) above will include the transfer of the Associated Collateral Balance(s):

(i)     In respect of an Associated Collateral Balance that is subject to a Deed of Charge entered into between the Carrying Clearing Member and the Clearing House, such transfer shall be effected as follows:

(A)     the Carrying Clearing Member shall relinquish all rights to such Associated Collateral Balance (including, for the avoidance of doubt, any beneficial interest and/or equity of redemption in respect thereof);

(B)     such Associated Collateral Balance shall immediately upon such relinquishment be held by the Clearing House on behalf of the Receiving Clearing Member;

(C)     where the Receiving Clearing Member is not an FCM Clearing Member, its rights to such Associated Collateral Balance arising as described in sub-paragraph (B) above shall become, in respect of the Relevant SwapClear Contracts, subject to the Deed of Charge entered into between the Receiving Clearing Member and the Clearing House (such rights thereby becoming Charged Property within the meaning of that Deed of Charge); and

(D)     where the Receiving Clearing Member is an FCM Clearing Member, the Associated Collateral Balance shall be deemed to have been delivered by the Receiving Clearing Member to the Clearing House by way of a first-priority security interest granted by the Receiving Clearing Member to the Clearing House under the FCM Regulations and the FCM Clearing Membership Agreement between the Receiving Clearing Member and the Clearing House.

(ii)    In respect of any part of an Associated Collateral Balance that is not subject to the Deed of Charge entered into between the Carrying Clearing Member and the Clearing House, such transfer shall be by novation of the Carrying Clearing Member's rights and obligations in respect of such part of the Associated Collateral Balance to the Receiving Clearing Member.

(iii)    For the avoidance of doubt, the Carrying Clearing Member shall have no right or entitlement to assert any claim over, or right with respect to, the Associated Collateral Balance transferred.

(iv)    The transfer of the Relevant SwapClear Contracts and Associated Collateral Balance shall be deemed to occur simultaneously, and the transfer of the Relevant SwapClear Contracts shall be conditioned on the transfer of the Associated Collateral Balance, and vice versa.

(v)    If the transfer of the Relevant SwapClear Contracts and Associated Collateral Balance is not completed for any reason, then any actual transfer of any part of the Associated Collateral Balance or Relevant SwapClear Contracts that has occurred, as the case may be, shall be deemed not to have occurred, and any actual transfer of any part of the Associated Collateral Balance or Relevant SwapClear Contracts that has occurred shall be immediately unwound.

(vi)    (i) That portion (if any) of the Clearing House Current Collateral Balance in respect of the Carrying Clearing Member which is attributable to the Relevant SwapClear Contracts (the "**Relevant Portion**") shall be reduced to zero; and (ii) the Clearing House Current Collateral Balance in respect of the Receiving Clearing Member shall be increased by an amount equal to the value of the Relevant Portion immediately prior to the reduction referred to in (i) immediately above.

(g)    Rights under a SwapClear Contract entered into by a SwapClear Clearing Member in respect of SwapClear Client Clearing Business shall not be capable of assignment by a SwapClear Clearing Member. Any such purported assignment by a SwapClear Clearing Member, or any purported transfer that is not in compliance with this Regulation 60 or the Procedures shall be void.

(h)    If a SwapClear Clearing Member is a Defaulter, the Clearing House shall take such actions, subject to and in accordance with the Default Rules in relation to SwapClear Contracts carried by such SwapClear Clearing Member on behalf of SwapClear Clearing Clients, **provided always that** the Clearing House shall take such actions as are required to meet the Clearing House's continuing regulatory obligations including those applicable to it as a Recognised Clearing House and a Derivatives Clearing Organization.

(i)    Subject to paragraph (j) below, but otherwise notwithstanding anything to the contrary in these Regulations, in making any transfer of Relevant SwapClear Contracts and (if applicable) an Associated Collateral Balance pursuant to this Regulation 60, the Clearing House shall be authorised and entitled to rely conclusively on the instructions of, and information provided by, the relevant SwapClear Clearing Member(s), which shall be solely responsible for all such instructions and information, including for the purposes of ensuring that (i) the transfer is properly authorised or rejected (as the case may be); (ii) the appropriate Client Account of the Carrying Clearing Member (from which the transfer is to be made) has been identified and the transfer is made from that Client Account; and (iii) in the case of a partial transfer of SwapClear Contracts pursuant to paragraph (c) above, the appropriate Relevant SwapClear Contracts have been identified by the Receiving Clearing Member, and the Clearing House shall have no responsibility or liability therefor.

(j)     The Clearing House shall verify that the Relevant SwapClear Contracts identified to it by a SwapClear Clearing Member as being the subject of such a transfer correspond to SwapClear Contracts which, according to its records, are registered in the name of the Carrying SwapClear Clearing Member on behalf of the relevant SwapClear Clearing Client.  In the event that the Clearing House identifies a discrepancy, it will notify the relevant SwapClear Clearing Member(s) and no transfer will occur pursuant to this Regulation 60 until such time as the Relevant SwapClear Contracts identified to the Clearing House by the relevant SwapClear Clearing Member(s) can be verified by the Clearing House.

(k)     The Carrying Clearing Member agrees to indemnify the Clearing House in respect of all liabilities, costs, loss, fees, damages or expenses suffered or incurred by the Clearing House (howsoever arising or occurring) by reason of a proposed transfer being rejected by the Carrying Clearing Member other than in compliance with the grounds set out in the final paragraphs of Regulation 60(b) and Regulation 60(c) above.

(l)     If and to the extent permitted under applicable law, and if applicable under the rules of an Approved Trade Source System, a SwapClear Clearing Member may transfer positions from one Client Account to another Client Account of that SwapClear Clearing Member, provided that: (i)(a) the transferring SwapClear Contracts will be owned or beneficially owned by the same Clearing Client(s); or (i)(b) an error has been made in the registration of a SwapClear Contract and the error is discovered and the transfer is completed within three Business Days (or any such longer period that the Clearing House may agree to in its sole discretion) after the registration that SwapClear Contract; or (ii) the Clearing House otherwise approves the transfer in its sole discretion. Any transfers carried out in accordance with this Regulation 60(l) are subject to the provisions of the Procedures.

# CHAPTER XV – REPOCLEAR REGULATIONS

## REGULATION 61   APPLICATION OF REPOCLEAR REGULATIONS

(a)     The Clearing House shall provide the RepoClear Service subject to and in accordance with the terms of these RepoClear Regulations and the Procedures.

(b)     RepoClear Clearing Members shall be bound by these RepoClear Regulations. Applications to become a RepoClear Clearing Member shall be made in accordance with Regulation 61(d) and (e). Other than as expressly specified in this Regulation 61, the remainder of the Regulations shall not apply to the RepoClear Service. A summary table of those Regulations which apply to the RepoClear Service as described in Regulation 61(a) to (p) is provided at Regulation 61(q).

(c)     Regulation 2 and Regulation 3 of the Regulations apply to the RepoClear Service.

**RepoClear Clearing Membership**

(d)     A Clearing Member may apply to become a RepoClear Clearing Member in accordance with the Procedures.

(e)     Regulation 4 applies to membership of the RepoClear Service and applications for such membership.

(f)     Regulation 5 applies to a RepoClear Clearing Member.

**Accounts**

(g)     Regulation 10 applies to the opening and operation of accounts with respect to a RepoClear Clearing Member. Such accounts shall be designated in accordance with Regulation 15.

**Client Clearing**

(h)     Regulation 11 applies to those RepoClear Clearing Members who provide (or wish to provide) Client Clearing Services.

**Formation, registration and transfers of RepoClear Contracts**

(i)     Regulation 16(b), (c) and (e) to (m), Regulation 17 and Regulation 19 apply to the formation and registration of a RepoClear Contract.

(j)     Regulation 61 to Regulation 66 applies to the RepoClear Service.

(k)     Regulation 18 (and, insofar as relevant, Regulation 12(b)) apply to a RepoClear Contract that is an open contract.

**Margin and Collateral**

(l)     Regulation 20 applies to a RepoClear Clearing Member.

**Reference prices and Revaluation**

(m)    Regulation 22 and Regulation 66 apply to open RepoClear Contracts.

**Other Applicable Regulations**

(n)    Regulation 37 to Regulation 46 inclusive apply to RepoClear Clearing Members and RepoClear Contracts.

**Default Rules**

(o)    The Default Rules (including the RepoClear DMP Annex) apply to RepoClear Clearing Members and RepoClear Contracts.

**Clearing House Settlement Finality Regulations**

(p)    The Clearing House Settlement Finality Regulations apply in relation to RepoClear Clearing Members and RepoClear Contracts.

**Summary table of Regulations which apply to the RepoClear Service**

(q)    The Regulations listed in this Regulation 61(q) apply to the RepoClear Service as described under Regulation 61(a) to (p).

| *Regulation* | *Title* |
|---|---|
| Regulation 2 | Obligation to the Clearing House to each Member |
| Regulation 3 | Performance by the Clearing House of its Obligations under the Terms of an Open Contract |
| Regulation 4 | Clearing Member Status of the Clearing House |
| Regulation 5 | Resigning and Retiring Members |
| Regulation 8 | Dealer Status |
| Regulation 9 | Service Withdrawal |
| Regulation 10 | Accounts |
| Regulation 11 | Client Clearing Business |
| Regulation 12(b) | Novation |
| Regulation 15 | Designation |
| Regulation 16(b), (c) and (e) to (m) | Registration |
| Regulation 17 | Trading Information |
| Regulation 18 | Transfer |

| Regulation | Title |
|---|---|
| Regulation 19 | Transactions entered into through an Automated Trading System or Platform |
| Regulation 20 | Margin and Collateral |
| Regulation 22 | Official Quotations and Reference Price |
| Regulation 25 | Other modes of settlement and Revaluation |
| Regulation 35 | Delivery (or other) Failures |
| Regulation 37 | Market Disorders, Impossibility of Performance, Trade Emergency |
| Regulation 38 | Force Majeure |
| Regulation 39 | Invoicing Back |
| Regulation 40 | Currency Conversion |
| Regulation 41 | Disclosure and Reporting |
| Regulation 42 | Fees and Other Charges |
| Regulation 43 | Records |
| Regulation 44 | Alteration of Regulations and the Procedures |
| Regulation 45 and Regulation 46 | Netting and Distribution of Assets |
| Regulation 47 | Procedures |
| Regulation 48(b) | Interpretation of these Regulations |
| Regulation 49 | Waiver |
| Regulation 50(a) | Validity of Regulations and Action |
| Regulation 51(a) and (c) to (e) | Governing Law and Jurisdiction |
| Regulation 52 | Exclusion of Liability |
| Regulation 61 to Regulation 66 | RepoClear Regulations |
| Default Rules | Default Rules (including RepoClear DMP Annex) |

| *Regulation* | *Title* |
|---|---|
| Settlement Finality Regulations | Settlement Finality Regulations |

**REGULATION 62 SUBMISSION OF DETAILS OF REPOCLEAR TRANSACTIONS AND REPOCLEAR GC TRANSACTIONS THROUGH AN APPROVED TRADE MATCHING SYSTEM**

(a)     Details of RepoClear Transactions and RepoClear GC Transactions other than those referred to in Regulation 63 (RepoClear Transactions and RepoClear GC Transactions entered into through an Automated Trading System) which are to be submitted for registration must be submitted by the RepoClear Participants party to such transactions through an Approved Trade Matching System ("**ATMS**") specified for the purpose of this Regulation in the Procedures, and in accordance with the Procedures.

## REGULATION 63   REPOCLEAR TRANSACTIONS ENTERED INTO THROUGH AN AUTOMATED TRADING SYSTEM

(a)      This Regulation 63 applies to Repo Trades, Bond Trades and GC Trades made by RepoClear Clearing Members or RepoClear Dealers through an Automated Trading System which such RepoClear Clearing Member or RepoClear Dealer is authorised by the Clearing House to use under the Procedures ("an **ATS**") either as direct participants in the ATS or indirectly through a participant in the ATS.  In the event of any inconsistency between the Regulations (including any applicable RepoClear Dealer Clearing Agreement and the terms of any other agreement entered into between the RepoClear Dealer, the RepoClear Clearing Member and the Clearing House, or any of them), and the rules, practices, procedures and arrangements of the ATS ("**ATS Rules**") the Regulations shall prevail.

(b)      If an "**ATS Participant**" (defined for these purposes as a RepoClear Dealer or a RepoClear Clearing Member, who is a direct or indirect participant in an ATS) has given notice to the Clearing House, in accordance with the Procedures, that it intends to carry out Repo Trades and/or Bond Trades and/or GC Trades through an ATS specified in its notice and has not withdrawn such notice in accordance with the Procedures, the Clearing House will enter into RepoClear Contracts or RepoClear GC Contracts, as the case may be, with the ATS Participant (where it is a RepoClear Clearing Member) or the ATS Participant's RepoClear Clearing Member (where the ATS Participant is not a RepoClear Clearing Member itself) pursuant to such dealings in accordance with and subject to the following provisions of this Regulation.  The terms of a registered RepoClear Contract or RepoClear GC Contract shall be as notified to the Clearing House by the ATS and otherwise subject to the Regulations (and the Clearing House and the RepoClear Clearing Member party to the registered RepoClear Contract or RepoClear GC Contract, as the case may be, shall be obliged to perform their obligations thereunder in accordance with such terms).

(c)      The Clearing House makes an open offer to the ATS Participant (where it is a RepoClear Clearing Member) or the ATS Participant's RepoClear Clearing Member (where the ATS Participant is not a RepoClear Clearing Member itself) that it shall enter into a RepoClear Contract in respect of any Repo Trade or any Bond Trade or to enter into a RepoClear GC Contract in respect of any GC Trade, in accordance with paragraph (d) of this Regulation, as applicable, pursuant to the ATS Participant's dealings through any ATS referred to in paragraph (b), **provided that** the following requirements ("**the RepoClear Open Offer Eligibility Criteria**") shall have been complied with:

(i)       the Clearing Membership Agreement:

(A)      to which the ATS Participant is party has not been terminated in accordance with its terms for more than ten minutes; or

(B)      to which the ATS Participant's RepoClear Clearing Member is party has not been terminated in accordance with its terms;

(ii)      the ATS Participant has not (where it is not itself a RepoClear Clearing Member) been removed or suspended from the Register of RepoClear Dealers,

or (where it is a RepoClear Clearing Member) has not had its authorisation to participate in the RepoClear Service removed by the Clearing House;

(iii)

(A)    in the case of an ATS Participant who is a RepoClear Clearing Member, not more than ten minutes have lapsed since a Default Notice was signed in respect of the ATS Participant under Rule 3 of the Default Rules (without prejudice to the Clearing House's rights to register new Contracts (including RepoClear Contracts and RepoClear GC Contracts, whether closing out contracts or otherwise) in the ATS Participant's name under the Default Rules in connection with the Clearing House's default proceedings); or

(B)    in the case of an ATS Participant who is not a RepoClear Clearing Member, a Default Notice has not been issues in respect of the ATS Participant's RepoClear Clearing Member under Rule 3 of the Default Rules (without prejudice to the Clearing House's rights to register new Contracts (including RepoClear Contracts and RepoClear GC Contracts, whether closing out contracts or otherwise) in the RepoClear Clearing Member's name under the Default Rules in connection with the Clearing House's default proceedings);

(iv)    such dealings satisfy the terms and conditions stated in the Regulations and the Procedures with respect to such dealings (together the "**RepoClear Eligibility Criteria for RepoClear Contracts and RepoClear GC Contracts**") and the offers made in this Regulation 63, including the terms of any Contract which would arise under paragraph (d) and all necessary details as required by the Clearing House, shall have been provided to the Clearing House;

(v)    the dealings are recognised by the relevant ATS as satisfying the RepoClear Eligibility Criteria for a RepoClear Contract or RepoClear GC Contract and as dealings which the parties thereto have identified are to be registered by the Clearing House as RepoClear Contracts or RepoClear GC Contracts, as applicable;

(vi)    the ATS Participant (including, where applicable, as agent for the relevant RepoClear Clearing Member) has executed such agreements or documents as may be required by the Clearing House from time to time in connection herewith (or, where applicable, in connection with the relevant RepoClear Dealer Clearing Agreement); and

(vii)    all or any conditions imposed by the Clearing House have been satisfied.

(d)    If particulars with respect to (i) a Repo Trade; (ii) a Bond Trade or (iii) a GC Trade which satisfy the relevant RepoClear Open Offer Eligibility Criteria have been input into the relevant ATS by or on behalf of an ATS Participant as seller (or buyer) and have been matched by, or in accordance with the ATS Rules with particulars with respect to a Repo Trade, Bond Trade or GC Trade, on such terms input into such ATS by another ATS Participant as buyer (or seller), and the relevant RepoClear Open Offer Eligibility Criteria have been satisfied, two RepoClear Contracts or RepoClear

GC Contracts, as the case may be, shall arise immediately on the matching of such details as follows (**provided that**, if the selling ATS Participant has not identified all relevant details required by the Clearing House in respect of the securities to be delivered by him under a transaction other than for a RepoClear GC Trade, the RepoClear Open Offer Eligibility Criteria will only be satisfied on his identifying all such relevant details in accordance with the ATS Rules and the two RepoClear Contracts shall arise immediately on such details being identified **provided always that** the other RepoClear Open Offer Eligibility Criteria are also satisfied at the time of such details being so provided).  The Clearing House shall be the buyer (or seller) under one RepoClear Contract or RepoClear GC Contract (as the case may be) to the selling (or buying) ATS Participant, and the seller (or buyer) under the second RepoClear Contract or relevant RepoClear GC Contract, as the case may be to the buying (or selling) ATS Participant.

(e)    The Clearing House undertakes to keep open the offer made by it in this Regulation 63 until:

(i)    in the case of an ATS Participant who is a RepoClear Clearing Member, such ATS Participant is no longer eligible to have RepoClear Contracts or RepoClear GC Contracts registered in its name or has withdrawn from trading through each ATS notified to the Clearing House under paragraph (b); or

(ii)    in the case of an ATS Participant who is not a RepoClear Clearing Member, each ATS referred to in paragraph (b) has removed from the ATS Participant the ability to submit Repo Trades or Bond Trades or GC Trades for registration with the Clearing House.

Any such intended withdrawal from trading through an ATS must be notified to the Clearing House in accordance with the Procedures.

**REGULATION 64   DISPUTES**

(a)     In the event of a dispute arising out of, or in respect of, the existence of a trade, or whether it was identified to the ATS by the ATS Participants (as defined above) as a trade to be registered by the Clearing House as a RepoClear Contract or RepoClear GC Contract, such dispute shall be settled as provided for in the ATS Rules, without recourse to the Clearing House.  In respect of a dispute arising out of, or in respect of, a registered RepoClear Contract or RepoClear GC Contract, other than a dispute in respect of a matter referred to above as a dispute to be settled as provided for in the ATS Rules, such dispute shall be settled as provided in the Regulations.

## REGULATION 65   AUTHORISATION TO ACT AS A REPOCLEAR CLEARING MEMBER

(a)     A Member may not become party to RepoClear Contracts or RepoClear GC Contracts unless it has been authorised by the Clearing House as a RepoClear Clearing Member and is eligible to be party to such RepoClear Contracts or RepoClear GC Contracts and such authorisation has not been withdrawn or suspended by the Clearing House.

(b)     Application for authorisation as a RepoClear Clearing Member shall be made in accordance with these Regulations and the Procedures.  In order to be authorised as a RepoClear Clearing Member, a Member must meet the criteria applicable to the RepoClear Contracts or RepoClear GC Contracts to which it wishes to become a party.  A Clearing Member may be authorised as eligible to become party to certain RepoClear Contracts or RepoClear GC Contracts and not others.

(c)     The withdrawal or suspension of a Member's authorisation referred to in paragraph (a) shall not, of itself, affect its membership of the Clearing House, or its entitlement (if any) to become party to RepoClear Contracts or RepoClear GC Contracts which are not caught by the withdrawal or suspension of such authorisation.

(d)     Where a Default Notice is served in accordance with these Regulations, or the Clearing Membership Agreement of a RepoClear Clearing Member is terminated, the service of such notice or the termination of such Clearing Membership Agreement, as the case may be, shall automatically withdraw the authorisation of that Member to be a RepoClear Clearing Member.

(e)     Without prejudice to paragraph (d) of this Regulation, the Clearing House shall suspend the authorisation referred to in paragraph (a) of any Member who is no longer otherwise eligible to have RepoClear Contracts and/or RepoClear GC Contracts registered in its name for such period as the Clearing House may determine.

(f)     If a Member's authorisation to act as RepoClear Member is withdrawn, or is withdrawn with respect to some but not all RepoClear Contracts and RepoClear GC Contracts, those RepoClear Contracts or RepoClear GC Contracts which the Member is no longer eligible to clear with the Clearing House shall be closed-out in accordance with directions given by the Clearing House.

**REGULATION 66   DAILY MARGINING OF REPOCLEAR CONTRACTS AND REPOCLEAR GC CONTRACTS**

(a)    This Regulation 66 shall be without prejudice to the Clearing House's rights to require Collateral to be transferred to it under Regulation 20.

(b)    The Net Present Value of each RepoClear Contract and each RepoClear GC Contract shall be calculated by the Clearing House in such manner and at such times as may be provided in the Procedures.  Except as prescribed in the Procedures, the Net Present Value calculated by the Clearing House may in no circumstances be challenged.

(c)    Subject to paragraph (d), the Clearing House shall require transfer, in accordance with the Procedures, at least daily, of cash Collateral to the Clearing House in respect of variation margin from a RepoClear Clearing Member, or will be required to transfer cash collateral in respect of variation margin to such RepoClear Clearing Member, representing the change in the Net Present Value of all RepoClear Contracts and RepoClear GC Contracts registered in the RepoClear Clearing Member's name for a particular currency from the preceding RepoClear Opening Day (as defined in the Procedures), in an amount calculated in accordance with the Procedures.  Transfer of cash collateral shall be made in accordance with and by the time or times stated in the Procedures.

(d)    Interest shall be paid by the Clearing House on cash Collateral (other than Clearing Member Returned Collateral) transferred to the Clearing House by such RepoClear Member and shall be calculated on the basis set out in the Procedures.  A RepoClear Clearing Member shall pay interest to the Clearing House on cash collateral (other than returned cash collateral) transferred by the Clearing House to the RepoClear Clearing Member in respect of variation margin as calculated by the Clearing House on the basis set out in the Procedures.

## CHAPTER XVI – EQUITYCLEAR REGULATIONS

## REGULATION 67    APPLICATION OF EQUITYCLEAR REGULATIONS

(a)     The Clearing House shall provide the EquityClear Service subject to and in accordance with the terms of these EquityClear Regulations and the Procedures.

(b)     EquityClear Clearing Members shall be bound by these EquityClear Regulations. Applications to become an EquityClear Clearing Member shall be made in accordance with Regulation 67(d) and (e). Other than as expressly specified in this Regulation 67, the remainder of the Regulations shall not apply to the EquityClear Service. A summary table of those Regulations which apply to the EquityClear Service as described in Regulation 67(a) to Regulation 67(q) is provided at Regulation 67(r).

(c)     Regulation 2 and Regulation 3 of the Regulations apply to the EquityClear Service.

**EquityClear Clearing Membership**

(d)     A Clearing Member may apply to become an EquityClear Clearing Member in accordance with the Procedures.

(e)     Regulation 4 applies to membership of the EquityClear Service and applications for such membership.

(f)     Regulation 5 applies to an EquityClear Clearing Member.

**Accounts**

(g)     Regulation 10 applies to the opening and operation of accounts with respect to an EquityClear Clearing Member. Such accounts shall be designated in accordance with Regulation 15.

**Client Clearing**

(h)     Regulation 11 applies to those EquityClear Clearing Members who provide (or wish to provide) Client Clearing Services.

**Formation, registration and transfers of EquityClear Contracts**

(i)     Regulation 16(b), (c) and (e) to (l), Regulation 17 and Regulation 19 apply to the formation and registration of an EquityClear Contract.

(j)     Regulation 67 to Regulation 71 apply to the EquityClear Service.

(k)     Regulation 18 (and, insofar as relevant, Regulation 12(b)) apply to an EquityClear Contract that is an open contract.

**Margin and Collateral**

(l)     Regulation 20 applies to an EquityClear Clearing Member.

**Reference prices and Revaluation**

(m)    Regulation 22 applies to open EquityClear Contracts.

*Arbitration*

(n)    Regulation 33 and Regulation 34 apply to EquityClear Contracts.

**Other Applicable Regulations**

(o)    Regulation 37 to Regulation 46 inclusive apply to EquityClear Clearing Members and EquityClear Contracts.

**Default Rules**

(p)    The Default Rules apply to EquityClear Clearing Members and EquityClear Contracts.

**Clearing House Settlement Finality Regulations**

(q)    The Clearing House Settlement Finality Regulations apply in relation to EquityClear Clearing Members and EquityClear Contracts.

**Summary table of Regulations which apply to the EquityClear Service**

(r)    The Regulations listed in this Regulation 67(r) apply to the EquityClear Service as described under Regulation 67(a) to (q).

| *Regulation* | *Title* |
|---|---|
| Regulation 2 | Obligation to the Clearing House to each Member |
| Regulation 3 | Performance by the Clearing House of its Obligations under the Terms of an Open Contract |
| Regulation 4 | Clearing Member Status of the Clearing House |
| Regulation 5 | Resigning and Retiring Members |
| Regulation 7 | Non-Member Market Participant  Status |
| Regulation 9 | Service Withdrawal |
| Regulation 10 | Accounts |
| Regulation 11 | Client Clearing Business |
| Regulation 12(b) | Novation |
| Regulation 15 | Designation |
| Regulation    16(b), (c) and (e) to (l) | Registration |

| Regulation | Title |
|---|---|
| Regulation 17 | Trading Information |
| Regulation 18 | Transfer |
| Regulation 19 | Transactions entered into through an Automated Trading System or Platform |
| Regulation 20 | Margin and Collateral |
| Regulation 21 | Premium under Option Contracts |
| Regulation 22 | Official Quotations and Reference Price |
| Regulation 33 | Arbitration: Cleared Exchange Contracts, LSE Derivatives Markets Cleared Exchange Contracts, EquityClear Contracts or LCH EnClear Contracts (for Physical Delivery) |
| Regulation 34 | Collateral in Event of a Claim |
| Regulation 35 | Delivery (or other) Failures |
| Regulation 37 | Market Disorders, Impossibility of Performance, Trade Emergency |
| Regulation 38 | Force Majeure |
| Regulation 39 | Invoicing Back |
| Regulation 40 | Currency Conversion |
| Regulation 41 | Disclosure and Reporting |
| Regulation 42 | Fees and Other Charges |
| Regulation 43 | Records |
| Regulation 44 | Alteration of Regulations and the Procedures |
| Regulation 45 and Regulation 46 | Netting and Distribution of Assets |
| Regulation 47 | Procedures |
| Regulation 48(b) | Interpretation of these Regulations |
| Regulation 49 | Waiver |
| Regulation 50(a) | Validity of Regulations and Action |

| Regulation | Title |
|---|---|
| Regulation 51(a) and (c) to (e) | Governing Law and Jurisdiction |
| Regulation 52 | Exclusion of Liability |
| Regulation 67 to Regulation 71 | EquityClear Regulations |
| Default Rules | Default Rules |
| Settlement Finality Regulations | Settlement Finality Regulations |

**REGULATION 68    EQUITYCLEAR OPEN OFFER FOR EQUITYCLEAR ATP MATCHES**

(a)     This Regulation 68 applies to EquityClear ATP Matches arising pursuant to Trading Platform Particulars submitted by or on behalf of an EquityClear Clearing Member (which shall, for the avoidance of doubt, exclude any Co-operating Clearing House in connection with the EquityClear service). In the event of any inconsistency between the Regulations, (including the terms of any agreement entered into between the EquityClear Clearing Member and the Clearing House) and any relevant ATP Market Rules, the Regulations shall prevail.

(b)     If an EquityClear Clearing Member has been given approval by the Clearing House to clear eligible EquityClear (Equities) ATP Matches and/or eligible EquityClear (ccCFD) ATP Matches in respect of the ATP specified in such approval and such approval has not been withdrawn by the Clearing House the Clearing House will enter into EquityClear Contracts with that EquityClear Clearing Member pursuant to such approval in accordance with and subject to the following provisions of this Regulation. The terms of a registered EquityClear Contract shall be as received by the Clearing House, or its relevant approved agent, from the relevant ATP (in the case of EquityClear (Equities) ATP Matches) or from the relevant EquityClear Clearing Member (in the case of EquityClear (ccCFD) ATP Matches) and otherwise subject to the Regulations (and the Clearing House and the EquityClear Clearing Member party to the registered EquityClear Contract shall be obliged to perform their obligations thereunder in accordance with such terms and the Regulations).

(c)     The Clearing House makes an open offer to EquityClear Clearing Members to enter into an EquityClear Contract in respect of an EquityClear ATP Match in accordance with paragraphs (e) and (f) of this Regulation 68, as applicable, pursuant to the submission of Trading Platform Particulars by or on behalf of those EquityClear Clearing Members **provided that** the following requirements ("**the EquityClear Open Offer Eligibility Criteria**") shall have been satisfied:

(i)     at the relevant times the EquityClear Clearing Member was party to a valid and subsisting Clearing Membership Agreement;

(ii)    at the relevant times and up to and including the time at which the Clearing House or its relevant approved agent receives the details referred to under sub-paragraph (iv) of this paragraph (c) the EquityClear Clearing Member had not been declared a Defaulter, by default notice or otherwise, by the Clearing House or the ATP, where applicable;

(iii)   the financial instruments the subject of the EquityClear ATP Matches satisfy, at the relevant times, the EquityClear Eligible Equities criteria or the EquityClear Eligible ccCFD criteria (as applicable);

(iv)    all necessary details as required by the Clearing House from time to time in respect of the EquityClear ATP Matches shall have been provided to the Clearing House or its approved agent in the form, and by the times, prescribed by the Clearing House from time to time. Such information must be complete, must not be corrupted and must be legible at the time of receipt by the Clearing House, or its relevant approved agent, as applicable;

(v)    the EquityClear Eligible Equities or EquityClear Eligible ccCFD, which are or is the subject of the EquityClear ATP Match, are or is not subject to any trading halts, suspension of dealings or any other action having equivalent effect published by the relevant ATP;

(vi)    at the relevant times, the EquityClear service or any relevant part of the EquityClear Open Offer in respect of EquityClear ATP Matches made on such ATP had not been suspended or withdrawn;

(vii)    the EquityClear Clearing Member has executed such other agreements or documents as may be required by the Clearing House from time to time in connection with the EquityClear service;

(viii)    in the case of an EquityClear (Equities) ATP Match, there are in place appropriate arrangements (as prescribed from time to time by the Clearing House) between the EquityClear Clearing Member (or its nominated agent, where applicable) and an Approved EquityClear Settlement Provider for the delivery, or receipt, as applicable, of the EquityClear Eligible Equities which are the subject of an EquityClear (Equities) ATP Match; and

(ix)    in the case of an EquityClear (Equities) ATP Match which is an EquityClear Mixed Member Match:

(A)    the eligibility criteria (howsoever defined on the Clearing House's website) of the relevant Co-operating Clearing House in respect of such EquityClear (Equities) ATP Match have been satisfied and the relevant Co-operating Clearing House has not declined to register, rejected, cancelled, avoided or terminated such EquityClear (Equities) ATP Match or any contract between the Co-operating Clearing House and its member arising out of it; and

(B)    a balancing contract is deemed to arise between the Clearing House and the relevant Co-operating Clearing House in respect of such EquityClear (Equities) ATP Match pursuant to the agreement in place between them in relation to the co-clearing of the relevant ATP and such balancing contract has not been rejected, cancelled, avoided or terminated for any reason; and

(C)    at the relevant times and up to and including the time at which the Clearing House or its relevant approved agent receives the details referred to under sub-paragraph (iv) of this paragraph (c), neither the Clearing House or the relevant Co-operating Clearing House has been declared a Defaulter by the other, by default notice or otherwise.

(d)    For the avoidance of doubt, Trading Platform Particulars are deemed to have been submitted by or on behalf of the EquityClear Clearing Member if the details of the EquityClear ATP Matches received by the Clearing House identify, in accordance with any relevant ATP Market Rules, the Regulations or the Procedures, the EquityClear ATP Matches as having been made by or on behalf of that EquityClear Clearing Member.

(e)     If Trading Platform Particulars have been input into the relevant ATP by or on behalf of an EquityClear Clearing Member, as seller (the "**selling EquityClear Clearing Member**") (or buyer (the "**buying EquityClear Clearing Member**")) and have been matched by, or in accordance with the ATP Market Rules with Trading Platform Particulars input into such ATP by or on behalf of another EquityClear Clearing Member, as buyer (the "**buying EquityClear Clearing Member**") (or seller (the "**selling EquityClear Clearing Member**")), and the resulting EquityClear ATP Match satisfies the EquityClear Open Offer Eligibility Criteria, two EquityClear Contracts shall arise immediately on the EquityClear ATP Match being made, as follows:

  (i)     the Clearing House shall be the buyer under one EquityClear (Equities) Contract or one EquityClear (ccCFD) Contract (as the case may be) to the selling EquityClear Clearing Member; and

  (ii)    the Clearing House shall be the seller under one EquityClear (Equities) Contract or one EquityClear (ccCFD) Contract (as the case may be) to the buying EquityClear Clearing Member.

(f)     In respect of an EquityClear Mixed Member Match which is at EquityClear (Equities) ATP Match, where Trading Platform Particulars submitted by, or on behalf of, an EquityClear Clearing Member to the relevant ATP have been matched, in accordance with the ATP Market Rules, with Trading Platform Particulars submitted by, or on behalf of, a member of a relevant Co-operating Clearing House, the Clearing House shall, on receipt of details of such EquityClear (Equities) ATP Match through the ATP (or by such other means) and subject to the EquityClear (Equities) Open Offer Eligibility Criteria having been met with respect to such EquityClear Clearing Member and the relevant Co-operating Clearing House being party to a valid and subsisting agreement with the Clearing House for the co-clearing of EquityClear Mixed Member Matches, register Contracts in the name of the EquityClear Clearing Member and in the name of the relevant Co-operating Clearing House as follows:

  (i)     where the EquityClear Clearing Member is identified in the EquityClear (Equities) ATP Match as the buyer, (A) the Clearing House shall be the seller under an EquityClear (Equities) Contract with the EquityClear Clearing Member as buyer; and (B) the Clearing House shall be the buyer under a Contract with the Co-operating Clearing House as seller; and

  (ii)    where the EquityClear Clearing Member is identified in the EquityClear (Equities) ATP Match as the seller, (A) the Clearing House shall be the buyer under an EquityClear (Equities) Contract with the EquityClear Clearing Member as seller; and (B) the Clearing House shall be the seller under a Contract with the Co-operating Clearing House as buyer.

(g)     Subject to its rights to suspend the EquityClear Open Offer and/or the EquityClear service generally or in respect of one or more ATPs or to withdraw the EquityClear service in whole or in part, as set out in these Regulations or the Procedures, the Clearing House undertakes to keep open the offer made by it in this Regulation 68 until such EquityClear Clearing Member is no longer eligible to have EquityClear Contracts registered in its name or has withdrawn from trading through each ATP notified to the Clearing House under paragraph (b). Any such intended withdrawal

from trading through an ATP must be notified to the Clearing House in accordance with the Procedures.

**REGULATION 69    EQUITYCLEAR NOVATION TRANSACTIONS**

(a)    Details of any EquityClear Novation Transaction in respect of an ATP which is to be submitted for registration must be submitted in accordance with the Procedures by or on behalf of the EquityClear Clearing Member who is party to, or is providing clearing services to a party to, such EquityClear Novation Transaction.  For the avoidance of doubt, where the particulars of an EquityClear Novation Transaction submitted by or on behalf of an EquityClear Clearing Member and received by the Clearing House identify, in accordance with the relevant ATP Market Rules or the Procedures, that EquityClear Clearing Member as buyer or seller, or as acting as clearing member for the buyer or seller, in respect of the EquityClear Novation Transaction, the Clearing House will enter into an EquityClear (Equities) Contract or EquityClear (ccCFD) Contract, as applicable with that EquityClear Clearing Member in accordance with and subject to the following provisions of this Regulation 69.

(b)    Without prejudice to the Clearing House's rights under Regulation 16(i), an EquityClear Novation Transaction, particulars of which are submitted for registration as an EquityClear (Equities) Contract or EquityClear (ccCFD) Contract by or on behalf of an EquityClear Clearing Member, must meet the following eligibility criteria at the time when the particulars of such EquityClear Novation Transaction are presented to the Clearing House and must continue to meet such criteria at all times thereafter up to and including the Registration Time (each such time, for the purposes of this Regulation 69, the "**relevant times**") in order to be registered as an EquityClear (Equities) Contract or EquityClear (ccCFD) Contract, as applicable:

(i)    either (x) the securities the subject of the EquityClear Novation Transaction are, at the relevant times, EquityClear Eligible Equities or (y) the financial instruments the subject of the EquityClear Novation Transaction are, at the relevant times, EquityClear Eligible ccCFD Underlying Instruments, as applicable;

(ii)    all necessary details as required by the Clearing House from time to time in respect of the EquityClear Novation Transaction shall have been provided to the Clearing House or its approved agent in the form, and by the times, prescribed by the Clearing House from time to time.  Such information must be complete, must not be corrupted and must be legible at the time of receipt by the Clearing House, or its relevant approved agent, as applicable;

(iii)    the EquityClear Eligible Equities, which are the subject of the EquityClear Novation Transaction, are not subject to any trading halts, suspension of dealings or any other action having equivalent effect published by or on behalf of the ATP;

(iv)    at the relevant times, the EquityClear services for the relevant ATP has not been suspended or withdrawn, generally or in relation to the relevant EquityClear Eligible Equities or EquityClear Clearing Member;

(v)    the EquityClear Clearing Member has executed such other agreements or documents as may be required by the Clearing House from time to time in connection with the EquityClear service;

(vi)     there are in place appropriate arrangements (as prescribed from time to time by the Clearing House) between the EquityClear Clearing Member (or its nominated agent, where applicable) and an ASP for the delivery, or receipt, as applicable, of the EquityClear Eligible Equities which are the subject of the EquityClear Novation Transaction; and

(vii)    in the case of an EquityClear Novation Transaction which is an EquityClear Mixed Member Match:

(A)     the eligibility criteria (howsoever defined on the Clearing House's website) of the relevant Co-operating Clearing House in respect of such EquityClear Novation Transaction have been satisfied and the relevant Co-operating Clearing House has not declined to register, rejected, cancelled, avoided or terminated such EquityClear Novation Transaction or any contract between the Co-operating Clearing House and its member arising out of it; and

(B)     a balancing contract is deemed to arise between the Clearing House and the relevant Co-operating Clearing House in respect of such EquityClear Novation Transaction pursuant to the agreement in place between them in relation to the co-clearing of the relevant ATP and such balancing contract has not been rejected, cancelled, avoided or terminated for any reason; and

(C)     at the relevant times and up to and including the time at which the Clearing House or its relevant approved agent receives the details referred to under sub-paragraph (ii) of this paragraph (b), neither of the Clearing House or the relevant Co-operating Clearing House has been declared a Defaulter by the other, by default notice or otherwise.

(c)     In the case of an EquityClear Novation Transaction which is an EquityClear Mixed Member Match, the Clearing House shall, on receipt of details of such EquityClear Novation Transaction and subject to Regulation 69(b) having been met with respect to such EquityClear Novation Transaction and the relevant Co-operating Clearing House being party to a valid and subsisting agreement with the Clearing House for the co-clearing of EquityClear Mixed Member Matches, register Contracts in the name of the EquityClear Clearing Member and in the name of the relevant Co-operating Clearing House as follows:

(A)     where the EquityClear Clearing Member is identified in the EquityClear Novation Transaction as the buyer, (A) the Clearing House shall be the seller under an EquityClear (Equities) Contract with the EquityClear Clearing Member as buyer; and (B) the Clearing House shall be the buyer under a Contract with the Co-operating Clearing House as seller; and

(B)     where the EquityClear Clearing Member is identified in the EquityClear Novation Transaction as the seller, (A) the Clearing House shall be the buyer under an EquityClear (Equities) Contract with the EquityClear Clearing Member as seller; and (B) the Clearing House

shall be the seller under a Contract with the Co-operating Clearing House as buyer.

**REGULATION 70   DISPUTES AND LIMITATION OF LIABILITY**

(a)     In the event of a dispute:

(i)     arising out of, or in respect of, the existence of an EquityClear (Equities) ATP Match or an EquityClear (ccCFD) ATP Match or, where applicable, whether it was identified to the ATP by the relevant EquityClear Clearing Members as an EquityClear (Equities) ATP Match or as an EquityClear (ccCFD) ATP Match to be registered by the Clearing House as an EquityClear (Equities) Contract or as an EquityClear (ccCFD) Contract (as the case may be) such dispute shall be settled as provided for in the ATP Market Rules without recourse to the Clearing House;

(ii)    in respect of registered EquityClear (Equities) Contracts or EquityClear (ccCFD) Contracts, a dispute arising out of, or in respect of, such registered Contracts, or in relation to these Regulations relating to the clearing of such Contracts, other than a dispute referred to in (i) above, shall be referred to arbitration and settled as provided in Regulation 33(a) where the relevant ATP Market Rules provide for arbitration.  Where the relevant ATP Market Rules do not include relevant arbitration provisions, or the application of such arbitration provisions to EquityClear (Equities) Contracts or EquityClear (ccCFD) Contracts (as applicable) is disapplied in these Regulations or the Procedures, a dispute arising out of, or in respect of, such registered Contracts, or in relation to these Regulations relating to the clearing of such Contracts, shall be settled in accordance with the Regulations and the Procedures, as applicable.

(b)     Without prejudice to the generality of Regulation 52 or any other provision of the Regulations or Procedures concerning liability of the Clearing House or a Member, any liability of the Clearing House (and each other member of the LCH.Clearnet Group and their respective officers, employees and agents) to a Member or to any other person (including, without limitation, any client of a Member) which might otherwise arise in connection with the EquityClear service shall, if and to the extent such liability arises out of any act or omission of any third party upon whom the Clearing House is reliant in any material respect in its provision of the EquityClear service (including, without limitation, an Approved EquityClear Trading Platform, Approved EquityClear Settlement Provider, a Co-operating Clearing House or any provider of transaction routing functionality), be limited to such amounts as the Clearing House is entitled to recover and is successful in recovering from that third party in respect of that party's acts and/or omissions.

**REGULATION 71   SUSPENSION OF THE EQUITYCLEAR SERVICE OR THE EQUITYCLEAR OPEN OFFER**

The Clearing House may, from time to time, in its absolute discretion suspend the EquityClear service or the EquityClear Open Offer in respect of ATP Matches or the EquityClear (ccCFD) Open Offer in respect of EquityClear (ccCFD) ATP Matches or its service in respect of any EquityClear Novation Transaction on one or more ATPs for such period of time as it may determine.

## REGULATION 72   REJECTION OF ATP MATCHES AND OF EQUITYCLEAR NOVATION TRANSACTIONS

(a)     Any EquityClear ATP Match, particulars of which are submitted to the Clearing House, or its relevant approved agent, for registration by the Clearing House as an EquityClear Contract, which does not meet the relevant EquityClear Open Offer Eligibility Criteria as published on the Clearing House's website (or any EquityClear (Equities) ATP Match which is an EquityClear Mixed Member Match where the relevant Co-operating Clearing House subsequently declines to register, rejects, cancels, avoids or terminates such EquityClear (Equities) ATP Match or any contract between the Co-operating Clearing House and its member arising out of it and any balancing contract deemed to arise between the Clearing House and the relevant Co-operating Clearing House in respect of such EquityClear (Equities) ATP Match), or which the Clearing House declines to register under any other provision within these Regulations will, subject to paragraph (c), be rejected by the Clearing House and no EquityClear Contracts shall be deemed to have arisen.   Without prejudice to the generality of Regulation 52, or any other provision of the Regulation or Procedures concerning liability of the Clearing House or a Member, the Clearing House (and each other member of the LCH.Clearnet Group and their respective officers, employees and agents) shall have no liability whatsoever to any Member or any other person with regard to the rejection by it of any such EquityClear ATP Match.

(b)     Any EquityClear Novation Transaction, particulars of which are submitted to the Clearing House, or its relevant approved agent, for registration by the Clearing House as an EquityClear Contract, which does not meet the applicable eligibility criteria as published on the Clearing House's website (or any EquityClear Novation Transaction which is an EquityClear Mixed Member Match where the relevant Co-operating Clearing House subsequently declines to register, rejects, cancels, avoids or terminates such EquityClear Novation Transaction or any contract between the Co-operating Clearing House and its member arising out of it and any balancing contract deemed to arise between the Clearing House and the relevant Co-operating Clearing House in respect of such EquityClear Novation Transaction), or which the Clearing House declines to register under any other provision within these Regulations will, subject to paragraph (c), be rejected by the Clearing House and no EquityClear Contracts shall be deemed to have arisen.   Without prejudice to the generality of Regulation 52, or any other provision of the Regulation or Procedures concerning liability of the Clearing House or a Member, the Clearing House (and each other member of the LCH.Clearnet Group and their respective officers, employees and agents) shall have no liability whatsoever to any Member or any other person with regard to the rejection by it of any such EquityClear Novation Transaction.

(c)     The Clearing House may, in its absolute discretion, agree to register an EquityClear Contract, notwithstanding that it does not meet the relevant EquityClear Open Offer Eligibility Criteria or the eligibility criteria as published on the Clearing House's website (as applicable) or it contains invalid or incomplete message data, in accordance with provisions prescribed by the Clearing House from time to time in the Procedures.

## CHAPTER XVII – LCH ENCLEAR REGULATIONS

## REGULATION 73   APPLICATION OF LCH ENCLEAR REGULATIONS

(a)    The Clearing House shall provide the LCH EnClear Service subject to and in accordance with the terms of these LCH EnClear Regulations and the Procedures.

(b)    LCH EnClear Clearing Members shall be bound by these LCH EnClear Regulations. Applications to become an LCH EnClear Clearing Member shall be made in accordance with Regulation 73(d) and (e). Other than as expressly specified in this Regulation 75, the remainder of the Regulations shall not apply to the LCH EnClear Service. A summary table of those Regulations which apply to the LCH EnClear Service as described in Regulation 73(a) to (q) is provided at Regulation 73(r).

(c)    Regulation 2 and Regulation 3 of the Regulations apply to the LCH EnClear Service.

**LCH EnClear Clearing Membership**

(d)    A Clearing Member may apply to become an LCH EnClear Clearing Member in accordance with the Procedures.

(e)    Regulation 4 applies to membership of the LCH EnClear Service and applications for such membership.

(f)    Regulation 5 applies to an LCH EnClear Clearing Member.

**Accounts**

(g)    Regulation 10 applies to the opening and operation of accounts with respect to an LCH EnClear Clearing Member. Such accounts shall be designated in accordance with Regulation 15.

**Client Clearing**

(h)    Regulation 11 applies to those LCH EnClear Clearing Members who provide (or wish to provide) Client Clearing Services.

**Formation, registration and transfers of LCH EnClear Contracts**

(i)    Regulation 16, Regulation 17 and Regulation 74 apply to the formation and registration of an LCH EnClear Contract.

(j)    Regulation 73 to Regulation 75 apply to the LCH EnClear Service.

(k)    Regulation 18 (and, insofar as relevant, Regulation 12(b)) apply to an LCH EnClear Contract that is an open contract.

**Margin and Collateral**

(l)    Regulation 20 applies to an LCH EnClear Clearing Member.

**Reference prices and Revaluation**

(m)    Regulation 22 applies to open LCH EnClear Contracts.

*Arbitration*

(n)    Regulation 33 and Regulation 34 apply to LCH EnClear Contracts.

**Other Applicable Regulations**

(o)    Regulation 37 to Regulation 46 inclusive apply to LCH EnClear Clearing Members and LCH EnClear Contracts.

**Default Rules**

(p)    The Default Rules apply to LCH EnClear Clearing Members and LCH EnClear Contracts.

**Clearing House Settlement Finality Regulations**

(q)    The Clearing House Settlement Finality Regulations apply in relation to LCH EnClear Clearing Members and LCH EnClear Contracts.

**Summary table of Regulations which apply to the LCH EnClear Service**

(r)    The Regulations listed in this Regulation 73(r) apply to the LCH EnClear Service as described under Regulation 73(a) to (q).

| *Regulation* | *Title* |
|---|---|
| Regulation 2 | Obligation to the Clearing House to each Member |
| Regulation 3 | Performance by the Clearing House of its Obligations under the Terms of an Open Contract |
| Regulation 4 | Clearing Member Status of the Clearing House |
| Regulation 5 | Resigning and Retiring Members |
| Regulation 9 | Service Withdrawal |
| Regulation 10 | Accounts |
| Regulation 11 | Client Clearing Business |
| Regulation 12(b) | Novation |
| Regulation 15 | Designation |
| Regulation 16 | Registration |
| Regulation 17 | Trading Information |
| Regulation 18 | Transfer |

| Regulation | Title |
|---|---|
| Regulation 20 | Margin and Collateral |
| Regulation 22 | Official Quotations and Reference Price |
| Regulation 25 | Other modes of settlement and Revaluation |
| Regulation 33 | Arbitration: Cleared Exchange Contracts, LSE Derivatives Markets Cleared Exchange Contracts, EquityClear Contracts or LCH EnClear Contracts (for Physical Delivery) |
| Regulation 34 | Collateral in Event of a Claim |
| Regulation 37 | Market Disorders, Impossibility of Performance, Trade Emergency |
| Regulation 38 | Force Majeure |
| Regulation 39 | Invoicing Back |
| Regulation 40 | Currency Conversion |
| Regulation 41 | Disclosure and Reporting |
| Regulation 42 | Fees and Other Charges |
| Regulation 43 | Records |
| Regulation 44 | Alteration of Regulations and the Procedures |
| Regulation 45 and Regulation 46 | Netting and Distribution of Assets |
| Regulation 47 | Procedures |
| Regulation 48(b) | Interpretation of these Regulations |
| Regulation 49 | Waiver |
| Regulation 50(a) | Validity of Regulations and Action |
| Regulation 51(a) and (c) to (e) | Governing Law and Jurisdiction |
| Regulation 52 | Exclusion of Liability |
| Regulation 73 to Regulation 75 | LCH EnClear Regulations |

| *Regulation* | *Title* |
|---|---|
| Default Rules | Default Rules |
| Settlement  Finality Regulations | Settlement Finality Regulations |

**REGULATION 74    REGISTRATION OF LCH ENCLEAR CONTRACTS**

(a)    An LCH EnClear Clearing Member must submit particulars of an Eligible EnClear Trade for registration as an LCH EnClear Contract, through such means as shall be prescribed by the Procedures.

## REGULATION 75    DAILY SETTLEMENT

(a)    Where the LCH EnClear Procedures so provide, in respect of any Eligible EnClear Trade, and any LCH EnClear Contract arising therefrom the Clearing House may effect the daily settlement to market, of such open LCH EnClear Contracts in accordance with the Procedures.

(b)    The Clearing House may, in accordance with the Procedures, in respect of each such open LCH EnClear Contract in an LCH EnClear Clearing Member's name which is subject to daily settlement to market, effect and register a settlement contract, being a contract on the same terms (except as to price) as the open contract, save that where that Clearing Member is the seller or the party paying a Fixed Price (as the case may be) under the terms of the open contract, that Clearing Member shall be the buyer or the party paying a Floating Price (as the case may be) under the terms of the settlement contract and vice-versa, such settlement contract to be effected in accordance with the Procedures at the relevant Reference Price for that day.  The Clearing House shall thereupon settle each open contract against the respective settlement contract in accordance with the Procedures.

(c)    Upon completion of the process set out in paragraph (b) above, the Clearing House may, if the Procedures so provide, calculate the daily settlement amounts in accordance with the Procedures and may thereafter debit or credit (as the case may be) the LCH EnClear Clearing Member's account and upon the Clearing House so doing, that Clearing Member and the Clearing House shall (unless otherwise agreed) settle any daily settlement amounts arising in accordance with the arrangements set out in the Procedures in respect of the relevant LCH EnClear Contract.

(d)    The Clearing House shall, upon completion of the calculation of daily settlement amounts pursuant to paragraph (c) above in the manner prescribed by the Procedures, in respect of those open LCH EnClear Contracts in an LCH EnClear Clearing Member's name which have been settled pursuant to paragraph (b) above and which are subject to daily settlement to market, register at the Reference Price referred to in paragraph (b) above, which price shall be deemed to be the Traded Price, contracts in that Clearing Member's name as open LCH EnClear Contracts on the same terms (except as to price) as the settled open contracts, save that no contract for the purchase and no contract for the sale of the same commodity, for the same delivery month, or expiry month and price, shall be registered in that Clearing Member's name.

## CHAPTER XVIII – LSE DERIVATIVES MARKETS REGULATIONS

## REGULATION 76   APPLICATION OF REGULATIONS FOR LSE MARKET

(a)   The Clearing House shall provide the LSE Derivatives Markets Service subject to and in accordance with the terms of these LSE Derivatives Markets Regulations and the Procedures.

(b)   LSE Derivatives Markets Clearing Members shall be bound by these LSE Derivatives Markets Regulations. Applications to become an LSE Derivatives Markets Clearing Member shall be made in accordance with Regulation 76(d) and (e). Other than as expressly specified in this Regulation 76, the remainder of the Regulations shall not apply to the LSE Derivatives Markets Service. A summary table of those Regulations which apply to the LSE Derivatives Markets Service as described in Regulation 76(a) to (q) is provided at Regulation 76(r).

(c)   Regulation 2 and Regulation 3 of the Regulations apply to the LSE Derivatives Markets Service.

### LSE Derivatives Markets Clearing Membership

(d)   A Clearing Member may apply to become an LSE Derivatives Markets Clearing Member in accordance with the Procedures.

(e)   Regulation 4 applies to membership of the LSE Derivatives Markets Service and applications for such membership.

(f)   Regulation 5 applies to an LSE Derivatives Markets Clearing Member.

### Accounts

(g)   Regulation 10 applies to the opening and operation of accounts with respect to an LSE Derivatives Markets Clearing Member. Such accounts shall be designated in accordance with Regulation 15.

### Client Clearing

(h)   Regulation 11 applies to those LSE Derivatives Markets Clearing Members who provide (or wish to provide) Client Clearing Services.

### Formation, registration and transfers of LSE Derivatives Markets Contracts

(i)   Regulation 16(b) to (e), Regulation 17, Regulation 78 and Regulation 79 apply to the formation and registration of an LSE Derivatives Markets Contract.

(j)   Regulation 76 to Regulation 87 apply to the LSE Derivatives Markets Service.

(k)   Regulation 18 (and, insofar as relevant, Regulation 12(b)) apply to an LSE Derivatives Markets Contract that is an open contract.

### Margin and Collateral

(l)    Regulation 20 applies to an LSE Derivatives Markets Clearing Member.

**Reference prices and Revaluation**

(m)    Regulation 22 applies to open LSE Derivatives Markets Contracts.

*Arbitration*

(n)    Regulation 33 and Regulation 34 apply to LSE Derivatives Markets Contracts.

**Other Applicable Regulations**

(o)    Regulation 37 to Regulation 46 inclusive apply to LSE Derivatives Markets Clearing Members and LSE Derivatives Markets Contracts.

**Default Rules**

(p)    The Default Rules apply to LSE Derivatives Markets Clearing Members and LSE Derivatives Markets Contracts.

**Clearing House Settlement Finality Regulations**

(q)    The Clearing House Settlement Finality Regulations apply in relation to LSE Derivatives Markets Clearing Members and LSE Derivatives Markets Contracts.

**Summary table of Regulations which apply to the LSE Derivatives Markets Service**

(r)    The Regulations listed in this Regulation 76(r) apply to the LSE Derivatives Markets Service as described under Regulation 76(a) to (q).

| *Regulation* | *Title* |
|---|---|
| Regulation 2 | Obligation to the Clearing House to each Member |
| Regulation 3 | Performance by the Clearing House of its Obligations under the Terms of an Open Contract |
| Regulation 4 | Clearing Member Status of the Clearing House |
| Regulation 5 | Resigning and Retiring Members |
| Regulation 7 | Non-Member Market Participant  Status |
| Regulation 9 | Service Withdrawal |
| Regulation 10 | Accounts |
| Regulation 11 | Client Clearing Business |
| Regulation    12(b) and (c) | Novation |

| Regulation | Title |
|---|---|
| Regulation 15 | Designation |
| Regulation 16(b) to (e) | Registration |
| Regulation 17 | Trading Information |
| Regulation 18 | Transfer |
| Regulation 20 | Margin and Collateral |
| Regulation 21 | Premium under Option Contracts |
| Regulation 22 | Official Quotations and Reference Price |
| Regulation 25 | Other modes of settlement and Revaluation |
| Regulation 26 | Exercise of Options |
| Regulation 27 | Delivery Contract Arising upon the Exercise of an Option |
| Regulation 29 | Delivery Contracts |
| Regulation 31(a), (b) and (c) | Arrangements for Delivery and Payment of Price |
| Regulation 32 | Restrictions on Clearing House's Obligations and Liability |
| Regulation 33 | Arbitration: Cleared Exchange Contracts, LSE Derivatives Markets Cleared Exchange Contracts, EquityClear Contracts or LCH EnClear Contracts (for Physical Delivery) |
| Regulation 34 | Collateral in Event of a Claim |
| Regulation 35 | Delivery (or other) Failures |
| Regulation 37 | Market Disorders, Impossibility of Performance, Trade Emergency |
| Regulation 38 | Force Majeure |
| Regulation 39 | Invoicing Back |
| Regulation 40 | Currency Conversion |
| Regulation 41 | Disclosure and Reporting |
| Regulation 42 | Fees and Other Charges |

| Regulation | Title |
|---|---|
| Regulation 43 | Records |
| Regulation 44 | Alteration of Regulations and the Procedures |
| Regulation 45 and Regulation 46 | Netting and Distribution of Assets |
| Regulation 47 | Procedures |
| Regulation 48(b) | Interpretation of these Regulations |
| Regulation 49 | Waiver |
| Regulation 50(a) | Validity of Regulations and Action |
| Regulation 51(a) and (c) to (e) | Governing Law and Jurisdiction |
| Regulation 52 | Exclusion of Liability |
| Regulation 76 to Regulation 87 | LSE Derivatives Markets Regulations |
| Default Rules | Default Rules |
| Settlement Finality Regulations | Settlement Finality Regulations |

**REGULATION 77   LSE DERIVATIVES MARKETS ORDERBOOK MATCHES MADE ON LSE MARKET**

(a)     This Regulation 77 applies to LSE Derivatives Markets Orderbook Matches made in accordance with the Exchange Rules pursuant to the matching of LSE Derivatives Markets Trade Particulars submitted to the LSE Derivatives Markets Orderbook by or on behalf of Members.  This Regulation 77 also applies to LSE Derivatives Markets Orderbook Matches made on the Combined LSE Derivatives Markets Orderbook.  As between the Clearing House and a Clearing Member, in the event of any inconsistency between the Regulations (including the terms of any agreement entered into between a Clearing Member and the Clearing House) and the Exchange Rules, the Regulations shall prevail.

(b)     The Clearing House will enter into LSE Derivatives Markets Cleared Exchange Contracts with Clearing Members pursuant to LSE Derivatives Markets Orderbook Matches made in the LSE Derivatives Markets Orderbook in accordance with and subject to the following provisions of this Regulation 77.

(c)     This paragraph (c) shall be without prejudice to paragraph (m).  The Clearing House makes an open offer to a Clearing Member to enter into an LSE Derivatives Markets Cleared Exchange Contract in accordance with paragraph (f) of this Regulation 77 in respect of an LSE Derivatives Markets Orderbook Match made in accordance with the Exchange Rules pursuant to the submission of LSE Derivatives Markets Trade Particulars by or on behalf of that Clearing Member, **provided that** the following requirements shall have been satisfied:

(i)      at the relevant times the Clearing Member was party to a valid and subsisting Clearing Membership Agreement;

(ii)     at the relevant times, the Clearing Member has not been declared a Defaulter, by default notice or otherwise, by the Clearing House or LSE;

(iii)    the product the subject of the LSE Derivatives Markets Orderbook Match is, at the relevant times, an LSE Derivatives Markets Eligible Product;

(iv)     all necessary details as required by the Clearing House from time to time in respect of the LSE Derivatives Markets Orderbook Match shall have been received by the Clearing House, through LSE, in accordance with procedures established by the Clearing House with LSE from time to time or otherwise. Such information must be complete, must not be corrupted and must be legible at the time such details were received;

(v)      at the time at which any LSE Derivatives Markets Orderbook Match is effected, the LSE Derivatives Markets Eligible Product which is the subject of the LSE Derivatives Markets Orderbook Match is not subject to any trading halts, suspension of dealings or any other action having equivalent effect published by or on behalf of LSE; and

(vi)     at the relevant times, the Open Offer for LSE Derivatives Markets in respect of LSE Derivatives Markets Orderbook Matches made on LSE has not been suspended or withdrawn generally or with respect to such Clearing Member.

(d)     It is a requirement of the Exchange Rules and the Procedures that, in order for a Clearing Member to be eligible to have LSE Derivatives Markets Cleared Exchange Contracts registered in its name with the Clearing House:

    (i)     the Clearing Member shall have executed such agreements or documents as may be required by the Clearing House from time to time in connection with the LSE Derivatives Markets Services;

    (ii)    there are in place appropriate arrangements (as prescribed from time to time by the Clearing House) between the Clearing Member (or its nominated agent) and an Approved LSE Derivatives Markets Settlement Provider for the delivery, or receipt, as applicable, of any securities or other instruments which may be or become deliverable under the terms of an LSE Derivatives Markets Cleared Exchange Contract.

The Clearing House shall be entitled to take such steps as are set out in the Procedures in respect of any Clearing Member who does not satisfy any of these requirements.

(e)     For the purposes of this Regulation 77, LSE Derivatives Markets Trade Particulars giving rise to an LSE Derivatives Markets Orderbook Match in the EDX Orderbook are deemed to have been submitted by or on behalf of a Clearing Member if the details of a LSE Derivatives Markets Orderbook Match, received by the Clearing House pursuant to Regulation 77(c)(iv) identify, in accordance with the Exchange Rules or the Procedures, that LSE Derivatives Markets Orderbook Match as having been made by or on behalf of that Clearing Member.

(f)     If LSE Derivatives Markets Trade Particulars have been submitted to the LSE Derivatives Markets Orderbook by or on behalf of a Clearing Member as seller (for the purposes of this paragraph (f), the "**selling Clearing Member**") and have been matched by, or in accordance with, the Exchange Rules with LSE Derivatives Markets Trade Particulars which have been submitted to the LSE Derivatives Markets Orderbook by or on behalf of another Clearing Member as buyer (for the purposes of this paragraph (f), the "**buying Clearing Member**"), and the requirements stated in paragraph (c) have been satisfied in respect of the selling Clearing Member and the buying Clearing Member, two LSE Derivatives Markets Cleared Exchange Contracts shall arise immediately on registration by the Clearing House, as follows:

    (i)     the Clearing House shall be the buyer under one LSE Derivatives Markets Cleared Exchange Contract with the selling Clearing Member as the seller; and

    (ii)    the Clearing House shall be the seller under one LSE Derivatives Markets Cleared Exchange Contract with the buying Clearing Member as the buyer.

(g)     This paragraph (g) shall be without prejudice to paragraph (m).  Where pursuant to arrangements entered into between LSE and one or more Co-operating Exchanges, LSE Derivatives Markets Trade Particulars submitted by or on behalf of a Clearing Member to the LSE Derivatives Markets Orderbook have been matched in the Combined LSE Derivatives Markets Orderbook with LSE Derivatives Markets Trade Particulars submitted by or on behalf of a Linked Member, the Clearing House shall, on receipt of details of such LSE Derivatives Markets Orderbook Match through LSE

(or by such other means) and subject to the requirements of Regulation 14(c) having been met with respect to such Clearing Member and the relevant Co operating Clearing House being party to a valid and subsisting Link Agreement, register an LSE Derivatives Markets Cleared Exchange Contract in the name of the Clearing Member and in the name of the relevant Co-operating Clearing House. The Clearing House shall be party:

(i)    as seller to an LSE Derivatives Markets Cleared Exchange Contract with the Clearing Member, where the Clearing Member is identified in the details received by LSE as the buying Clearing Member and party as buyer to an LSE Derivatives Markets Cleared Exchange Contract with such Co-operating Clearing House as seller; and

(ii)   as buyer to an LSE Derivatives Markets Cleared Exchange Contract with the Clearing Member, where the Clearing Member is identified in the details received by LSE as the selling Clearing ember and party as seller to an LSE Derivatives Markets Cleared Exchange Contract with such Co-operating Clearing House as buyer.

(h)    LSE Derivatives Markets Cleared Exchange Contracts registered in respect of an LSE Derivatives Markets Orderbook Match shall be on the terms received by the Clearing House pursuant to Regulation 77(c)(iv) and otherwise on the terms of the relevant LSE Derivatives Markets Contract Specification contained in the Exchange Rules and any other terms specified in these Regulations and the Procedures. The Clearing House and the Clearing Member party to an LSE Derivatives Markets Cleared Exchange Contract shall be obliged to perform their obligations thereunder in accordance with such terms and the Regulations.

(i)     Subject to its rights to suspend the Open Offer for LSE Derivatives Markets generally under Regulation 82 or to withdraw the LSE Derivatives Markets Services in whole or in part as set out in these Regulations or the Procedures, the Clearing House undertakes to keep open the Open Offer for LSE Derivatives Markets to a Clearing Member until the Member is no longer eligible under the Exchange Rules or these LSE Derivatives Markets Regulations to have LSE Derivatives Markets Cleared Exchange Contracts registered in its name or has given notice to the Clearing House, in accordance with the Procedures, stating that it no longer wishes to participate in the LSE Derivatives Markets Services.

(j)     Without prejudice to the generality of Regulation 52, any other provision of these Regulations, the Procedures or the Exchange Rules concerning the liability of the Clearing House, the Clearing House shall not be liable to any Clearing Member (or any other person, Co operating Clearing House or Linked Member), for any loss, cost, damage or expense of whatsoever nature suffered or incurred by it or them if the Clearing House does not receive the details of an LSE Derivatives Markets Orderbook Match pursuant to Regulation 77(c)(iv) or does not receive accurate, complete or legible details of such LSE Derivatives Markets Orderbook Match in accordance with such Regulation. The Clearing House shall be under no duty or obligation to verify the accuracy or completeness of details of LSE Derivatives Markets Orderbook Matches received by the Clearing House through LSE.

(k)     Without prejudice to Regulation 35 or Regulation 81 a Clearing Member shall be bound by an LSE Derivatives Markets Cleared Exchange Contract registered in its name in respect of an LSE Derivatives Markets Orderbook Match under these Regulations and notwithstanding that the requirements of paragraph (c) may not have been satisfied in respect of the Clearing Member.

(l)     In the event of a dispute arising out of, or in respect of, the existence or terms of an LSE Derivatives Markets Orderbook Match or, where applicable, whether LSE Derivatives Markets Trade Particulars giving rise to an LSE Derivatives Markets Orderbook Match were submitted by or on behalf of the Clearing Members in whose names LSE Derivatives Markets Cleared Exchange Contracts have been (or are to be) registered by the Clearing House, such dispute shall be settled as provided for in the Exchange Rules relating to cancellation of incorrect transactions and Protests and, in connection with this, in accordance with Regulation 3.

(m)    If a Clearing Member fails to satisfy the criteria referred to in Regulation 77(c)(i) and (ii) or the Open Offer for LSE Derivatives Markets has been withdrawn with respect to such Clearing Member (as opposed to generally), the Clearing House may, in respect of any LSE Derivatives Markets Orderbook Match which has been submitted by or on behalf of such Clearing Member to the LSE Derivatives Markets Orderbook, register an LSE Derivatives Markets Cleared Exchange Contract in the LSE Derivatives Markets Account where required by, and in accordance with, arrangements agreed from time to time with LSE.  This paragraph shall not apply where both Clearing Members (or a Clearing Member and a Linked Member) party to an LSE Derivatives Markets Orderbook Match fails to satisfy the criteria referred to in Regulation 77(c).

## REGULATION 78   REPORTED TRADES AND LSE DERIVATIVES MARKETS OTC TRADES REPORTED TO LSE FOR REGISTRATION

(a)     Regulation 78(d) and 78(g) and the Procedures apply to Reported Trades and LSE Derivatives Markets OTC Trades made by or on behalf of Clearing Members or by or on behalf of a Clearing Member and a Member of a Co-operating Exchange. Reported Trades and LSE Derivatives Markets OTC Trades will not be registered by the Clearing House unless the Clearing House accepts such trades for registration. Acceptance by the Clearing House of Reported Trades and LSE Derivatives Markets OTC Trades for registration shall be at the discretion of the Clearing House.

(b)     Details of Reported Trades and LSE Derivatives Markets OTC Trades made by or on behalf of LSE Derivatives Markets Members which are reported to LSE in accordance with Exchange Rules for registration with the Clearing House may only be submitted to the Clearing House by LSE, who shall submit such details on behalf of the Clearing Members party thereto in accordance with arrangements made between the Clearing House and LSE from time to time.

(c)     Details of Reported Trades and LSE Derivatives Markets OTC Trades made by or on behalf of a Clearing Member and a Linked Member may only be submitted to the Clearing House by LSE, who shall submit such details on behalf of the Clearing Member and the relevant Co-operating Exchange in accordance with arrangements made between the Clearing House and LSE from time to time.

(d)     If the Clearing House determines to accept a Reported Trade or LSE Derivatives Markets OTC Trade for registration, the Clearing House shall arrange for LSE to confirm the Clearing House's acceptance to the relevant LSE Derivatives Markets Members or to the relevant LSE Derivatives Markets Member and the relevant Co-operating Exchange.

(e)     Subject to paragraph (f), the Clearing House shall register LSE Derivatives Markets Cleared Exchange Contracts which it has accepted for registration pursuant to Regulation 78(d), at the time referred to in the Procedures and in accordance with Regulation 78(g).

(f)     The Clearing House shall not register a Reported Trade or LSE Derivatives Markets OTC Trade, of which details have been reported to the Clearing House under paragraph (c), if the relevant Co-operating Exchange declines to enter into an LSE Derivatives Markets Cleared Exchange Contract with respect to such Reported Trade.

(g)     Without prejudice to Regulation 35 or Regulation 81, a Clearing Member shall be bound by an LSE Derivatives Markets Cleared Exchange Contract registered under Regulation 79 in its name pursuant to the presentation to the Clearing House by LSE under paragraph (b) or (c) of details of a Reported Trade or LSE Derivatives Markets OTC Trade to which it is party.

**REGULATION 79  REGISTRATION    OF    LSE    DERIVATIVES    MARKETS CLEARED EXCHANGE CONTRACTS FOLLOWING SUBMISSION OF DETAILS OF A REPORTED TRADE OR LSE DERIVATIVES MARKETS OTC TRADE**

(a)     Details of a Reported Trade or LSE Derivatives Markets OTC Trade accepted for registration by the Clearing House under Regulation 78(d) shall, subject to Regulation 78(f), be registered by the Clearing House as two LSE Derivatives Markets Cleared Exchange Contracts between:

     (i)     as seller, the Clearing Member who was named in the Reported Trade or LSE Derivatives Markets OTC Trade as the seller (or, where a Linked Member was named as the seller, the Member which is the relevant Co-operating Clearing House) and the Clearing House as buyer; and

     (ii)    as buyer, the Clearing Member who was named in the Reported Trade or LSE Derivatives Markets OTC Trade as the buyer (or, where a Linked Member was named as the buyer, the Member which is the relevant Co-operating Clearing House) and the Clearing House as seller.

(b)     Where a Reported Trade is accepted for registration by the Clearing House, each LSE Derivatives Markets Cleared Exchange Contract registered under paragraph (a) of this Regulation 79 shall be on the terms received by the Clearing House from LSE and otherwise on the terms of the relevant LSE Derivatives Markets Contract Specification contained in the Exchange Rules and any other terms specified in these Regulations and the Procedures.  Where an LSE Derivatives Markets OTC Trade is accepted for registration, each LSE Derivatives Markets Cleared Exchange Contract registered under paragraph (a) of this Regulation 79 shall be on the terms set out in the Product Specific Contract Terms and Eligibility Criteria Manual.

(c)     Without prejudice to Regulation 9, if a Reported Trade is revoked, avoided or otherwise declared invalid for any reason by a person other than the Clearing House or LSE after particulars of it have been accepted by the Clearing House for registration that revocation, avoidance or invalidity shall not affect any LSE Derivatives Markets Cleared Exchange Contract arising under this Regulation or Regulation 78(b) and the Clearing Member party thereto shall be bound by such LSE Derivatives Markets Cleared Exchange Contract.

**REGULATION 80 SUSPENSION OF THE OPEN OFFER FOR LSE DERIVATIVES MARKETS**

The Clearing House may, from time to time, in its absolute discretion suspend the LSE Derivatives Markets Services for such period of time as it may determine in the circumstances referred to in this Regulation 80 or with the agreement of LSE.

The LSE Derivatives Markets Services may be suspended:

(a)     as a result of a malfunction, breakdown or other failure in the electronic communication link between LSE London and the Clearing House (including any linkage via a third party system) or in the Clearing House's computer systems or any other relevant communication link or computer system such that the Clearing House is not able to receive or otherwise access all such particulars as it may require in order to exercise adequate risk management controls over contracts registered under the LSE Derivatives Markets Services;

(b)     as a result of a significant banking crisis or an extended disruption to any relevant bank payment system or any other event the occurrence of which in the Clearing House's reasonable opinion may jeopardise the solvency or the integrity of the Clearing House, and in any such case in the Clearing House's reasonable opinion there is a need to suspend the LSE Derivatives Markets Services in order to protect the solvency or the integrity of the Clearing House;

(c)     where a market emergency affecting LSE London and/or the Clearing House has a material effect on the provision of the LSE Derivatives Markets Services and/or the LSE market;

(d)     in order to comply with any requirements to which it is subject under applicable laws or regulations or with any order or direction given by, or a requirement of, a relevant regulation or pursuant to the rules of any such regulator.

**REGULATION 81   CANCELLATION, VARIATION ETC OF LSE DERIVATIVES MARKETS CLEARED EXCHANGE CONTRACTS**

(a)     The Clearing House shall, in accordance with procedures agreed with LSE, cancel, or vary the terms of, an LSE Derivatives Markets Cleared Exchange Contract and the corresponding LSE Derivatives Markets Cleared Exchange Contract pursuant to a determination to this effect made by LSE under the Exchange Rules that such Contracts have been entered into in error or certain terms have been agreed in error or in such other circumstances as may be set out in the Exchange Rules.

(b)     If following receipt of a statement from LSE recording the details of LSE Derivatives Markets Cleared Exchange Contracts which have been registered on a business day in the name of a Clearing Member under the Regulations, the Clearing Member considers that there has been an error or omission in such statement, it shall submit a Protest to LSE in accordance with, and by the time required, by the Exchange Rules. On receipt of such Protest, LSE will consult with the Clearing House with a view to determining whether the Protest is valid and, if valid, what step or steps (if any) should be taken in respect of such Clearing Member or any other affected Clearing Member, which may include registering, re-registering, cancelling or varying a LSE Derivatives Markets Cleared Exchange Contract.  The Clearing House shall take such steps as LSE and the Clearing House determine to be appropriate and any other step or steps as may be required by the Procedures, which may include requiring Collateral to be transferred to the Clearing House as required by the Clearing House.  If the Clearing House does not take any steps under this paragraph (b) in respect of an LSE Derivatives Markets Cleared Exchange Contract, the Clearing Member shall remain bound by the terms of each such LSE Derivatives Markets Cleared Exchange Contract registered in his name with the Clearing House.  This paragraph shall not apply in the circumstances contemplated by paragraph (a) of this Regulation.

(c)     LSE Derivatives Markets Cleared Exchange Contracts may be registered in the LSE Derivatives Markets Account in connection with any step taken by the Clearing House under paragraph (b) of this Regulation 81 or in such other circumstances as may be agreed between LSE and the Clearing House from time to time.

(d)     A Clearing Member whose LSE Derivatives Markets Cleared Exchange Contracts have been varied under this Regulation 81 shall be bound by the terms of such Contracts as varied and any relevant provisions of the Procedures.

(e)     Upon an LSE Derivatives Markets Cleared Exchange Contract being cancelled under this Regulation 81, the particulars of the transaction in question shall be deemed never to have been submitted to the Clearing House for registration.  Any payment (other than fees) made to the Clearing House under, or in respect of, an LSE Derivatives Markets Cleared Exchange Contract which has been cancelled under this Regulation 81 shall be repayable to the person who made the payment, subject to LCH's rights under Regulation 20 and the Default Rules.

(f)     Without prejudice to Regulation 52 and its rights and obligations set out in this Regulation 81, the Clearing House shall have no liability whatsoever to any person in respect of any step taken under paragraph (a) or (b) of this Regulation 81.

**REGULATION 82    REJECTION OF ORDERBOOK MATCHES**

(a)    Subject to paragraphs (b) and (c) of this Regulation 82 and to Regulation 77(m), any LSE Derivatives Markets Orderbook Match, which does not meet the requirements set out in Regulation 77(c), or in respect of which the Clearing House declines to register LSE Derivatives Markets Cleared Exchange Contracts under Regulation 16(c), will be rejected by the Clearing House and no LSE Derivatives Markets Cleared Exchange Contracts shall be deemed to have arisen.  Without prejudice to the generality of Regulation 52, any other provision of these Regulations, the Procedures, or the Exchange Rules concerning the liability of the Clearing House, the Clearing House shall have no liability whatsoever to any Clearing Member or any other person (including but not limited to any Linked Member)) with regard to the rejection by it of any such LSE Derivatives Markets Orderbook Match or any Reported Trade.

(b)    The Clearing House may, in its absolute discretion, agree to register an LSE Derivatives Markets Cleared Exchange Contract in the account of a Clearing Member in respect of an LSE Derivatives Markets Orderbook Match in accordance with any provisions in this regard set out in the Procedures, notwithstanding that the Clearing Member does not meet the requirements set out in Regulation 77(c) in respect of the LSE Derivatives Markets Orderbook Match or the Clearing House receives invalid or incomplete message data in respect of an LSE Derivatives Markets Orderbook Match.

(c)    The Clearing House shall only exercise its rights to decline to register LSE Derivatives Markets Cleared Exchange Contracts under Regulation 16(c) if:

(i)    the Clearing House is required by an order or direction issued by, or a requirement of, a Regulatory Body pursuant to its rules or otherwise, or in order to comply with any applicable laws, regulations or court order, to cancel, decline to enter into or reject an LSE Derivatives Markets Cleared Exchange Contract or to take other similar measures in relation to an LSE Derivatives Markets Cleared Exchange Contract; or

(ii)    an LSE Derivatives Markets Orderbook Match exceeds a size specified in the Exchange Rules or the Procedures from time to time.

(d)    If any of the circumstances referred to in paragraph (c)(i) apply in respect of an affected Clearing Member, the Clearing House shall take such action as it may determine in order that the Clearing House does not have (or to minimise the effect of) an unbalanced position. Any such action may, without limit, include entering into contracts with a Clearing Member or a third party in order to balance its position, or to vary or cancel LSE Derivatives Cleared Exchange Contracts entered into with a Co-operating Clearing House, as appropriate and the affected Clearing Member shall indemnify the Clearing House against all losses, costs, taxes or expenses suffered or incurred by the Clearing House in taking such action.

**REGULATION 83    CROSS-BORDER TRANSFERS TO THE CLEARING HOUSE OF CONTRACTS EXECUTED BY A MEMBER OF A CO-OPERATING EXCHANGE - AUTOMATIC TRANSFERS**

(a)     Where, pursuant to arrangements set forth in the Exchange Rules, a Clearing Member wishes automatically to accept transfers of contracts executed by a Linked Member on or under the Rules of a Co-operating Exchange for registration with the Clearing House, the Clearing Member shall enter into such agreements as may be required for this purpose by the Exchange Rules and shall notify to the Clearing House, in accordance with the Procedures, the account of the Linked Member (the "**Linked Account**") from which such contracts shall be transferred and the Clearing Member's account with the Clearing House in which such contracts shall be registered.    The Clearing House shall register such transferred contracts as LSE Derivatives Markets Cleared Exchange Contracts in such account of the Clearing Member in accordance with this Regulation 83 and the Exchange Rules.

(b)     Cross-Border Transfers shall be effected at the time or times and in accordance with procedures agreed between the Clearing House and the relevant Co-operating Clearing House from time to time and otherwise subject to these Regulations and the Exchange Rules.

(c)     Cross-Border Transfers shall not be made in the circumstances set out in 84 or 85 or if LSE notifies the Clearing House that the Clearing Member is no longer party to the applicable agreements required by Exchange Rules with respect to Cross-Border Transfers to be made under this Regulation 83.

(d)     The Clearing House shall be entitled to rely on the details notified to it by LSE of the contracts to be transferred from a Linked Account to the account of a Clearing Member and shall be under no obligation to verify such details with LSE or the Clearing Member.

(e)     Cross-Border Transfers of Contracts to the account of a Clearing Member with the Clearing House shall be automatically made in accordance with this Regulation 83 without further instructions from the Clearing Member.

(f)     The Clearing House shall not be liable to a Clearing Member, a Linked Member or any person whatsoever in accepting a transfer of contracts for registration in a Clearing Member's account in accordance with this Regulation 83 or if the Clearing House does not accept any such transfer pursuant to Regulation 84 or 85.

(g)     If the Clearing House would have an unbalanced position on registering LSE Derivatives Markets Cleared Exchange Contracts in an account of a Member in respect of a Cross-Border Transfer made in accordance with this Regulation 83, the Clearing House shall register an equal number of corresponding LSE Derivatives Markets Cleared Exchange Contracts in the name of the relevant Co-operating Clearing House.

(h)     LSE Derivatives Markets Cleared Exchange Contracts registered under this Regulation 83 in a Clearing Member's account shall have the same economic terms as the contracts executed by the Linked Member on a Co-operating Exchange, but otherwise shall be subject to the Regulations and the Exchange Rules.

The Clearing House shall have the same rights to decline to register or accept a contract for registration under this Regulation 83 as it has under these Regulations in respect of an LSE Derivatives Markets Orderbook Match or a Reported Trade or LSE Derivatives Markets OTC Trade.

**REGULATION 84   DEFAULT AFFECTING A CROSS-BORDER TRANSFER**

If, prior to effecting a Cross-Border Transfer under these Regulations, a Clearing Member or a Linked Member party to such proposed Cross-Border Transfer is a Defaulter or in default under the rules of the relevant Co-operating Exchange the Cross-Border Transfer shall not occur, unless the Clearing House and the relevant Co-operating Clearing House decide otherwise or it is not practicable to prevent any such Cross-Border Transfer.

**REGULATION 85   IMPOSSIBILITY OF TRANSFER**

(a)     Cross-Border Transfers shall not occur on any day under Regulation 83 if it is impossible, for any technological or other reason, for any such transfer to take place. Any affected Cross-Border Transfer shall take place as soon as it is possible for such transfer to be effected.

(b)     Cross Border Transfers shall not occur if it would contravene any applicable law or regulation or requirement of a regulator for any such transfer to take place.

**REGULATION 86   OPTIONS**

An LSE Derivatives Cleared Exchange Contract, being an option, shall be exercised by a Member in accordance with the applicable Exchange Rules and these Regulations and the Procedures.  Where there is any conflict between the terms of the applicable Exchange Rules and these Regulations and Procedures, the terms of the Regulations and Procedures shall prevail.  References in Regulation 26 to a notice in writing shall be construed to mean an instruction given, or to be given to LSE, in accordance with the Exchange Rules, as agent for the Clearing House.

## REGULATION 87   RE-REGISTRATION OF CONTRACTS

(a)     A Clearing Member may arrange for an LSE Derivatives Markets Cleared Exchange Contract to be transferred to another Clearing Member or to a member of a Co-operating Clearing House in the circumstances prescribed in LSE Derivatives Markets Rules 2.14 and 3.4 or as contemplated by this Regulation 87.  Any such transfer to an account of another Clearing Member shall be effected by the Clearing House in accordance with Regulation 18.

(b)     Where a Clearing Member submits a Request for Re-Registration to LSE in accordance with LSE Derivatives Markets Rule 3.4, LSE shall notify the Clearing House, in accordance with the Procedures, that it has received such Request for Re-Registration.

(c)     Transfers of LSE Derivatives Markets Cleared Exchange Contracts pursuant to a Request for Re-Registration submitted by a Clearing Member to LSE and notified to the Clearing House under paragraph (b) shall be effected only if LSE and the Clearing House have determined to accept such Request for Re-Registration.  The Clearing House shall effect such transfer in accordance with Regulation 18 and the Procedures.

(d)     Where a Clearing Member has submitted a Request for Re-Registration to LSE requesting that one or more LSE Derivatives Markets Cleared Exchange Contracts be transferred to an account maintained by a Linked Member with a Co-operating Clearing House, Co-operating Exchange or its Associated Clearing House, the Clearing Member shall notify the Clearing House, in accordance with the Procedures, that such request has been made to LSE.  No such transfers shall be made, unless such conditions set forth in the Exchange Rules have been satisfied and the Clearing House, LSE and the relevant Co-operating Clearing House, Co-operating Exchange or Associated Clearing House, as the case may be, have given their approval to the transfer.   Any such transfer shall be on such terms as the Clearing House may stipulate.

A Clearing Member may in accordance with the Procedures and with the approval of the Clearing House accept for registration in his name contracts executed by a Linked Member and registered with the relevant Co-operating Clearing House or Associated Clearing House which the Linked Member wishes to transfer to an account of the Clearing Member with the Clearing House.

# CHAPTER XIX

**REGULATION 88**   *[INTENTIONALLY LEFT BLANK]*

## CHAPTER XX – NODAL REGULATIONS

## REGULATION 89    APPLICATION

*General*

(a)    The Clearing House shall provide the Nodal Service subject to and in accordance with the terms of this Regulation and the Procedures.

(b)    Clearing Members which are Nodal Service Clearing Members, and applicants to become Nodal Service Clearing Members, shall be bound by this Regulation and the other Regulations specified in this Regulation to apply to the Nodal Service.  Other than as specified in this Regulation, the remainder of the Regulations shall not apply to the Nodal Service.

(c)    Regulations 2 and 3 of the Regulations apply to the Nodal Service.

*Nodal Service Clearing Membership*

(d)    A Clearing Member may apply to become a Nodal Service Clearing Member in accordance with the Procedures.

(e)    Regulation 4 applies to Nodal Service Clearing Membership and applications therefor.

(f)    Regulation 5 applies to a Nodal Service Clearing Member.

(g)    In the event of any inconsistency between Nodal's Rules and the Nodal Regulations, the Nodal Regulations shall prevail.

*Accounts*

(h)    Regulation 10 applies to the opening and operation of accounts with respect to a Nodal Service Clearing Member.  Such accounts shall be designated in accordance with Regulation 15.

*Client Clearing*

(i)    Regulation 11 applies to those Nodal Service Clearing Member who provide (or wish to provide) Client Clearing Services.

*Formation, registration and transfers of Nodal Contracts*

(j)    Nodal's Rules govern the formation of a Nodal Transaction.

(k)    Regulation 13 (except Regulation 13(d)) and Regulation 16 govern the registration and formation of a Nodal Contract.

(l)    Regulation 18 (and, insofar as relevant, Regulation 12(b)) apply to a Nodal Contract which is an open contract.

*Margin and Collateral*

(m)     Regulation 20 applies to a Nodal Service Clearing Member.

*Daily settlement*

(n)     Regulation 21, Regulation 22, Regulation 23 and Regulation 24 apply to the daily settlement to market of open Nodal Contracts.

*Options*

(o)     Regulation 26 and Regulation 27 apply to Nodal Contracts which are options.

*Physical settlement*

(p)     Regulation 28 to 32 (inclusive) and Regulation 36 apply to Nodal Contracts.

*Arbitration*

(q)     Regulation 33 and Regulation 34 apply to Nodal Contracts.

*Market disorders; force majeure; invoicing back; currency conversion; disclosure; fees and other charges; records; Procedures; alteration of Regulations and Procedures; interpretation; waiver; validity; governing law and jurisdiction; exclusion of liability; netting*

(r)     Regulation 36 to Regulation 52 (inclusive) apply to Nodal Service Clearing Members and Nodal Contracts.

*Default Rules*

(s)     The Default Rules apply to Nodal Service Clearing Members and Nodal Contracts.

*Clearing House Settlement Finality Regulations*

(t)     The Clearing House Settlement Finality Regulations apply in relation to Nodal Service Clearing Members and Nodal Contracts.

*Summary table of Regulations which apply to the Nodal Service*

(u)     The Regulations listed in this Regulation 89(u) apply to the Nodal Service as described under Regulation 89(a) to (t).

| *Regulation* | *Title* |
|---|---|
| Regulation 2 | Obligation to the Clearing House to each Member |
| Regulation 3 | Performance by the Clearing House of its Obligations under the Terms of an Open Contract |
| Regulation 4 | Clearing Member Status of the Clearing House |

| Regulation | Title |
|---|---|
| Regulation 5 | Resigning and Retiring Members |
| Regulation 7 | Non-Member Market Participant Status |
| Regulation 9 | Service Withdrawal |
| Regulation 10 | Accounts |
| Regulation 11 | Client Clearing Business |
| Regulation 12(b) | Novation |
| Regulation 13 (except Regulation 13(d)) | Presentation of Particulars of Original Exchange Contracts and Confirmation of Original Exchange Contracts |
| Regulation 14 | Allocation of Original Exchange Contracts |
| Regulation 15 | Designation |
| Regulation 16 | Registration |
| Regulation 17 | Trading Information |
| Regulation 18 | Transfer |
| Regulation 20 | Margin and Collateral |
| Regulation 21 | Premium under Option Contracts |
| Regulation 22 | Official Quotations and Reference Price |
| Regulation 23 | Daily Settlement or Marking to Market |
| Regulation 24 | Settlement and Revaluation: Clearing Processing System |
| Regulation 26 | Exercise of Options |
| Regulation 27 | Delivery Contract Arising upon the Exercise of an Option |
| Regulation 28 | Obligation to Make and Accept Tender under Cleared Exchange Contracts |
| Regulation 29 | Delivery Contracts |
| Regulation 30 | Open Contracts Subject to Tender |
| Regulation 31 | Arrangements for Delivery and Payment of Price |

| Regulation | Title |
|---|---|
| Regulation 32 | Restrictions on Clearing House's Obligations and Liability |
| Regulation 33 | Arbitration: Cleared Exchange Contracts, LSE Derivatives Markets Cleared Exchange Contracts, EquityClear Contracts or LCH EnClear Contracts (for Physical Delivery) |
| Regulation 34 | Collateral in Event of a Claim |
| Regulation 36 | Default of a Member: Substituted Obligation |
| Regulation 37 | Market Disorders, Impossibility of Performance, Trade Emergency |
| Regulation 38 | Force Majeure |
| Regulation 39 | Invoicing Back |
| Regulation 40 | Currency Conversion |
| Regulation 41 | Disclosure and Reporting |
| Regulation 42 | Fees and Other Charges |
| Regulation 43 | Records |
| Regulation 44 | Alteration of Regulations and the Procedures |
| Regulation 45 | Netting |
| Regulation 46 | Distribution of Assets |
| Regulation 47 | Procedures |
| Regulation 48 | Interpretation of these Regulations |
| Regulation 49 | Waiver |
| Regulation 50 | Validity of Regulations and Action |
| Regulation 51 | Governing Law and Jurisdiction |
| Regulation 52 | Exclusion of Liability |
| Regulation 89 | Nodal Regulations |
| Default Rules | Default Rules |
| Settlement Finality | Settlement Finality Regulations |

| Regulation | Title |
|---|---|
| Regulations | |

## CHAPTER XXI – FOREXCLEAR REGULATIONS

## REGULATION 90   APPLICATION OF FOREXCLEAR REGULATIONS

(a)   The Clearing House shall provide the ForexClear Service subject to and in accordance with the terms of these ForexClear Regulations and the Procedures.

(b)   ForexClear Clearing Members shall be bound by these ForexClear Regulations. Applications to become a ForexClear Clearing Member shall be made in accordance with Regulation 90(d) and (e).   Other than as expressly specified in this Regulation 90, the remainder of the Regulations shall not apply to the ForexClear Service.   A summary table of those Regulations which apply to the ForexClear Service as described in Regulation 90(a) to (p) is provided at Regulation 90(q).

(c)   Regulations 2 and 3 of the Regulations apply to the ForexClear Service.

*ForexClear Clearing Membership*

(d)   A Clearing Member may apply to become a ForexClear Clearing Member in accordance with the Procedures.

(e)   Regulation 4 applies to membership of the ForexClear Service and applications for such membership.

(f)   Regulation 5 applies to a ForexClear Clearing Member.

*Accounts*

(g)   Regulation 10 applies to the opening and operation of accounts with respect to a ForexClear Clearing Member.   Such accounts shall be designated in accordance with Regulation 15.

*Client Clearing*

(h)   Regulation 11 applies to those ForexClear Clearing Member who provide (or wish to provide Client Clearing Services.

*Formation, registration and transfers of ForexClear Contracts*

(i)   Regulation 16(b), (c), (e), (f), (g), (h), (j), (k) and (l), Regulation 17 and Regulation 91 govern the registration and formation of a ForexClear Contract.

(j)   Regulation 90 to Regulation 93 apply to the ForexClear Service.

(k)   Regulation 18 (and, insofar as relevant, Regulation 12(b)) apply to a ForexClear Contract that is an open contract**.**

*Margin and Collateral*

(l)   Regulation 20 applies to a ForexClear Clearing Member.

*Reference prices and Revaluation*

(m)     Regulation 22 and Regulation 93 apply to open ForexClear Contracts.

*Other Applicable Regulations*

(n)     Regulations 37 to 46 inclusive apply to ForexClear Clearing Members and ForexClear Contracts.

*Default Rules*

(o)     The Default Rules (including the ForexClear DMP Annex) apply to ForexClear Clearing Members and ForexClear Contracts.

*Clearing House Settlement Finality Regulations*

(p)     The Clearing House Settlement Finality Regulations apply in relation to ForexClear Clearing Members and ForexClear Contracts.

*Summary table of Regulations which apply to the ForexClear Service*

(q)     The Regulations listed in this Regulation 90(q) apply to the ForexClear Service as described under Regulation 90(a) to (p).

| Regulation | Title |
|---|---|
| Regulation 2 | Obligation to the Clearing House to each Member |
| Regulation 3 | Performance by the Clearing House of its Obligations under the Terms of an Open Contract |
| Regulation 4 | Clearing Member Status of the Clearing House |
| Regulation 5 | Resigning and Retiring Members |
| Regulation 8 | Dealer Status |
| Regulation 9 | Service Withdrawal |
| Regulation 10 | Accounts |
| Regulation 11 | Client Clearing Business |
| Regulation 12(b) | Novation |
| Regulation 15 | Designation |
| Regulation 16 (except Regulation 16(a), (d), (i) | Registration |

| Regulation | Title |
| --- | --- |
| and (m)) | |
| Regulation 17 | Trading Information |
| Regulation 18 | Transfer |
| Regulation 20 | Margin and Collateral |
| Regulation 22 | Official Quotations and Reference Price |
| Regulation 37 | Market Disorders, Impossibility of Performance, Trade Emergency |
| Regulation 38 | Force Majeure |
| Regulation 39 | Invoicing Back |
| Regulation 40 | Currency Conversion |
| Regulation 41 | Disclosure and Reporting |
| Regulation 42 | Fees and Other Charges |
| Regulation 43 | Records |
| Regulation 44 | Alteration of Regulations and the Procedures |
| Regulation 45 and Regulation 46 | Netting and Distribution of Assets |
| Regulation 47 | Procedures |
| Regulation 48(b) | Interpretation of these Regulations |
| Regulation 49 | Waiver |
| Regulation 50(a) | Validity of Regulations and Action |
| Regulation 51(a) and (c) to (e) | Governing Law and Jurisdiction |
| Regulation 52 | Exclusion of Liability |
| Regulation 90 to Regulation 93 | ForexClear Regulations |

| Regulation | Title |
|---|---|
| Default Rules | Default Rules (including ForexClear DMP Annex) |
| Settlement Finality Regulations | Settlement Finality Regulations |

**REGULATION 91   REGISTRATION OF FOREXCLEAR CONTRACTS**

(a)     In order to use the ForexClear Service, a ForexClear Participant must submit the particulars of a ForexClear Transaction for registration as a ForexClear Contract in accordance with these ForexClear Regulations and the Procedures.

(b)     Subject to Regulation 91(d), if at any time falling after the registration of any ForexClear Contract the Clearing House determines that the corresponding transaction of which details were submitted for registration did not, at the Registration Time, meet the ForexClear Eligibility Criteria in existence at the Registration Time (an "**Ineligible Transaction**"), the Clearing House shall, as soon as practicable thereafter, set aside both ForexClear Contracts arising from such Ineligible Transaction in accordance with Regulation 91(c) below.

(c)     Upon a ForexClear Contract (an "**Ineligible ForexClear Contract**") being set aside under Regulation 91(b), the Clearing House will notify the FXCCM party to such Ineligible ForexClear Contract via the ForexClear Approved Trade Source System that such Ineligible ForexClear Contract has been set aside.  The following shall take effect immediately upon the delivery of such notice:  (i) such Ineligible ForexClear Contract shall be deemed to be terminated at the time of the notification and shall thereafter have no force or effect; (ii) all collateral in respect of variation margin obligations (if any) provided by the Clearing House or by an FXCCM in respect of such Ineligible ForexClear Contract shall be retained by the receiving party upon termination; (iii) where there is a difference between the value of the Ineligible ForexClear Contract as at the last margin run and the value (as determined by the Clearing House) of that Ineligible ForexClear Contract at the time of the next official settlement rate for that currency pair, then a payment shall be made between the FXCCMs to the original Ineligible Transaction equal to such difference; and (iv) these payments shall be deemed to satisfy in full the relevant party's obligations under the Ineligible ForexClear Contract and shall be retained by the receiving party upon termination as a termination payment.

(d)     The Clearing House may not determine a transaction to be an Ineligible Transaction after the Valuation Date (as defined in the Procedures) in respect of the ForexClear Contracts arising from the registration of such a transaction has occurred.

(e)     The Clearing House shall provide no less than 10 business days' prior notice (including by email) to ForexClear Clearing Members of an amendment to the ForexClear Eligibility Criteria.

(f)     Where a ForexClear Contract relates to an FCM ForexClear Transaction, it is a condition for registration as a ForexClear Contract that the FCM ForexClear Transaction to which the ForexClear Contract relates be presented for clearing:  (i) by an executing party (in its capacity as an FCM Clearing Member or ForexClear Clearing Member or through its designated FCM Clearing Member or ForexClear Clearing Member) as a ForexClear Contract or FCM ForexClear Contract (as the case may be); and (ii) by an FCM Clearing Member on behalf of its FCM Client as an FCM ForexClear Contract.   In the event that the Clearing House registers a ForexClear Contract and, for whatever reason, the corresponding FCM ForexClear Contract has not also been registered, the ForexClear Contract shall be deemed not to

be registered as a ForexClear Contract until such time as such corresponding FCM ForexClear Contract has been registered.

(g)     In relation to an FCM ForexClear Transaction, if either the executing party (in its capacity as an FCM Clearing Member or ForexClear Clearing Member or through its designated FCM Clearing Member or ForexClear Clearing Member) or the FCM Clearing Member (as the case may be) does not present an FCM ForexClear Transaction for clearing, the Clearing House shall set aside any FCM ForexClear Contract or ForexClear Contract that has been registered (if any) and the particulars of the corresponding FCM ForexClear Transaction in question shall at the Clearing House's discretion be either:  (i) deemed never to have been submitted to the Clearing House; or (ii) rejected until such time as the Executing Party (in its capacity as an FCM Clearing Member or ForexClear Clearing Member or through its designated FCM Clearing Member or ForexClear Clearing Member) or the FCM Clearing Member have presented the relevant contract to the Clearing House.  In addition, any payment made under, or in respect of, any FCM ForexClear Contract set aside or deemed not cleared under this paragraph shall be repayable to the person who made the payment.  Without prejudice to FCM Regulation 44 and its obligations under this Regulation 91 and under FCM Regulation 49, the Clearing House (and each other member of the LCH.Clearnet Group and their respective officers, employees and agents) shall have no liability whatsoever to any person arising out of or in respect of the registration by it in error or otherwise of an FCM ForexClear Contract.

## REGULATION 92    CANCELLATION OF FOREXCLEAR CONTRACTS

(a)    A ForexClear Clearing Member may, in accordance with this Regulation 92 and the Procedures, cancel a ForexClear Contract to which it is a party.

(b)    A ForexClear Dealer may, in accordance with this Regulation 92 and the Procedures, cancel a ForexClear Contact that arose from a ForexClear Transaction to which it is a party.

(c)    A ForexClear Clearing Member shall be bound by the cancellation of a ForexClear Contract made by the relevant ForexClear Dealer.

(d)    A ForexClear Dealer shall have no obligation to inform, notify or seek the consent of any ForexClear Clearing Member prior to initiating the cancellation of a ForexClear Contract in accordance with Regulation 92(b).

(e)    Each ForexClear Clearing Member is deemed to grant a continuing authority to the Clearing House to terminate any ForexClear Contract registered in the name of that ForexClear Clearing Member upon the request of a ForexClear Dealer with whom that ForexClear Clearing Member is a party to an FDC Agreement.

(f)    The Clearing House shall have no obligation to inform, notify or seek the consent of any ForexClear Clearing Member prior to cancelling a ForexClear Contract in accordance with this Regulation 92.

(g)    The cancellation of a ForexClear Contract to which a ForexClear Clearing Member is a party (in this Regulation, the "**First ForexClear Contract**") is contingent upon *inter alia* the cancellation of the corresponding ForexClear Contract that arose from the same underlying ForexClear Transaction (in this Regulation, the "Second ForexClear Contract), and vice versa.

(h)    The date and time of the cancellation of a ForexClear Contract shall be as reported by the Clearing House in accordance with the Procedures and shall be binding on ForexClear Clearing Members.

(i)    The Clearing House may decline to cancel a ForexClear Contract if:

    (i)    in the opinion of the Clearing House acting in its sole discretion, the cancellation of that ForexClear Contract is not consistent with the Regulations and Procedures of the Clearing House and any policies of the clearing house concerning risk management;

    (ii)    if there is insufficient Collateral standing to the credit of a ForexClear Clearing Member's account to accommodate the cancellation of the First ForexClear Contract and/or the Second ForexClear Contract.

(j)    With effect from the time of the cancellation of a ForexClear Contract in accordance with this Regulation 92, neither the ForexClear Clearing Member nor the Clearing House shall have any obligations under the terms of that ForexClear Contract and liability in respect thereof.

**REGULATION 93   VARIATION MARGIN**

(a)     The Clearing House shall, at least daily and in accordance with and at the times stated in the Procedures, transfer to, or require transfer from a ForexClear Clearing Member of, cash collateral in respect of variation margin.  The amount transferred represents the change from the preceding business day in the net present value of all ForexClear Contracts registered in that ForexClear Clearing Member's name.

(b)     The net present value of each ForexClear Contract shall be calculated by the Clearing House in such manner and at such times as may be provided in the Procedures. Except as prescribed in the Procedures, the net present value calculated by the Clearing House may in no circumstances be challenged.

(c)     The Clearing House pays to (or receives from) each ForexClear Clearing Member interest on cash collateral received (or provided) by the Clearing House in respect of variation margin, calculated in accordance with the Procedures.

(d)     This Regulation is without prejudice to the Clearing House's right to require Collateral to be transferred to it under Regulation 20.

# CHAPTER XXII – NLX REGULATIONS

## REGULATION 94   APPLICATION

### *General*

(a)    The Clearing House shall provide the NLX Service subject to and in accordance with the terms of this Regulation and the Procedures.

(b)    Clearing Members which are NLX Service Clearing Members, and applicants to become NLX Service Clearing Members, shall be bound by this Regulation and the other Regulations specified in this Regulation to apply to the NLX Service.  Other than as specified in this Regulation, the remainder of the Regulations shall not apply to the NLX Service.

(c)    Regulations 2 and 3 of the Regulations apply to the NLX Service.

### *NLX Service Clearing Membership*

(d)    A Clearing Member may apply to become a NLX Service Clearing Member in accordance with the Procedures.

(e)    Regulation 4 applies to NLX Service Clearing Membership and applications therefor.

(f)    Regulation 5 applies to a NLX Service Clearing Member.

(g)    In the event of any inconsistency between NLX's Rules and the NLX Regulations, the NLX Regulations shall prevail.

### *Accounts*

(h)    Regulation 10 applies to the opening and operation of accounts with respect to a NLX Service Clearing Member.  Such accounts shall be designated in accordance with Regulation 15.

### *Client Clearing*

(i)    Regulation 11 applies to those NLX Service Clearing Member who provide (or wish to provide Client Clearing Services.

### *Formation, registration and transfers of NLX Contracts*

(j)    NLX's Rules govern the formation of a NLX Transaction.

(k)    Regulation 13 (except Regulation 13(d)) and Regulation 16 govern the registration and formation of a NLX Contract.

(l)    Regulation 18 (and, insofar as relevant, Regulation 12(b)) apply to a NLX Contract which is an open contract.

### *Margin and Collateral*

(m)    Regulation 20 applies to a NLX Service Clearing Member.

*Daily settlement*

(n)    Regulation 21, Regulation 22, Regulation 23 and Regulation 24 apply to the daily settlement to market of open NLX Contracts.

*Options*

(o)    Regulation 26 and Regulation 27 apply to NLX Contracts which are options.

*Physical settlement*

(p)    Regulation 28 to 32 (inclusive) and Regulation 36 apply to NLX Contracts.

*Arbitration*

(q)    Regulation 33 and Regulation 34 apply to NLX Contracts.

***Market disorders; force majeure; invoicing back; currency conversion; disclosure; fees and other charges; records; Procedures; alteration of Regulations and Procedures; interpretation; waiver; validity; governing law and jurisdiction; exclusion of liability; netting***

(r)    Regulation 36 to Regulation 52 (inclusive) apply to NLX Service Clearing Members and NLX Contracts.

*Default Rules*

(s)    The Default Rules apply to NLX Service Clearing Members and NLX Contracts.

*Clearing House Settlement Finality Regulations*

(t)    The Clearing House Settlement Finality Regulations apply in relation to NLX Service Clearing Members and NLX Contracts.

*Summary table of Regulations which apply to the NLX Service*

(u)    The Regulations listed in this Regulation 94(u) apply to the NLX Service as described under Regulation 94(a) to (t).

| *Regulation* | *Title* |
| --- | --- |
| Regulation 2 | Obligation to the Clearing House to each Member |
| Regulation 3 | Performance by the Clearing House of its Obligations under the Terms of an Open Contract |
| Regulation 4 | Clearing Member Status of the Clearing House |
| Regulation 5 | Resigning and Retiring Members |

| *Regulation* | *Title* |
|---|---|
| Regulation 7 | Non-Member Market Participant Status |
| Regulation 9 | Service Withdrawal |
| Regulation 10 | Accounts |
| Regulation 11 | Client Clearing Business |
| Regulation 12(b) | Novation |
| Regulation 13 (except Regulation 13(d)) | Presentation of Particulars of Original Exchange Contracts and Confirmation of Original Exchange Contracts |
| Regulation 14 | Allocation of Original Exchange Contracts |
| Regulation 15 | Designation |
| Regulation 16 | Registration |
| Regulation 17 | Trading Information |
| Regulation 18 | Transfer |
| Regulation 20 | Margin and Collateral |
| Regulation 21 | Premium under Option Contracts |
| Regulation 22 | Official Quotations and Reference Price |
| Regulation 23 | Daily Settlement or Marking to Market |
| Regulation 24 | Settlement and Revaluation: Clearing Processing System |
| Regulation 26 | Exercise of Options |
| Regulation 27 | Delivery Contract Arising upon the Exercise of an Option |
| Regulation 28 | Obligation to Make and Accept Tender under Cleared Exchange Contracts |
| Regulation 29 | Delivery Contracts |
| Regulation 30 | Open Contracts Subject to Tender |
| Regulation 31 | Arrangements for Delivery and Payment of Price |
| Regulation 32 | Restrictions on Clearing House's Obligations and Liability |

| Regulation | Title |
|---|---|
| Regulation 33 | Arbitration: Cleared Exchange Contracts, LSE Derivatives Markets Cleared Exchange Contracts, EquityClear Contracts or LCH EnClear Contracts (for Physical Delivery) |
| Regulation 34 | Collateral in Event of a Claim |
| Regulation 36 | Default of a Member: Substituted Obligation |
| Regulation 37 | Market Disorders, Impossibility of Performance, Trade Emergency |
| Regulation 38 | Force Majeure |
| Regulation 39 | Invoicing Back |
| Regulation 40 | Currency Conversion |
| Regulation 41 | Disclosure and Reporting |
| Regulation 42 | Fees and Other Charges |
| Regulation 43 | Records |
| Regulation 44 | Alteration of Regulations and the Procedures |
| Regulation 45 | Netting |
| Regulation 46 | Distribution of Assets |
| Regulation 47 | Procedures |
| Regulation 48 | Interpretation of these Regulations |
| Regulation 49 | Waiver |
| Regulation 50 | Validity of Regulations and Action |
| Regulation 51 | Governing Law and Jurisdiction |
| Regulation 52 | Exclusion of Liability |
| Regulation 94 | NLX Regulations |
| Default Rules | Default Rules |
| Settlement Finality Regulations | Settlement Finality Regulations |

## **Exhibit B**

Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                           :
In re:                                     :        Chapter 11 Case
                                           :
LEHMAN BROTHERS HOLDINGS INC., et al.,     :        No. 08-13555 (SCC)
                                           :
                Debtors.                   :
                                           :
------------------------------------------------------------- x
                                           :
LEHMAN BROTHERS SPECIAL FINANCING          :
INC.,                                      :
                                           :
                Plaintiff,                 :
                                           :        Adversary Proceeding
          -  against -                     :
                                           :        No. 14-02030 (SCC)
MERRILL LYNCH CAPITAL SERVICES, INC.,      :
                                           :
                Defendant.                 :
                                           :
-------------------------------------------------------------x
```

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

Upon consideration of Defendant Merrill Lynch Capital Services, Inc.'s Motion to

Dismiss Counts I, II, and III of Adversary Complaint pursuant to Fed. R. Civ. P. 12(b)(7) and

Fed. R. Bankr. P. 7012(b) or, in the alternative, Fed. R. Civ. P. 12(c) for failure to join a required

party under Fed. R. Civ. P. 19 and Fed. R. Bankr. P. 7019 and memorandum of law in support

thereof (together the "Motion") in the above-captioned adversary proceeding and any responses

and replies thereto, and based on the files, records, and proceedings herein, **IT IS HEREBY**

**ORDERED** that the Motion is **GRANTED**, and Counts I, II, and III of the Complaint are

**DISMISSED WITH PREJUDICE**.

Dated:  New York, New York
        _____, 2015

                                        _____
                                        HONORABLE SHELLY C. CHAPMAN
                                        UNITED STATES BANKRUPTCY JUDGE